## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

|  |  |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | |
| Plaintiffs, | Civil Action No.  2:21-CV-2253 |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | |
| Defendants. | |

Plaintiffs VoteAmerica and Voter Participation Center ("Plaintiffs") file this Complaint for Declaratory and Injunctive Relief against Defendants Scott Schwab, in his official capacity as the Kansas Secretary of State, Derek Schmidt, in his official capacity as the Kansas Attorney General, and Stephen M. Howe, in his official capacity as District Attorney of Johnson County ("Defendants"), for violation of Plaintiffs' First and Fourteenth Amendment rights and breach of the dormant Commerce Clause, and allege the following:

### INTRODUCTION

1.      This lawsuit challenges restrictions on political speech and activity in violation of the First and Fourteenth Amendments and the dormant Commerce Clause of the United States Constitution.  Plaintiffs seek to enjoin enforcement of certain provisions of a new Kansas law, HB 2332, that unconstitutionally chill and burden their core political speech and associational rights. HB 2332 prohibits Plaintiffs from employing their most effective means of persuading voters to

1

engage in the democratic process: mailing advance mail ballot applications to registered Kansas voters, complete with a pre-addressed return envelope, and personalizing those applications by prefilling the individual's name and address information.  Providing Kansas voters with printed copies of advance mail ballot applications sends a powerful message encouraging eligible Kansans to vote with advance mail voting ballots, reassuring Kansans that voting by mail is safe and secure, and emphasizing the importance of democratic participation by every eligible citizen.  This type of "interactive communication concerning political change" is "core political speech."  *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  The challenged provisions cannot survive the exacting scrutiny applied to restrictions on such core political speech.

2.      Kansas law permits all eligible citizens to vote by an advance mail voting ballot (also known as voting-by-mail or absentee voting), instead of voting in person.  An eligible citizen may cast an advance mail voting ballot before or on Election Day, either by mailing a completed ballot or dropping off the ballot at the voter's local election office.  Plaintiffs VoteAmerica and Voter Participation Center are vocal advocates of advance mail voting in Kansas because advance mail voting encourages and facilitates participation by the entire electorate.  Voting by advance ballot provides a means of democratic participation for registered voters, including particularly those who face difficulties with voting in person due to, for example, work or school obligations, lack of transportation, illness, or disability.

3.      Nonpartisan civic organizations such as Plaintiffs have long played a vital role in our democracy, persuading citizens to engage with the political process by providing them with the necessary applications and forms—including advance mail ballot applications—to facilitate that engagement.  Plaintiffs served this important function in Kansas during the 2020 election, helping achieve historic turnout by encouraging and helping tens of thousands of Kansans to vote

through advance mail ballots.  Indeed, an estimated 69,577 Kansas voters requested advance mail ballots in the 2020 general election using applications provided by Plaintiff Voter Participation Center.

4.      Rather than embracing Plaintiffs' messaging to persuade eligible citizens to vote by advance mail ballot, the State enacted HB 2332 to prohibit Plaintiffs' advance ballot application operations in Kansas.   HB 2332 includes at least two unconstitutional restrictions on the distribution of advance mail voting applications by third-party organizations (collectively, the "Ballot Application Restrictions").  Each of these two provisions is challenged by Plaintiffs in this lawsuit.

5.      *First*, HB 2332 *bans* any person who is not a resident of or domiciled in Kansas from mailing or causing to be mailed an advance mail ballot application to a Kansas voter (the "Out-of-State Distributor Ban").  Because neither VoteAmerica nor Voter Participation Center is a resident of or domiciled in Kansas, the Out-of-State Distributor Ban precludes Plaintiffs' current and planned efforts to persuade and assist Kansas voters to vote using advance mail ballots.

6.      *Second*, HB 2332 prohibits mailing any advance mail ballot application that has been personalized with the voter's information, *even where voters provide that information themselves* (the "Personalized Application Prohibition").   Providing Kansas voters with personalized advance mail voting applications is a critical part of VoteAmerica's and Voter Participation Center's communications with Kansas voters.  By sending a personalized advance mail ballot application, Plaintiffs convey the message that the recipient is personally entitled to, and should, participate in the democratic process by requesting an advance mail ballot application. Plaintiffs believe that personalizing advance mail ballot applications enhances the effectiveness of Plaintiffs' message encouraging individuals to exercise their right to vote by mail, increasing the

likelihood that a voter will engage in the democratic process. Yet HB 2332 would prohibit Plaintiffs—under threat of criminal sanctions—from using this tried and tested method of persuading potential Kansas voters to vote by mail.

7. Thus, the Ballot Application Restrictions violate Plaintiffs' First Amendment rights by banning Plaintiffs' core political speech and discriminating based on the content of Plaintiffs' communications, Plaintiffs' identity as out-of-state speakers, and the viewpoints Plaintiffs express. Moreover, the Out-of-State Distributor Ban violates the dormant Commerce Clause because it implements new protectionist measures affecting interstate commerce that explicitly disadvantage Plaintiffs as non-residents of Kansas and their use of the instrumentalities of commerce.

8. If Plaintiffs continue to mail advance mail voting applications to Kansas voters after HB 2332 becomes effective on January 1, 2022—as they had planned to do before the new law was enacted—they risk steep fines and criminal sanctions. The Ballot Application Restrictions are also unconstitutionally overbroad, sweeping in protected speech for no legitimate purpose. These overbroad provisions violate Plaintiffs' First Amendment and Due Process rights, will chill their constitutionally protected core political speech, and diminish their message of encouraging broad political participation in Kansas through the distribution of advance mail ballots.

9. For organizations like Plaintiffs VoteAmerica and Voter Participation Center that do not reside and are not domiciled in Kansas, HB 2332 makes it impossible to continue their mission of expanding, encouraging, and assisting voter participation through their advance voting operations in Kansas.

10. Because Plaintiffs' advance voting operations will be burdened, scaled back, less effective, and potentially altogether eliminated, the number of voices who will convey Plaintiffs' message of encouraging democratic participation by all eligible Kansans through the use of

advance mail voting ballots and, as a result, the size of the audience who will receive that message, will be reduced.

11.     The Ballot Application Restrictions do not serve, and cannot be justified by, any compelling state interest.

12.     The challenged provisions of HB 2332 violate the U.S. Constitution and their enforcement must be enjoined.

## JURISDICTION AND VENUE

13.     This action is brought under the United States Constitution.  The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

14.     This Court has personal jurisdiction over Defendants in their official capacity because each is a citizen and elected officer in the State of Kansas and their principal places of business are in Kansas.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants in their official capacities reside in Kansas, and because a substantial portion of the events giving rise to these claims occurred in this district.

## PARTIES

### A.     Plaintiffs

16.     *VoteAmerica*.  Plaintiff VoteAmerica is a California-based 501(c)(3) nonprofit, nonpartisan organization.  VoteAmerica's core mission is to persuade and assist eligible American voters to engage in the electoral process, with a particular emphasis on voting by mail, which VoteAmerica believes is the most effective way to ensure the broadest participation in elections.

It does so by providing access to trusted election information, open platform technology, and education programs to support and empower voters to navigate the path to exercising their vote.

17.    A key component of VoteAmerica's civic engagement messaging is providing voters with information and resources to facilitate their applications for mail and absentee ballots, or in Kansas, advance voting ballots.  The VoteAmerica website provides extensive guides and tools for voter registration; absentee, mail, or advance voting; and voting in person in each state. VoteAmerica's resources for advance voting in Kansas consist of a guide to advance voting rules, including deadlines, identification requirements, and other instructions, as well as links to relevant election offices and other election resources.

18.    VoteAmerica's primary resource for promoting advance voting in Kansas is an interactive Absentee and Mail Ballot tool that allows voters to provide their name, address, date of birth, email, and phone number and receive an official advance mail voting application form partially prefilled with the information the voter provided, which they can complete and send to the appropriate local election official.  The tool also signs voters up for follow-up communications from VoteAmerica to assist them in voting in that election and future elections, as well as further voter engagement communications from VoteAmerica. During the 2020 election, VoteAmerica staffed the Absentee and Mail Ballot tool with at least three researchers at all times to keep the information provided on the tool up-to-date.

19.    VoteAmerica's Absentee and Mail Ballot tool delivered personalized advance mail voting applications to Kansas voters by email during the 2020 election cycle.  During the 2020 election cycle, the web tool offered users in four states—Texas, Montana, Ohio, and Utah—the option to receive a pre-printed personalized advanced voting application by mail in addition to email.  In 2020, VoteAmerica mailed 16,520 absentee ballot applications to voters in these states.

VoteAmerica plans to provide this personalized print-and-mail feature nationwide and is actively planning to offer the service to Kansas voters.

20.     The print-and-mail feature would enable Kansas voters to choose whether to receive their personalized advance mail voting application by mail, email, or both.  When a voter chooses to receive their application by mail, VoteAmerica's print-and-mail feature sends the personalized application to be printed by a secure third-party printer and mailed by first class mail to the voter, along with instructions, a blank advance mail voting application form, and a pre-addressed, postage paid envelope for the voter to submit the application directly to their county election official.  Expanding the print-and-mail feature is vital to serving VoteAmerica's mission to support and empower the most vulnerable voters to navigate the path to exercising their vote.  It enables VoteAmerica to reach a broader audience with its message, including low-income and low-propensity voters who may have fewer resources for printing and postage and less access to those services.

21.     The Absentee and Mail Ballot tool is available to potential voters on the VoteAmerica website and on the websites of partner organizations.  VoteAmerica makes its tool freely available for this purpose.  Partner organizations have used VoteAmerica's Absentee and Mail Ballot tool to engage voters throughout the country.

22.     VoteAmerica seeks to reach the largest possible number of potential voters with its voter engagement message by pairing the tools and resources on its website with other modes of speech, including peer-to-peer texting, campus engagement, billboards, and digital ad campaigns, to assist voters at each step of the voting process.  These communications guide voters to VoteAmerica's online tools and resources, which in turn serve as a foundation for further communications with Kansas voters about engaging in the political process. VoteAmerica also

shares graphics, messaging, and other communications products with partners to amplify its message.

23.     VoteAmerica provides resources and communications to millions of voters in all fifty states, including Kansas.  During the 2020 election cycle, more than one million registered voters nationwide requested a vote-by-mail ballot through VoteAmerica's online resources.  At least 7,700 Kansas voters used VoteAmerica's Absentee and Mail Voting tool during Kansas's most recent elections to receive a personalized advance ballot application.  VoteAmerica also helped more than 6,000 Kansas voters register to vote through its online tools and mailed voter registration forms to 981 Kansas voters.  At least 28,500 Kansas voters currently subscribe to VoteAmerica's educational emails and reminder text messages.  VoteAmerica anticipates that the number of Kansas voters who wish to use its resources will increase and has invested in scaling its technology and outreach programs to meet anticipated demand.   It plans to continue communicating educational messages, assistance, and reminders about voting, including during the 2020 election cycle.

24.     Prior to enactment of HB 2332, VoteAmerica planned to continue offering its Absentee and Mail Voting tool to Kansas voters going forward, including after January 1, 2022. As part of this service, VoteAmerica planned to use its print-and-mail feature to mail advance mail voting applications to Kansas voters upon request.

25.     But for the Ballot Application Restrictions, VoteAmerica would encourage Kansas voters to vote by advance mail ballot, and facilitate such advance mail voting, by mailing personalized advance mail ballot applications requested by those voters.  If HB 2332's Absentee Ballot Restrictions are not enjoined, VoteAmerica will be precluded from doing so altogether and

prohibited from fulfilling its essential purpose in Kansas: to persuade and assist Kansas voters to participate in the democratic process by voting by advance mail ballot.

26.     ***Voter Participation Center.***  Plaintiff Voter Participation Center ("VPC") is a Washington, D.C.-based 501(c)(3) nonprofit, nonpartisan organization founded in 2003.  VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

27.     VPC focuses its efforts on associating and communicating with and encouraging these potential voters to increase their engagement with the political process and assist them in doing so.  VPC has designed and implemented direct mail programs to send mass mailers to their target demographics with resources for eligible citizens to submit voter registration applications and absentee ballot applications.  In 2020 alone, through their direct mail programs and other voter engagement activities, VPC sent more than 60 million absentee ballot applications across the country.  In 2018, VPC distributed more than 6.8 million absentee ballot applications nationally.

28.     In Kansas, these direct mail efforts are VPC's primary and, VPC believes, most effective form of communicating with and assisting Kansas voters.

29.     VPC's mail campaign is designed to encourage Kansans to participate in elections through advance mail voting.  VPC uses statewide voter registration files for the State of Kansas to identify target voters who are registered to vote but have not yet applied for an advance ballot. In 2020, using state-generated voter registration lists, VPC paid for nearly 1.2 million advance mail voting applications to be sent to Kansas voters, partnering with a 501(c)(4) organization called the Center for Voter Information to facilitate sending the mailers.  In 2018, VPC mailed more than 90,000 advance mail voting applications to Kansas voters.

30.     VPC's mailers include a cover letter that encourages the voter to request and cast an advance ballot; a printed copy of an advance mail voting application obtained directly from the Kansas Secretary of State; and a pre-addressed, postage-paid envelope addressed to the voter's county election office.  VPC personalizes the advance mail voting application with some of the voter's information obtained from state-generated registration records.

31.     The cover letter included in the mailer provides instructions for submitting the advance mail voting application to the voter's county election official, and clearly states that the recipient should not submit the enclosed advance mail voting application if they have already requested an advance mail ballot.  For example, mailers sent to Kansas voters in the 2020 election cycle stated: "[i]f you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request."  VPC's mailers also provide instructions to recipients about how to unsubscribe from VPC's mailing list.

32.     VPC's mailers convey VPC's message of encouraging voting by mail and assisting voters to do so.  An estimated 69,577 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election, and an estimated 5,342 voters did so for the 2018 general election.

33.     To execute its direct mail programs, VPC pays data vendors to identify target demographics, as well as direct mail consulting firms and professional printers to produce and send mailers to its targeted eligible citizens over an election cycle.  Because VPC's operations are nationwide, it submits millions of printing requests at a time for mailers intended to be sent to potential voters in multiple states, including Kansas.  In addition, VPC requests updated voter records from state election officials to proactively remove from VPC's mailing lists voters who have already requested or submitted an advance mail voting application.

34.     Prior to the enactment of HB 2332, VPC planned to continue communicating with and assisting Kansas voters by mailing personalized advance mail voting applications going forward, including after January 1, 2022 and during the November 2022 election cycle.  If HB 2332's Out-of-State Distributor Ban and Personalized Application Prohibition are not enjoined, VPC will have to stop its advance mail voting application direct mail program in Kansas entirely. VPC will thus be precluded from fulfilling its mission in Kansas of encouraging and supporting traditionally underserved Kansas voters to vote by mail.

**B.     Defendants**

35.     Defendant Scott Schwab is the Secretary of State of Kansas and is sued in his official capacity.  As the chief elections official of the State, he is responsible for overseeing all Kansas elections and administering the State's election laws and regulations.  Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements.  Kan. Stat. Ann. § 25-124.  Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting.  *Id.*  §§ 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

36.     Defendant Derek Schmidt is the Attorney General of the State of Kansas and is sued in his official capacity.  As the State's chief law enforcement officer, he has the authority and discretion to investigate and prosecute violations of state law, including criminal violations. *See* Kan. Stat. Ann. §§ 22-2202(q); 75-708.  The Kansas Attorney General also consults with and advises county attorneys in prosecuting criminal matters, Kan. Stat. Ann. § 75-704, and "shall, at the request of the[] secretary of state . . . prosecute or defend for the state all actions, civil or criminal, relating to any matter connected with" the department of state, *id.* § 75-703.  HB 2332

11

also requires Defendant Schmidt to investigate complaints alleging violations of the new Out-of-State Distributor Ban and permits him to prosecute such civil violations.  HB 2332, § 3(*l*)(2)-(3).

37.     Defendant Stephen M. Howe is the District Attorney of Johnson County and is sued in his official capacity.  Defendant Howe is responsible for investigating and prosecuting "all" criminal violations of state law in Johnson County.  Kan. Stat. Ann. §§ 19-702, 22a-107.  Because violations of HB 2332's Personalized Application Prohibition are class C nonperson misdemeanors, Defendant Howe is charged with prosecuting these violations in Johnson County. *See* HB 2332, § 3(k)(5).

## GENERAL ALLEGATIONS

### I.     Advance Voting in Kansas

38.     Any eligible citizens in Kansas may cast their ballot through advance voting.  Kan. Stat. Ann. § 25-1122(a).  There are two types of advance voting in Kansas: advance voting in person (*i.e.*, early voting), and advance mail voting.  *Id.* §§ 25-1122(b)-(c).  To vote by advance mail ballot, an eligible citizen must first file an advance mail voting application with the county election officer where the voter resides or where the voter is authorized to vote as a former precinct resident.  *Id.* § 25-1122(a).  For primary elections held in August of relevant years, voters must submit applications for advance mail voting no earlier than April 1 of the election year and no later than the Tuesday of the week preceding the election.  *Id.* § 25-1122(f)(1).  For general elections held in November of relevant years, voters must submit applications for advance mail voting no earlier than 90 days prior to the election and no later than the Tuesday of the week preceding the election.  *Id.* § 25-1122(f)(2).  Voters must provide their Kansas driver's license number, Kansas nondriver's ID card number, or a copy of one of the forms of identification specified in Kan. Stat. Ann. § 25-2908(h) in their advance mail voting application.  *Id.* § 25-1122(e)(2).  County election

officers are also required to verify that the voter's signature matches the signature on file in the county voter registration records before providing the voter with an advance voting ballot. *Id.* § 25-1122(e)(1).

39.    Officials at the state and local level participate in administering advance mail voting. The Secretary of State coordinates advance voting statewide by promulgating rules that seek to establish uniform procedures and prescribe standard forms for printed materials including applications for advance mail voting. *See id.* § 25-1122(k); *see also* HB 2332 § 3(m). County election officers administer advance voting locally by, *inter alia*, accepting and processing advance mail voting applications, providing advance mail ballots to eligible citizens, receiving voted ballots, and ultimately accepting or rejecting advance mail voted ballots. *Id.* §§ 25-1122(e)-(j). The county election officer also is required to prepare and maintain a list of the names of all persons who have filed advance mail voting applications and make that list available to registered voters for inspection upon request. *Id.* § 25-1122(i).

40.    The official advance mail voting application form promulgated by the Secretary of State of Kansas was publicly available online on the Secretary of State's website, on county election offices' websites, and on third-party websites during the 2020 election cycle.

41.    Kansas held two statewide election days in 2020. Primary elections for offices including the U.S. Senate, the U.S. House of Representatives, the Kansas Senate, and the Kansas House of Representatives, among others, were held on August 4, 2020. The 2020 general election was held on November 3, 2020. The deadline to submit advance mail voting applications to county election officials was July 28 for the 2020 primary election and October 27 for the 2020 general election.

42.     The 2020 elections saw historic turnout among Kansans of all political persuasions and, given the COVID-19 pandemic, a steep increase in advance mail voting.

43.     More than 1.3 million Kansans voted in the November 2020 election compared to approximately 1.23 million voters in November 2016, an increase of nearly 6%.  And in the November 2020 election, more Kansans voted by advance mail ballot than in the 2018 and 2016 elections combined.

44.     The 2020 elections in Kansas were safe and secure.  On July 30, 2020, shortly before the August 2020 primary, Defendant Schwab noted that the State "ha[d] implemented measures to ensure the security and safety of the August and November elections."[1]  Shortly after the November 2020 election, Defendant Schwab's office confirmed that assessment: "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . . We are very pleased with how the election has gone up to this point."[2]

## II.     Plaintiffs' Advance Mail Voting Operations

45.     VoteAmerica delivered personalized advance mail voting applications to Kansas voters by email via its Absentee and Mail Ballot tool during the 2020 election cycle.  In addition, VoteAmerica has plans to provide its print-and-mail feature in Kansas in the upcoming 2022 election.  The print-and-mail feature would enable a Kansas voter to choose whether to receive their personalized advance mail voting application by mail, email, or both.  When a voter chooses to receive their application by mail, VoteAmerica's print-and-mail feature sends the personalized application to be printed by a secure third-party printer and mailed by first class mail to the voter,

---

[1] Secretary Schwab Responds to November Election Delay Suggestion, Kansas Secretary of State (July 30, 2020), https://sos.ks.gov/media-center/media-releases/2020/07-30-20-secretary-schwab-responds-to-november-election-delay-suggestion.html.
[2] Nick Corasaniti, Reid J.  Epstein & Jim Rutenburg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N.Y.  Times (Nov.  19, 2020), https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

along with instructions, a blank advance mail voting application form, and a pre-addressed, postage paid envelope for the voter to submit the application directly to their county election official.

46.     In 2020, VPC paid for nearly 1.2 million mailers that included advance mail voting applications to be sent in Kansas.  The application form was obtained from the Kansas Secretary of State's website. The mailers also included a pre-addressed, postage-paid envelope addressed to the voter's county election office, and a persuasive cover letter with instructions for completing and submitting the applications.

47.     The cover letter encouraged the voter to request and cast an advance ballot.  For example, mailers sent to Kansans in the 2020 election cycle included the following messages: "County election officials in Kansas encourage voters to use mail ballots in upcoming elections," "[v]oting by mail is EASY," and "[y]ou can even research the candidates as you vote."

48.     In the lead up to the 2020 general election, the Kansas Director of Elections at the time, Bryan Caskey, confirmed to VPC in writing that the advance mail voting application form and instructions that VPC was planning to distribute to Kansas voters were consistent with Kansas law and with the forms that the Secretary of State's office uses.

49.     VPC has plans to continue encouraging and assisting Kansas voters to vote by advance mail ballot by mailing personalized advance mail voting applications going forward, including after January 1, 2022 and during the November 2022 election cycle.

50.     The mailers contemplated by both VoteAmerica and VPC for the lead up to the November 2022 election are core political speech because they communicate the message that eligible citizens should participate in the political process by requesting, completing, and submitting an advance mail ballot.  Essential to the effective communication of this message is the

inclusion of an advance mail voting application in the mailer.  These mailers are VoteAmerica's and VPC's most effective and preferred method for effectuating their core missions of expanding and encouraging voter engagement, particularly among low-income individuals who might otherwise be unable to print and submit an advance mail voting application because of lack of access to the internet, printing services, and/or envelopes and stamps.

### III.     HB 2332's Ballot Application Restrictions

51.     Following the 2020 election, on May 3, 2021, the Kansas Legislature overrode the Governor's veto to enact HB 2332.  Plaintiffs challenge two provisions of HB 2332.  Each targets Plaintiffs' core political speech and freedom of association by restricting their ability to encourage and assist Kansas voters to participate in elections by mail.  HB 2332 goes into effect on January 1, 2022.  HB 2332 § 11.

#### A.     The Ban on Out-of-State Distribution

52.     HB 2332 bans all out-of-state persons and organizations from distributing advance mail voting applications to Kansas voters.  Section 3(*l*)(1) (to be codified at Kan. Stat. Ann. § 25-1122) provides: "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  This provision is a blanket ban on all out-of-state speakers; it applies regardless of whether the sender is mailing single advance mail voting applications in response to requests from individual Kansas voters or mass mailing unsolicited advance mail voting applications.

53.     Despite its overbroad sweep, HB 2332 imposes harsh civil penalties for violations: $20 for "*[e]ach instance* in which a person mails an application for an advance voting ballot." H.B.   2332 § 3(*l*)(3) (emphasis added).   There is no cap on the total liability a person or organization can face for violations of HB 2332's Out-of-State Distributor Ban.  Organizations

like Plaintiffs may send advance mail voting applications to hundreds of thousands of Kansas voters.

54.    Furthermore, HB 2332 permits "[a]ny individual" to "file a complaint in writing with the attorney general alleging a violation of" the Out-of-State Distribution Ban, and the attorney general is *required* to investigate all complaints. H.B. 2332 § 3(*l*)(2) ("Upon receipt of a complaint, the attorney general shall investigate[.]").  The attorney general also has the power to "file an action against any person found to have violated this [provision]." *Id.*

55.    HB 2332 establishes a speaker-based prior restraint on Plaintiffs' right to engage in core political speech by mailing advance mail voting applications to Kansas voters.  It applies to out-of-state speakers, but not to in-state speakers.  This ban prohibits the central component of Plaintiffs' model for encouraging, associating with and assisting Kansas voters in participating in the democratic process by advance voting by mail.  It severely undercuts the effectiveness of Plaintiffs' speech and expressive conduct on the importance and effectiveness of advance voting by mail, merely because Plaintiffs reside outside of Kansas.

56.    HB 2332 also imposes a content-based restriction on speech.  It prohibits out-of-state entities from mailing advance mail voting applications, but it does not prohibit them from mailing other communications, including other communications relating to voting.

57.    Likewise, HB 2332 discriminates based on Plaintiffs' pro-advance-mail-voting viewpoint.  It singles out organizations that seek to promote advance mail voting in Kansas for disfavored treatment, while imposing no restrictions on speakers that advocate against Kansans voting by advance ballot.

58.    HB 2332's Out-of-State Distributor Ban imposes a severe burden on Plaintiffs' rights to free speech and free association.

59.     Because VoteAmerica and VPC do not maintain residency or domicile in Kansas, they will be barred from communicating and associating with Kansas voters by mailing advance mail voting applications.

60.     HB 2332's overbroad restriction on causing advance mail voting applications to be mailed, combined with the law's harsh, uncapped penalties for noncompliance, will also chill Plaintiffs' exercise of their rights to free speech and association.  HB 2332 § 3(*l*)(1).  For instance, Plaintiffs will be deterred from assisting and associating with partners that mail advance mail voting applications to voters in Kansas, due to the risk that these expressive activities and associations will make them liable for causing advance mail voting applications to be mailed.  HB 2332 § 3(*l*)(1).

61.     The risk of HB 2332's steep civil penalties for violations of the Out-of-State Distributor Ban would make it prohibitive for VoteAmerica and VPC to operate their advance voting programs in Kansas.

62.     The State has no compelling interest, or even rational basis, for imposing a restraint based on content, speaker, and viewpoint that so severely restricts Plaintiffs' political speech and associations, and the Out-of-State Distributor Ban is not narrowly tailored to further any such interest.  If the State's objective were to prevent voters from receiving or submitting duplicate ballot applications, HB 2332's Out-of-State Distributor Ban would be simultaneously under- and overinclusive: a Kansas-based political party could send a voter one hundred advance mail ballot applications without penalty, while an out-of-state organization that seeks to encourage voting and provide needed assistance is prohibited from sending even a single advance mail voting application, even if that is the only advance mail voting application mailed to the voter.  HB 2332's

Out-of-State Distributor Ban also applies regardless of whether the voter has *requested* the sender to mail them an advance mail voting application.

63.     To the extent that the State seeks to ensure that voters do not receive multiple advance mail ballots, existing law requires local election officials to maintain a list of every voter who requested an advance mail ballot application and make that list available to registered voters for inspection upon request.  Kan. Stat. Ann. § 25-1122(i).  Upon information and belief, these lists ensure that local election officials do not send out more than one advance mail ballot to an eligible citizen, even if that voter submits more than one advance mail ballot application.

### B.     The Personalized Application Prohibition

64.     Even if Plaintiffs were not wholly barred from distributing advance mail voting applications by virtue of their residency, HB 2332 would still bar Plaintiffs from sending Kansas voters personalized advance mail voting applications that include information such as the voter's name and address. This prohibition applies even if the information is derived directly from the State's voter list or the voters have provided this information themselves and specifically requested a personalized advance mail ballot application.

65.     Section 3(k)(2) (to be codified at Kan. Stat. Ann. § 25-1122) provides: "No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter."

66.     The statutory prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing."  HB 2332 § 3(k)(*1*).  HB 2332 does not define what it means to "solicit by mail," leaving unanswered whether the restriction applies to, for example, circumstances in which the voter asks for an application, fills it out, and receives a prefilled version to file with election officials.

67.     The consequences of falling within the law's overbroad sweep are severe.  A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines.  *Id.* § 3(k)(5); Kan. Stat. Ann. §§ 21-6602(a)(3), (b).

68.     Section 3(k)(4) carves out limited and narrow exceptions to the Personalized Application Prohibition: it permits the mailing of partially-completed advance mail voting applications by state and county election officials, by the state's single Protection & Advocacy for Voting Access (PAVA) agency under the Help America Vote Act of 2002, and by any entity required to provide information about elections under federal law.  These exceptions would not alleviate the burden, for example, on a voter whose disabilities make it difficult to fill out a ballot and who asks Plaintiff VoteAmerica for a personalized advance mail voting application that they could then simply sign and return to their county election office.

69.     The Personalized Application Prohibition substantially restricts the content of the communications Plaintiffs can send to Kansas voters, interferes with Plaintiffs' ability to associate with, engage, and assist voters, and reduces the effectiveness of Plaintiffs' speech and expressive conduct.

70.     For instance, the Personalized Application Prohibition would prohibit Kansans from using the print-and-mail feature of VoteAmerica's Absentee and Mail Ballot tool, which will soon enable any Kansas voter to visit VoteAmerica.com, click "Request Your Mail-In Ballot" or "Request Your Absentee Ballot," provide their personal information, and receive a copy by mail of the Kansas Secretary of State's Application for Advance Ballot by Mail prefilled with the information the voter provided.  In using this tool, the voter voluntarily agrees to receive further civic engagement communications from VoteAmerica.  The Personalized Application Prohibition

would substantially impede VoteAmerica's efforts to build a broad associational base with which it can communicate further with Kansas voters about political engagement and civic participation.

71.     Both VoteAmerica and VPC believe that mailing personalized advance mail ballot applications more effectively communicates their message of encouraging voting by mail than simply mailing unfilled advance mail voting applications.  If Plaintiffs are limited to sending blank applications—on threat of criminal charges—that would substantially reduce the efficacy of their efforts to encourage voting by mail.

72.     The Personalized Application Prohibition imposes serious harms on Plaintiffs' freedom of speech and freedom of association.  The prohibition would substantially alter both the method by which Plaintiffs seek to engage with voters and the content of Plaintiffs' communications.

73.     The State has no compelling interest, or even rational basis, for so severely restricting the content of Plaintiffs' political speech.  To the extent the State seeks to prevent the submission of fraudulent advance mail ballot applications, existing laws criminalize the creation or submission of a fraudulent advance mail ballot application.  *See* Kan. Stat. Ann. § 25-2431. Further, local election officials are required to identify errors or anomalies by matching the signature on advance mail voting applications to the voter's signature on file in county voter registration records systems and by verifying the voter's driver's license or ID number provided on the advance mail voting application and/or a copy of their photo ID.  Kan. Stat. Ann. § 25-1122(e)(1)-(2).  Indeed, the Secretary of State proclaimed that there was no problem with fraud in the 2020 election.

74.     Upon information and belief, there were no widespread errors in election administration arising from the distribution of personalized advance mail voting applications.  In

any event, the HB 2332 Personalized Application Prohibition is not meaningfully, and certainly not narrowly, tailored to address any such conceivable errors in election administration.

75.    The Personalized Application Prohibition is also substantially overbroad because it prohibits personalization even when the pre-filled information is correct, and when voters themselves provide the information and request such an application.

## CAUSES OF ACTION

### Count I: Freedom of Speech
### (Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs' First Amendment Rights)

76.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-75 as if fully set forth herein.

77.    The First Amendment to the United States Constitution prohibits government abridgment of the freedom of speech.

78.    The First Amendment applies to the states through the Fourteenth Amendment.  In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

79.    Like circulating an initiative petition for signatures or conducting voter registration, persuading voters to vote by advance mail ballot and facilitating such voting is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988).  Whether a citizen should participate in an election and exercise their right to vote by absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking" sanctions or other penalties.  *Meyer*, 486 U.S.  at 421; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186–87 (1999).

80.     Together and individually, the Ballot Application Restrictions in HB 2332 unconstitutionally curtail Plaintiffs' core political speech, which includes their interactive communications and activities aimed at encouraging Kansas voters to participate in democracy through advance mail voting.   Plaintiffs' activities represent a political and philosophical statement.  Plaintiffs take a position and express a point of view in the ongoing debate on whether to engage or to disengage from the political process, and urge eligible citizens to participate through the advance mail voting opportunities offered to all Kansas citizens.

81.     Plaintiffs' activities express their belief in the capacity and authority of the popular will to shape the composition and direction of the government in the democratic system.  Plaintiffs advocate for that belief by seeking to persuade Kansans to participate in democracy, by distributing the means for eligible citizens to do so, by convincing voters that voting by advance mail ballot is safe and secure, and by helping them request an advance mail ballot.  The challenged HB 2332 Ballot Application Restrictions thus inhibit Plaintiffs' core political speech and expressive conduct that are at the heart of First Amendment protections.

82.     HB 2332's Ballot Application Restrictions obstruct Plaintiffs' core political speech by "reducing the total quantum of speech on a public issue" because the law wholly bans an entire class of non-resident speakers, *see Meyer*, 486 U.S. at 423, and by hindering Plaintiffs' right "to select what they believe to be the most effective means for" expressing their core political speech, *see id.* at 424.  These restrictions "reduce[] the voices available to convey political messages," *Buckley*, 525 U.S. at 210 (Thomas, J., concurring), because they either preclude or substantially impair Plaintiffs' ability to engage with potential voters and to encourage political participation through the use of advance mail voting.

83.     The Out-of-State Distributor Ban disfavors Plaintiffs' speech based on its content, the identity of the speaker, and the viewpoints Plaintiffs express.

84.     The Out-of-State Distributor Ban is an unconstitutional content-based restriction on Plaintiffs' First Amendment communications because it defines the coverage of its prohibition based on the subject of Plaintiffs' speech.   The ban targets its restrictions on out-of-state organizations' communications about voting by advance mail ballots, but allows the same organizations to make identical communications in other content areas, such as voter registration. Likewise, it prevents Plaintiffs and similar out-of-state organizations from sending mailers discussing advance mail voting in Kansas but does not prohibit analogous mailers communicating other content.  The Out-of-State Distributor Ban is thus a paradigmatic content-based restriction on speech.

85.     The Out-of-State Distributor Ban is also an unconstitutional speaker-based restraint on Plaintiffs' First Amendment rights.  The ban allows speakers who are Kansans to speak about advance mail ballot applications, but prohibits the exact same speech from Plaintiffs and other similarly situated non-resident civic organizations.  This disparate treatment unconstitutionally favors the speech of some speakers and bars the exact same speech from others.

86.     The Out-of-State Distributor Ban constitutes unconstitutional viewpoint discrimination.  The provision restricts Plaintiffs' First Amendment rights because of the positions they espouse; it prevents Plaintiffs from speaking in favor of advance mail ballots by way of distributing advance mail ballot applications and empowering Kansans to use that method of voting, but would not restrict Plaintiffs' speech if they advocated for Kansans not to vote by advance mail ballot.

87.     These infirmities of the Out-of-State Distributor Ban, standing alone, would warrant strict scrutiny.  Defendants cannot satisfy that standard because they have no compelling, substantial, or even rational interests in restricting Plaintiffs' core political speech, much less in doing so based on what Plaintiffs say, who says it, and the viewpoints they express.  Far from being narrowly tailored, as the strict scrutiny standard requires, the Out-of-State Distributor Ban is both over- and under-inclusive.  It allows in-state speakers distributing advance ballot applications to potentially cause confusion and burdens, but bars an out-of-state speaker who actually helps alleviate confusion and burdens.

88.     The Out-of-State Distributor Ban severely burdens Plaintiffs' First Amendment rights to engage in election-related speech.  Coupled with the threat of substantial civil penalties for even an inadvertent violation, HB 2332's ban on out-of-state distributors heavily encumbers Plaintiffs' political expression.  By excising an entire class of speakers on this subject, the law severely burdens Plaintiffs' rights to convey their message and further it by engaging more individuals in the political process through advance mail voting.  These burdens are not justified by any legitimate state interests and are not necessary to serve any state interests.

89.     The Personalized Application Prohibition, coupled with the threat of criminal penalties, is likewise a severe and discriminatory burden on Plaintiffs' First Amendment rights. The Personalized Application Prohibition restricts Plaintiffs' core political speech by proscribing their "most effective means for" engaging with their audience and only "leaves open 'more burdensome' avenues of communication."  *Meyer*, 486 U.S. at 424.  Plaintiffs' method of encouraging and assisting Kansans to use advance voting opportunities relies on personalizing applications for voters through information that the voter provides or that is publicly available. The Personalized Application Prohibition, and its steep criminal sanctions for even inadvertent

violations, severely restricts Plaintiffs' core political speech, and may prevent them from speaking with Kansans about advance mail voting applications at all.

90. The Personalized Application Prohibition is also an unconstitutional content-based restriction on Plaintiffs' First Amendment rights. Its limitations apply only to particular speech because of the topic discussed and it defines the category of covered communications by their content. The prohibition singles out personalized advanced voting applications but has no such prohibition on other similar forms of speech. For example, it does not prohibit personalizing applications for Plaintiffs' voter registration activities.

91. Because the Personalized Application Prohibition burdens core political speech and restricts speech based on its content, it is subject to strict scrutiny. The Defendants cannot meet that standard because they have no compelling, substantial, or even rational interests that justify restricting Plaintiffs' core political speech or doing so based on the content of their speech. Far from being narrowly tailored, as the standard requires, the Personalized Application Prohibition applies even when voters themselves solicited and directly inputted the information, and even when the information is drawn directly from reliable State-generated voter registration lists.

92. Backed by the threat of steep criminal sanctions that punish even inadvertent violations with potential fines and incarceration, HB 2332's ban on personalizing advanced ballot applications heavily encumbers Plaintiffs' First Amendment rights. These burdens are not justified by any legitimate state interests.

93. Plaintiffs' credible fear of prosecution engenders caution to avoid inadvertent violations of the Ballot Application Restrictions, which would generate financial sanctions and significant criminal penalties. The restrictions thus chill Plaintiffs' protected speech and force Plaintiffs to self-censor.

94.     Under the exacting scrutiny standard applied in *Meyer* and *Buckley*—indeed, under any level of judicial scrutiny—the challenged requirements in HB 2332 violate Plaintiffs' First Amendment free speech rights.

**Count II: Freedom of Association**
**(Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs'**
**First Amendment Rights)**

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-94 as if fully set forth herein.

96.     The First Amendment prohibits government abridgment of the freedom of association.  *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963).

97.     The Ballot Application Restrictions in HB 2332 directly and severely burden Plaintiffs' associational rights by preventing Plaintiffs from banding together with others to engage potential voters and assist community members to further participate in the civic community through advance mail voting.  These restrictions prevent Plaintiffs from broadening the base of public participation in and support for their activities promoting democratic engagement through voting an advance mail ballot.  The challenged provisions will reduce the options and opportunities for Plaintiffs to associate with potential voters and jointly participate in First Amendment-protected activities with them and other civic engagement organizations.

98.     The Out-of-State Distributor Ban entirely prohibits Plaintiffs from associating with Kansas voters through Plaintiffs' advance mail ballot application programs.  The overbroad ban on causing any advance mail voting application to be mailed, and the burdensome monetary sanctions for any violation, also inhibit Plaintiffs from recruiting, consulting, and otherwise associating with Kansas-based organizations that do advance voting activities for fear of incurring

crippling penalties.  The Out-of-State Distributor Ban specifically impedes Plaintiff VoteAmerica's ability to associate with local partner organizations that use VoteAmerica's Absentee and Mail Voting tool on their own websites to assist Kansas voters with advance mail voting applications.

99.  The Personalized Application Prohibition interferes with Plaintiffs' use of an effective advance mail voting application service as a means to associate with voters.  It involves a direct regulation of the communications and political association between Plaintiffs and Kansans that seeks to increase participation in democracy and effect change.  The provision eliminates the method by which Plaintiffs connect with voters at the advance ballot application phase to gain a foothold with Kansans for further association and group engagement for political expression.

100.  For example, Plaintiff VoteAmerica assists voters by personalizing the advance ballot application with the information they provided.  In providing that information, the voter also voluntarily agrees to receive further communications from VoteAmerica.  This streamlined process enables VoteAmerica to build a broad associational base with which it can communicate further about civic participation.  By eliminating this service to voters, the Personalized Application Prohibition removes one of Plaintiffs' critical tools for developing and enhancing their political associations.

101.  Together and individually, the Ballot Application Restrictions impose a severe burden on Plaintiffs' freedom of association and are subject to strict scrutiny.

102.  The Ballot Application Restrictions are not narrowly tailored to serve any compelling state interest.  They restrict Plaintiffs and all similarly situated organizations from engaging with voters and civic organizations on this subject in their preferred and most effective manner.

103.    These requirements cannot satisfy even a more lenient standard of review because they do not actually advance and are not rationally related to any legitimate regulatory interest. They do nothing more than hinder civic organizations from associating with voters concerning advance ballot applications and other future engagement in the political process.

104.    Under the scrutiny standard applied in *Meyer* and *Buckley*—indeed, under any level of judicial scrutiny—the challenged requirements in HB 2332 violate Plaintiffs' First Amendment guarantee of freedom of association.

### Count III: Substantial Overbreadth
### (Claims Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of Plaintiffs' First Amendment Rights)

105.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-104 as if fully set forth herein.

106.    The First Amendment prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws.  *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987).

107.    HB 2332's Out-of-State Distributor Ban and Personalized Application Prohibition are unconstitutionally overbroad, as they needlessly regulate a substantial amount of constitutionally protected expression and associations.

108.    The Ballot Application Restrictions' threat of civil and criminal penalties for violations will impermissibly chill Plaintiffs' protected speech, including Plaintiffs' efforts to inform voters about their right to file an advance ballot application and the process for doing so.

109.    The Out-of-State Distributor Ban is overbroad because it prohibits every single out-of-state individual or organization from engaging in political expression by mailing or causing to be mailed an application for an advance voting ballot.

110.    The Personalized Application Prohibition is also unconstitutionally overbroad.  The substantial overbreadth of the provision would sweep in a range of protected First Amendment activity by applying regardless of whether the advance ballot application distributor is sending personalized applications in response to isolated requests from voters or mass applications on an unsolicited basis.  Such unconstitutional applications of the substantially overbroad Personalized Application Prohibition would also include a situation where the advance ballot application is solicited by voters and the voters themselves provides Plaintiffs with the required personalized information.  The few narrow exceptions to the Personalized Application Prohibition do not meaningfully limit its unconstitutional overbreadth.

111.    The Ballot Application Restrictions also contain steep criminal and civil sanctions for even a single inadvertent violation.  These penalties lack any cap on liability or scienter requirement that might possibly mitigate their unconstitutional overbreadth.

112.    These substantially overbroad provisions in HB 2332 risk capricious enforcement, and therefore do not survive First Amendment scrutiny.

**Count IV: Dormant Commerce Clause**
**(Claims Against Defendants Scott Schwab and Derek Schmidt for Violations of Commerce Clause, U.S. Const. art. I, § 8, cl. 3)**

113.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-112 as if fully set forth herein.

114.    The Commerce Clause not only vests Congress with power to "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, but "also prohibits state laws that unduly restrict interstate commerce," *Tenn Wine & Spirits Retailers Ass'n v.  Thomas*, 139 S.  Ct. 2449, 2459 (2019).  This so-termed "dormant" Commerce Clause "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services," *id.*,

by prohibiting state laws that "discriminate against or burden the interstate flow of articles of commerce," *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 98 (1994).

115.     HB 2332's Out-of-State Distributor Ban is per se unconstitutional under the dormant Commerce Clause because it discriminates against and unjustifiably burdens interstate commerce.

116.     The Out-of-State Distributor Ban directly regulates the articles, instrumentalities, and flow of interstate commerce that Plaintiffs employ to conduct their absentee ballot application business.

117.     Plaintiffs are engaged in commerce both "as a provider of goods and services" and "as a purchaser[.]" *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573–74 (1997).  Plaintiffs provide a product and service for Kansans seeking to participate in the electoral process using an advance ballot application.  To do so, Plaintiffs purchase physical mailer materials, open Post Office boxes, and buy intangible goods such as voter data.  Plaintiffs also purchase various services, including but not limited to data aggregation, web hosting, consulting, printing, and mailing.  Plaintiffs fundraise to support their programs by showcasing the positive effects of their work in Kansas and nationally.  Plaintiffs and their agents effectuate their programs by entering the stream of commerce and utilizing the channels and instrumentalities of interstate commerce in the form of transportation and mail service.

118.     The Out-of-State Distributor Ban is facially discriminatory against interstate commerce because it explicitly proscribes non-residents' mailer activities involving advance ballot applications but favors Kansas residents engaged in the same conduct.

119.    Indeed, the Out-of-State Distributor Ban is facially discriminatory against interstate commerce because it also restricts even entities residing in Kansas from contracting with out-of-state vendors and thereby "caus[ing] to be mailed an application for an advance voting ballot."

120.    The Out-of-State Distributor Ban also directly infringes on Congress's Commerce Clause authority to regulate the channels and instrumentalities of interstate commerce, including but not limited to mail service.  For example, it forces Plaintiffs and similar out-of-state entities to redirect their stream of commerce by entirely cutting off mail conveyance.

121.    There are no legitimate justifications for the ban's discriminatory treatment of out-of-state entities.   To the extent any justifications exist, they can be served by reasonable nondiscriminatory alternatives.

122.    The Out-of-State Distributor Ban constitutes a substantial burden on interstate commerce.  It prevents Plaintiffs and similar organizations from engaging in commerce in Kansas concerning this subject at all.  The ban causes Plaintiffs to incur compliance and other costs while also diminishing Plaintiffs' ability to raise funds for their programs.  Moreover, affected out-of-state entities such as Plaintiffs who fail to comply with HB 2332's requirements are subject to substantial monetary penalties under the statute.

123.    The local benefits advanced by HB 2332's discrimination against and substantial burdens on interstate commerce are virtually nonexistent.  These burdens are also excessive to any perceived local benefit, and Kansas cannot show by concrete evidence that nondiscriminatory alternatives to the flat ban are unworkable or fail to promote local interests.  For example, Kansas could implement reasonable, non-discriminatory procedures for both in-state and out-of-state entities to follow.

124.     Moreover, the Out-of-State Distributor Ban involves a national interest in federal elections that extends well beyond any local concerns.  The burdens on national elections reinforce that Kansas's regulations are not merely to serve local objectives that might justify the substantial burdens of HB 2332.

125.     Thus, the Out-of-State Distributor Ban is a per se violation of the dormant Commerce Clause because it discriminates against and unjustifiably burdens interstate commerce.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.       Declare that the challenged provisions in HB 2332 violate the First and Fourteenth Amendments, both facially and as-applied to Plaintiffs;

B.       Declare that the Out-of-State Distributor Ban violates the Commerce Clause, both facially and as applied to Plaintiffs;

C.       Preliminarily and permanently enjoin Defendants from enforcing the challenged provisions in HB 2332, including the punitive sanctions contained therein;

D.       Retain jurisdiction to render any and all further orders that this Court may deem necessary;

E.       Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this suit pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and

F.       Grant any and all other relief this Court deems just and proper.

Dated June 2, 2021

By: _____

Tedrick A. Housh III

LATHROP GPM LLP
Tedrick A. Housh III (KS #15414)

33

Reid K. Day (KS #78783)
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Facsimile:  (816) 292-2001
tedrick.housh@lathropgpm.com
reid.day@lathropgpm.com

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice* forthcoming)
Meredith D. Karp (*pro hac vice* forthcoming)
Brooke Jarrett (*pro hac vice* forthcoming)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

CAMPAIGN LEGAL CENTER
Aseem Mulji* (*Pro Hac Vice Forthcoming*)
Dana Paikowsky* (*Pro Hac Vice Forthcoming*)
Rob Weiner (*Pro Hac Vice Forthcoming*)
Hayden Johnson (*Pro Hac Vice Forthcoming*)
Jade Ford** (*Pro Hac Vice Forthcoming*)
1101 14TH Street, NW, St. 400
Washington, D.C. 20005
(212) 736-2000
amulji@campaignlegalcenter.org
DPaikowsky@campaignlegalcenter.org
RWeiner@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org
JFord@campaignlegalcenter.org

*Attorneys for Plaintiffs*

* Licensed to practice in CA only; supervised by
Robert N. Weiner, member of the D.C. Bar

** Licensed to practice in NY only; supervised by
Robert N. Weiner, member of the D.C. Bar