## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 21-2253-KHV |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; DEREK SCHMIDT, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

VoteAmerica and Voter Participation Center bring suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Derek Schmidt in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. Complaint For Declaratory And Injunctive Relief (Doc. #1) filed June 2, 2021. Plaintiffs allege that defendants violated their First and Fourteenth Amendment rights and breached the Dormant Commerce Clause. Plaintiffs seek a preliminary injunction against enforcement of two provisions of HB 2332, which will be codified as K.S.A. § 25–1122: (1) Section 3(l)(1), which bars persons and organizations that are not residents of or domiciled in Kansas from mailing or causing to be mailed advance mail ballot applications to Kansas voters and (2) Section 3(k)(2), which criminalizes mailing personalized advance ballot applications.

On September 8, 2021, the Court held an evidentiary hearing on plaintiffs' motion for preliminary injunction. This matter is before the Court on Defendants' Motion To Dismiss

Plaintiffs' Complaint (Doc. #26) filed July 9, 2021[1] and Plaintiffs' Motion For Preliminary Injunction (Doc. #24) filed July 8, 2021.

## I.   Motion To Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face.  Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To determine whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions. See id. at 678.  Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged.  Id. However, plaintiffs must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent with" defendants' liability. Id. (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not "shown"—that the pleaders are entitled to relief.  Id. at 679.  The degree of specificity

---

[1]     On August 27, 2021, the Court overruled Defendants' Motion To Dismiss (Doc. #26) in part, finding that plaintiffs' complaint was not subject to dismissal for lack of subject matter jurisdiction.  The Court reserved ruling on defendants' arguments with regard to failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P.

necessary to establish plausibility and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2) depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

When ruling on a Rule 12(b)(6) motion, the Court does not analyze potential evidence that the parties might produce or resolve factual disputes.  Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).  A motion to dismiss does not ask the Court to analyze plaintiffs' likelihood of success on the merits; rather, the Court must find only a reason to believe that plaintiffs have a "reasonable likelihood of mustering factual support for the claims," Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007), and that their claims are "plausible." Twombly, 550 U.S. at 570.

Highly summarized, plaintiffs' complaint alleges as follows:[2]

## A.    Voting In Kansas

Kansas law permits any eligible voter to cast an advance ballot.  Kansas has two types of advance voting: advance voting in person (i.e., early voting) and advance mail voting.[3]  Advance voting requires a voter to apply to a county election officer for a mail-in ballot.  The Secretary of State coordinates advance voting statewide by creating uniform procedures and forms.  County election officers administer voting locally by accepting and processing applications, providing ballots to eligible voters, receiving ballots that have been cast and ultimately accepting or rejecting ballots. County election officers also prepare and maintain lists of persons who have filed advance voting applications.  During the 2020 election cycle, the advance voting application form was

---

[2]     The Court assumes that the reader is familiar with the allegations of plaintiffs' complaint and does not attempt to recite them in their entirety.

[3]     All references to advance voting are references to advance voting by mail.  This case does not involve early voting in person.

publicly available on the web sites of the Kansas Secretary of State, local election offices and various third parties.

To apply for an advance mail ballot, a voter must provide a Kansas driver's license number, a Kansas nondriver's ID card number or another specified form of identification. A county election officer must verify that the voter's signature matches the signature on file in voter registration records. Voters may cast advance ballots on or before Election Day, either by mailing completed ballots or dropping off their ballots at a local election office.

In 2020, Kansas voters of all political persuasions turned out in historic numbers. Particularly given COVID-19, Kansas also saw a steep increase in advance mail voting. More than 1.3 million Kansans voted in the 2020 general election, nearly six per cent more than in 2016. More Kansans voted by advance mail ballot in November of 2020 than the elections in 2016 and 2018 combined. Shortly after the 2020 election, the Secretary of State's office stated that "Kansas did not experience any widespread, systematic issues with voter fraud intimidation, irregularities or voting problems. . . . We are very pleased with how the election has gone up to this point."

In March of 2021, the Kansas Legislature introduced HB 2332 to regulate the advance ballot application process. Governor Laura Kelly vetoed the bill on April 23, 2021. On May 3, 2021, the Kansas Senate and House overrode the Governor's veto, and HB 2332 will become effective on January 1, 2022. HB 2332, § 11.

HB 2332 contains two provisions (collectively, "Ballot Application Restrictions") that are at issue in this action.

### 1.    Out-of-State Distributor Ban

HB 2332 bans any person from mailing an advance voting application or causing an application to be mailed, unless the sender is a resident of Kansas or domiciled in Kansas.

HB 2332, § 3(l)(1) (the "Out-of-State Distributor Ban"). This ban applies whether the sender is mailing a single application in response to a request from an individual Kansas voter or is engaged in mass mailing of unsolicited applications.

The legislation imposes a civil penalty of $20.00 for "[e]ach instance in which a person mails an application for an advance voting ballot." HB 2332, § 3(l)(3). Anybody can file a complaint alleging a violation of the Out-of-State Distributor Ban, and the attorney general must investigate all complaints. HB 2332, § 3(l)(2). The attorney general may also file suit against anyone who violates this provision.

2.   Personalized Application Prohibition

The "Personalized Application Prohibition" prohibits the mailing of any advance mail ballot application that has been personalized with a voter's information, even where the voter has personally provided that information. The Prohibition applies to any person who by mail solicits a registered voter to apply for an advance voting ballot and includes in such mailing an application for an advance voting ballot. HB 2332, § 3(k)(1).

Personalized application violations are class C nonperson misdemeanors, which are punishable by up to one month in jail and/or fines. HB 2332, § 3(k)(5); K.S.A. § 21-6602(a)(3). The Personalized Application Prohibition does not apply to state or county election officials or to entities which must provide information about elections under federal law. HB 2332, § 3(k)(4).

**B.   Parties**

Plaintiffs are out-of-state, nonpartisan organizations which provide voter information, applications and forms to facilitate political engagement by voters, including advance mail ballot applications. Such organizations have long played a vital role in democracy by persuading citizens to engage with the political process.

VoteAmerica is a California-based 501(c)(3) nonprofit, nonpartisan organization. Its core mission is to help eligible voters engage in the electoral process, emphasizing voting by mail. VoteAmerica believes that voting by mail is the most effective way to ensure the broadest participation in elections. To empower voters to exercise their votes, VoteAmerica provides access to trusted election information, open platform technology and education programs. The VoteAmerica web site provides extensive guides and tools for voter registration, absentee, mail and advance voting and voting in person in all 50 states, including Kansas. Its resources for advance voting in Kansas include a guide to advance voting rules, deadlines, links to local election offices, instructions and other relevant resources.

VoteAmerica engages voters by pairing tools and resources on its web site with other modes of speech to help voters in the voting process. These communications guide voters to its on line tools and resources and facilitate further communications with Kansas voters about the political process. To amplify its message, VoteAmerica shares graphics, messaging and other communications products with partners.

VoteAmerica's primary resource for promoting advance voting in Kansas is an interactive Absentee and Mail Ballot request tool. The tool allows voters to provide their names, addresses, dates of birth, emails and phone numbers, and populate the ballot application forms with that information. Voters receive the application forms with the voter-provided information pre-completed. Voters then sign and complete the forms and send them to their local election officials. The tool automatically signs up voters for follow-up communications from VoteAmerica to help them vote in future elections. In addition to the VoteAmerica web site, the Absentee Mail Ballot request tool is available on the web sites of partner organizations of VoteAmerica.

During the 2020 election cycle, the tool delivered personalized advance voting applications

to Kansas voters by email.  In four other states, voters have the option to receive a pre-printed personalized application by mail.  VoteAmerica is actively planning to offer this personalized print-and-mail feature service to Kansas voters.

With its preprinted applications, VoteAmerica sends blank advance mail voting application forms and pre-addressed, postage-paid envelopes.  Expanding the print-and-mail feature will enable VoteAmerica to reach a broader audience, including low-income and low propensity voters with fewer resources and decreased access to postage and printing.

During the 2020 election cycle, at least 7,700 Kansas voters used the VoteAmerica tool to receive a personalized ballot application.  VoteAmerica helped more than 6,000 Kansans register to vote, and at least 28,500 Kansas voters currently subscribe to VoteAmerica's educational emails and reminder text messages.  VoteAmerica is invested in scaling its technology and outreach programs to meet anticipated demand and plans to continue communicating educational messages, assistance and reminders about voting.

Before the Legislature enacted HB 2332, VoteAmerica planned to keep offering its tool to Kansas voters after January 1, 2022.  Upon request, it also planned to use its print-and-mail feature to mail advance mail voting applications to Kansas voters.

Voter Participation Center ("VPC") is a Washington, D.C.-based 501(c)(3) nonprofit, nonpartisan organization.  Its mission is to provide voter registration, early voting, vote by mail and get-out-to-vote resources and information to traditionally underserved groups, including young voters, voters of color and unmarried women.

VPC has implemented direct mail programs to send mass mailers to its target demographic. These mass mailers contain resources for eligible voters to submit voter registrations and absentee ballot applications.  VPC believes that direct mail is the most effective form of communicating

with and helping Kansas voters.  The mail campaign encourages advance voting.  VPC uses Kansas' statewide voter registration files to identify registered voters who have not requested an advance ballot application, and in 2020, it sent nearly 1.2 million advance voting applications to Kansas voters.  To facilitate these efforts, VPC has partnered with a 501(c)(4) organization called the Center for Voter Information.  VPC requests updated voter records from state election officials to proactively remove voters who have already requested or submitted advance voting applications.

VPC mailers include a cover letter encouraging voters to request and cast advance ballots; printed copies of an advance ballot application from the Kansas Secretary of State web site; and pre-addressed, postage-paid envelopes addressed to the county election offices.  VPC personalizes the voter's application with the information from the state-generated registration records.  The cover letter clearly instructs the voter not to submit more than one request.  The mailers encourage voting by mail and help voters do so.  Mailers sent to Kansans during the 2020 election cycle included messages such as: "County election officials in Kansas encourage voters to use mail ballots in upcoming elections," "Voting by mail is EASY" and "You can even research the candidates as you vote."  In the 2020 election cycle, an estimated 69,577 Kansas voters submitted VPC-provided advance voting applications to their county election officials.

Before the Legislature enacted HB 2332, VPC planned to continue communicating and helping Kansas voters by mailing personalized advance mail voting applications after January 1, 2022, and during the 2022 election cycle.

Scott Schwab is the Kansas Secretary of State.  As the State's chief elections official, Schwab oversees all Kansas elections and administers the State's election laws and regulations. He also issues guidance and instructions to county election officers.

Derek Schmidt is the Kansas Attorney General.  As the State's chief law enforcement officer, Schmidt has the authority and discretion to investigate and prosecute violations of State law, including criminal violations.  HB 2332 requires Schmidt to investigate complaints alleging violations of the Out-of-State Distributor Ban and permits him to prosecute such civil violations.

Stephen Howe is the District Attorney of Johnson County.  Howe is responsible for investigating and prosecuting all criminal violations of state law in Johnson County.  Because HB 2332's Personalized Application Prohibition violations are class C nonperson misdemeanors, Howe will prosecute these violations in Johnson County.

On June 2, 2021, plaintiffs filed suit against defendants in their official capacities, alleging violations of the First and Fourteenth Amendments and the Dormant Commerce Clause. Specifically, Count 1 alleges that the Ballot Application Restrictions violate the First Amendment by targeting plaintiffs' core political speech, i.e. their advocacy for advance mail voting, communicated through mailing of advance ballot application packets.  Count 2 alleges that the Ballot Application Restrictions inhibit plaintiffs' First Amendment right to associate with others to encourage and help Kansas voters to vote by mail.  Count 3 alleges that the Ballot Application Restrictions are overly broad, regulating and chilling a substantial amount of plaintiffs' constitutionally protected speech and associations.  Finally, Count 4 alleges that the Out-of-State Distributor Ban violates the Dormant Commerce Clause by facially discriminating against non-Kansas residents, including plaintiffs, in restricting them from mailing advance voting applications to Kansas residents.

## C.      Analysis

As noted, plaintiffs bring four claims: (1) HB 2332 violates their First Amendment rights to freedom of speech (Count 1); (2) HB 2332 violates their First Amendment rights to freedom to

associate (Count 2); (3) HB 2332 is overbroad (Count 3); and (4) the Out-of-State Distributor Ban of HB 2332 violates the Dormant Commerce Clause (Count 4).  Pursuant to Rule 12(b)(6), defendants ask the Court to dismiss plaintiffs' complaint for failure to state a claim on which relief may be granted.

As to Count 1, defendants argue that the Ballot Application Restrictions apply only to non-expressive conduct, not to any form of speech, and that as a matter of law, they do not violate the First Amendment.  As to Count 2, defendants argue that when a state invokes its constitutional authority to regulate elections, the restrictions on individual rights to associate—which will inevitably ensue—do not violate the First Amendment.  As to Count 3, defendants argue that as a matter of law, the restrictions in question are not overly broad in violation of the First Amendment. Finally, as to Count 4, defendants argue that the Dormant Commerce Clause does not apply to the restrictions aimed at minimizing voter confusion, eliminating voter fraud and preserving the limited resources of state election offices.

The Court considers each claim in turn.

1.     First Amendment Freedom of Speech Claim (Count 1)

Plaintiffs allege that the Ballot Application Restrictions violate their freedom of speech because they restrict their right to send packets which contain advance voting applications to Kansas voters and thus target core political speech.  Complaint (Doc. #1), ¶ 55.  Plaintiffs argue that in violation of the First Amendment, the Out-of-State Distributor Ban is content-based, viewpoint-based and speaker-based, and targets only non-resident speakers and pro-mail voting messages.  Id., ¶¶ 82, 84.  Plaintiffs also argue that the Personalized Application Prohibition singles out personalized advanced voting applications, without prohibiting other forms of speech.  Id., ¶¶ 89–91.

Defendants ask the Court to dismiss Count 1 because HB 2332 "prohibits no spoken or written expression whatsoever" and applies to non-expressive conduct, not to speech—and most certainly not to core political speech. Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) filed July 9, 2021 at 17, 20. Accordingly, the Court first analyzes whether HB 2332 regulates speech—that is, whether the First Amendment even applies to plaintiffs' application packets and personalized ballot applications.

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment "literally forbids the abridgement only of speech," but its protection is not limited to just spoken or written words. Texas v. Johnson, 491 U.S. 397, 404 (1989). Conduct that is "sufficiently imbued with elements of communication"—known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments. Id.; Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006). In deciding whether particular conduct is "inherently expressive," courts look to whether the conduct shows "an intent to convey a particular message" and whether "the likelihood was great that the message would be understood by those who viewed it." Voting for Am., Inc. v. Steen, 732 F.3d 382, 388 (5th Cir. 2013) (quoting Johnson, 491 U.S. at 404).

Citing Lichenstein v. Hargett, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), defendants argue that in mailing application packets and distributing personalized ballot applications, plaintiffs are not engaging in speech or expressive conduct. Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 16–17. Lichtenstein involved First Amendment challenges to a Tennessee statute which prohibited anyone except election officials from providing applications for absentee ballots. 489 F. Supp. 3d at 748. The district court held that the law did not prohibit

spoken or written expression, and therefore did not restrict expressive conduct.  Id. at 773. Plaintiffs correctly respond that Lichtenstein is not germane because their application packets include speech that communicates a pro-mail voting message.   Furthermore, mailing the application packets is inherently expressive conduct that the First Amendment embraces.  See League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314 (S.D. Fla. 2006); see also Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158 (M.D. N.C. 2020); Priorities USA v. Nessel, 462 F. Supp. 3d 792 (E.D. Mich. 2020).

Accepting their factual allegations as true, plaintiffs have sufficiently alleged that HB 2332 violates their First Amendment rights to engage in free speech and expressive conduct.  In other words, defendants are not entitled to dismissal of Count 1 on the theory that HB 2332 exclusively regulates conduct, not speech.

2.      First Amendment Freedom Of Association Claim (Count 2)

Count 2 alleges that the Ballot Application Restrictions chill plaintiffs' associational rights under the First Amendment because they impede plaintiffs' ability to engage and broaden their network and association base for political change.  Complaint (Doc. #1), ¶¶ 51, 60, 98–99; see also supra Section I.C.1.  Defendants do not dispute that the restrictions hinder plaintiffs' right to associate but argue that as a matter of law, the State may do so in exercising its constitutional authority to regulate elections.  Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 18.

The right to associate to advance beliefs and ideas is at the heart of the First Amendment. NAACP v. Button, 371 U.S. 415, 430 (1963).  An organization's attempt to broaden the base of public participation in and support for its activities is conduct "undeniably central to the exercise of the right of association."  Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d

1183, 1202 (D.N.M. 2010), on reconsideration in part, No. CIV-08-0702 JB/WDS, 2010 WL 3834049 (D.N.M. July 28, 2010) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 214–15 (1986)).  The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."  NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958); see Kusper v. Pontikes, 414 U.S. 51, 56–57 (1973).

The freedom of association encompasses not only the right to associate with others but also the right to choose how one associates with others.  See Boy Scouts of Am. v. Dale, 530 U.S. 640, 653 (2000) ("As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression.").  Public endeavors which "assist people with voter registration are intended to convey a message that voting is important," and which expend resources "to broaden the electorate to include allegedly under-served communities," qualify as expressive conduct which implicates the First Amendment freedom of association.  Democracy N.C., 476 F. Supp. 3d at 223 (quoting Am. Ass'n of People with Disabilities, 690 F. Supp. 2d at 1215–16).

Here, plaintiffs allege that the Out-of-State Distributor Ban prevents them from "recruiting, consulting, and otherwise associating with Kansas organizations that distribute [advance mail voting] applications."  Complaint (Doc. #1), ¶¶ 60, 98.  Working with these Kansas organizations allows them to increase the number of voices which share the message that voters are entitled to and should participate in the democratic process.  Id., ¶¶ 6, 10, 20.  Plaintiffs allege that the Personalized Application Prohibition interferes with their associational rights by prohibiting them from working with Kansas organizations to provide the Absentee and Mail Voting tool and limits their ability to "associate for the purposes of assisting persons" in requesting an application for an

advance ballot.  Id., ¶¶ 99–100.

Defendants have a legitimate interest in regulating elections.  Utah Republican Party v. Cox, 892 F.3d 1066, 1084 (10th Cir. 2018); see Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 191 (2008) (describing state interest generally as interest in "protecting the integrity and reliability of the electoral process"); Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.").  Defendants, however, do not contest that plaintiffs have an associational interest in engaging with Kansas residents about advance mail voting.  Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 18.

In Am. Ass'n of People with Disabilities v. Herrera, supra, nonprofit organizations engaged in voter-registration activities challenged a New Mexico law that allegedly burdened their right to expressive association.  690 F. Supp. 2d at 1190.  Like defendants here, defendants in that case conceded that the statute restricted plaintiffs' ability to associate, but argued that the burdens imposed by the challenged laws were non-existent when weighed against the State's substantial interest in regulating elections.  Id. at 1220.  On a motion to dismiss, however, the district court properly refused to weigh the relative burdens of the restrictions.  Id.

Accepting plaintiffs' allegations as true—as the Court must do in addressing a motion to dismiss—plaintiffs in this case have sufficiently alleged that HB 2332 violates their First Amendment rights to engage in free association.  Defendants are not entitled to dismissal of Count 2 on the theory that HB 2332 only minimally burdens plaintiffs' right to associate, because on this record the Court cannot weigh the relative burdens of plaintiffs' First Amendment rights against the State's professed interest in regulating elections.  Therefore the Court overrules defendants' motion to dismiss Count 2.

3.   <u>Overbreadth Claim (Count 3)</u>

Count 3 alleges that the Ballot Application Restrictions are unconstitutionally overbroad, in violation of the First Amendment, because they "needlessly regulate a substantial amount of constitutionally protected expression and associations," and "impermissibly chill [p]laintiffs' protected speech." <u>Complaint</u> (Doc. #1), ¶¶ 106–08.  Plaintiffs bring both as-applied and facial overbreadth challenges.  Plaintiffs argue that as applied to them, the restrictions are overbroad because (1) HB 2332 reaches a substantial amount of constitutionally protected activity in delivering their pro-mail voting message; (2) they cannot financially partner with other organizations to encourage Kansas voters to vote by mail; and (3) the threat of criminal and civil penalties impermissibly chills their speech.  <u>Id.</u>, ¶¶ 52–54, 59, 65, 109.  For largely the same reasons, plaintiffs also raise a facial attack that HB 2332 necessarily chills the speech of others not before the Court.  <u>Id.</u>, ¶¶ 52, 73, 93, 108.  Plaintiffs argue that HB 2332 reaches a substantial amount of constitutionally protected expression and exceeds any legitimate state interest in avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process, and that they sufficiently state a claim under Rule 12(b)(6).

Defendants seek dismissal on the theory that as a matter of law, because plaintiffs may communicate their messages in other ways, the restrictions do not substantially impair their constitutional activity, as required to state a valid overbreadth claim.  <u>Defendants' Memorandum In Support Of Motion To Dismiss</u> (Doc. #27) at 25.

Facial challenges and as-applied challenges can overlap conceptually.  <u>See</u> <u>Doe v. Reed</u>, 561 U.S. 186, 194 (2010).  Where the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs," "they must satisfy th[e] standards for a facial challenge to the extent of that reach."  <u>Id.</u>  Therefore, to determine whether plaintiffs have stated

a valid claim upon which relief may be granted, the Court analyzes their claims under the heightened facial challenge standard.  Id.; see United States v. Stevens, 559 U.S. 460, 472–73 (2010).

In general, to succeed in a typical facial attack, plaintiffs must establish that "no set of circumstances exists [in] which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." Stevens, 559 U.S. at 473 (citations omitted).  Generally, facial challenges are strongly disfavored, but overbreadth challenges under the First Amendment are an exception to that rule because the "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973); see Virginia v. Hicks, 539 U.S. 113, 118 (2003) (First Amendment overbreadth doctrine exception to normal rule for facial challenges).  The Supreme Court has cautioned, however, that the concept of substantial overbreadth is not readily reduced to an exact definition.  Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984).

A court should address an overbreadth challenge when the law may chill the free speech rights of parties not before the court, especially when the statute imposes criminal sanctions.  West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1367 (10th Cir. 2000); see also Hicks, 539 U.S. at 118–20.  To succeed on an overbreadth challenge, plaintiffs must show that the "potential chilling effect on protected expression is both real and substantial."  United States v. Brune, 767 F.3d 1009, 1018 (10th Cir. 2014) (quoting Jordan v. Pugh, 425 F.3d 820, 828 (10th Cir. 2005)).  At the motion to dismiss stage, the Court need not determine whether the illegitimate applications of the statute substantially outweigh the legitimate applications of the statute.  Animal Legal Def. Fund v. Reynolds, No. 419CV00124JEGHCA, 2019 WL 8301668, at *12 (S.D. Iowa Dec. 2, 2019).  At this stage of the litigation, plaintiffs need only allege "a claim to relief that is plausible

on its face," describing instances of arguable overbreadth of HB 2332.  Twombly, 550 U.S. at 570;

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008).

a.    Substantial Impairment Of Plaintiffs' Constitutionally Protected Rights

As noted above, plaintiffs allege that the Out-of-State Distributor Ban reaches a substantial

amount of their constitutionally protected activity in delivering their pro-mail voting messages.

HB 2332 bars plaintiffs from mailing application packets that contain applications for advance

mail ballots to Kansas voters and also prohibits them from even "causing" such applications to be

mailed.  Complaint (Doc. #1), ¶¶ 52, 59, 109; HB 2332, § 3(l)(1).  HB 2332 also prevents plaintiffs

from extending financial support and encouragement to partner organizations who work to mail

applications to Kansas voters or Kansas residents who mail applications to Kansas-based families.

Complaint (Doc. #1), ¶¶ 52, 60.  Under the Personalized Application Prohibition, plaintiffs cannot

distribute applications for advance ballots which contain personalized information from the State's

voter database or the voter himself.  Id., ¶¶ 29, 45.  Plaintiffs allege that the penalties associated

with both restrictions will chill their speech and associational rights, as they will be deterred from

engaging in constitutionally protected speech.

b.    Substantial Impairment Of Rights Of Other Parties

Plaintiffs allege that HB 2332 substantially impairs and chills not only their speech, but the

speech of others not before the Court.  Specifically, plaintiffs allege that it will prevent out-of-state

organizations from extending financial support and encouragement to Kansas partner

organizations and residents who mail advance ballot applications to Kansas voters, and

substantially impair the ability of Kansas-based organizations to advocate for voting by mail.

Plaintiffs allege that HB 2332 authorizes penalties which, when applied to all out-of-state entities,

will deprive society of an "uninhibited marketplace of ideas."  Taxpayers for Vincent, 466 U.S.

at 800, n.19.

As noted, the Court has determined that plaintiffs asserted a plausible claim that HB 2332 implicates protected speech.  Defendants counter that plaintiffs' examples are "hypothetical scenarios" and argue that the statute has several legitimate applications; plaintiffs, however, allege more than a single "discrete application of the statute that may be problematic."  Free Speech Coal., Inc. v. Holder, 729 F. Supp. 2d 691, 733 (E.D. Pa. 2010), aff'd in part, vacated in part, remanded sub nom. Free Speech Coal., Inc. v. Att'y Gen. of U.S., 677 F.3d 519 (3d Cir. 2012).

c.    Weighing The Legitimate State Interests

For a statute to be overly broad, the overbreadth must not only be real, but substantial, judged in relation to the statute's plainly legitimate sweep.  New York v. Ferber, 458 U.S. 747, 771 (1982).  Defendants put forward three alleged interests in enacting HB 2332: avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process.  On a motion to dismiss, the Court does not determine whether potentially illegitimate applications substantially outweigh any legitimate applications of the statute. [4]  Reynolds, 2019 WL 8301668, at *12.  To state a plausible claim, plaintiffs need only allege a meaningful number of illegitimate applications.  Id.; see also People for Ethical Treatment of Animals v. Hinckley, 526 F. Supp. 3d 218, 239 (S.D. Tex. 2021).

HB 2332 has clearly legitimate purposes: eliminating voter fraud, preventing voter confusion and preserving limited resources to maintain orderly administration of the electoral process.  Plaintiffs, however, raise significant issues whether protected expression will fall prey to

---

[4]    The Court recognizes that on a motion for summary judgment or at trial, it would consider evidence on the statute's limiting construction when determining what constitutes an illegitimate application of the statute.  See West v. Derby Unified School Dist. No. 260, 23 F. Supp. 2d 1223, 1234 (D. Kan. 1998), aff'd, 206 F.3d 1358 (10th Cir. 2000).

the statute.  See Ferber, 458 U.S. at 773.  Accepting plaintiffs' allegations as true, they allege a "realistic chilling effect" on their First Amendment rights and those not before the Court.  See Faustin v. City and Cnty. Of Denver, Colo., 423 F.3d 1192, 1199–1200 (10th Cir. 2005); see also West, 206 F.3d at 1367.  Plaintiffs plausibly allege that the First Amendment protects their pro-mail voting advocacy speech, and that HB 2332 prohibits the exercise of their First Amendment rights.  Plaintiffs are not "brainstorming hypotheticals."  See Nat'l Press Photographers Ass'n v. McCraw, 504 F. Supp. 3d 568, 586–87 (W.D. Tex. 2020).

Defendants are not entitled to dismissal of Count 3 on the ground that as a matter of law, HB 2332 does not substantially impair constitutional activities and is not overbroad.

### 4.   Dormant Commerce Clause Claim (Count 4)

Plaintiffs allege that because HB 2332 restricts non-Kansas residents from mailing advance voting applications to Kansas residents, it violates the Dormant Commerce Clause by discriminating against and unjustifiably burdening interstate commerce.  U.S. Const. art. I, § 8, cl.3; Complaint (Doc. #1), ¶¶ 115, 118; Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #31) filed July 30, 2021 at 25–26.  Defendants argue that plaintiffs have not stated an actionable claim because the State has legitimate purposes of eliminating potential voter fraud, minimizing voter confusion and preserving limited resources, and that the State's right to regulate elections is beyond the reach of the Dormant Commerce Clause.  Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 27–28; Defendants' Reply To Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #41) filed August 20, 2021 at 24.  Defendants also argue that the State is exempt from the Dormant Commerce Clause because it is a market participant.

Plaintiffs respond that a statute which mandates differential treatment of in-state and out-

of-state entities is *per se* invalid under the Dormant Commerce Clause; that the State's right to regulate elections is not exempt from scrutiny under the Dormant Commerce Clause; and that the State cannot show that nondiscriminatory alternatives would be insufficient to protect its alleged interests.

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations and among the several States." U.S. Const. art. I, § 8, cl. 3.  While the Commerce Clause is more frequently invoked as authority for federal legislation, the so-called Dormant Commerce Clause limits state legislation which adversely effects interstate commerce. See Hughes v. Oklahoma, 441 U.S. 322, 326 (1979).  The focus of a Dormant Commerce Clause challenge is whether a state law improperly interferes with interstate commerce.  Direct Mktg. Ass'n v. Brohl, 814 F.3d 1129, 1135 (10th Cir. 2016); see W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 192 (1994) ("Th[e] negative aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors") (internal citations omitted).

Under the Dormant Commerce Clause, the Court must first analyze whether the statute "regulates evenhandedly with only 'incidental' effects on interstate commerce or discriminates against interstate commerce." Or. Waste Sys., Inc. v. Dept. of Env't Quality of Or., 511 U.S. 93, 99 (1994) (quoting Hughes, 441 U.S. at 336.  Discrimination means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.  Id.  If a restriction on commerce is discriminatory, it is virtually *per se* invalid.  Id. (citing Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 344 n.6 (1992)).  A state regulation that discriminates against interstate commerce will survive constitutional challenge only if the state shows "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory

alternatives." Direct Mktg. Ass'n, 814 F.3d at 1136 (citing Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 581 (1997)).

Defendants do not deny that plaintiffs are engaged in interstate commerce or that HB 2332 restricts non-Kansas residents from mailing advance voting applications to Kansans.[5] Defendants' Memorandum In Support Of Motion To Dismiss (Doc. #27) at 27.  On this record, HB 2332 is not an even-handed regulation which only incidentally discriminates against non-residents such as plaintiffs.  Accordingly, to survive constitutional challenge, defendants must show that HB 2332 advances legitimate local purposes that cannot be adequately served by reasonable, nondiscriminatory alternatives.  In attempting to do so, defendants cite three goals of HB 2332: to "minimize voter confusion, eliminate potential voter fraud, and preserve limited resources from being expended on rectifying problems flowing from the same, including having to wade through duplicative advance mail voting applications." Id. at 27–28.  Defendants argue that HB 2332 "limits the amount of advance mail voting applications a voter receives" and ensures the State's ability to verify the accuracy of the sender's disclosures through Kansas records.  Id. at 28.  Lastly, defendants argue that the goal of the Out-of-State Distributor Ban is not economic protectionism, and in fact, defendants would prefer that no third-party organizations be allowed to distribute advance voting applications.  Id. at 29.  Plaintiffs respond that the State's "legitimate interests" do not justify discrimination against non-residents because the restrictions (1) do not combat voter

---

[5]     Defendants attempt to argue that under the Elections Clause, Article I, Section 4, Clause 1 of the Constitution, States may prescribe the "Times, Places, and Manner of holding Elections," and that this authority forecloses plaintiffs' cause of action.  Defendants raise this argument for the first time in their reply brief, Defendants' Reply To Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #41) at 24 and therefore the Court does not consider it.  See United States v. Gurule, 461 F.3d 1238, 1248 (10th Cir. 2006) (courts generally do not consider arguments raised for the first time in reply brief); see also Novosteel SA v. U.S., Bethlehem Steel Corp., 284 F.3d 1261, 1274 (Fed. Cir. 2002) (reply brief does not provide moving party new opportunity to present yet another issue for court consideration).

confusion or fraud, or preserve resources; (2) the Ban does not limit the number of advance voting applications a Kansas voter may receive; (3) voters may still receive and submit duplicate applications; and (4) defendants have no evidence that out-of-state distributors as a class behave differently from in-state distributors.   Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion To Dismiss (Doc. #31) at 27–28.  Defendants do not persuasively refute these points or establish why their legitimate local objectives could not be achieved by reasonable, nondiscriminatory alternatives.

Plaintiffs sufficiently allege that the Out-of-State Distributor Ban is *per se* illegal, as it prevents out-of-state, but not in-state, residents from mailing advance ballot applications.  Accepting plaintiffs' allegations and giving them the benefit of all favorable inferences, they sufficiently plead that the State's legitimate interests in regulating elections do not justify the discriminatory restrictions.

As noted, defendants also argue that the Dormant Commerce Clause does not apply to the State because it is a market participant.  This exception "covers States that go beyond regulation and themselves participate in the market so as to exercise the right to favor their own citizens over others."  Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 339 (2008) (internal citations omitted).  This exception reflects "a basic distinction between States as market participants and States as market regulators."  Id. (internal citations omitted).  In arguing that the state is a market participant, defendants go beyond the allegations of the complaint.  See GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) (court must exclude outside material unless motion converted to one for summary judgment under Rule 56).  The Court does not consider this argument in deciding defendants' motion to dismiss.

Defendants are also not entitled to dismissal of Count 4 on the theory that as a matter of

law the State has legitimate interests which cannot be served by reasonable, nondiscriminatory alternatives.  On a motion to dismiss, the Court confines its inquiry to the allegations of plaintiffs' complaint and cannot evaluate the sufficiency or weight of interests which defendants invoke to defeat those allegations.  Therefore, the Court overrules defendants' motion to dismiss Count 4.

## II.   <u>Preliminary Injunction</u>

Plaintiffs seek to preliminarily enjoin enforcement of HB 2332 because (1) they are substantially likely to succeed on the merit of their claims that the Ballot Application Restrictions violate the First Amendment and/or the Dormant Commerce Clause; (2) violation of First Amendment rights constitutes irreparable harm; (3) the injunction would not inflict substantial harm on defendants because HB 2332 does not serve important state interests; and (4) an injunction would further the public interest.  <u>Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction</u> (Doc. #25) filed July 8, 2021 at 2–4.

Defendants oppose plaintiffs' motion.  Defendants assert that plaintiffs' motion is flawed because (1) plaintiffs' claims have no substantive legal merit; (2) the State's regulatory interests outweigh any minor impact on the rights of plaintiffs and voters whom they represent; (3) plaintiffs have shown no risk of imminent harm to democracy; and (4) a preliminary injunction is not necessary because HB 2332 will not take effect until January 1, 2022 and advance ballot applications for the primaries in 2022 cannot be accepted until April 1, 2022.  <u>Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction</u> (Doc. #29) filed July 22, 2021 at 2–3; HB 2332, § 3, 11.

The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case."  <u>Tri-State Generation & Transmission Ass'n Inc. v. Shoshone River Power Inc.</u>, 805 F.2d 351, 355 (10th Cir. 1986).  A preliminary injunction is a drastic and extraordinary remedy,

and courts do not grant it as a matter of right.  <u>Paul's Beauty Coll. v. United States</u>, 885 F. Supp. 1468, 1471 (D. Kan. 1995); <u>see</u> <u>Nova Health Sys. v. Edmondson</u>, 460 F.3d 1295, 1298 (10th Cir. 2006) (preliminary injunction is extraordinary remedy, and right to relief must be clear and unequivocal).  To obtain a preliminary injunction, plaintiffs must establish (1) a substantial likelihood that they will eventually prevail on the merits; (2) irreparable injury unless a preliminary injunction issues; (3) that the threatened injury outweighs whatever damage the proposed preliminary injunction may cause to defendants; and (4) that, if issued, a preliminary injunction, will not be contrary to the public interest.  <u>Tri-State Generation</u>, 805 F.2d at 355.  If the moving parties demonstrate that the second, third and fourth factors "tip strongly" in their favor, the test is modified and the moving parties "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation." <u>Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.</u>, 455 F.3d 1107, 1113 (10th Cir. 2006).

### A.  Findings Of Fact

As noted, the Court conducted an evidentiary hearing on September 8, 2021.  As witnesses, plaintiffs called Daniel McCarthy, Vice President of Finance and Operations for VoteAmerica and Thomas Lopach, President and Chief Executive Officer for VPC.  Defendants called Bryan Caskey, Kansas Director of Elections; Andrew Howell, Shawnee County Elections Commissioner; and Connie Schmidt, retired Johnson County Elections Commissioner.  Based on the evidence received at that hearing, the Court makes the following findings of fact:

Plaintiffs are out-of-state, nonpartisan organizations whose mission is to persuade citizens to engage with the political process, with a focus on advance mail voting.

VoteAmerica's mission is to "see an electorate where all voters are informed and

participate time after time in our elections."  It specifically seeks to engage low propensity voters who are usually "neglected by partisan efforts and partisan turnout."  <u>Transcript Of Preliminary Injunction Motion Hearing Before The Honorable Kathryn H. Vratil, United States Senior District Judge</u> (Doc. #45) filed September 14, 2021 at 7–8.  VoteAmerica provides a range of services to potential voters, including a database of election laws for each state, municipality and county; voter registration verification; mail-in ballot request tools; and election reminders.  <u>Id.</u> at 8–9.  These services require VoteAmerica to work directly with secretaries of state and local election officials and administrators.  <u>Id.</u> at 23.

VoteAmerica offers a vote by mail service, which allows citizens to go to its web site and fill out advance mail ballot request forms which contain their personal information (name, address, driver's license, etc.).  <u>Id.</u> at 9.  VoteAmerica then prints and mails the ballot request form to the voter.  <u>Id.</u>  VoteAmerica's goal is to encourage safe voting, especially for populations who may be disabled, who lack the technology to print and mail a ballot request form or who need to work on election day, and thus expand participation in the electoral process.  <u>Id.</u>  By November of 2021, VoteAmerica plans to fully develop the Kansas tool for advance mail voting services.  <u>Id.</u> at 10, 12.  Its goal is to offer the tool for the 2022 election cycle, as it has done in other states.  <u>Id.</u> at 10, 12.  To be successful, the mail ballot request tool requires significant planning and financial expense.  <u>Id.</u> at 10–12.  Other web sites with similar voting missions may embed VoteAmerica's tool on their platforms.  <u>Id.</u> at 12.  Such partnerships align with VoteAmerica's mission because as more voices share the pro-mail voting message, voters are more likely to listen.  <u>Id.</u> at 12–13.

When voters request advance mail voting application packets, they receive personalized absentee ballot forms; blank absentee ballot forms; instruction forms that are personalized with local election office information; pro-voting messages such as "Your vote matters.  Get this in on

time;" and a free hotline number for nonpartisan advice.  Id. at 13–16.  VoteAmerica includes a blank absentee form so a voter can correct any errors in the personalized information or give the blank application to another voter.  Id. at 17–18.  VoteAmerica includes an envelope addressed to the local election office with pre-paid postage.  Id. at 18.  The personalized ballot application reduces the voter's burden in accessing the right to vote and increases the likelihood that the voter will submit the ballot application.  Id. at 16–17.  Mr. McCarthy believes that without the personalized ballot application, VoteAmerica will have lower response rates, especially among low-income and low-resource voters, and that its mission will suffer.[6]  Id. at 20.  The entire packet is vital to VoteAmerica's mission and serves to communicate and persuade voters to participate in the electoral process.  Id. at 28.

VoteAmerica plans to offer vote by mail services to Kansans in the 2022 election cycle. Though it did not offer the personalized request tool in 2020, about 7,700 Kansans requested advance voting application packets from VoteAmerica.  Id. at 22.  According to Mr. McCarthy, the Out-of-State Distributor Ban would end VoteAmerica's efforts in Kansas, as it could cost around $100,000 to become a resident of Kansas.  Id. at 19.  The ban on personalized ballot applications would detract from VoteAmerica's mission, as it would become more complicated for low-income, low-resource voters to access ballot applications.  Id. at 20.  The ban would also create coding issues, as VoteAmerica would need to hire an engineer to create a specific exception on its web site for Kansas residents.  Id.  Mr. McCarthy testified that overall, the most significant issue would be the isolation of Kansas residents; they would "always [have] an asterisk," lowering the potential impact of its communications.  Id. at 21, 27.

---

[6]     VoteAmerica monitors response rates by tracking "voter files" during an election cycle to see whether voters have returned their ballot applications to their local election offices. Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 29.

Like VoteAmerica, VPC's mission is to engage low propensity voting groups (people of color, unmarried women and young people) at levels equal to their actual representation in the population.  Id. at 39.  VPC uses direct mail and digital means to achieve this mission. Ninety per cent of VPC's work is focused on direct mail programs, "bring[ing] democracy to people's doors." Id. at 40.  In 2020, because that election cycle drastically increased VPC's digital footprint, VPC also partnered with a non-profit organization called the Center for Voter Information.  Id. at 42.  Moving forward, VPC plans to operate separately from the Center for Voter Information.  Id.

VPC mailers include a cover letter which explains and encourages voting by mail; reminds the voter to submit only one ballot application request; identifies a web site to check the status of an application; includes a personalized ballot application obtained on a form from the Kansas Secretary of State; and includes a photocopy of a pre-paid return envelope to the election office. Id. at 42–45.  To ensure the accuracy of the personalized information, VPC communicates with both the Kansas Secretary of State and the county election administrators.  Id. at 47–48; Plaintiffs' Exhibits In Support Of Their Motion For Preliminary Injunction (Doc. #43-2 Exhibit 6 Emails). Mr. Lopach testified that these communications involve (1) checking to make sure VPC has used the proper forms and (2) letting election offices know how many forms VPC plans to mail to each county.  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 52, 76–78.  At the suggestion of election administrators from various states, VPC added the reminder to submit only one ballot application.  Id. at 42.

Like Mr. McCarthy, Mr. Lopach testified that response rates significantly increase with the inclusion of personalized ballot applications and pre-paid postage mailers.  Id. at 45–46.  Many voters do not own printers or may not be able to access the internet, and in mailing their application

packets, such voters rely heavily on VPC resources.  Id. at 50.  VPC highlights each personalized ballot application to draw a voter's attention to (1) providing additional information where necessary, (2) verifying that personalized information is accurate and (3) the importance of submitting only one ballot application.  Id. at 50, 57.  By keeping up-to-date internal records on who has requested ballot applications, VPC tries to prevent voters from sending multiple ballot applications.  Id. at 48.

For the 2022 election cycle, VPC plans to send voter registration mailings to roughly 70,000 Kansans, communicating with these voters every three to four months before the November election.  Id. at 49.  In 2020, VPC sent 371 million pieces of mail nationwide (voter registration applications, vote by mail applications and election day information pamphlets).  Id. at 58.  In 2022, these communications will include reminders to vote and information necessary to make an informed decision about voting in person on election day or in advance by mail.  Id. at 49.  Mr. Lopach testified that HB 2332 will inhibit VPC's ability to effectively engage with Kansans.  Id.  It will prevent VPC from mailing personalized ballot applications, thus reducing response rates and increasing the potential number of errors.  Id. at 49, 60.  The ban on out-of-state distributors will likely limit all of VPC's mail programs in Kansas, because VPC is not a Kansas resident and it cannot afford to become one.  Id. at 49–50, 61.

Since February of 2015, Mr. Caskey has been responsible for overseeing Kansas elections at the national and state levels and for assisting 105 county election offices at the local level.  Id. at 62–63.  He has been in the state election office since February of 1998.  Id. at 63.  Mr. Caskey testified that since 1996, any Kansas voter may vote before election day for any reason, either by mail or in person.  Id.  "Unlike many states which struggle to implement mail balloting for the first time, Kansas . . . has 25 years of experience with mail ballots."  Id. at 84.  To vote by mail, a voter

must complete an advance mail ballot application, which is available on line, in person, by mail or by email.  Id. at 63–64.  The process in each county is a little different.  Id. at 64.  Before 2020, a handful of counties sent advance mail voting applications to all registered voters.  Id.  In 2020, approximately 50 per cent of counties did so.  Id.

In the primary election cycle in 2020, Mr. Caskey's office received twice as many phone calls compared to the 2016 election from all parts of the State.  Id. at 66–68.  Voters submitted three times as many advance ballot applications, compared to 2016, and more than 90 per cent of those voters submitted ballots.  Id. at 75, 85.  The added phone calls increased his office's workload.  Id. at 67.  The phone calls did not pertain to novel questions, but remained "consistent with previous elections." The only new questions had to do with COVID-19.  Id. at 68.  According to Mr. Caskey, the 2020 elections "were successful and . . . were conducted according to Kansas law, and . . . voters were allowed to vote privately, securely, accurately and had their vote counted for who they intended to vote for."  Id. at 81–82; Plaintiffs' Exhibits In Support Of Their Motion For Preliminary Injunction (Doc. #43-2 Exhibit 7 11.16.20 Letter from Sec. of State).

Mr. Caskey testified that duplicate advance ballot applications impact the integrity of the election process because they take more time.  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 69.  He testified that while it typically takes one to three minutes to process an initial ballot application, a duplicate application "dramatically" increases the amount of time needed.  Id.  The Election Voter Information System ("ELVIS") tracks registered voters in Kansas in real time.  Id. at 71.  Outside organizations may request this information from Mr. Caskey's office.  Id.  As it gets closer to the election, however, more requests come in and it takes more time to update ELVIS.  Id. at 72.

Mr. Caskey testified that his office will work with the "appropriate stakeholders" to

determine what regulations under HB 2332 will look like.  Id. at 74.  The goal is for regulations to take effect before the primary election in August of 2022, which will require at least three or four months of processing time.  Id.

Mr. Howell, Shawnee County Elections Commissioner, testified that before 2020, Shawnee County did not proactively mail advance ballot applications to all registered voters, but voters could use the election web site to retrieve applications.  Id. at 89.  In 2020, Shawnee County proactively mailed a blank application to each registered voter.  Id. at 90.  Because ELVIS updated the voter database every day, Shawnee County did not pre-populate the ballot application forms with personalized information.  Id. at 92.

In 2020, Shawnee County received 24,699 advance mail ballot applications, of which 2,955 were duplicates.  Shawnee County had a budget overrun of $400,000 for the 2020 election, with around $20,000 due to duplicate ballot applications.  Id. at 96.  Every ballot application is tracked against ELVIS to ensure that no voter receives more than one mail ballot.  If ELVIS indicates that a voter may be submitting a duplicate ballot application, a local election official must verify that the name, address and signature match the voter record on file and check identifying information, such as driver's license number and date of birth.  Id. at 96–97.  If the ballot application is not a duplicate, the official must process the application and mail a ballot to the voter within 48 hours. Id. at 104.  A voter often has legitimate reasons to submit more than one ballot application, such as changes in personal information or mailing addresses.  Id. at 102.  If the ballot application is a true duplicate, the election official engages what is called a "cure process."  Id. at 98.  The first stage of the cure process is to contact the voter, either by email, mail or phone call, to make certain "that we know who the person is, we know who we're sending it to, and that it's handled correctly." Id. at 98–99.  This process may take anywhere from five to ten minutes on average but may take

up to 30 minutes if it is not easily resolved.  Id. at 99.  The cure process is not just limited to duplicate ballot applications; some applications enter the process because the application is missing information, a voter forgot to sign the application, a voter failed to include a driver's license number or other reasons.  Id. at 102.  In 2020, the Shawnee County election office hired 25 to 30 people to handle cure processes and process applications within the required 48 hours. Id. at 100–01.  Mr. Howell's office did not anticipate receiving as many mail ballot applications as it did.  Id. at 101.

Ms. Schmidt served as the Johnson County Election Commissioner for 11 years, first from 1995 to 2005 and then again in 2020.  Id. at 111.  In 2020, Johnson County mailed more than 165,000 mail ballot applications and processed a little more than 200,000 applications.  Id. at 112. Before 2020, Johnson County did not proactively send out actual advance mail voting applications to all registered voters.  In 2020, it changed its policy.  Id. at 113.  In 2020, Johnson County received well more than three times as many ballot applications, compared to typical presidential election years.  Id. at 112–13.  Before 2020, Johnson County received some duplicate ballot applications, but not as many as it did in 2020.  Id. at 113.  The processing time for each duplicate application ranged from five to ten minutes.  Id. at 114.  After the 2020 election, Ms. Schmidt tweeted that the Kansas general election was both "historic and successful."  Id. at 118.

**B.  Likelihood Of Success On The Merits**

Plaintiffs contend that they are likely to succeed on the merits of their constitutional claims that HB 2332 violates their rights under the First and Fourteenth Amendments and the Dormant Commerce Clause.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 11, 22; see also supra Section I.C.1–4.  Defendants argue that plaintiffs are unlikely to succeed on the merits because their activities do not involve speech under the First

Amendment (let alone core political speech), and the restrictions do not contravene the Dormant Commerce Clause.   Defendants also argue that even if the restrictions implicate the First Amendment, they must be reviewed under the Anderson-Burdick test, Anderson-Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992), and that because HB 2332 imposes "reasonable, neutral, non-discriminatory prophylactic measures," plaintiffs will not be entitled to relief.   Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 16–17.

As noted above, plaintiffs sufficiently allege that HB 2332 violates their rights to engage in protected speech and expressive conduct under the First Amendment.   The Court therefore addresses the likelihood that plaintiffs will eventually prevail on those claims.

1.   What Level Of Scrutiny Is Warranted?

To determine the likelihood of plaintiffs' eventual success on the merits, the Court must determine which level of scrutiny applies: strict scrutiny or the Anderson-Burdick balancing test. See Chandler v. City of Arvada, Colo., 292 F.3d 1236, 1241 (10th Cir. 2002); Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d 1174, 1196 (10th Cir. 2000). Federal courts often disagree on what level of scrutiny applies to state election and voter registration laws.   Plaintiffs argue that the Ballot Application Restrictions are subject to strict or "exacting scrutiny" because they restrict plaintiffs' ability to engage in core political speech.[7] Defendants argue that because the restrictions do not target speech, the Court should analyze them under the more flexible Anderson-Burdick balancing test.   Defendants' Response To Plaintiffs'

---

[7]        Specifically, plaintiffs argue that strict scrutiny applies because HB 2332 (1) abridges their core political speech, (2) limits their speech based on content, viewpoint and speaker identity and (3) curbs the overall quantum of speech available to the election or voting process.   Complaint (Doc. #1), ¶¶ 60–61, 69–72, 80–82, 88–89.

Motion For A Preliminary Injunction (Doc. #29) at 13; see Anderson, 460 U.S. at 789; Burdick, 504 U.S. at 433–34.

Although voting is of the "most fundamental significance under our constitutional structure," the right to vote in any manner and the right to associate for political purposes through the ballot is not absolute. Utah Republican Party, 892 F.3d at 1076–77 (quoting Burdick, 504 U.S. at 433). The Constitution grants states the authority to regulate the "Times, Places, and Manner" of elections. Id. at 1076 (citing Tashjian, 479 U.S. at 217); U.S. Const. art. 1, § 4, cl.1. When a state invokes its constitutional authority to regulate elections, an individual's right to vote and associate with others may be affected. Anderson, 460 U.S. at 788; see Timmons, 520 U.S. at 358 ("States may, and inevitably must, enact reasonable regulations of parties, elections and ballots to reduce election- and campaign-related disorder"). An example of permissible regulation is a decision to close the polls at 7:00 pm instead of 8:00 pm. Utah Republican Party, 892 F.3d at 1077. In evaluating the validity of a state election regulation under Anderson-Burdick, a Court applies a flexible standard, "weigh[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the precise interests which the State advances to justify the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden plaintiffs' rights. Fish v. Schwab, 957 F.3d 1105, 1122 (10th Cir. 2020) (citing Burdick, 504 U.S. at 434). The degree of scrutiny "will wax and wane with the severity of the burden imposed on the right to vote in any given case; heavier burdens will require closer scrutiny; lighter burdens will be approved more easily." Fish, 957 F.3d at 1124 (quoting Burdick, 504 U.S. at 434).

The Supreme Court has declined to apply Anderson-Burdick to cases which govern election-related speech rather than the "mechanics of the electoral process." McIntyre v. Ohio

Elections Comm'n, 514 U.S. 334, 345 (1995); see also Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 146 (2d Cir. 2000) ("Restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary") (citing Buckley v. Am. Const. L. Found. Inc., 525 U.S. 182, 208 (1999) (Thomas, J., concurring)).  Strict scrutiny applies to restrictions on core First Amendment activities.  See Yes On Term Limits, Inc. v. Savage, 550 F.3d 1023, 1028–29 (10th Cir. 2008).  Under strict scrutiny, a state must assert a significant and compelling government interest which is sufficiently narrowly tailored to serve that interest.  See Perry Educ. Ass'n. v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009) ("If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest.").

The Tenth Circuit has applied the Anderson-Burdick test, which it has characterized as a "highly fact specific inquiry," when deciding the "constitutionality of content-neutral regulation of the voting process."   Libertarian Party of N.M. v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007); Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir. 2000).  It acknowledges that strict scrutiny must be applied, however, "where the government restricts the overall quantum of speech available to the election or voting process." Campbell, 203 F.3d at 745.  In fact, the Tenth Circuit has expressly identified circumstances which merit strict scrutiny: restrictions on campaign expenditures, the available pool of political petition circulators or other supporters of an initiative or candidate, or the anonymity of such supporters.  Id.  Other courts have noted that some laws which govern elections, particularly election-related speech and associations, go beyond the intersection between voting rights and election administration, and veer into the area where "the First Amendment 'has its fullest and most urgent application.'" Tennessee State Conf. of NAACP

v. Hargett, 420 F. Supp. 3d 683, 701 (M.D. Tenn. 2019) (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989)).

HB 2332 addresses more than the time, place or manner of election administration, and impacts speech in a way that is not minimal.  See Utah Republican Party, 892 F.3d at 1076–77. The Ballot Application Restrictions regulate First Amendment-protected activity in ways that are not merely incidental; in effect, they limit "the overall quantum of speech available."  Campbell, 203 F.3d at 745; see McCullen v. Coakley, 573 U.S. 464, 489 (2014) ("Commenting on matters of public concern [is] classic form[] of speech that lie[s] at the heart of the First Amendment. When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden.") (quoting Schenck v. Pro-Choice Network of W. New York, 519 U.S. 357, 377 (1997)).  HB 2332 goes beyond invoking the State's constitutional authority to regulate election processes and involves direct regulation of communication among private parties who are advocating for particular change—more voting by mail, especially in under-represented populations.  HB 2332 significantly inhibits communication with voters about proposed political change and eliminates voting advocacy by plaintiffs and other out-of-state entities, based on the content of their message and the residency of the advocate.  Accordingly, the Court applies strict scrutiny to evaluate plaintiffs' likelihood of success on the merits.  Campbell, 203 F.3d at 745; McIntyre, 514 U.S. at 346 (limitations on political expression subject to strict scrutiny) (citing Meyer v. Grant, 486 U.S. 414, 420 (1988)).

Before the Court addresses plaintiffs' likelihood of success under the strict scrutiny standard, it notes that on this record, the difference between strict scrutiny and the Anderson-Burdick balancing framework is not necessarily relevant.  Anderson-Burdick falls back to a "less-searching examination closer to rational basis" when the challenged law is "minimally

burdensome" on the exercise of constitutional rights.  Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016) (citing Burdick, 504 U.S. at 434).  If the burden is "severe," however, Anderson-Burdick leads to strict scrutiny, with restrictions failing unless they are narrowly tailored to advance compelling state interests.  Id. (citing Burdick, 504 U.S. at 434); Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002)); Schmitt v. LaRose, 933 F.3d 628, 639 (6th Cir. 2019) ("The first, most critical step is to consider the severity of the restriction" and if law imposes severe burdens on plaintiffs' rights, apply strict scrutiny).

Plaintiffs have produced evidence of significant burdens associated with HB 2332, and defendants have provided almost no factual basis for disputing plaintiffs' claims that HB 2332 will drastically limit the number of voices advocating for the politically controversial topic of voting by mail, limit the audience which proponents can reach and make it less likely that proponents will gather the necessary support to continue sharing their message.  See Chandler, 233 F. Supp. 2d at 1311 (citing Meyer, 486 U.S. at 422; Meyer, 120 F.3d at 1099).  HB 2332 will have the inevitable effect of reducing the total quantum of speech on an important public issue.  Plaintiffs have shown a sufficiently heavy burden on First Amendment rights to justify a significantly more demanding standard of review than the "rational basis" standard which defendants seek to satisfy under Anderson-Burdick.  For this reason, on this record, plaintiffs' likelihood of success on the merits does not depend on whether the Court applies the Anderson-Burdick balancing test.

2.  Strict Scrutiny Analysis

To survive strict scrutiny, defendants must show that the restrictions of HB 2332 are narrowly tailored to serve a compelling state interest.  Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn., 536 U.S. at 774–75).  Here, defendants identify three

government interests at issue: "avoiding fraud, minimizing voter confusion, and facilitating an orderly administration of the electoral process." Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 2.  The Court analyzes each government interest in turn.

a.      Preventing Voter Fraud

Defendants argue that HB 2332 prevents voter fraud because it limits the number of advance ballot applications that each Kansas voter may receive.  Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 15.  They argue that when a voter receives more than one ballot application, it invites fraud, which the State has a strong interest in avoiding.  Id.  Fraud may affect the outcome of a close election, dilute the right of citizens to cast ballots that carry the appropriate weight and undermine public confidence in the fairness of elections and legitimacy of the announced outcome.  Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2340 (2021); see also Crawford, 553 U.S. at 191.

Defendants' argument has superficial appeal, but it actually boils down to an issue of administrative efficiency.  The state employs a rigorous process to make sure that no voter can receive a duplicate mail ballot.  Apparently, these procedures are highly effective.[8]  The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of

---

[8]      Defendants presented no evidence of any voter fraud effectuated through advance voting by mail, or a single instance in which a voter received duplicate mail ballots.  On October 8, 2021, when the Court asked defense counsel about what evidence supported the legislature's rationale for HB 2332, he responded that the State had no legal duty to present evidence of its rationale, citing FCC v. Beach Commc'ns, Inc., 508 U.S. 307 (1993).  In Beach Commc'ns, the Supreme Court held that a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if any reasonably conceivable state of facts could provide a rational basis for the classification.  Id. at 313–14.  It also held that "for purposes of rational-basis review," equal protection does not demand that the legislature or governing decisionmaker articulate the purpose or rationale for the classification.  Id. at 315.  This case is distinguishable, however, from Beach Commc'ns.  This is not an Equal Protection case and the Ballot Application Restrictions are not subject to rational-basis review under Anderson-Burdick or any other test.

dealing with requests for initial ballots.

While preventing voter fraud is a potentially compelling state interest, HB 2332 is not narrowly tailored to prevent voter fraud.  HB 2332 does not limit the potential number of applications a voter may receive, because in-state residents may mail Kansas voters any number of advance ballot applications.  In-state residents must disclose their name, address and (if the sender is an organization) the name of its president, chief executive officer, or executive director. HB 2332, § 3(k)(1).  It seems unlikely that such information deters voter fraud, but the record contains no evidence on that point.  If such information does deter voter fraud, the State could allow out-of-state entities to exercise their First Amendment rights after they provide the same information.  See Yes On Term Limits, 550 F.3d at 1030; see also Chandler, 292 F.3d at 1242–44. The record contains no evidence that duplicate ballot applications disproportionately originate with out-of-state organizations.  When plaintiffs challenge a content-based speech restriction, the State must prove that proposed alternatives would not be as effective as the challenged statute.  Ashcroft v. ACLU, 542 U.S. 656, 665 (2004).  Defendants have not met that burden in this case.

In Yes On Term Limits, supra, Oklahoma residents challenged a law that created a residency requirement for initiative petition circulators.  2007 WL 2670178 at *1.  Initially, the district court found that the state's restriction on non-resident petition circulation was narrowly tailored to serve the compelling state interest of promoting the integrity of the electoral system, with an emphasis on eliminating fraud.  Id. at *7–8.  The state's main evidence consisted of the allegedly fraudulent practices of a "handful of non-resident circulators."  Yes On Term Limits, 550 F.3d at 1030–31.  The Tenth Circuit overturned the district court's ruling, finding that the evidence did not support a finding that as a class, non-resident circulators were more likely than resident circulators to engage in fraud.  Id. at 1031.  It therefore held that Oklahoma had failed to

prove that banning all non-resident circulators was a narrowly tailored means to prevent fraud.  Id. at 1029, 1031.

On this record, defendants have not shown that HB 2332 is narrowly tailored to prevent voting fraud.  The record contains no evidence that out-of-state entities are more likely than in-state entities to encourage voter fraud or that HB 2332 is necessary to prevent Kansas voters from receiving duplicate mail ballots.  Plaintiffs will likely demonstrate that HB 2332 impermissibly restricts their ability to engage in protected First Amendment activity and that it is not narrowly tailored to serve the admittedly compelling state interest of preventing voter fraud.

### b.        Minimizing Voter Confusion

Defendants argue that HB 2332 prevents voter confusion, as it limits the number of advance ballot applications that a Kansas voter may receive and reduces any mistaken belief that the applications originated from election officials.  Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 17.  The State's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity.  Fish v. Kobach, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016), aff'd, 840 F.3d 710 (10th Cir. 2016).

With respect to voter confusion, Mr. Caskey testified that local election offices received more phone calls in 2020 than in 2016—an increase which he attributed to voter confusion.  Mr. Howell also testified that "after talking with voters," it became clear that plaintiffs and similar entities caused the duplicate ballot applications.[9]

Although minimizing voter confusion is a compelling interest, HB 2332 is not narrowly tailored to serve that interest.  Local election offices received more phone calls in 2020, but other

---

[9]        Defendants did not call any witness who claimed to be a "confused voter" or who received numerous ballot applications.  Transcript Of Oral Arguments Re: Preliminary Injunction Before The Honorable Kathryn H. Vratil, United States Senior District Judge at 45.

than calls about COVID-19, the questions received "were consistent with previous elections." Id. at 68. The 2020 election had the highest return rate of ballot applications and a record number of advance ballot votes; in fact, the number of mail-in ballots tripled. Id. at 85. Such evidence of voter confusion is not persuasive, given the record turnout and the fact that other than COVID-19, voter questions were not different from in previous elections. Id. at 68. Furthermore, even if some voters were confused about receiving duplicate ballot applications, defendants presented no evidence on how limiting participation by out-of-state speakers or mailing of personalized ballot applications would serve to prevent that confusion.

In short, defendants have not shown that HB 2332 is narrowly tailored to alleviate voter confusion. Plaintiffs are likely to demonstrate that HB 2332 restricts their ability to engage in protected First Amendment activity and is not narrowly tailored to serve a compelling state interest.

### c.   Ensuring Orderly Administration Of Elections

Defendants argue that HB 2332 ensures orderly administration of elections because it prevents local election offices from spending limited resources to wade through duplicate applications for mail ballots. Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 27. Preserving the integrity and administration of the electoral process is a compelling state interest. Fish, 957 F.3d at 1133.

As noted, defendant's witnesses testified about the amount of time which they require to process a ballot application and ensure it is not a duplicate. Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 96–99. When a ballot application is received, the election official has 48 hours to confirm that the application is not a duplicate, process it and mail a ballot to the voter. Id. at 104. Local election officials employ ELVIS to ensure that no voter who submits more

than one ballot application receives more than one ballot.  An official takes one to three minutes to process an initial application.  Id. at 69.  If ELVIS indicates that a voter has already submitted an application, the process may take on average five to ten minutes (up to 30 minutes) to determine whether the application is a true duplicate.  Id. at 99, 114.  As noted above, in 2020, both the Shawnee County and Johnson County election offices received duplicate ballot applications.  Shawnee County hired 25 to 30 people to handle ballot applications and because its office did not anticipate so many advance applications, Shawnee County went $20,000 over budget in handling duplicate applications.  Id. at 96, 100–01.  Duplicate ballot applications significantly slowed down the Johnson County election office work flow, even with the additional 30 to 40 "temps" hired to help manage the applications.  Id. at 114–15.

While orderly administration of elections is an important government interest, HB 2332 is not narrowly tailored to serve that interest.  Defendants argue that HB 2332 will limit the number of duplicate ballot applications which the local election offices receive, and in turn decrease the amount of resources required to process the applications.  On this record, however, it is not clear that out-of-state entities contribute to duplicate applications in any meaningful way.  The 2020 election cycle presented historic challenges defendants have not tied to advance mail ballot applications that originated with out-of-state residents.  Id. at 95–97.  Before 2020, few local election offices mailed advance ballot applications to all registered voters.  In 2020, for the first time, both Shawnee County and Johnson County proactively did so.  Id. at 89, 113.  Approximately 50 per cent of all counties in Kansas did so.  Id. at 64.  The record contains no evidence about the source of duplicate ballot applications or whether voters submitted duplicate requests because of COVID-19, anticipated delays in postal delivery service or increased interest in voting itself.  The 2020 election cycle had a record number of Kansans register to vote, cast votes in advance, cast

votes by mail and return their actual ballots.  Id. at 85.  The 2020 election cycle was not similar to the election cycles in 2008, 2012 or 2016 and the record does not address the obvious reasons for the lack of similarity.  Accordingly, while defendants' evidence is credible, it is not persuasive.

Kansas officials publicly declared that the 2020 election was successful, without "any widespread, systematic issues [of] voter fraud, intimidation, irregularities, or voting problems." Secretary Schwab Responds to November Election Delay Suggestion, Kansas Secretary of State (July 30, 2020), https://sos.ks.gov/media-center/media-releases/2020/07-30-20-secretary-schwab-responds-to-november-election-delay-suggestion.html;  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 118.  Mr. Caskey testified that the Kansas elections system has 25 years of experience with mail ballot applications, developing institutional knowledge, procedures and infrastructure to "securely process the anticipated increase in mail ballots." Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 83–84.  Both statements refute any compelling need to enact HB 2332, and defendants have not shown that HB 2332 is narrowly tailored to ensure the orderly administration of elections.  Plaintiffs will likely demonstrate that HB 2332 restricts their ability to engage in protected First Amendment activity and that it is not narrowly tailored to serve a compelling state interest.

Defendants have therefore failed to prove that HB 2332 is narrowly tailored to achieve any of the State's allegedly compelling interests.  Given the evidence before the Court, plaintiffs have shown that they are likely to succeed on the merits of their freedom of speech First Amendment claim (Count 1).

For purposes of preliminary injunctive relief, the Court need not inquire into the likely merit of plaintiffs' other three claims.

## C.     Likelihood Of Irreparable Harm

Because they are likely to prevail on the merits of their First Amendment freedom of speech claim, plaintiffs argue that absent an injunction, they will suffer irreparable harm.  Defendants argue that plaintiffs will not suffer any harm at all because the statute does not take effect until early 2022, and the election offices cannot accept applications until April 1, 2022.

The Supreme Court and the Tenth Circuit have instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Verlo v. Martinez, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); Heideman v. S. Salt Lake City, 348 F.3d 1182, 1190 (10th Cir. 2003); see also Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

Precedent dictates that the Court must treat alleged First Amendment harms "gingerly." Heideman, 348 F.3d at 1190.  Plaintiffs have sufficiently pled that unless enjoined, HB 2332 will limit Kansas voters in navigating the path to ballot access and interfere with plaintiffs' First Amendment rights.  See Verlo, 820 F.3d at 1127.  Such losses are ones that money damages cannot redress, so this factor weighs strongly in favor of an injunction.  See United Utah Party v. Cox, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017).

## D.     Balance Of The Equities

Plaintiffs argue that the prospect of substantial harm to them dramatically outweighs any harm which an injunction would impose on defendants.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 29.  Defendants argue that plaintiffs will suffer no harm, especially compared to the harm which the State will suffer if an injunction is granted because whenever a State is "enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury."  Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 29–30 (citing Maryland v. King, 567 U.S. 1301, 1303 (2012)).

Injury to plaintiffs who are deprived of First Amendment rights almost always outweighs the potential harm to the government if an injunction is granted.  Verlo v. City & Cnty. of Denver, Co., 124 F. Supp. 3d 1083, 1095 (D. Colo. 2015), aff'd sub nom. Verlo v. Martinez, 820 F.3d 1113 (10th Cir. 2016).  Here, the restrictions would substantially impair, if not effectively eliminate, plaintiffs' ability to convey their message to their target audience in a timely and effective manner. For VoteAmerica, including the personalized ballot application in their communications packet is the most "effective way to communicate that you find it important for someone to do something." Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 16.  For VPC, these distributions increased the voters' likelihood of returning the ballot applications to their local Kansas election offices.  Id. at 46–47.  The response rate would drop significantly without these packets, as most of VPC's targeted audience do not own printers or cannot access the internet to secure an advance ballot application.  Id. at 50.

In countering these injuries, the State has not provided evidence that any potential injury from an injunction is fairly traceable to plaintiffs or other out-of-state organizations.  See Verlo, 820 F.3d at 1127.  At the evidentiary hearing and at oral argument, defendants cited no evidence that duplicate ballot applications disproportionately originate with out-of-state speakers or that voter confusion results from plaintiffs' mailings, as opposed to mailings by in-state organizations or topics that have nothing to do with voting by mail.  Mr. Caskey stated that county officials received ballot applications with improper information but did not tie those incorrect applications

to plaintiffs or to other out-of-state organizations.[10]   Defendants also failed to present evidence that the time required to process duplicate applications in 2020 exceeded processing times in 2008, 2012 or 2016 on account of specific problems which HB 2332 purports to address.  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 75, 85.  Defendants posited no numbers which showed anything more than "light administrative burdens," which might not even be solved by an out-of-state ban, since Kansans may still solicit applications by mail from in-state residents. See Fish, 840 F.3d at 754–55.

HB 2332 does not appear to address any immediate problem and delayed implementation is not likely to cause material harm, even if it is eventually found to be constitutional and enforceable.  Awad, 670 F.3d at 1132.  In weighing the balance of equities, the substantial denial of fundamental constitutional rights clearly outweighs the prospect of demonstrated administrative burdens on the Kansas Secretary of State and local election offices.  See Fish, 840 F.3d at 755.

Plaintiffs make a strong showing that their threatened injury outweighs any potential harm to defendants in granting this injunction.

### E.      The Public Interest

Plaintiffs argue that implementation of HB 2332 will also harm the public and that it is always in the public interest to prevent a violation of a party's constitutional rights.  Plaintiffs' Memorandum Of Law In Support Of Motion For Preliminary Injunction (Doc. #25) at 30; see also Verlo, 820 F.3d at 1127.  Defendants argue that public confidence in government will be undermined if the Court invalidates a statute that has made its way through the legislative process. Defendants' Response To Plaintiffs' Motion For A Preliminary Injunction (Doc. #29) at 30.

---

[10]      Such a connection is theoretical at best, because in 2020 out-of-state organizations mailed ballot applications and "approximately 50 percent of the counties sent out an application to every registered voter."  Transcript Of Preliminary Injunction Motion Hearing (Doc. #45) at 64.

The Tenth Circuit repeatedly acknowledges the strong public interest in protecting First Amendment rights.  <u>Awad</u>, 670 F.3d at 1132; <u>Verlo</u>, 820 F.3d at 1127–28 (citing <u>Pac. Frontier v. Pleasant Grove City</u>, 414 F.3d 1221, 1237 (10th Cir. 2005)); <u>Am. C.L. Union v. Johnson</u>, 194 F.3d 1149, 1163 (10th Cir. 1999).  With the other three factors leaning in favor of granting the preliminary injunction and the critical constitutional issues which still need to be decided, the public interest factor also leans in favor of granting the preliminary injunction.

**IT IS THERFORE ORDERED** that <u>Defendants' Motion To Dismiss Plaintiffs' Complaint</u> (Doc. #26) filed July 9, 2021 is **OVERRULED**.

**IT IS FURTHERED ORDERED** that <u>Plaintiffs' Motion For Preliminary Injunction</u> (Doc. #24) filed July 8, 2021 is **SUSTAINED**.  The Court hereby enjoins enforcement of HB 2332. Pending further order of the Court, this Order shall remain effective until the conclusion of the case.

Dated this 19th day of November, 2021 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge