IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VOTEAMERICA and
VOTER PARTICIPATION CENTER,

      *Plaintiffs,*

vs.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE, in his official capacity as
District Attorney of Johnson County,

      *Defendants.*

Case No. 2:21-cv-02253-KHV-GEB

## **PRETRIAL ORDER**

On September 27, 2022, U.S. Magistrate Judge Gwynne E. Birzer conducted a pretrial conference in this case by telephone.  Plaintiffs VoteAmerica and Voter Participation Center ("VPC") appeared through counsel Jonathan Youngwood, Meredith, Karp, Hayden Johnson, and Nicole Palmadesso.  Defendants Scott Schwab, Derek Schmidt, and Stephen M. Howe appeared through counsel Bradley J. Schlozman and Scott Schillings.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1.    PRELIMINARY MATTERS.

    **a.    Subject-Matter Jurisdiction.**    Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

      **b.**      **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

      **c.**      **Venue.**  Venue in this court is not disputed.

      **d.**      **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues remaining in this case are governed exclusively by the following federal laws:  U.S. Const. amend. I; U.S. Const. amend. XIV; and 42 U.S.C. § 1983.

**2.**      **STIPULATIONS.**

      Counsel for the parties have conferred in good faith to prepare comprehensive lists of stipulated facts and exhibits.  Although counsel have made substantial progress on these stipulations as summarized below, there may be additional facts and exhibits to which the parties may be able to stipulate for purposes of trial.  The court's ruling on any summary-judgment motions and/or any motions to exclude expert testimony is also likely to impact what stipulated facts and exhibits would be relevant at trial.

      **a.**    The following facts are stipulated:

        **i.**    Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas.

        **ii.**    Defendant Schwab is the Chief Election Officer for the State of Kansas.

        **iii.**    As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements. Kan. Stat. Ann. § 25-124.

        **iv.**    Defendant Kansas Attorney General Derek Schmidt does business in and is an elected official in the state of Kansas.

        **v.**    Defendant Schmidt is the Chief Legal Officer for the State of Kansas.

vi. Defendant Johnson County District Attorney Stephen M. Howe does business in and is an elected official in the state of Kansas.

vii. Plaintiff VPC is a Washington, D.C.-based 501(c)(3) nonprofit organization founded in 2003.

viii. Plaintiff VPC's mission is to provide voter registration, early voting, vote by mail, and get out the vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women.

ix. Plaintiff VPC designs and implements direct mail programs to send mass mailers to their mission populations.

x. Plaintiff VPC sent advance mail voting mailers to eligible Kansas voters during the 2020 election cycle.

xi. The Election Voter Information System ("ELVIS") is the Kansas state voter registration database.

xii. Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials.

xiii. When a voter registration application is received by a county election office, that office inputs the voter's registration information into the state's central database and thereby creates a voter record in ELVIS.

xiv. ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information.

xv. Kansas conducted a post-election audit after the 2020 general election.

xvi. The 2020 post-election audit did not reveal any systemic fraud in the Kansas general election.

xvii. On February 10, 2021, House Bill No. 2332 ("HB 2332") was formally introduced in the Kansas Legislature.

xviii. HB 2332 pertains to various election-related matters including the solicitation by mail of advance voting ballot applications.

xix. After the amendment process, HB 2332 was passed by the Kansas House (83-38) and Senate (27-11) and was presented to Governor Laura Kelly on April 16, 2021.

xx.      Governor Kelly vetoed HB 2332 and returned the bill to the House on April 23, 2021.

xxi.      On May 3, 2021, the Legislature overrode the governor's veto of HB 2332 (voting 86-37 in the House and 28-12 in the Senate).

xxii.      Section 3(k)(2) of HB 2332 (codified at K.S.A. 25-1122(k)(2)) states that "The application for an advance voting ballot included in [a mail solicitation to a registered voter to file an advance voting ballot application] shall be the official application for advance ballot by mail provided by the secretary of state. No portion of such application shall be completed prior to mailing such application to the registered voter." This statute will be referred to as the "Personalized Application Prohibition."

xxiii.      Section 3(k)(2) of HB 2332 does not apply to persons who mail or cause to be mailed an application for an advance voting ballot with any portion completed to a registered voter where the portion of such application completed prior to mailing is completed at the request of the registered voter. In other words, where a registered voter asks a person to mail or cause to be mailed an advance voting ballot application to such registered voter, and that person does so, that person does not "solicit[] by mail a registered voter to file an application for an advance voting ballot" as set forth in Section 3(k)(1) of HB 2332.

xxiv.      Section 3(*l*)(1) of HB 2332 provides that "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state." This statute will be referred to as the "Out-of-State Distributor Ban."

xxv.      At passage, Sections 3(k)(2) and 3(*l*)(1) of HB 2332 were scheduled to go into effect on January 1, 2022.

xxvi.      In a Memorandum & Order on November 19, 2021 (and a *nunc pro tunc* Order on December 15, 2021), District Judge Vratil preliminarily enjoined enforcement of Sections 3(k)(2) and 3(*l*)(1) of HB 2332.

xxvii.      Defendants, via a Stipulation with Plaintiffs that the Court entered on February 25, 2022, agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of Plaintiffs' First and Fourteenth Amendment rights. Those claims have thus been fully resolved and are no longer part of this litigation (other than Plaintiffs' request for their attorney fees as prevailing parties).

xxviii.      The only claims remaining in dispute pertain to the Personalized Application Prohibition.

xxix.      The Personalized Application Prohibition does not cover Plaintiff VoteAmerica's conduct because Plaintiff VoteAmerica mails personalized

advance voting ballot applications to voters who have requested them via its interactive website. Thus, Plaintiff VoteAmerica has not participated in any discovery in this case.

xxx.    Generally, to vote by mail in Kansas, a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote.

xxxi.   If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet.

xxxii.  Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. 25-1122(f)(2).

xxxiii. Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received.  K.S.A. 25-1123(a) and 25-1220.  Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the county election office starting on the commencement of the 20-day period before the election. K.S.A. 25-1123(a).

xxxiv.  If a received advance voting ballot application does not contain sufficient information or if the information is illegible, or there is a signature mismatch or missing signature, the county election office must attempt to contact the voter to obtain the correct information and/or signature before Election Day.  K.A.R. 7-36-7 and 7-36-9; K.S.A. 25-1122(e).  If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot.  K.A.R. 7-36-7(f).

xxxv.   Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS.  The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter.

xxxvi.  The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail).  This compared to 1,039,085 total votes cast in the 2018 General Election, a 56.4% turnout rate, with 152,267 votes cast by mail.  It also compared to 1,225,667 total votes cast in the 2016 General Election, a 67.4% turnout rate, with 173,457 votes having been cast by mail. *See* https://sos.ks.gov/elections/elections-statistics.html.

| | |
|---|---|
| **xxxvii.** | Plaintiff VPC sent advance voting ballot application mailers to Kansas voters in connection with the 2020 General Election. |
| **xxxviii.** | Plaintiff VPC's advance ballot application mailers contained a cover letter, a Kansas advance voting ballot application, and a pre-paid, pre-addressed envelope that voters could use to send a completed application to the appropriate county election office. |
| **xxxix.** | In 2020, VPC received Kansas active voter registration lists through its vendor (Catalist) on January 31, April 10, and September 15. |
| **xl.** | VPC sent five "waves" of advance voting ballot application mailers to Kansas voters in advance of the 2020 General Election.  The dates were as follows: |

  a. Wave A: data uploaded on 7/6/2020, mailer expected in homes 8/17/2020

  b. Wave B: data uploaded on 7/27/2020, mailer expected in homes 8/26/2020

  c. Wave C: data uploaded on 8/10/2020, mailer expected in homes 9/8/2020

  d. Wave D: data uploaded on 8/24/2020, mailer expected in homes 9/16/202

  e. Wave E: data uploaded on 8/24/2020, mailer expected in homes 9/28/2020


**b.**     The parties have stipulated to the admissibility of the following exhibits for

purposes of summary judgment and trial:

| | |
|---|---|
| **i.** | HB 2332, Caskey Deposition Exhibit 2 |
| **ii.** | Chapter I. Voter Registration, Caskey Deposition Exhibit 5 |
| **iii.** | Application for Advance Ballot by Mail, Form AV1M, Caskey Deposition Exhibit 7 |
| **iv.** | Email correspondence, Caskey Deposition Exhibit 8, KS000209VA – 215VA |
| **v.** | PowerProfile Processing Early Voters, Caskey Deposition Exhibit 8a, KS000216VA – 231VA |

vi.     Chapter II. Election Administration, Caskey Deposition Exhibit 9, KS000121VA – 201VA

vii.    Email correspondence, Caskey Deposition Exhibit 10, KS000233VA – 237VA

viii.   Email correspondence, Caskey Deposition Exhibit 15, KS001922VA – 2068VA

ix.     Email correspondence, Caskey Deposition Exhibit 16, VPC000048 – 050

x.      Email correspondence, Caskey Deposition Exhibit 17, KS000001VA – 007VA

3.     **FACTUAL CONTENTIONS.**

    a.     **Plaintiff Voter Participation Center's Factual Contentions.**

Plaintiff VPC incorporates the stipulated facts regarding HB 2332's legislative history and content. The Personalized Application Prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing." HB 2332 § 3(k)(1). A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor. *See id.* § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). It contains no scienter requirement, and a violation is punishable by up to one month in jail and/or fines. *Id.* The Personalized Application Prohibition does not limit the number of advance mail voting applications a person or nongovernmental organization may solicit by mail. Put another way, it does not concern duplicative applications sent to registered Kansas voters.

Plaintiff VPC's core mission is to provide voter registration, early voting, vote by mail, and get-out-the-vote resources and information to traditionally underserved groups, including young voters, voters of color, and unmarried women. It encourages these voters to participate in elections through advance mail voting by sending registered voters in its mission populations, among other things, advance mail ballot applications. VPC sent personalized mailers to Kansas voters in 2018 and 2020 and is in the process of sending personalized mailers to Kansas voters for

the 2022 general election. VPC intends to send personalized mailers to Kansas voters for future elections.

In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. VPC provides this notice in order to ensure it includes accurate election information and forms in the mailings it sends to Kansas voters and also to provide the Election Director with an opportunity to provide feedback.

The personalized advance ballot application mailers VPC sends to Kansas voters include a letter encouraging the voter to request and cast an advance ballot; a printed copy of an advance mail voting application obtained directly from the Kansas Secretary of State's website and personalized with the voter's name and address obtained from state registration records via VPC's data vendor; and a postage-paid envelope addressed to the voter's county election office. VPC's mailers include messages expressing VPC's advocacy in favor of mail voting.

**Count I**: VPC believes that intermixing encouragement with information about the mail voting process and a personalized application for the eligible Kansas voter receiving the mailer most effectively conveys its message that the recipient—the person for whom the enclosed application is personalized—should participate via advance mail voting. The Personalized Application Prohibition would limit the overall quantum and content of VPC's speech, would abridge VPC's ability to express its viewpoint on advance mail voting and discriminate against VPC's pro-advance mail voting views, and would stop VPC from engaging in what it believes is the most effective way to communicate its pro-advance mail voting message.

Kansas election officials have indicated that the state held an effective election in 2020 under unprecedented circumstances with the highest percentage of advance mail ballot voters ever

experienced in a statewide election. After the 2020 general election Kansas conducted a post-election audit that revealed no systemic fraud in that election. Other Kansas laws, including provisions of HB 2332 not challenged in this lawsuit, address the purported interests raised by Defendants in defense of Section 3(*k*)(2). Moreover, personalized advance mail voting applications with typeface voter information derived from the voter file can and do reduce any perceived burdens on county election officials processing the applications.

**Count II:** VPC consults with and aids other organizations that distribute personalized advance voting applications to Kansas voters. The Personalized Application Prohibition would prevent VPC's collaboration with other pro-voting organizations in this way. It would also eliminate the method and content of speech by which VPC connects with voters at the advance ballot application phase to build a relationship with Kansans for further association and engagement for political expression.

**Count III:** The Personalized Application Prohibition is unconstitutionally overbroad because it would ban distribution of personalized advance mail ballot applications even if the personalized information exactly matches the voter's registration. Additionally, it has no scienter requirement and carries criminal sanctions. HB 2332 § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). Defendants improperly conflate "inaccurately pre-filled and/or duplicate pre-filled advance voting ballot applications." The Personalized Application Prohibition bans any personalized applications (not only those that are "inaccurately pre-filled") and does not ban duplicate applications.

**b.      Defendants' Factual Contentions.**

The only statutory prohibition still at dispute in this case is K.S.A. 25-1122(k)(2), which generally prohibits soliciting voters by mail with an advance voting ballot application that has been pre-filled in whole or in part. Defendants submit that the Kansas Legislature had strong interests

in adopting this Pre-Filled Application Prohibition and the impact on Plaintiffs' First Amendment rights, if any, is outweighed by those State interests.

### i.    *State Interests.*

The proliferation of pre-filled advance voting ballot applications in connection with the 2020 General Election, many of which were completed by VPC (through its sister organization, CVI), caused substantial confusion, frustration, and anger among Kansas voters who received such unsolicited applications from third-parties not affiliated with a state or county election office. These pre-filled applications were replete with data that did not match voters' information in the State's voter file. The waves of duplicate applications sent to Kansas voters exacerbated the electorate's confusion, frustration, and anger.

The surge of inaccurate and duplicate pre-filled advance voting ballot applications adversely impacted efficient election administration by taxing the ability of overburdened county election offices to timely process such applications and enhanced the possibility that mistakes would be made both in connection with advance voting ballot applications and election administration in general. VPC's mailing of waves of pre-filled advance voting ballot applications to Kansas voters increased the number of individuals submitting multiple/duplicate applications, thereby increasing the workload of election officials and testing their limits to administer the election efficiently and ensure adequate safeguards.

### a.    Minimizing Voter Confusion / Preserving Voter Confidence

After receiving unsolicited duplicate and/or inaccurate pre-filled advance voting ballot applications from VPC and other third-party organizations, voters across the State contacted their county election offices and the Secretary of State's Office in the months preceding the 2020 General Election to express their confusion, frustration, and anger at what they had received. Many voters believed that they were required to send in to the county election office any and all

applications they received in the mail, particularly those that were partially pre-filled.  Many voters erroneously believed that the county was responsible for mailing out the inaccurate and/or duplicate applications.

VPC's practices contributed greatly to the confusion, frustration, and anger experienced by the Kansas electorate.  In fact, VPC was so concerned about the reliability of the information it was receiving from its vendor, and so uneasy about the accuracy of the data it was using to pre-populate the advance voting ballot applications it had sent to voters, that it felt the need to include only *blank* advance voting ballot applications with subsequent waves of mailings.

Meanwhile, Defendants will demonstrate other problems with VPC's mailings of pre-filled advance voting ballot applications to Kansas voters, including the following:

- Due to the 4-6 week lead time between the date that VPC sent its data to its printer for pre-filling advance voting ballot applications for Kansas voters and the date such applications arrived in voters' mailboxes, *at best*, VPC was using a Kansas voter file from April 10, 2020 to pre-populate the advance voting ballot applications being sent to Kansas voters in connection with the November 2020 election.  Kansas election officials identified multiple voters whom VPC sent advance voting ballot applications in connection with the 2020 General Election, yet whose registration status had been cancelled prior to April 10, 2020.

- Many of the VPC mailer file records had no voter registration number associated with the voter even though every individual in Kansas' voter file has a voter registration number;

- There were multiple pairs of matched records in which two different voters showed the same voter registration number;

- In VPC's first wave of mailing, hundreds of voters to whom it sent pre-filled advance voting ballot applications had had their voter registrations cancelled prior to the date that VPC sent the mailers to the printer; and

- VPC continued to send pre-filled advance voting ballot applications to voters who had already sent in applications or whose voter registration had previously been cancelled.

Individuals whose voter registration has been formally cancelled by the State but who subsequently receives a pre-filled advance voting ballot application encouraging him/her to send

that application in for an advance ballot is likely going to be confused as to how to interpret and what to do with such mailing.  The State has a strong interest in avoiding such situations.

Because VPC sent its data to its printer for pre-filling advance voting ballot applications for Kansas voters nearly 4-6 weeks before such mailings were expected to land in the mailbox of such voters, it was virtually guaranteed that voters who promptly completed and sent in such applications to their county election office would receive additional pre-populated application from CVI after submitting the initial one.

VPC's own data reveals that large numbers of duplicate applications were submitted by the Kansas voters whom it targeted in the 2020 General Election.  The problems created by duplicate applications were exponentially disproportionate to anything that had ever previously occurred.  Defendants will present evidence of the number and percentage of duplicate applications in Ford, Shawnee, and Johnson Counties.  The percentage of duplicate advance voting ballot applications in these counties ranged from nine to eighteen percent of all advance voting ballot applications received.

Moreover, the number of duplicate applications likely would have been greater but for the telephone calls that county election officials had with many other confused voters who called to ask whether they were required to submit the duplicate application(s) they had received from outside organizations even though they had already submitted another application.  Election officials frequently had to look up voters' information in ELVIS to determine the status of a prior application and to advise the voter whether he/she needed to send in another one.

VPC further exacerbated this voter confusion and frustration, as well as the toll on county election offices, by instructing voters who might have any concerns about the mailings and pre-

filled applications that they received from VPC to call their respective county election office rather than VPC itself.

**b.**   Minimizing Potential Voter Disenfranchisement

When an advance voting ballot application is submitted to a county election office with incomplete or inaccurate information, county election officials, when feasible, undertake a "cure" procedure, attempting to contact the voter in an effort to gather the correct information.  If election officials are unable to reach the voter or secure the correct information in a timely manner, the voter may ultimately only receive a provisional ballot by mail that may not be counted.

**c.**   Efficient and Orderly Election Administration

The amount of time that county election officials had to expend reviewing and processing inaccurately pre-filled and/or duplicate advance voting ballot applications in connection with the 2020 General Election was substantial.  State law requires that such applications received after the start of early voting must be processed within two business days.  Every piece of information on every application must be verified against the information in ELVIS.  A voter will be sent an advance ballot only if everything matches.  On average, it takes an experienced election official 3-5 minutes to process an accurate, non-duplicative application.  It takes election officials as much as 15-30 minutes to process advance voting ballot applications where the information does not match.  The burden that processing inaccurate or duplicate advance voting ballot applications has on already overworked election officials is substantial.

Many voters who submitted pre-filled advance voting ballot applications (and thus received advance ballots) also showed up to vote on Election Day.  When these voters were told that they would have to vote a provisional ballot, they became confused and often agitated.  Having to deal

with voters who sent in pre-filled advance voting ballot applications and later attempted to vote in person further burdened election officials.

ii.     *Problems Created by VPC and Similarly-Situated Entities in Other States*

Kansas was not the only state to be plagued by voter confusion, anger, and frustration from VPC's mailing of pre-filled absentee ballot applications to voters.  Indeed, Defendants will present evidence of problems experienced by other states from VPC's practices.

iii.    *De Minimis Impact on Plaintiffs' First Amendment Rights*

Defendants dispute that Kansas' Personalized Application Prohibition implicates VPC's First Amendment rights at all.  But even it somehow does, there is no competent or admissible evidence in the record that pre-filling an advance voting ballot application conveys any particular message to voters or that voters understand any such message from such pre-filled application. Nor is there any competent or admissible record evidence that pre-filling the advance voting ballot applications included in its mailers more effectively communicates any message about the benefits of voting by mail than a blank application would.  There is, in short, simply no evidence in the record – other than VPC's own *ipse dixit* – that the Personalized Application Prohibition diminishes (let alone makes it impossible to achieve) their objectives of encouraging broad political participation or expanding the use of advance voting and voting by mail.

Likewise, there is no evidence that the State's Personalized Application Prohibition impedes VPC from associating with either voters or other civic advocacy organizations in pursuit of these goals.  VPC is free to communicate any message it wants in the materials it sends to voters, and it is able to include an advance voting ballot application in those mailers.  It is similarly unrestricted in its right to affiliate with any other organization in furthering its stated objectives.

4.      **LEGAL CLAIMS AND DEFENSES.**

    a.      **Plaintiff VoteAmerica's Claims Have Been Fully Resolved via Stipulation**

Plaintiffs claimed in their Complaint that the enforcement of K.S.A. 25-1122(*l*)(1) would violate their rights under the First and Fourteenth Amendments to the U.S. Constitution, and the Commerce Clause of the U.S. Constitution.  The parties resolved all those claims pursuant to a Stipulation (Doc. 73), which Judge Vratil signed on Feb. 25, 2022.  As part of that Stipulation, the Court permanently enjoined the enforcement of K.S.A. 25-1122(*l*)(1), declared Plaintiffs to be prevailing parties on Counts I-III of the Complaint with respect to that subsection, dismissed as moot the Commerce Clause claim, and directed that Plaintiffs were entitled to attorney fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988.  The Court separately directed that Plaintiffs' motion deadline for any fees and expenses in connection with those claims would be extended until 45 days following the issuance of a final judgment in the case.  (Doc. 52).

All of VoteAmerica's claims have been resolved by virtue of the Stipulation.  Only the claims of Plaintiff VPC, which are directed at H.B. 2332 §3(k)(2), remain pending.

    b.      **Plaintiff Voter Participation Center's Claims.**

Plaintiff asserts that they are entitled to recover upon the following theories, which correspond to Counts I-III of the Complaint:

        i.      <u>**Count I:**</u> The Personalized Application Prohibition, Section 3(k)(2) in HB 2332, violates Plaintiff's First Amendment rights to freedom of speech. Persuading voters to vote by advance mail ballot and facilitating such voting constitutes core political speech and expressive conduct at the heart of First Amendment protections. The Personalized Application Prohibition unconstitutionally precludes or substantially impairs Plaintiff's ability to engage in such protected activities. Because it burdens core political speech and restricts speech based on content, the

identity of the speaker, and viewpoints, it is subject to strict scrutiny. Defendants cannot meet this heightened standard, as the Personalized Application Prohibition is not narrowly tailored to serve any compelling state interest.

      **ii.**      VPC contends that *Anderson-Burdick* balancing does not apply to this case, in which VPC challenges restrictions on its own First Amendment free speech rights, not others' right to vote or access the ballot. Even if *Anderson-Burdick* were the appropriate legal framework, strict scrutiny would apply because the Personalized Application Prohibition severely burdens VPC's speech. Regardless of the level of scrutiny, Defendants' witnesses have not demonstrated that the fact that applications are personalized has caused voter confusion, voter disenfranchisement, inefficient or disorderly election administration, or voter fraud. Defendants have not produced any evidence that their recited harms are real, or that the Personalized Application Prohibition will in fact alleviate these asserted harms or is sufficiently tailored to address these asserted harms. Defendants have not produced any evidence that alternative measures that burden substantially less speech would fail to achieve the government's interests. VPC's rebuttal expert witness, Dr. Eitan Hersh, will establish that the conclusions of Defendants' proposed expert Ken Block (to the extent they are found to be admissible) are inaccurate and/or unreliable.

      **iii.**      <u>**Count II:**</u> The Personalized Application Prohibition in HB 2332 directly and severely burdens Plaintiff's First Amendment associational rights by preventing Plaintiff from banding together with others to engage potential voters and assisting community members to participate further in the civic community through advance mail voting. Because the Personalized Application Prohibition burdens Plaintiff's rights to association protected by the First Amendment,

it is subject to strict scrutiny. Defendants cannot meet this heightened standard, as the Personalized Application Prohibition is not narrowly tailored to serve any compelling state interest.

    **iv.**      **<u>Count III</u>:** The First Amendment prohibits the government restriction of speech through the enactment of substantially overbroad laws. The Personalized Application Prohibition is unconstitutionally overbroad, as it needlessly regulates a substantial amount of constitutionally protected expression and associations and impermissibly chills Plaintiff's protected speech.  It burdens a substantial amount of innocent associations and protected speech such as applications personalized with information that is true or exactly matches a voter's registration. The Personalized Application Prohibition is not limited to "inaccurately" prefilled information. It does not prohibit "duplicate" advance mail ballot applications at all.

    **v.**      To the extent Defendants' asserted defenses were not raised in their Motion to Dismiss (Doc. 27) or Answer (Doc. 55), such defenses were not preserved and are therefore waived; specifically, points (1)(c)-(d) and (3) of Defendants' Defenses, below, do not appear in their Motion to Dismiss or Answer.  However, Defendants' Defenses do not appear to be defenses, but merely arguments that Plaintiff has not met its burden.

    **c.**    **Defendants' Defenses.**

Defendant asserts the following defenses:

    **i.**      Kansas' Personalized Application Prohibition in K.S.A. 25-1122(k)(2) targets only non-expressive conduct and does not implicate any First Amendment rights.

        **a.**    Neither pre-filling an advance voting ballot application, nor mailing the same to potential voters, represents inherently expressive conduct.

        **b.**    Nothing in K.S.A. 25-1122(k)(2) impedes VPC from communicating any message it seeks to impart regarding political participation, advance voting,  or voting by mail.

    **c.**    The Personalized Application Prohibition is properly reviewed under the most deferential standard – rational basis scrutiny.

    **d.**    The Personalized Application Prohibition is rationally related to legitimate state interests (set forth in Section III.B. above). And those state interests outweigh any impact – to the extent there even is one – that the Personalized Application Prohibition has on VPC's First Amendment right.

**ii.**    Even if K.S.A. 25-1122(k)(2) implicates VPC's First Amendment rights, the statute is viewpoint- and content-neutral and not subject to heightened scrutiny.

    **a.**    The Personalized Application Prohibition does not target core political speech.

    **b.**    The Personalized Application Prohibition does not restrict VPC from communicating with anyone about anything.

    **c.**    Assuming the First Amendment is implicated, the proper standard for evaluating VPC's claims is the *Anderson-Burdick* balancing test.

    **d.**    The burden on VPC's speech and advocacy efforts is extremely minimal.

    **e.**    Although Plaintiffs produced no competent evidence that the Personalized Application Prohibition inhibits their ability to achieve their alleged objectives of encouraging broad political participation or expanding the use of advance voting and voting by mail, it would not matter even if they had because the First Amendment does not guarantee success in outcomes.

    **f.**    The State's compelling interests in adopting this statute (set forth in Section III.B. above) outweigh any potential burden on VPC's First Amendment rights.

    **g.**    Although inapplicable, the Personalized Application Prohibition would survive heightened scrutiny as well.

**iii.**    The Personalized Application Prohibition does not contravene VPC's freedom of association rights.

    **a.**    Mailing a pre-filled advance voting ballot application does not implicate the freedom of association.

**b.** Nothing in K.S.A. 25-1122(k)(2) impedes VPC from associating with voters or other civic advocacy organizations in pursuit of its goals

**iv.** VPC's overbreadth claim fails to meet the elements for such a cause of action.

  **a.** The Personalized Application Prohibition is not overbroad as a facial matter or as applied to VPC's conduct.

  **b.** The Personalized Application Prohibition does not implicate VPC's First Amendment rights.

  **c.** The Personalized Application Prohibition targets only non-expressive conduct.

  **d.** There are an infinite number of ways for VPC to communicate its messages regarding political participation, advance voting, or voting by mail.

**5.** **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

  **a.** Plaintiff VPC does not seek any damages. Instead, Plaintiff VPC only seeks the following declaratory and injunctive relief pursuant to 42 U.S.C. § 1983:

  **i.** A declaration that Section 3(k)(2) of HB 2332 violates the First and Fourteenth Amendments, both facially and as-applied to Plaintiff VPC;

  **ii.** An order enjoining Defendants from enforcing the Section 3(k)(2) of HB 2332, including the punitive sanctions contained therein;

  **iii.** An order retaining jurisdiction to render any and all further orders that this Court may deem necessary;  and

  **iv.** Any other relief the Court deems proper.

  **b.** Plaintiffs also seek attorneys' fees and costs incurred in bringing this suit pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

**6.** **AMENDMENTS TO PLEADINGS.**

None.

7.     **DISCOVERY.**

Discovery is now complete.

8.     **MOTIONS.**

a.     **Pending Motions.**

There are no pending motions.

b.     **Additional Pretrial Motions.**

After the pretrial conference, Plaintiff VPC intends to file a motion for summary judgment and may also file a motion to exclude testimony of the Defendants' expert witness.  Defendants likewise intend to file a motion for summary judgment.  The dispositive-motion deadline, as established in the scheduling order and any amendments, is **October 14, 2022**.  The parties should follow the summary-judgment guidelines on the court's website:

   *http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

c.     **Motions Regarding Expert Testimony.**  All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the dispositive-motion deadline stated above.

9.     **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **May 1, 2023, at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 5 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the

trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.     ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows.  The parties currently believe the prospects for settlement of this case are poor and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated September 30, 2022, at Wichita, Kansas.


s/ Gwynne E. Birzer
_____
GWYNNE E. BIRZER
U. S. Magistrate Judge

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By:  /s/ Mark P. Johnson____
Mark P. Johnson (KS Bar #22289)
DENTONS US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64105
Tel: (816) 460-2400
Fax: (816) 531-7545
mark.johnson@dentons.com

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Hayden Johnson (*pro hac vice*)
Christopher Lapinig (*pro hac vice*)
CAMPAIGN LEGAL CENTER
1101 14th Street, NW, St. 400
Washington, D.C. 20005
Tel: (202) 736-2200
dlang@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
clapinig@campaiginlegalcenter.org

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com
nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

**We agree to abide by the terms of this Order**

Respectfully Submitted,

By:  /s/ Bradley J. Schlozman____
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
HINKLE LAW FIRM LLC
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*