**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

VOTEAMERICA and VOTER
PARTICIPATION CENTER,

                Plaintiffs,

     v.

SCOTT SCHWAB, in his official capacity as
Secretary of State of the State of Kansas;
DEREK SCHMIDT, in his official capacity
as Attorney General of the State of Kansas;
STEPHEN M. HOWE, in his official capacity
as District Attorney of Johnson County,

                Defendants.

Civil Action No. 2:21-CV-2253

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

***<u>Oral Argument Requested</u>***

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS ............................................. 2

PROCEDURAL HISTORY................................................................. 17

LEGAL STANDARD.................................................................. 18

ARGUMENT .................................................................. 19

I.      The Undisputed Facts Demonstrate That Plaintiff's Mailing of Personalized Ballot Applications Constitutes Protected First Amendment Speech, Conduct, and Association.................................................................. 19

II.      The Undisputed Facts Establish That The Personalized Application Prohibition is Subject to Strict Scrutiny. .................................................................. 24

     A.      The Personalized Application Prohibition Infringes Plaintiff's Core Political Speech Under *Meyer-Buckley*. .................................................................. 25

     B.      The Personalized Application Prohibition is Content- and Viewpoint-based Discrimination of Plaintiff's Speech.................................................................. 27

     C.      The Personalized Application Prohibition Infringes Associational Rights. ......... 29

     D.      The *Anderson-Burdick* Framework is the Improper Analysis to Apply, But Nevertheless Requires Strict Scrutiny. .................................................................. 31

     E.      The Personalized Application Prohibition is Unconstitutionally Overbroad. .................................................................. 33

III.      Defendants Cannot Meet Their Burden To Show the Personalized Application Prohibition Is Narrowly Tailored To Serve A Compelling State Interest. .................... 34

     A.      The Personalized Application Prohibition Does Not Serve a Compelling State Interest.................................................................. 35

     B.      The Personalized Application Prohibition is Not Narrowly Tailored. ................ 37

         1.      The Personalized Application Prohibition is Not Narrowly Tailored to Ease Election Administration.................................................................. 38

         2.      The Personalized Application Prohibition is Not Narrowly Tailored to Prevent Voter Fraud or Promote Voter Confidence.............. 40

3.      The Personalized Application Prohibition is Not Narrowly
        Tailored to Prevent Voter Confusion. ...................................................... 42

CONCLUSION .................................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*ACORN v. City of Tulsa, Okl.*,
  835 F.2d 735 (10th Cir. 1987) ................................................................. 23

*Adams v. Am. Guarantee & Liab. Ins. Co.*,
  233 F.3d 1242 (10th Cir. 2000) .............................................................. 19

*ALDF v. Kelly*,
  434 F. Supp. 3d 974 (D. Kan. 2020) ............................................... 29, 38

*ALDF v. Kelly*,
  9 F.4th 1219 (10th Cir. 2021) ........................................................ 22, 29

*Am. Ass'n of People with Disabilities v. Herrera*,
  690 F. Supp. 2d 1183 (D.N.M. 2010) .................................................... 24

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ................................................................................ 31

*Artes-Roy v. City of Aspen*,
  31 F.3d 958 (10th Cir. 1994) ................................................................. 38

*Ashcroft v. Am. C.L. Union*,
  542 U.S. 656 (2004) ................................................................................ 38

*Bethune-Hill v. Va. State Bd. of Elections*,
  137 S. Ct. 788 (2017) ....................................................................... 35, 36

*Bolger v. Youngs Drug Prod. Corp.*,
  463 U.S. 60 (1983) .................................................................................. 43

*Bones v. Honeywell Int'l, Inc.*,
  366 F.3d 869 (10th Cir. 2004) ............................................................... 19

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004) ............................................................. 35

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ................................................................................ 30

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) ....................................................... 38, 42

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ................................................................................ 33

*Brown v. Hartlage*,
  456 U.S. 45 (1982) ......................................................................................... 19

*Buckley v. Am. Const. L. Found., Inc.*,
  525 U.S. 182 (1999) ................................................................................. passim

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ........................................................................................... 37

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ....................................................................................... 31

*Chandler v. City of Arvada*,
  292 F.3d 1236 (10th Cir. 2002) ......................................................... 24, 25, 26

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S. Ct. 1464 (2022) .............................................................................. 28, 29

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
  447 U.S. 530 (1980) ....................................................................................... 43

*Democracy N.C. v. N.C. State Bd. of Elections*,
  476 F. Supp. 3d 158 (M.D. N.C. 2020) .......................................................... 24

*Doe v. Reed*,
  561 U.S. 186 (2010) ....................................................................................... 20

*Fish v. Kobach*
  304 F. Supp. 3d 1027 (D. Kan. 2018) ............................................................ 18

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ..................................................................... 32

*Grynberg v. Total*
  538 F.3d 1336 (10th Cir. 2008) ..................................................................... 18

*Harmon v. City of Norman, Oklahoma*,
  981 F.3d 1141 (10th Cir. 2020) ..................................................................... 33

*Healy v. James*,
  408 U.S. 169 (1972) ....................................................................................... 30

*iMatter Utah v. Njord*,
  774 F.3d 1258 (10th Cir. 2014) ..................................................................... 34

*Kusper v. Pontikes*,
  414 U.S. 51 (1973) ................................................................................... 30, 31

*League of Women Voters v. Hargett*,
   400 F. Supp. 3d 706 (M.D. Tenn. 2019) ............................................................... 22, 23, 24, 33

*Lichtenstein v. Hargett*,
   489 F. Supp. 3d 742 (M.D. Tenn. 2020) ................................................................................ 22

*Martin v. City of Struthers, Ohio*,
   319 U.S. 141 (1943) ............................................................................................................... 43

*McCraw v. City of Oklahoma City*,
   973 F.3d 1057 (10th Cir. 2020) ............................................................................................ 38

*McIntyre v. Ohio Election Comm'n*,
   514 U.S. 334 (1995) ................................................................................................... 23, 28, 32

*McLaughlin v. City of Lowell*,
   140 F. Supp. 3d 177 (D. Mass. 2015) ............................................................................ 35, 36

*Meyer v. Grant*,
   486 U.S. 414 (1988) ..................................................................................................... passim

*NAACP v. Button*,
   371 U.S. 415 (1963) ......................................................................................................... 29, 31

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ............................................................................................ 23

*Peck v. McCann*,
   43 F.4th 1116 (10th Cir. 2022) ...................................................................................... 28, 38

*Priorities USA v. Nessel*,
   462 F. Supp. 3d 792 (E.D. Mich. 2020) .............................................................................. 24

*Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*,
   847 F.2d 642 (10th Cir. 1988) ............................................................................................. 38

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ......................................................................................................... 28, 29

*Republican Party of Minnesota v. White*,
   536 U.S. 765 (2002) ............................................................................................................. 34

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ............................................................................................................. 20

*Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ............................................................................................................. 21

*SD Voice v. Noem*,
    432 F. Supp. 3d 991 (D.S.D. 2020) ........................................................................ 29

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................... 22

*Spence v. Washington*,
    418 U.S. 405 (1974) ............................................................................................... 23

*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986) ............................................................................................... 40

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989) ............................................................................................... 40

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................................................... 35

*United States v. Hernandez-Calvillo*,
    39 F.4th 1297 (10th Cir. 2022) .............................................................................. 34

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................................................... 33

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) ............................................................................. 37

*VoteAmerica v. Schwab*
    576 F. Supp. 3d 862 (D. Kan. 2021) ............................................................... passim

*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*,
    259 F.3d 1226 (10th Cir. 2001) ............................................................................. 18

*Yes On Term Limits, Inc. v. Savage*,
    550 F.3d 1023 (10th Cir. 2008) ....................................................................... passim

**Statutes**

52 U.S.C. § 20301 ........................................................................................................... 3

52 U.S.C. § 21083 ........................................................................................................... 2

Fed. R. Civ. P. 56 .......................................................................................................... 19

H.B. 2332 § 3(k) ...................................................................................................... 16, 17

H.B. 2332 § 3(k)(2), (m) ................................................................................................. 2

H.B. 2332 § 3(k)(5) ....................................................................................................... 28

H.B. 2332, Session of 2021 (Kan.) ............................................................................................. 2

K.A.R. § 7-36-7 ......................................................................................................................... 4

K.A.R. § 7-36-9 ......................................................................................................................... 4

K.S.A. § 21-6602 ...................................................................................................................... 17

K.S.A. § 21-6602(a)(3) ......................................................................................................... 27, 28

K.S.A. § 21-6602(b) .................................................................................................................. 28

K.S.A. § 25-1121 ....................................................................................................................... 2

K.S.A. § 25-1122 ............................................................................................................... passim

K.S.A. § 25-1122(k) .................................................................................................................. 29

K.S.A. § 25-1122(k)(2)-(5) ....................................................................................................... 27

K.S.A. § 25-1123 ..................................................................................................................... 3, 4

K.S.A. § 25-1124 ....................................................................................................................... 4

K.S.A. § 25-1131 ....................................................................................................................... 2

K.S.A. § 25-1220 ....................................................................................................................... 3

K.S.A. § 25-124 ......................................................................................................................... 2

K.S.A. § 25-2431 ................................................................................................................. 15, 42

## PRELIMINARY STATEMENT

This case presents a narrow question: can a prohibition on civic organizations distributing personalized vote-by-mail applications, the Personalized Application Prohibition, survive strict First Amendment scrutiny? The Court has already considered the central legal questions in the case and decided them in Plaintiff's favor. Plaintiff Voter Participation Center's communications containing a personalized application represents "election-related speech and associations" and "inherently expressive conduct." *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 875, 888 (D. Kan. 2021). And the Prohibition's abridgment of Plaintiff's protected speech "go[es] beyond the intersection between voting rights and election administration, and veer[s] into the area where the First Amendment has its fullest and most urgent application." *Id.* at 888 (citations and quotations omitted). The uncontroverted facts established during discovery only further reinforce that these legal conclusions continue to apply here.

Thus, the issue left to be resolved is whether the State can establish, through admissible evidence, that such an abridgment of First Amendment rights will survive strict scrutiny. On the developed record here, it remains the case that "[D]efendants have not shown that [the Prohibition] is narrowly tailored to alleviate" any of the asserted state interests. *Id.* at 891. And Defendants likewise fail to carry their burden to prove that any stated interests are real as opposed to merely conjectural or post-hoc rationalizations that cannot satisfy strict scrutiny. No genuine dispute of material fact remains to assist in answering this question. Based on the record, Defendants cannot sustain their asserted justifications for the Personalized Application Prohibition's infringement of Plaintiff VPC's core First Amendment rights. The law cannot withstand strict scrutiny and the Court should enter summary judgment in favor of Plaintiff.

## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

### I.   Advance Mail Voting in Kansas

1.     Defendant Kansas Secretary of State Scott Schwab does business in and is an elected official in the state of Kansas. *See* Stipulations, Pretrial Order, Dkt. No. 140 (Sept. 30, 2022) ("Stipulated Facts"), at § 2(a)(i).

2.     Defendant Schwab is the Chief Election Officer for the State of Kansas. *See id.* at §2(a)(ii).

3.     As the Chief Election Official for the State of Kansas, Defendant Schwab is responsible for overseeing all Kansas elections and administering the State's election laws and regulations. Defendant Schwab also issues guidance and instruction to county election officers on a range of election procedures and requirements. *See id.* at §2(a)(iii) (citing K.S.A. § 25-124).

4.     Kansas law permits Defendant Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. §§ 25-1131, 25-1121(a)-(b), 25-1122d(c); *see also* HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

5.     Defendant Schwab, as Kansas's Secretary of State, is responsible for maintaining an online voter registration database. 52 U.S.C. § 21083(a)(1)(A).

6.     The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS"). *See* Stipulated Facts at § 2(a)(xi).

7.     Election officials in Kansas's 105 counties are responsible for maintaining the voter files for voters within their respective counties and ELVIS reflects the voter data maintained by those county officials. *See id.* at §2(a)(xii).

8.      When a voter registration application is received by the respective county election office, they input that voter's registration information into the state's central database by hand and thereby create a voter record in ELVIS. *See id*. at § 2(a)(xiii).

9.      ELVIS is a dynamic system that reflects in real-time changes that are made to individual voter files. County election officials input information on voters, including the voters' registration and advance mail ballot information. *See id.* § 2(a)(xiv).

10.     To vote by mail in Kansas a voter must complete an advance voting ballot application and return it to the county election office in the county in which the voter is registered to vote. *See id*. at § 2(a)(xxx).

11.     If an advance voting ballot application has been timely submitted to the county election office, an individual working in such office processes the application and, if the county accepts the application, the county will mail the voter an advance ballot packet. *See id.* at § 2(a)(xxxi).

12.     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election. K.S.A. § 25-1122(f)(2).

13.     Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq.*, counties cannot transmit advance ballots to voters prior to the 20th day before the election for which an application has been received. K.S.A. §§ 25-1123(a), 25-1220.

14.     Ballots must be issued to advance voting voters within two business days of the receipt of the voter's application by the election office or the commencement of the 20-day period. K.S.A. § 25-1123(a).

15.     If an advance mail ballot application does not contain sufficient information, does not match the voter file, or if the information is illegible, the election office confirms the validity of the application before accepting it. K.A.R. § 7-36-7 and 7-36-9; K.S.A. §§ 25-1122(e), 25-1124; Declaration of Mark Johnson in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 14, 2022) ("Johnson Decl."),[1] Ex. 1, (Deposition of Connie Schmidt (Sept. 16, 2022) ("Schmidt Tr.")) 91:8-17, 93:9-13, 110:24-111:16; *id.* at Ex. 2, (Deposition of Deborah Jean Cox (Sept. 9, 2022) ("Cox Tr.")) 52:14-53:6, 56:22-57:11, 72:6-16; *id.* at Ex. 3, (Deposition of Jameson Shew (Sept. 15, 2022) ("Shew Tr.") 51:12-13; *id.* at Ex. 4, (Deposition of Andrew Howell (Sept. 14, 2022) ("Howell Tr.") 66:13-25, 77:12-78:17, 132:17-133:21, 138:5-11, 147:8-148:23; *id.* at Ex. 5, (30(b)(6) Deposition of the office of Kansas Secretary of State (May 24, 2022) ("KS SOS Tr.")), Ex. 9 (Kansas Election Standards on Election Administration) at KS000167VA.

16.     In such cases, county election office must attempt to contact the voter to obtain the correct information and cure the application. Johnson Decl., Ex. 1, (Schmidt Tr.) 130:14-131:22; *id.* at Ex. 2, (Cox Tr.) 69:12-21; *id.* at Ex. 3, (Shew Tr.) 40:6-14.

17.     If the voter cannot be contacted, or it would be impracticable to make contact before the election, the voter will be mailed a provisional ballot. K.A.R. § 7-36-7(f); Stipulated Facts at § 2(a)(xxxiv).

18.     Once an advance voting ballot application has been received and processed by the county election office, the fact and date of such processing is recorded in ELVIS. The office also documents in ELVIS the date on which it transmits the regular or provisional ballot to the voter. *See* Stipulated Facts at § 2(a)(xxxv).

---

[1] The Declaration of Mark Johnson is filed concurrently herewith.

## II.    VPC's Program and Speech

19.    Plaintiff Voter Participation Center is a 501(c)(3) nonprofit, nonpartisan organization founded in 2003. *See* Stipulated Facts at § 2(a)(vii); Johnson Decl., Ex. 6 (Deposition of Thomas Lopach (May 18, 2022) ("Lopach Tr.")) 57:25-58:1, 58:24-59:4; Declaration of Thomas Lopach in Support of Plaintiff Voter Participation Center's Motion to Dismiss (Oct. 13, 2022) ("Lopach Decl.")[2] ¶ 2.

20.    Plaintiff VPC's core mission is to promote voting among traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups. *See* Stipulated Facts at § 2(a)(viii); Johnson Decl., Ex. 7 (Deposition of Lionel Dripps (Aug. 30, 2022) ("Dripps Tr.")) 111:25-112:9; *id.* at Ex. 6, (Lopach Tr.) 153:12-16, 96:14-17, 204:3-6; *id.* at Ex. 8 (September 8, 2021 Hearing on Plaintiffs' Motion for Preliminary Injunction ("9/8/2021 PI Tr.")) 50:9-20 (Thomas Lopach testimony); Lopach Decl. ¶ 7-11, 28.

21.    VPC primarily encourages these voters to register and to participate in the electoral process through direct mailings. *See* Stipulated Facts at §2(a)(ix); Johnson Decl., Ex. 6 (Lopach Tr.) 146:24-147:15; Lopach Decl. ¶¶ 7, 13.

22.    Distributing advance ballot applications is a common part of civic engagement communications among partisan and nonpartisan actors alike. *See, e.g.*, Johnson Decl., Ex. 3 (Shew Tr.) 22:23-24:6; *id.* at Ex. 8  (9/8/2021 PI Tr.) 70:18-25 (Bryan Caskey testimony).

23.    VPC encourages registered Kansas to participate in this manner by mailing voters a package communication that advocates for mail voting and provides a personalized advance mail ballot application. *See* Stipulated Facts at §2(a)(x); Johnson Decl., Ex. 7 (Dripps Tr.) 124:14-125:2; Lopach Decl. ¶¶ 12, 17-18, 21, 23-24.

---

[2] The Declaration of Thomas Lopach is filed concurrently herewith.

24.     VPC considers providing young voters, voters of color, and unmarried women—who may have fewer resources for, and less access to, printing and postage—with the necessary personalized applications is key to effectively advocating its message.  Johnson Decl., Ex. 6 (Lopach Tr.) 185:25-186:3; *id.* at Ex. 8 (9/8/2021 PI Tr.) 59:23-60:20; Lopach Decl. ¶¶ 10, 21, 23, 28.

25.     Doing so provides the voter simple access to an advance mail ballot application that is personalized with required information from the voter file. Lopach Decl. ¶ 21.

26.     VPC believes that distributing personalized advance mail ballot applications as a part of its advance mail voting mailer conveys its viewpoint that voting by mail is convenient and a good option for the recipient to participate in democracy. Johnson Decl., Ex. 6 (Lopach Tr.) 149:11-13, 150:13-19, 151:14-16, 183:9-184:1, 185:21-186:3, 188:1-4*; id.* at Ex. 7 (Dripps Tr.) 192:5-13; *id.* at Ex. 8 (9/8/2021 PI Tr.) 44:24-45:7, 49:17-24 (Thomas Lopach testimony); Lopach Decl. ¶¶ 9, 23-24, 66.

27.     VPC is a data-driven operation. ███████████████████████████████ ███████████████████████████████████████. Johnson Decl., Ex. 7 (Dripps Tr.) 77:24-79:17, 116:3-18; *id.* at Ex. 6 (Lopach Tr.) 14:15-20:13, 33:2-35:3, 112:13-24, 116:17-117:12, 155:1-157:15, 165:1-166:9, 170:7-174:9.

28.     █████████████████████████████████████ ██████████████████████████████████████ ████████████████. Lopach Decl. ¶ 16; Johnson Decl., Ex. 6 (Lopach Tr.) 13:15-16:10; *id.* at Ex. 7 (Dripps Tr.) 159:20-160:16.

29.     VPC also personalizes its applications with prefilled information to make the application processing easier for election officials. Lopach Decl. ¶ 60.

30.     Kansas county election officials indicated their support for the benefits of prefilling for a mailer communication's effectiveness. Johnson Decl., Ex. 1 (Schmidt Tr.) 85:6-14 (noting that handwriting can be harder to read than typeface), 108:15-18; *id.* at Ex. 2 (Cox Tr.) 149:20-150:14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would prefer to personalize the applications sent to voters with their prefilled information. *Id.* at Ex. 3 (Shew Tr.) 24:15-20.

31.     In 2020, Johnson County sent applications for the primary and general elections to all voters in the county, opting to expend additional resources to personalize the applications and in fact prefilled *more* information than VPC's communications by also adding the voter's date of birth. *See id.* at Ex. 1 (Schmidt Tr.) 222:10-227:7, 234:23-236:20, 284:2-8; *id.* at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Ex. 10 (Schmidt Tr. Ex. 35) (2020 prefilled Johnson County advance mail ballot application mailer); *id.* at Ex. 11 (Schmidt Tr. Ex. 38) (same).

32.     Staff in the Johnson County Elections Office decided to "pre-fill as much of the [voter's] information from their registrant record as possible," *id.* at Ex. 12 (Schmidt Tr. Ex. 31) at 3 (Apr. 2, 2020 emails), believing that doing so "makes it easier for the voter and reduces mistakes that we then have to work harder to fix on the back end," *id.* at Ex. 9 (Schmidt Tr. Ex. 32) at 1 (Apr. 16, 2020 emails).

33.     VPC's mailer communications sent to Kansas voters also included a letter encouraging the voter to request and cast an advance ballot with instructions on how to do so, or if they choose, to opt out of future VPC communications; a step-by-step guide and other assistance for how voters may submit the included application; and a postage-paid envelope addressed to the voter's county election office. Lopach Decl., Ex. A (2020 VPC mailer) at VPC000001-005.

34.     The letter's opening paragraph specifically refers to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentions the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." *See id.* at VPC000002. The step-by-step guide was printed on the reverse side of the enclosed personalized advance ballot application. *Id.* at VPC000004.

35.     . Johnson Decl., Ex. 6 (Lopach Tr.) 91:4-92:18; Lopach Decl. ¶¶ 37-40. . *See* Lopach Decl. ¶¶ 18, 39; Johnson Decl., Ex. 6 (Lopach Tr.) 33:2-35:3, 92:13-25, 93:20-96:8; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20.

36.     . Johnson Decl., Ex. 6 (Lopach Tr.) 100:12-101:13; *id.* at Ex. 7 (Dripps Tr.) 123:13-21, 147:16-20; Lopach Decl. ¶ 39.

37.     VPC carefully designs this package of materials to convey to the recipient VPC's message that this particular Kansan should participate in the democratic process by mail voting, that voting by mail is easy, and that VPC's audience can act on this encouragement by returning the supplied advance mail ballot application that VPC has personalized. Lopach Decl. ¶¶ 11, 17-18, 22, 28-29;  Johnson Decl., Ex. 8 (9/8/2021 PI Tr.) 47:7-13.

38.     In 2018, VPC sent approximately 90,000 advance mail ballot application mailers to Kansas voters in a single wave of mailers. Lopach Decl. ¶ 35.

39.     Approximately 5,000 Kansans applied for an advance mail ballot in 2018 using a personalized application from VPC. Lopach Decl. ¶ 26.

40.     In 2020, VPC anticipated that the pandemic would result in many voters voting by mail for the first time. Johnson Decl., Ex. 7 (Dripps Tr.) 136:4-16; Lopach Decl. ¶ 33.

41.     VPC therefore increased the amount that it communicated with Kansas voters about advance mail voting in 2020 to five waves of mailers and sending nearly 1.2 million advance mail ballot application mailers to Kansas voters. Lopach Decl. ¶¶ 34-35.[3]

42.     An estimated 69,000 Kansas voters submitted an advance mail voting application provided by VPC to their county election official in the 2020 general election. Lopach Decl. ¶ 26. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Johnson Decl., Ex. 13 (Lopach Tr. Ex. 4) at VPC000133), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at Ex. 14 (Lopach Tr. Ex. 3) at VPC000135 (VPC's 2018 and 2020 unsubscribe lists).

43.     For the 2022 election, VPC sent one wave of advance mail voting mailers sent approximately 4 weeks apart. *Id.* at Ex. 7 (Dripps Tr.) 135:12-20; Lopach Decl. ¶¶ 47, 52.

---



[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Lopach Decl. ¶ 48. ▮▮▮▮. *Id.* ¶ 49. ▮▮▮▮▮▮▮▮. *Id.* ¶ 50.

44.     The 2022 mailers contain the same basic components as VPC's prior mailer communications, including personalized advance mail ballot applications. Lopach Decl. ¶ 17; *id.* at Ex. B at VPC000743-746 (2022 VPC mailer).

45.     VPC also sent a follow-up letter in September 2022 to remind voters that they have previously received a personalized advance mail ballot application and further encouraging the voter to return the application and vote by advance mail ballot. *Id.* at ¶ 52; Johnson Decl., Ex. 6 (Lopach Tr.) 30:3-10.

46.     Each year, VPC notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions regarding advance mail voting that VPC plans to distribute. *See* Johnson Decl., Ex. 15 (KS SOS Tr. Ex. 15) KS001922VA—2068VA (Apr. 19, 2018 email);[4] Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread);[5] Johnson Decl., Ex. 18 (Dripps Tr. Ex. 8) VPC000706-09 (July 28, 2022 emails); *id.* at Ex. 19 (Dripps Tr. Ex. 9) VPC000712-16 (Aug. 25, 2022 emails).

47.     In the 2020 election cycle, the Kansas Director of Elections confirmed to VPC in writing that its advance mail voting application form and instructions complied with Kansas law and with the forms that the Secretary of State's office uses. Johnson Decl., Ex. 16 (KS SOS Tr. Ex. 16) VPC000048—50 (June 22, 2020 to July 1, 2020 email thread).

48.     VPC understands that the Personalized Application Prohibition would prevent it from its most effective means of conveying its pro-mail voting message, and as such would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it

---

[4] *See* also Stipulated Facts at §§ 2(b)(viii) (stipulating to admissibility).
[5] *See* also Stipulated Facts at §§ 2(b)(ix) (stipulating to admissibility).

cannot speak in this manner. Lopach Decl. ¶¶ 55-66; *see also id.* ¶ 18 ("[p]ersonalizing the applications with prefilled information drawn from states' voter registration files best ensures that VPC's message and assistance are both effective and accurate"); Johnson Decl., Ex. 6 (Lopach Tr.) 150:14-19, 151:14-16, 185:21-186:3, 188:1-4; *Id.* at Ex. 8 (PI Hearing Tr.) 44:24-45:7, 49:17-24, 60:11-20 (Thomas Lopach testimony).

## III.   2020 Election

49.     The 2020 General Election in Kansas had record turnout (1,375,125 total votes cast, a 70.9% turnout rate) and had more votes cast than the 2018 General election (1,039,085 total votes cast, a 56.4% turnout rate) and the 2016 General Election (1,225,667 total votes cast, a 67.4% turnout rate). *See* Stipulated Facts at §2(a)(xxxvi).

50.     Conducting a high-turnout presidential election race held in the middle of a worldwide pandemic introduced many challenges for those tasked with administering it. *See* Johnson Decl., Ex. 1 (Schmidt Tr.) 155:7–156:20; *id.* at Ex. 2 (Cox Tr.) 98:25-100:13; *id.* at Ex. 4 (Howell Tr.) 49:2-25; *id.* at Ex. 3 (Shew Tr.) 85:5-24.

51.     It also presented new hurdles for voters who wanted to participate without jeopardizing the health of themselves or their loved ones. *Id.* at Ex. 1 (Schmidt Tr.) 149:4-150:6.

52.     As a result, there was a mass shift in the way voters voted in 2020, with a steep increase in advance mail voting; 459,229 Kansans voted by mail in the 2020 General Election as compared to 152,267 votes cast by mail during the 2018 General Election and 173,457 votes cast by mail in the 2016 General Election. *See* Stipulated Facts at § 2(a)(xxxvi); *see also* Johnson Decl., Ex. 17  (KS SOS Tr.) 274:19-22; *id.* at Ex. 1 (Schmidt Tr.) 74:21-24, 138:21-139:6, 149:4-150:6; *id.* at Ex. 2 (Cox Tr.) 98:25-100:13; *id.* at Ex. 4 (Howell Tr.) 240:9-241:10; *compare id.* at Ex. 3 (Shew Tr.) 84:3-12, 85:5-24.

53.     As the use of mail voting increased during the 2020 General Election, a national debate unfolded about the efficacy and security of mail voting as public figures both in Kansas and nationwide discouraged voters from voting by mail. *See, e.g.*, *id.* at Ex. 20 (Bryan Lowry & Sarah Ritter*, Despite Trump's attacks, Kansas voters request 2020 mail ballots at historic rate*, The Kansas City Star (May 29, 2020), https://www.kansascity.com/news/politics-government/article243052656.html).

54.     Given both the novel challenges of the 2020 election and the public debate concerning voters' confidence in mail voting, many organizations, campaigns, and elections offices, including Plaintiff VPC as well as Kansas election officials, sought to encourage voters to vote by mail. *Compare*, Lopach Decl. at Ex. A (2020 VPC mailer) *and* Johnson Decl., Ex. 21 (Schmidt Tr. Ex. 17) (May 18, 2020 emails); *see also* Johnson Decl., Ex. 1 (Schmidt Tr.) 287:4-14.

55.     Several Kansas counties sent mailers regarding the advance mail voting process, including advance mail ballot applications, to their registered voters. *See, e.g.*, Johnson Decl., Ex. 1 (Schmidt Tr.) 82:25-83:2; *id.* at Ex. 2 (Cox Tr.) 102:9-15; *id.* at Ex. 3 (Shew Tr.) 21:23-22:2.

56.     The Johnson County election office opted to send advance mail ballot applications that were prepopulated with the voter's data on the application form. *Id.* at Ex. 1 (Schmidt Tr.) 227:2-236:20, 240:12-243:12; 285:12-286:19; *see also id.* at Ex. 12 (Schmidt Tr. Ex. 31) (Apr. 3, 2020 emails); *id.* at Ex. 9 (Schmidt Tr. Ex. 32) (Apr. 16, 2020 emails); *id.* at Exs. 10 (Schmidt Tr. Ex. 35), 22 (Schmidt Tr. Ex. 36), 23 (Schmidt Tr. Ex. 37) and 11 (Schmidt Tr. Ex. 38) (redacted examples of Johnson County prefilled mailers from May 2020).

57.     Kansas election officials engaged in this and other outreach efforts especially because many Kansans were voting by advance mail ballot for the first time in 2020 and had

questions about the process. *See*, *e.g.*, *id.* at Ex. 1 (Schmidt Tr.) 241:2-4 ("Again, these are reminders because a lot of our voters, in 2020, during COVID, have never dealt with voting by mail before."), 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post); *id.* at Ex. 2 (Cox Tr.) 91:18-24, 107:9-15, 146:3-147:19.

58.     When incomplete or inaccurate applications were submitted, county election officials attempted to help voters cure them regardless of whether the voter had used a blank form or a form pre-populated with personalized information and without incurring a particular burden from those that were prefilled.  *Id.* at Ex. 1 (Schmidt Tr.) 84:18-85:20, 86:22-87:5, 134:6-22, 135:25-136:13, 294:2-13; *id.* at Ex. 2 (Cox Tr.) 67:9-68:1; 89:3-90:5; *id.* at Ex. 4 (Howell Tr.) 245:13-246:16, 252:11-23; *id.* at Ex. 17 (KS SOS Tr.) 250:18-252:6.

59.     During the 2020 election cycle, many voters who had concerns about lost advance mail ballot applications or mail delays called their respective election office to inquire about the status of their application. *Id.* at Ex. 1 (Schmidt Tr.) 195:1-196:8, 293:13-18; *see also id.* at Ex. 2 (Cox Tr.) 73:25-74:5, 100:14-101:1.

60.     Others chose to re-submit their application out of an abundance of caution. *Id.* at Ex. 1 (Schmidt Tr.) 120:12-24; *id.* at Ex. 2 (Cox Tr.) 100:14-101:1. In some cases this resulted in duplicative advance mail ballot applications being received in county election offices. *Id.* at Ex. 1 (Schmidt Tr.) 309:1-6 ("The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications."), 288:3-12, 293:7-294:13, 308:8-11, 309:1-6; *Id.* at Ex. 17 (KS SOS Tr.) 150:13-19 (testifying to conversations about duplicate applications that election offices received in the 2020 election); *id.* at Ex. 2 (Cox Tr.) 91:13-17; 100:19-101:1; *id.* at Ex. 3 (Shew Tr.) 73:13-74:7.

61.     Other voters' concerns of mail delays were grounded in experience. *See, e.g.*, *id.* at Ex. 1 (Schmidt Tr.) 195:1-197:21, 201:7-12, 211:24-212:8, 293:13-294:1; *id.* at Ex. 25 (Schmidt Tr. Ex. 25) (July 22, 2020 Johnson County Election Office Facebook post); *id.* at Ex. 26 (Schmidt Tr. Ex. 26) (July 24, 2020 emails); *id.* at Ex. 27 (Schmidt Tr. Ex. 27) (Apr. 11, 2020 emails).

62.     When voters called their election offices about advance mail ballot applications received in the mail, officials instructed voters that the application forms were legitimate and that the voters could complete and submit those applications if they chose to do so. *See, e.g.*, *id.* at Ex. 1 (Schmidt Tr.) 297:25-298:8; *id.* at Ex. 24 (Schmidt Tr. Ex. 43) (Johnson County FAQ and Facebook post).

63.     Voters who expressed a desire to not do so, election officials informed the voter that the applications could be discarded. *See id.* at Ex. 1 (Schmidt Tr.) 294:20-295:1; *id.* at Ex. 2 (Cox Tr.) 139:20-140:3.

64.     The 2020 General Election nevertheless saw high turnout throughout Kansas and state and local Kansas election officials deemed it a successful election. *Id.* at Ex. 17 (KS SOS Tr.) 274:5-22, 282:8-9; *id.* at Ex. 1 (Schmidt Tr.) 167:10-168:11; *id.* at Ex. 28 (Schmidt Tr. Ex. 15) (Aug. 5, 2020 letter); *id.* at Ex. 29 (Schmidt Tr. Ex. 23) (Johnson County Board of Canvassers report); *id.* at Ex. 30, Press Release, Kansas Att'y Gen., *AG Derek Schmidt: Kansas asks U.S. Supreme Court to hear Texas election lawsuit* (Dec. 9, 2020), https://ag.ks.gov/media-center/news-releases/2020/12/09/ag-derek-schmidt-kansas-asks-u.s.-supreme-court-to-hear-texas-election-lawsuit, (quoting Defendant Schmidt that "Kansas ran its elections honestly and by the rules…."); *id.* at Ex. 31, Russel Falcon, *Zero evidence of voter fraud in any state, including Kansas officials report to NYT*, KSNT (Nov. 11, 2020), https://www.ksnt.com/news/kansas/zero-evidence-of-voter-fraud-in-any-state-including-kansas-officials-report-to-nyt, (quoting Defendant

Schwab that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems. . . .").

65.     The advance mail voting process includes multiple safeguards against fraud, *id.* at Ex. 1 (Schmidt Tr.) 64:3-20, 124:9-25, 212:25-216:9; *id.* at Ex. 2 (Cox Tr.) 58:5-8; *id.* at Ex. 4 (Howell Tr.) 42:9-23, 113:4-19, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431.

66.     The 2020 post-election audit produced no evidence that voter fraud was a concern in Kansas. Johnson Decl., Ex. 17 (KS SOS Tr.) 282:25-283:13; *id.* at Ex. 1 (Schmidt Tr. 212:25-213:22, 292:1-5; *id.* at Ex. 2 (Cox Tr.) 105:5-106:9; *id.* at Ex. 4 (Howell Tr.) 42:9-23.

**IV.     Passage of HB 2332**

67.     On February 10, 2021, the Kansas Legislature introduced HB 2332, which, among other things, sought to tightly restrict the distribution of advance ballot applications to potential Kansas voters. *See* Stipulated Facts at § 2(a)(xvii).

68.     On March 17, 2021, the Kansas Secretary of State's Office submitted written testimony on HB 2332 that did not include any discussion of prefilled advance mail ballot applications. Stipulated Facts at § 2(b)(x); *see also* Johnson Decl., Ex. 32 (KS SOS Tr. Ex. 17) *id.* at Ex. 17 (KS SOS Tr.) 295:21-297:7.

69.     The Office's official position was "neutral." *Id.*

70.     On May 3, 2021, the Legislature enacted HB 2332 over the Governor's veto. *See* Stipulated Facts at § 2(a)(xxi); Johnson Decl., Ex. 33 (Schmidt Tr. Ex. 4) (Governor Kelly's veto letter).

71.     Plaintiffs challenged two of HB 2332's provisions, but only one—the Personalized Application Prohibition—is still at issue in this lawsuit. *See* Stipulated Facts at § 2(a)(xxviii).

72.     HB 2332's Personalized Application Prohibition bans any person or organization from mailing registered Kansas voters a personalized advance mail voting application that is prefilled with any information, such as a voter's name and address. *See* H.B. 2332 § 3(k)(2) (codified at K.S.A. § 25-1122(k)(2)) ("No portion of such [advance mail voting application] shall be completed prior to mailing such application to the registered voter.").

73.     This prohibition applies to "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing," even if the prefilled information is derived from the State's publicly available voter registration file. *Id.*[6]

74.     A violation of the Personalized Application Prohibition is a class C nonperson misdemeanor, which contains no scienter requirement and is punishable by up to one month in jail and/or fines. *Id.* § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b).

75.     HB 2332 carves out limited and narrow exceptions to the Personalized Application Prohibition by permitting a subset of state and county election officials to mail prefilled advance mail voting applications. *Id.* § 3(k)(4).

76.     In defense of the Personalized Application Prohibition the State has asserted interests such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. Johnson Decl., Ex. 34 (Defendant Schwab's Responses and Objections to Plaintiff's First Interrogatories) at 3-4.

---

[6] The Parties' February 2022 Stipulated Agreement states that the prohibition does not apply when a voter requests an application, fills it out online, and is mailed the filled version for signature and submission.

77.     These rationales for the Personalized Application Prohibition are not a part of the Legislative Record for HB 2332. *See* Kansas House Bill 2332 (2021), Legislative Record, http://kslegislature.org/li/b2021_22/measures/hb2332/ (last accessed Oct. 14, 2022).

## PROCEDURAL HISTORY

On June 2, 2021, Plaintiffs Voter Participation Center ("VPC" or "Plaintiff") and VoteAmerica (collectively, "Plaintiffs") filed this action against Scott Schwab, in his official capacity as Secretary of State of the State of Kansas; Derek Schmidt, in his official capacity as Attorney General of the State of Kansas; and Stephen M. Howe, in his official capacity as District Attorney of Johnson County (collectively, "Defendants"). ECF No. 1.

Plaintiffs' complaint alleges that Defendants' enforcement of the challenged HB 2332 provisions would violate their rights under the First and Fourteenth Amendments to the U.S. Constitution, and, as to Out-of-State Distributor Ban only, the Commerce Clause of the U.S. Constitution, and seeks declaratory and injunctive relief, attorneys' fees, and costs. *Id.* at ¶¶ 76-125.

On July 8, 2021, Plaintiffs filed a motion for preliminary injunction. ECF No. 24. On July 9, 2021, Defendants filed a motion to dismiss for failure to state a claim and for lack of jurisdiction. ECF No. 26. On August 27, 2021, the Court rejected the jurisdictional arguments that Defendants advanced in their motion to dismiss, finding that "Defendants' arguments with regard to jurisdiction are without merit under well established, long-standing principles of law" and holding that the action "is not subject to dismissal for lack of subject matter jurisdiction." ECF No. 42.

On September 8, 2021, the Court held an evidentiary hearing on Plaintiffs' motion for preliminary injunction, ECF No. 43, and on October 8, 2021, the Court heard oral argument on the motion, ECF No. 48. On November 19, 2021, the Court rejected the remainder of Defendants' motion to dismiss and granted Plaintiffs' motion for preliminary injunction, enjoining the

enforcement of the Personalized Application Prohibition and the Out-of-State Distributor Ban until the conclusion of the case. ECF No. 50.

By a stipulated order, on February 25, 2022, the Court permanently enjoined Defendants from enforcing the Out-of-State Distributor Ban, finding that the ban violated the First and Fourteenth Amendments, both facially and as applied to Plaintiffs, and dismissing Plaintiffs' claim under the Dormant Commerce Clause as moot. ECF No. 73 at 3.[7] The Court also entered the parties' stipulated agreement that the Personalized Application Ban does not apply to persons who mail or cause to be mailed an advance mail ballot application with any portion completed at the request of the registered voter. *Id.* at 2-3. The only remaining issue is the lawfulness of all other applications of the Personalized Application Ban. Discovery closed on September 14, 2022, and a bench trial is currently set for May 1, 2023. ECF No. 115.

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences from the evidence most favorably to the non-movant, "the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law." *Fish v. Kobach*, 304 F. Supp. 3d 1027, 1031-32 (D. Kan. 2018) (citing Fed. R. Civ. P. 56(a)); *accord Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

A fact is material only if it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). The material fact "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.

---

[7] The parties stipulated that the Personalized Application Prohibition does not cover Plaintiff VoteAmerica's conduct because Plaintiff VoteAmerica mails personalized advance voting ballot applications to voters who have requested them via its interactive website. Thus, Plaintiff VoteAmerica has not participated in any discovery in this case.

2000); *see also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). VPC seeks summary judgment because nothing in the record here, even construed in favor of Defendants, constitutes a genuine issue of material fact "such that a reasonable jury could return a verdict for the non-moving party." *Bones*, 366 F.3d at 875.

## ARGUMENT

The Personalized Application Prohibition abridges Plaintiff VPC's core political speech and associational rights without any compelling or sufficiently tailored justification. In an area where free speech rights are most robust, the State has passed a categorical ban that is divorced from evidence or facts and criminally prohibits Plaintiff's most effective means of advocating its pro-advance mail voting message. The ways in which the Prohibition violates Plaintiff's First Amendment rights are numerous, while evidence supporting the State's asserted interests in the law is lacking. The Personalized Application Prohibition fails strict scrutiny, and the Court should enter summary judgment in favor of Plaintiff.

I. **The Undisputed Facts Demonstrate That Plaintiff's Mailing of Personalized Ballot Applications Constitutes Protected First Amendment Speech, Conduct, and Association.**

Speech concerning the electoral process is interpreted broadly and given utmost protection because "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs[,]" which "of course includes … all such matters relating to political processes." *Brown v. Hartlage*, 456 U.S. 45, 52–53 (1982) (citation omitted). Because the First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (citation omitted), it requires vigilant application "to guard against undue

hindrances to political conversations and the exchange of ideas," *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191-92 (1999).[8]

Accordingly, Plaintiff VPC's communications advocating for advance mail voting and supplying a personalized application for Kansans to vote by mail is protected political speech, expressive conduct, and associational activity. In granting Plaintiffs' motion for a preliminary injunction and denying Defendants' motion to dismiss, this Court held that VPC had sufficiently alleged that the Personalized Application Prohibition violates VPC's right to engage in protected speech, expressive conduct, and free association under the First Amendment. *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 886 (D. Kan. 2021). In so doing, the Court rejected Defendants' argument that the First Amendment does not apply to VPC's mailing of personalized ballot applications. *Id.* at 875 (concluding that the "application packets include speech that communicates a pro-mail voting message" that "mailing the application packets is inherently expressive conduct that the First Amendment embraces"). Because the undisputed evidence establishes VPC's factual allegations, this Court should hold that VPC's mailing of personalized advance mail ballot applications implicates those First Amendment protections.

First, VPC's distribution of personalized advance mail ballot applications is "communication among private parties who are advocating for particular change—more voting by mail, especially in under-represented populations." *Id.* at 888. Plaintiffs' speech "involve[s] . . . the expression of a desire for political change," "communication of information" to encourage and

---

[8] Robust protections for election-related speech also serves a structural role in promoting self-government. *See, e.g.*, *Doe v. Reed*, 561 U.S. 186, 195 (2010) (Having "cho[sen] to tap the energy and the legitimizing power of the democratic process," the State "must accord the participants in that process the First Amendment rights that attach to their roles"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J., concurring) ("[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government.")

assist voters, and "dissemination and propagation of views and ideas" about the electoral process. *Meyer*, 486 U.S. at 421, 422 & n.5 (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). Plaintiff's message "involves both the expression of a desire for [an engaged electorate] and a discussion of the merits of [absentee voting]." *Id.* at 421. Plaintiff promotes the benefits of mail voting to reach its desired political change: a broadened electorate that includes traditionally underserved voters, not just those who can easily vote in-person or have the resources and time to independently navigate the mail-voting process. *See* SOF ¶¶ 20, 24. In the debate of whether to trust or distrust mail voting, Plaintiffs advise trust and encourage Kansans to use this safe and convenient method. *See* SOF ¶¶ 26, 37.  To persuade voters to turn Plaintiff's encouragement into action, VPC creates and disseminates communications that provide the necessary information, instruction, and resources for voters to apply for an advance mail ballot. *See* SOF ¶¶ 21-23. This is core political speech. *Meyer*, 486 U.S. at 422.

VPC's distribution of personalized advance mail voting applications specifically is protected speech in numerous ways. Distributing personalized applications encourages and facilitates Plaintiff's pro-mail voting message and is "characteristically intertwined" with expressing it. *Schaumburg*, 444 U.S. at 632. The personalized application is an integral component of the entire communication that, as a package, conveys VPC's pro-voting message. *See* SOF ¶¶ 23-29.  Defendants' attempt to disaggregate VPC's communication, urging it to merely send a letter with or without a blank application, would undermine the blanket First Amendment protections of core political speech here. The Court should reject Defendants' narrow view of the First Amendment that "would countenance slicing and dicing the activities involved in the plaintiffs'" speech, "both because doing so would allow the government to burden the protected [speech] indirectly and because the entire [pro-mail voting] activity implicates the freedom of the

plaintiffs to associate with others for the advancement of common beliefs that is protected by the First and Fourteenth Amendments." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (citations, quotations, and internal alterations omitted). And it violates Plaintiff's "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing," *Meyer*, 486 U.S. at 424, as discussed *infra* Part II.A.

VPC's personalization of the advance mail voting applications is also speech in and of itself. "[T]he creation and dissemination of information are speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *accord ALDF v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021). As this Court recognized in distinguishing *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742 (M.D. Tenn. 2020), a case involving the distribution of blank applications, that decision was "not germane" in part because "distributing personalized ballot applications" instead "include[s] speech that communicates a pro-mail voting message." *VoteAmerica*, 576 F. Supp. 3d at 874-75. VPC's personalization of its communications is speech in the literal sense—words on a page. However, this personalization is also critical to how VPC expresses its pro-mail voting message in its mailers. *See* SOF ¶¶ 23-29. Unlike anonymous mass mailings, VPC uses the personalized applications to convey its belief that the *particular voter* to whom VPC sent its mailer should apply for an advance mail ballot and participate in the democratic process. *See* SOF ¶ 28. The personalization expresses to that specific voter that voting by mail will be convenient and accessible *for them*, creating a seamless path for that voter to act on VPC's persuasion.

*Second*, sending personalized applications is expressive conduct. As the Court recognized, VPC's personalized mailers "communicate[] a pro-mail voting message" that "is inherently expressive conduct that the First Amendment embraces." *VoteAmerica*, 576 F. Supp. 3d at 875. "Conduct that is intended and reasonably perceived to convey a message falls within the free

speech guarantee of the first amendment." *ACORN v. City of Tulsa, Okl.*, 835 F.2d 735, 742 (10th Cir. 1987). The question is "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022) (citation omitted). The "nature of [the] activity, combined with the factual context and environment in which it [is] undertaken," demonstrates that the "activity [is] sufficiently imbued with elements of communication" to be expressive conduct. *Spence v. Washington*, 418 U.S. 405, 409-10 (1974). The expressive nature is beyond doubt where, as here, conduct is "intertwined with speech and association." *League of Women Voters of Tenn.*, 400 F. Supp. 3d at 720. A personalized application is a critical component of a VPC's mailer, which is a single, unified package of speech.

Further, VPC's distribution of a personalized application is expressive conduct because both the political moment and the surrounding context of the mailer make clear that it is imbued with expressive elements. VPC intends to convey a pro-mail voting message in personalizing its applications. *See* SOF ¶¶ 23-29. And a reasonable recipient would interpret "some sort of message" in receiving VPC's mailer, *NetChoice*, 34 F.4th at 1212, evidenced by over 69,000 Kansans acting on VPC's mailer to submit an application in 2020. *See* SOF ¶¶ 42. Indeed, in taking sides on the national debate about mail voting, VPC adopts a strong stance in favor—the only stance that would lend itself to sending a personalized application. VPC's speech and conduct "advoca[ting for] a politically controversial viewpoint" is "the essence of First Amendment expression." *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 347 (1995).

*Third*, VPC's distribution of personalized applications is also protected associational activity. As the Court ruled, "[a]n organization's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of

association." *VoteAmerica*, 576 F. Supp. 3d at 875 (citation and quotations omitted). This includes "[p]ublic endeavors which assist people," "are intended to convey a message that voting is important," and which expend resources "to broaden the electorate to include allegedly under-served communities" *Id.* (citation omitted). VPC engages in such associational endeavors. *See* SOF ¶¶ 20, 24.

Finally, numerous courts have recognized that materially indistinguishable activity advocating for mail voting or increased voter registration represents protected speech, conduct, or associational activity. *See, e.g.*, *League of Women Voters of Tenn.*, 400 F. Supp. 3d at 720; *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 224 (M.D. N.C. 2020); *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202, 1215-16 (D.N.M. 2010). And multiple binding decisions in the petition circulator context have recognized broad First Amendment protections for civic organizations' speech encouraging voters' engagement in the political process. *See Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 186, 192; *Chandler*, 292 F.3d at 1241; *Yes On Term Limits*, 550 F.3d at 1028. In short, finding that Plaintiff's activities are protected speech—as this Court did at the preliminary injunction stage—is grounded in numerous First Amendment doctrines and persuasive and binding authorities recognizing speech rights in the same or analogous contexts. Because the undisputed evidence establishes VPC's factual allegations, this Court should again hold that the First Amendment protects VPC's speech, expressive conduct, and free association.

## II. The Undisputed Facts Establish That The Personalized Application Prohibition is Subject to Strict Scrutiny.

The Personalized Application Prohibition infringes VPC's First Amendment rights in numerous respects that make it subject to strict scrutiny. Indeed, this Court previously applied

strict scrutiny in considering the Personalized Application Prohibition because, on the facts before the Court on Plaintiffs' motion for preliminary injunction, this Court found that the Personalized Application Prohibition, in effect, limits "the overall quantum of speech available," "involves direct regulation of communication among private parties who are advocating for particular change," and "significantly inhibits communicating with voters about proposed political change and eliminates voting advocacy by plaintiffs . . . based on the content of their message." *VoteAmerica*, 576 F. Supp. 3d at 888 (internal quotations omitted). The undisputed facts further establish that no genuine factual disputes exist with respect to these findings. Rather, they demonstrate that the Personalized Application Prohibition (i) abridges Plaintiff's core political speech by proscribing VPC's most effective means of conveying its pro-advance mail voting message and reducing the overall quantum of speech delivering that message; (ii) is content- and viewpoint-based discrimination because it regulates only pro-advance mail voting communications; (iii) limits Plaintiff's associational activity; and (iv) is unconstitutionally overbroad. For any of these independently sufficient reasons, the Court should again apply strict scrutiny and grant summary judgment for Plaintiff.

A.   **The Personalized Application Prohibition Infringes Plaintiff's Core Political Speech Under *Meyer-Buckley*.**

The Personalized Application Prohibition unconstitutionally abridges Plaintiff's core political speech. As explained *supra* Part I, VPC's mailer communications with personalized applications constitute protected speech and conduct taking a stance favoring more voting by mail, especially by underserved voting groups. Under the *Meyer-Buckley* standard, this is "core political speech" for which First Amendment protection is "at its zenith." *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002) (quoting *Meyer*, 486 U.S. at 425).

The Personalized Application Prohibition abridges Plaintiff's core political speech under *Meyer-Buckley* in two independently sufficient ways: (1) it eliminates what Plaintiff VPC believes is the "most effective means" of communicating its message, *id.* at 1244 (quoting *Meyer*, 486 U.S. at 424); and (2) it "restricts the overall quantum of speech available to the election or voting process." *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008).

First, the Personalized Application Prohibition criminally prohibits what Plaintiff believes is the most effective means of conveying its pro-advance mail voting message: distributing mailers including personalized applications. "The First Amendment protects [VPC's] right, 'not only to advocate their cause but also to select what they believe to be the most effective means for so doing.'" *Chandler*, 292 F.3d at 1244 (quoting *Meyer*, 486 U.S. at 424)). VPC believes that "[p]ersonalizing the applications with prefilled information best ensures that VPC's message and assistance are both effective and accurate." SOF ¶ 48 (Lopach declaration, Lopach deposition); *see also* SOF ¶ 28. VPC has consistently attested to this belief that personalizing applications effectively advocates its pro-advance mail ballot message, both by connecting with and convincing the voter recipient to engage with VPC's communication. SOF ¶ 26. HB 2332 directly regulates civic organizations' most effective method of conveying their pro-advance mail voting method by making the practice not just prohibited but a criminal offense punishable by jailtime. K.S.A. §§ 25-1122(k)(2)-(5), 21-6602(a)(3).

Second, the Personalized Application Prohibition threatens to "limit[] the quantum of this speech" concerning advance mail voting by eliminating one form of VPC's expression of its message and disincentivizing VPC from speaking on the issue in Kansas at all. *Yes On Term Limits*, 550 F.3d at 1028. As the Court stated, the prohibition "involves direct regulation of communication among private parties who are advocating for particular change—more voting by mail, especially

in under-represented populations." *VoteAmerica*, 576 F. Supp. 3d at 888. Such regulation "will *have the inevitable effect* of reducing the total quantum of speech on an important public issue." *Id.* at 889 (emphasis added). It does so by "limit[ing] the number of voices advocating for the politically controversial topic of voting by mail, limit[ing] the audience which proponents can reach and mak[ing] it less likely that proponents will gather the necessary support to continue sharing their message." *Id.* VPC's personalization of the application is itself speech—integrally intertwined with its overall pro-advance mail voting message—and the Personalized Application Prohibition makes that expression a criminal offense. SOF ¶¶ 26, 28, 74; H.B. 2332 § 3(k)(5); K.S.A. §§ 21-6602(a)(3), (b). And by taking away VPC's most effective means of conveying its message, the Personalized Application Prohibition would make VPC reconsider its resource allocation decision to convey its communications in Kansas if it cannot speak in this manner. SOF ¶ 48. The provision "regulate[s] First Amendment-protected activity in ways that are not merely incidental; in effect, [it] limit[s] 'the overall quantum of speech available.'" *VoteAmerica*, 576 F. Supp. 3d at 888 (citation omitted).

In sum, the Personalized Application Prohibition abridges Plaintiffs' core political speech by limiting what Plaintiff's believe is a most effective means of conveying its message and reducing the overall quantum of speech. Such speech restrictions are subject to strict scrutiny. *Yes On Term Limits*, 550 F.3d at 1028.

**B.    The Personalized Application Prohibition is Content- and Viewpoint-based Discrimination of Plaintiff's Speech.**

The Personalized Application Prohibition is also subject to strict scrutiny because it indisputably targets and infringes Plaintiff's speech based on its content and the viewpoint VPC expresses. Facially "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves

that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A restriction is content-based and warrants strict scrutiny if it "applies to particular speech because of the topic discussed or the idea or message expressed," *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. at 163), or if it defines the "category of covered documents . . . by their content," *McIntyre*, 514 U.S. at 345.

This Court previously concluded "HB 2332 significantly inhibits communication with voters about proposed political change," including "based on the content of their message[.]" *VoteAmerica*, 576 F. Supp. 3d at 888, and Defendants cannot reasonably dispute this finding based on the record. Indeed, the provision "targets and prohibits speech based on its content"— personalized information on advance mail ballot applications. *Peck v. McCann*, 43 F.4th 1116, 1134–35 (10th Cir. 2022). It then "single[s] out [this] topic or subject matter for differential treatment," *City of Austin*, 142 S. Ct. at 1472, by proscribing the content that may appear on Plaintiff's communications. K.S.A. § 25-1122(k)(2). The provision also defines the speech regulation based on the category of covered documents: "The application for an advance voting ballot included" in a communication that "solicits by mail a registered voter to file an application." *Id.* § 25-1122(k)(1)-(2). This prohibition does not apply to any other types of communications, including those involving voter registration. *See, e.g.*, *McIntyre*, 514 U.S. at 345 (holding that a restriction only on publications designed to influence voters in an election discriminated based on content because the document's content defined the law's coverage); *Buckley*, 525 U.S. at 209 (Thomas, J., concurring) (reasoning that restrictions on initiative petitions but not candidate petitions were content-based). Thus, the provision is content-based discrimination because it singles out Plaintiff's communications based on VPC's personalization of its applications to

advocate for mail voting. Such regulations that "target speech based on its communicative content" are "presumptively invalid." *ALDF v. Kelly*, 434 F. Supp. 3d 974, 997 (D. Kan. 2020) (Vratil, J.) (citations omitted), *aff'd*, 9 F.4th 1219 (10th Cir. 2021).

The Personalized Application Prohibition is also viewpoint discrimination. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *City of Austin*, 142 S. Ct. at 1472. But "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *ALDF*, 9 F.4th at 1229 (quoting *Reed*, 576 U.S. at 168). The Personalized Application Prohibition is viewpoint discrimination because only communications *advocating* advance mail voting would include a personalized application. Thus, Personalized Application Prohibition imposes no limit on communications taking a position *against* mail voting because that contrary message would, by default, not include a personalized application. *See, e.g.*, *SD Voice v. Noem*, 432 F. Supp. 3d 991, 996 (D.S.D. 2020) (finding a law viewpoint discriminatory because it "specifically applies a burden to the speech of those who 'solicit' others to sign ballot measure petitions, but not those who solicit them not to do so"). Such content- and viewpoint-based speech restrictions are subject to strict scrutiny and are "presumptively unconstitutional." *Reed*, 576 U.S. at 163-64.

### C.    The Personalized Application Prohibition Infringes Associational Rights.

Finally, the Personalized Application Prohibition is subject to strict scrutiny because interferes with VPC's associational rights. As this Court has acknowledge, "[t]he right to associate to advance beliefs and ideas is at the heart of the First Amendment." *VoteAmerica*, 576 F. Supp. 3d at 875 (citing *NAACP v. Button*, 371 U.S. 415, 430 (1963)). This "freedom of association encompasses not only the right to associate with others but also the right to choose how one

associates with others." *Id.* at 875 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000)). And Plaintiff's associational rights are "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" on their "means of communicating" to further their associations. *Healy v. James*, 408 U.S. 169, 181-83 (1972). Accordingly, a restriction is unconstitutional even if it does not "deprive those in the [plaintiff's] position of all opportunities to associate." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).

Here, the Personalized Application Prohibition interferes with VPC's associational rights by limiting its ability to associate with Kansans to persuade them to vote by mail and assist them with requesting an advance mail ballot. Moreover, the Personalized Application Prohibition forecloses VPC from using the assistance it offers its intended population of underrepresented voters to gain a foothold for future electoral engagement with those voters. VPC personalizes its communications to encourage specific voters to act on its advocacy and to make the application processing easier for election officials. SOF ¶¶ 26, 28, 30-32, 37 But VPC also personalizes its communications because it has carefully identified *these specific voters* as individuals with whom VPC wants to band together to increase electoral participation, tout the security and convenience advantages of mail voting, and provide inroads for future engagement on electoral issues. SOF ¶¶ 28, 37. VPC tracks which recipients are responsive to its communications and methodically tests its messaging to ensure that it is effectively reaching its specific identified audience and building a relationship with those voters to create a more inclusive electorate. *See* SOF ¶ 27. VPC also sends a follow-up letter to voter recipients that references its prior communications and continues to associate with voters throughout the voting process. SOF ¶ 45. ███████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████. SOF ¶ 42 (Lopach declaration and Dripps deposition).

VPC's associational activities are a modern analogy to the protected activity in *NAACP v. Button*. There, the Supreme Court blocked a law that restricted NAACP's associational activity informing and soliciting clients for litigation. *Button*, 371 U.S. at 421, 434. The law violated NAACP's First Amendment rights because it prevented them from associating to persuade others to action and using those associations to build relationships and bring litigation, their chosen "means for achieving" its desired change. *Id*. at 429-31; *see also id.* at 437 (ruling that "advocating lawful means of vindicating legal rights" through signing up as a plaintiff in litigation is protected associational activity). Similarly here, VPC uses prefilled applications as its chosen means of affecting change: persuading its audience to take action by requesting a mail ballot. VPC relies on the effectiveness of its personalized communications, and the ease with which voters can act on VPC's persuasion, to build relationships to increase mail voting in Kansas. As in *Button*, the restrictions on VPC's activity abridges its ability "to engage in association for the advancement of beliefs and ideas" to "persuade [their audience] to action." *Id*. at 430, 437. Such encroachment warrants strict scrutiny. *Id.* at 438; *Kusper*, 414 U.S. at 59.

### D. The *Anderson-Burdick* Framework is the Improper Analysis to Apply, But Nevertheless Requires Strict Scrutiny.

The balancing and sliding scale scrutiny standard developed under the *Anderson-Burdick* framework[9] is not applicable to Plaintiff's advocacy to Kansans to encourage vote by mail. This is because "some laws which govern elections, particularly election-related speech and

---

[9] Under *Anderson-Burdick*, courts are permitted to apply lesser scrutiny to laws that are (1) "nondiscriminatory" and (2) impose insubstantial restrictions on the right of "access to the ballot." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *accord Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). For the reasons described *supra*, the Personalized Application Prohibition is neither nondiscriminatory nor a regulation of voters' or candidates' right of ballot access.

associations, go beyond the intersection between voting rights and election administration, and veer into the area where the First Amendment has its fullest and most urgent application." *VoteAmerica*, 576 F. Supp. 3d at 888 (citations and quotations omitted). As such, "[t]he Supreme Court has declined to apply *Anderson-Burdick* to cases which govern election-related speech rather than the 'mechanics of the electoral process.'" *Id.* at 887 (quoting *McIntyre*, 514 U.S. at 345).

As this Court has previously concluded, HB 2332 goes beyond time, place, and manner restrictions on election administration and the State's authority to regulate election processes. *Id.* at 888. The Personalized Application Prohibition impacts speech in a way that is not minimal or incidental: it makes it more difficult to engage in VPC's chosen mode of communication, involves direct regulation of communication among private parties who are advocating for more voting by mail in under-represented populations, and significantly inhibits VPC's communication with voters about proposed political change based on the content of its message. This limitation on political expression is subject to strict scrutiny.

Even if *Anderson-Burdick* were an appropriate analytical lens, strict scrutiny would still apply because HB 2332 severely burdens VPC's speech. *Fish v. Schwab*, 957 F.3d 1105, 1124-25 (10th Cir. 2020). Burdens on core political speech are *per se* severe. *See Buckley*, 525 U.S. at 207 (Thomas, J., concurring). And the evidence further establishes that the Personalized Application Prohibition "impacts speech in a way that is not minimal." *VoteAmerica*, 576 F. Supp. 3d at 888 (citation omitted). Indeed, the inability to personalize applications in Kansas would eliminate VPC's most effective way of furthering its speech and association, ███████████████████████████████████ ███████████████████████████████████. *See* SOF ¶ 48 (Lopach declaration, Lopach deposition, Lopach PI testimony). On the other side of the balance, Kansas's

interest in the Personalized Application Prohibition is virtually nonexistent. *See infra* Part III. Defendants have not gathered evidence that meaningfully differs from what they presented during the preliminary injunction hearing in this case. Thus, "the difference between strict scrutiny and the *Anderson-Burdick* balancing framework is not necessarily relevant" based on the developed facts here, and the prohibition fails under both. *VoteAmerica*, 576 F. Supp. 3d at 888; *see also League of Women Voters of Tenn.*, 400 F. Supp. 3d at 725 n.9 (observing that *Anderson-Burdick* "is just another road to strict scrutiny").

### E.     The Personalized Application Prohibition is Unconstitutionally Overbroad.

The Personalized Application Prohibition is an unconstitutionally overbroad restriction of First Amendment protected activity, both facially and as-applied to Plaintiff. The ban "lacks any plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 473 (2010), and its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression," *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *VoteAmerica*, 576 F. Supp. 3d at 877 (concluding that a "law may chill the free speech rights of parties not before the court, especially when the statute imposes criminal sanctions"). "Establishing substantial overbreadth … requires a comparison between the legitimate and illegitimate applications of the law." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1153 (10th Cir. 2020) (citation omitted)

Based on the record, the illegitimate applications of HB 2332 to curb protected speech far exceeds any potential legitimate applications. The legitimate applications are hypothetical or rare—the prohibition attacks applications that are personalized with incorrect information or fraudulently prefilled incorrectly. . But the record indicates neither issue is a serious problem in Kansas. The illegitimate applications are far broader. VPC's communications are personalized using reliable data from specialized vendors hired to professionally manage and maintain voter information and culls its lists with the goal of keeping the information accurate and current.  SOF

¶ 35. But even if an organization drew directly from the Kansas voter file to instantaneously personalize and deliver applications,[10] HB 2332 would still prohibit that practice. Thus, the law overbroadly prohibits *all* personalization of applications, regardless of source or timing, meaning that "many of [the statute's] potential applications involve protected speech." *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1311 (10th Cir. 2022). This broad-sweeping law, combined with the criminal penalty that lacks a scienter requirement, "creat[es] a real danger that the statute will chill First Amendment expression." *Id.* at 1300.

### III.   Defendants Cannot Meet Their Burden To Show the Personalized Application Prohibition Is Narrowly Tailored To Serve A Compelling State Interest.

Throughout this litigation, Defendants have proffered a variety of justifications for the Personalized Application Prohibition. But "when a law infringes on the exercise of First Amendment rights, its proponent … bears the burden of establishing its constitutionality" through evidence. *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) (citation omitted). To survive strict scrutiny, its proponents have the burden to prove that the law is narrowly tailored to serve a compelling state interest. *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002). The State cannot meet this burden. Defendants lack the evidence needed to show an actual compelling interest as opposed to a post hoc rationalization developed in response to this litigation. Nor have Defendants developed any evidence that would alter this Court's previous holding that the Personalized Application Prohibition is not narrowly tailored to any of the proffered interests. As such, the Personalized Application Prohibition's abridgment of Plaintiff's protected First Amendment rights cannot be justified, and summary judgment is warranted.

---

[10] Even for this type of practically infeasible mailing program, however, inaccuracies or out-of-date information in the state voter registration file would still inevitably result in some errors in personalization. *See, e.g.*, Schmidt Tr. 58:20-24, 107:19-24.

## A.     The Personalized Application Prohibition Does Not Serve a Compelling State Interest.

The Personalized Application Prohibition serves no compelling state interest. In applying strict scrutiny, a court must look to the "actual considerations that provided the essential basis for the [decision-making], not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). That is, "after-the-fact explanations cannot help a law survive strict scrutiny" under the First Amendment. *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1323 (11th Cir. 2004) (rejecting defendant's effort "to engage in post hoc rationalizations of its policy" in the context of a First Amendment challenge).

Here, the legislative record for the Prohibition is silent regarding the state interests purportedly served. Despite the Legislature's silence, Defendants have developed an evolving list of justifications for the Prohibition, such as "[m]inimizing voter confusion" and disenfranchisement, "[p]reserving and enhancing voter confidence," and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud. *See* SOF ¶ 76; *see also VoteAmerica*, 576 F. Supp. 3d at 878 ("Defendants put forward three alleged interests in enacting HB 2332: avoiding fraud, minimizing voter confusion and facilitating an orderly administration of the electoral process.").

But what Defendants have in number of stated interests, they lack in evidence supporting that these "recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality op.) (citations omitted). Defendants fail to "do more than simply posit the existence of the disease sought to be cured." *Id.*; *see also Buckley*, 525 U.S. at 210 (Thomas, J., concurring) (applying *Turner* and concluding that "the State has failed to satisfy its burden of

demonstrating that fraud is a real, rather than a conjectural, problem"). Defendants' unsupported, "after-the-fact explanations cannot help [the Prohibition] survive strict scrutiny." *McLaughlin*, 140 F. Supp. 3d at 190. They are "post hoc justifications the legislature in theory could have used but in reality did not," not the "actual considerations that provided the essential basis" for the Prohibition, as strict scrutiny requires. *Bethune-Hill*, 137 S. Ct. at 799.

In fact, the evidence demonstrates that Kansas election officials are concerned not with any purported harm caused by prefilled, personalized information on advance mail ballot applications, but with voters' receipt of *multiple* applications. *See* SOF ¶ 30 (Shew testifying that the Douglas County election office would like to prefill information on applications but cannot due to budgetary constraints); SOF ¶ 58 (Cox testifying that the only inquiry that Ford County election office received about prefilled information was one voter asking why her middle initial had been printed incorrectly) (Caskey testifying that he does not recall any particular conversations that he had with election offices about concerns about prefilled applications and that his office does not possess any data or notes memorializing such conversations); SOF ¶ 60 (Schmidt testified "The bigger issue for us was apps coming from outside the State of Kansas to our voters, and multiple applications.") (Caskey testifying to conversations about duplicate applications that election offices received in the 2020 election); SOF ¶ 68 (Caskey testifying that his office made no mention of prefilled applications as a concern in its testimony or communications before HB 2332's passage).

The Personalized Application Prohibition—or any other part of HB 2332—does not address this distribution of duplicate applications.[11] The Prohibition does nothing to prevent a

---

[11] In theory, HB 2332's Out-of-State Distributor Ban could have indirectly addressed this concern (*i.e.*, forbidding an out-of-state organization from sending communications reduces the overall

person or organization from mailing several blank advance mail ballot applications to a particular voter. In any event, VPC has built-in financial and practical incentives to avoid sending successive personalized applications to voters who have already applied, filters its recipient lists for this purpose, and has itself decided to reduce the number of mailings sent to voters now that the uniquely challenging 2020 election conditions have subsided. *See* SOF ¶¶ 35, 43.

In sum, the Personalized Application Prohibition addresses neither election officials' expressed concerns in the record nor the purported interests Defendants assert. Untethered from a state interest, compelling or otherwise, the Prohibition cannot withstand constitutional scrutiny.

### B. The Personalized Application Prohibition is Not Narrowly Tailored.

In addition, the disconnect between the Personalized Application Prohibition and any compelling, or even legitimate, government interest is fatal under any level of scrutiny. This is especially true under the "well-nigh insurmountable" scrutiny required here. *Meyer*, 486 U.S. at 425. Indeed, even if the *Anderson-Burdick* balancing framework were applied here, burdening Plaintiff's core political speech requires the State to demonstrate that the Prohibition is "narrowly tailored to advance a compelling state interest." *VoteAmerica*, 576 F. Supp. 3d at 887.

To be narrowly tailored, the restriction must: (i) be the least restrictive means available to achieve the compelling interest (*i.e.*, must not burden any more speech than necessary), *see Verlo v. Martinez*, 820 F.3d 1113, 1134 (10th Cir. 2016); and (ii) not be underinclusive by having "a loose fit between its means and the [government]'s interest," *McCraw v. City of Oklahoma City*,

---

number), but this Ban was so patently unconstitutional that even Defendants agreed to enjoining its enforcement. *See* ECF 73. Any such restriction would likely violate the First Amendment. There is nothing constitutionally suspect about speakers conveying their message more than once and well-established case law forbids speech infringements seeking to limit the quantity of speech. *See Meyer*, 486 U.S. at 422; *Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (holding that federal campaign finance expenditure limits violated the First Amendment by "restrict[ing] the quantity of campaign speech by individuals, groups, and candidates" and "limit[ing] political expression at the core of our electoral process").

973 F.3d 1057, 1077 (10th Cir. 2020); *accord ALDF*, 434 F. Supp. 3d at 1002 (Vratil, J.). The discovery record has confirmed that Defendants cannot carry their "heavy burden of demonstrating that [the] restriction is 'the least restrictive means among available, effective alternatives.'" *Peck v. McCann*, 43 F.4th 1116, 1135 (10th Cir. 2022) (quoting *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 665-66 (2004)). When the Personalized Application Prohibition's "restrictions on speech and expressive conduct are juxtaposed against the paltry record evidence of real, non-speculative harms ameliorated by the" law in this case, it is clear the Prohibition fails strict scrutiny and warrants summary judgment for Plaintiff. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1226 (10th Cir. 2021).

### 1. The Personalized Application Prohibition is Not Narrowly Tailored to Ease Election Administration.

Defendants speculate that its asserted interest in easing election administration would be furthered by banning personalization of applications. The State additionally asserts that its interest in minimizing the potential for voter disenfranchisement is similarly furthered by HB 2332. *See* SOF ¶ 76. These speculations are not borne out by any record evidence. Each county election official deposed in this case discussed challenges presented by the unprecedented volume of mail voting that occurred during the 2020 general election. *See* SOF ¶¶ 50, 52. To the extent they indicated that the administration burden processing the high volume of advance mail ballot applications in 2020 was affected by third party distribution of applications, they uniformly identified voters' inquiries about and submission of multiple applications as its primary source; not *personalized* applications. *See* SOF ¶ 60. Speculation for an interest is insufficient to create a genuine issue of material fact, and Plaintiff on summary judgment "has no burden to disprove unsupported claims of his opponent." *Artes-Roy v. City of Aspen*, 31 F.3d 958, 963 (10th Cir. 1994) (quoting *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642, 649 (10th Cir. 1988)).

Moreover, county election offices have similar processes in place to cure incomplete or inaccurate applications submitted by voters. *See* SOF ¶ 40. These cure processes apply regardless of whether the voter had used a blank form or a form pre-populated with personalized information. *See* SOF ¶ 58. The record does not contain admissible evidence that there was a greater likelihood of errors that trigger the cure process on applications with personalized information. *Id.* Nor is there any evidence in the record that elections offices spent more time curing personalized applications than they would have had voters only started with blank applications. *Id.* Indeed, county election officials attested that they did not track personalized applications and could not accurately decipher whether an application was prefilled by a third party or typed in by a voter. *Id.* (Cox testimony). Processing prefilled applications was not identified as a particular source of additional burden, and the State offers no evidence that prefilling caused administrative concerns. *Id.* (Howell testimony).[12]

Nothing in the record indicates that these benefits are outweighed by any inefficiencies created by voters' use of prefilled applications, making it impossible for the State to demonstrate that the Personalized Application Prohibition is sufficiently narrowly tailored. *See Yes On Term Limits*, 550 F.3d at 1029 (finding an Oklahoma law insufficiently narrow where the asserted state interest relied on an assumption that non-resident circulators lead to an increased prevalence of fraudulent activity than resident circulators for which the state "provided no data to this effect").

---

[12] Nothing in the evidence indicates causation, or indeed any sort of connection, between personalized applications and voters' submission of multiple applications. Any tortured attempt to connect these two things further demonstrates that the Personalization Prohibition is not narrowly tailored to this professed State interest. In fact, the evidence makes clear that in some cases the use of prefilled applications actually reduces the election offices' workload. *See* SOF ¶ 30 (Cox testified "Q: Is it fair to say that at least in some ways, prefilled application – prefilled information increases the likelihood and the ease that your office can match information between the voter file and application? A: Normally, I would say yes.").

The State's "general speculation that some administrative burden might" be eased by the Prohibition is insufficient "to justify a meat-ax abridgment of [] First Amendment rights." *Thornburgh v. Abbott*, 490 U.S. 401, 433 (1989) (Stevens, J., concurring and dissenting in part).

Similarly, while theoretically personalized information may trigger the cure process that the voter did not complete, the State has no evidence of this, and there is no evidence indicating that voters are systemically disenfranchised due to their use of personalized applications. Narrow tailoring cannot rest on an assumption. *Yes On Term Limits*, 550 F.3d at 1029.

Further, even if the facts in this case did indicate that personalized applications result in some inefficiencies—they do not—that type of minimal administrative burden would not justify infringement on protected political speech. The Supreme Court has held that while a state may "take administrative and financial considerations into account" in developing its election laws, the "possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing [others'] First Amendment rights." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 218 (1986) (concerning state law requiring closed primaries); *see also Buckley*, 525 U.S. at 192 (discussing lack of narrow tailoring to interest in administrative efficiency).

### 2. The Personalized Application Prohibition is Not Narrowly Tailored to Prevent Voter Fraud or Promote Voter Confidence.

The State has also attempted to justify the Personalized Application Prohibition as an effort to combat voter fraud or promote voter confidence. While this may be a compelling purpose in the abstract, the record here does not include any evidence indicating that the law would further this interest. To the contrary, the uncontroverted record shows that Kansas election officials are not concerned about fraud with respect to personalized advance mail ballot applications. *See* SOF ¶¶ 30-32, 65-66. And Defendants cannot identify admissible evidence showing that personalized

applications deteriorated voter confidence in elections, much less to any degree that could justify the Prohibition under strict scrutiny.

Additionally, discovery in this case makes clear that the occurrence of voter fraud in general is not a serious concern in Kansas elections. *See* SOF ¶¶ 65-66. (Caskey testimony confirming that the 2020 post-election audits did not reveal any systemic fraud in Kansas's elections). This is due, at least in part, to other provisions in Kansas law meant to safeguard against voter fraud within advance mail voting. *See* SOF ¶ 65 (Schmidt testimony on the multiple stages at which fraud can be detected and prevented). Local election officials review the voter's signature on both the application and the ballot to those in county voter registration records (with a notice and cure process). *See* SOF ¶¶ 15-16. Election officials also verify the driver's license or ID number on the application and/or a copy of their photo ID. *See* SOF ¶ 15. Existing laws also criminalize creation or submission of fraudulent advance mail ballot applications. *See, e.g.*, K.S.A. § 25-2431. Additionally, the ELVIS system itself limits election officials to issuing a single active ballot to a voter. *See* SOF ¶ 65.

The evidence makes clear that these preexisting laws and safeguards sufficiently address any purported State interest in preventing fraud in advance mail voting, particularly given the admitted lack of fraud in the last election. *See, e.g.,* SOF ¶ 65 (Cox testifying "Q: And is it fair to say that these verification procedures safeguard against potential vote by mail fraud? A: It should, yes."). And such existing safeguards already promote voter confidence by ensuring that the voter who applies for an advance mail ballot is who they say they are, and that the eligible voter will be allowed to vote only their own individual ballot. *See* SOF ¶ 65 (Schmidt testimony). Thus, at best the Personalized Application Prohibition is redundant; any claim that it is narrowly tailored to address voter fraud is without merit. *See Buckley*, 525 U.S. at 204-05; *Meyer*, 486 U.S. at 426-27.

3.    **The Personalized Application Prohibition is Not Narrowly Tailored to Prevent Voter Confusion.**

The State's asserted interest in protecting against voter confusion stemming from third parties' distribution of personalized advance mail ballot applications is also not supported by admissible evidence of such confusion. At best the record includes anecdotes, suppositions, and hearsay on this point, *see* SOF ¶ 57 which do not raise a genuine issue of material fact for trial.[13] While any voter confusion is regrettable, a "handful" of unverifiable accounts of its existence "do[] not support the inference" that prefilled applications cause voter confusion, and cannot justify restrictions on core political speech. *See Yes On Term Limits* 550 F.3d at 1029 (citing *Buckley*, 525 U.S. at 204 n. 23); *see also Brewer*, 18 F.4th at 1227 (affirming grant of summary judgment where there was "little evidence of non-speculative harms or interests that the [challenged law's] restrictions alleviate in a direct and material way").

Additionally, the record demonstrates that there are numerous less-restrictive avenues for assuaging voter confusion about the advance mail voting process. For example, Johnson County publicized FAQs and utilized social media outreach to explain to voters in bulk that applications received from Plaintiff were legitimate and could be used to apply for an advance mail ballot. *See* SOF ¶ 57 (Schmidt testimony and exhibit).  In Ford County, the election office put notice in the newspaper informing voters that civic organizations were sending applications and that voters were not under any obligation to submit such applications. *Id.* (Cox testimony). These are only a few of the many ways in which election officials throughout Kansas, and nationwide, address voter

---

[13] Despite hearsay objections sustained during the preliminary injunction hearing, Defendants have not deposed any Kansas voters. They continue to rely exclusively on the testimony of Kansas election officials as evidence of the state interests that purportedly justify the Personalized Application Prohibition.

confusion. It cannot be disputed that the Personalized Application Prohibition is not the State's least-restrictive means of achieving this interest.

Finally, individual recipients who find the personalized applications' contents to be confusing, misleading, or incompatible with their voting preferences are not required to engage with the communication. Such a voter, if she finds the application "objectionable" for whatever reason, can "escape exposure . . . simply by transferring the [mailer] from envelope to wastebasket." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 542 (1980); *see also Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 72 (1983). Many Kansans seemingly availed themselves of this disposal option and the explicit ability to unsubscribe from VPC's mailing list in 2020, *see* SOF ¶ 42, and in fact some election officials explicitly presented this option to voters who complained about receipt of applications. *See* SOF ¶ 63. And while some of those throwing out the application may find its distribution to be an annoyance, it is fundamental to our First Amendment jurisprudence that freedom of speech "may not be withdrawn even if it creates [a] minor nuisance for a community[.]" *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943).

## CONCLUSION

Plaintiffs respectfully request that this Court grant summary judgment to Plaintiff VPC, permanently enjoin the Personalized Application Prohibition, and grant all such permanent relief that this Court deems just and proper.

Date: October 14, 2022

By:   */s/ Mark P. Johnson*
      Mark P. Johnson

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Christopher Lapinig (*pro hac vice*)
Hayden Johnson (*pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2200
DLang@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
CLapinig@campaignlegalcenter.org
HJohnson@campaignlegalcenter.org

Mark P. Johnson KS Bar #22289, D. Kan. #22289
**DENTONS US LLP**
4520 Main Street, Suite 1100
Kansas City, MO 64105
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 14th day of October 2022, a copy of Plaintiff's Motion for Summary Judgment has been served upon other counsel of record via electronic mail only, to the following:

Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*

*/s/ Mark Johnson*
Mark P. Johnson