IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VOTEAMERICA and<br>VOTER PARTICIPATION CENTER,<br><br>         *Plaintiffs,*<br><br>vs.<br><br>SCOTT SCHWAB, in his official capacity as<br>Secretary of State of the State of Kansas;<br>DEREK SCHMIDT, in his official capacity as<br>Attorney General of the State of Kansas; and<br>STEPHEN M. HOWE, in his official capacity as<br>District Attorney of Johnson County,<br><br>         *Defendants.* | Case No. 2:21-cv-02253-KHV-GEB |

**DEFENDANTS' RESPONSE TO PLAINTIFF VOTER PARTICIPATION CENTER'S
MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF KENNTH J. BLOCK**

      Defendants Scott Schwab, Derek Schmidt, and Stephen M. Howe, acting by and through

counsel, respectfully submit this Response to Plaintiff Voter Participation Center's ("VPC")

Motion to Exclude the Testimony and Report of Kenneth J. Block (Dkt. 149).  For the reasons set

forth below, VPC's motion should be denied.

**I.  VPC's *Daubert* Motion is Untimely.**

      Before turning to the merits, Defendants note that VPC filed its motion out of time.  The

deadline for filing *Daubert* motions was October 14, 2022.  *See* Pretrial Order (Dkt. 140) at 20, ¶

8(c).  VPC failed to file its motion until the next day, October 15.  Moreover, VPC neither sought

nor received leave of court to file its motion late.  Considering that Plaintiffs have nearly a *dozen*

attorneys from two international law firms and a major national advocacy organization who have

entered appearances in this case, there is no excuse for VPC not adhering to the written deadlines

set forth in the Pretrial Order.  The deadline had already been extended once (by two weeks), *see*

Dkt. 115, and thus no need to wait until the last minute.  VPC's refusal to follow the rules here is particularly ironic given that this dispute revolves around election statutes, an area in which strict compliance with deadlines is an absolute necessity.  Defendants thus suggest that the motion may be summarily denied on the issue of untimeliness alone.

### II.  Pre-Trial Motions to Exclude Evidence Are Unnecessary in a Non-Jury Trial.

VPC's motion should also be denied because the pre-trial relief it seeks is unnecessary in a case involving a non-jury trial.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court charged district courts with the task of performing a "gatekeeping" role for the admission of expert testimony.  *Id*. at 592-93.  "*Daubert*'s primary purpose is to protect juries from unreliable or confusing scientific testimony." *Mountain v. United States*, No: 19-CV-005-J, 2020 WL 8571674, at *2 (D. Wyo. Sept. 11, 2020).  "[W]hile *Daubert*'s standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (citing *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002)).

VPC's argument that Mr. Block's testimony should also be excluded per Federal Rule of Evidence 403 likewise lacks merit in a bench trial.  Notably, the Tenth Circuit has found that "excluding [prejudicial] evidence in a bench trial under 'Rule 403's weighing of probative value against prejudice is improper.'" *United States v. Kienlen*, 349 F. App'x 349, 351 (10th Cir. 2009) (quoting *Gulf States Utils. Co. v. Ecodyne Corp*., 635 F.2d 57, 519 (5th Cir. 1981), and citing *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial")).  There are obvious rational reasons for this rule:

> Under the Federal Rules of Evidence, admissibility of evidence is favored unless the probative value of the evidence is so low as to warrant exclusion when prejudice is a factor.  Rule 403 was designed to keep evidence not germane to any issue outside the purview of the jury's consideration.  For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences.

*Schultz*, 24 F.3d at 632; *see also Mountain,* 2020 WL 8571674, at *2 (considering *Daubert* motion filed prior to bench trial and noting "trial judge is fully capable of sorting the wheat from the chaff at trial"); *Cramer v. Sabine Transp. Co*., 141 F. Supp.2d 727, 733 (S.D. Tex. 2001) (noting that in bench trials "any motion in limine [is] asinine on its face . . . such procedures are unnecessary, as the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk.").  Apprehensions about unfair prejudice or confusion, therefore, simply do not come into play, and the Court should deny VPC's motion.

### III.  Mr. Block's Testimony Should Not Be Excluded.

If the court elects to forgive the procedural deficiencies of VPC's *Daubert* motion, it should deny the motion in light of the applicable standards and the limited purposes for which Mr. Block's testimony will be used.  The only remaining issue for trial in this case is whether a third-party has a right under the First Amendment to pre-fill someone else's advance voting ballot application. Not only is that question properly answered in the negative (for the reasons outlined in Defendants' summary judgment motion), but the State also has legitimate regulatory interests in administering its elections to avoid voter confusion, facilitate orderly and efficient election administration, and deter voter fraud.  VPC's actions in pre-filling unsolicited advance voting ballot applications ran afoul of those interests as tens of thousands of its submissions to unsuspecting Kansas voters either (1) contained inaccurate information that did not match the data in the State's voter file or (2) resulted in duplicate applications (in many cases, *multiple* duplicate applications) being submitted by voters to county election offices.  To substantiate the depth of these issues, Defendants retained

Mr. Block to assist in synthesizing the data file that VPC used to pre-fill advance voting ballot applications with the State's official voter registration database—the Election Voter Information System ("ELVIS").

VPC's advance voting ballot applications file submitted to Defendants during discovery contained 312,918 records.  Ex. A, Decl. of Kenneth J. Block ("Block Decl."), ¶14.[1]  Given the exceptionally large number of records, comparing VPC's file to the State's voter file required more than a simple Excel spreadsheet analysis.  Consequently, Defendants sought out Mr. Block's expertise in database systems to run various analyses, utilizing PostgreSQL, a robust relational database, not used by lay computer users.  Using his expertise in relational database systems, Mr. Block ran various queries—some basic and others more complex—which demonstrated the breadth of issues related to the accuracy of VPC's mailings and the resulting chaos those issues caused for both Kansas voters and election officials.

### A.  Legal Standards.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "imposes upon the trial judge an important 'gate-keeping' function[2]

---

[1] And this was just a subset of the total number of Kansas voters to whom VPC sent advance voting ballot applications during the 2020 General Election.  Indeed, VPC disclosed in discovery that it mailed advance voting ballot applications to at least 507,864 Kansas voters in connection with that election.  *See* Ex. E Defs.' Memo. Supp. Summ. J.

[2] Again, the gate-keeping function is to keep unqualified and unreliable testimony from *juries*; it plays little to no role in a bench trial.

with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).  That function involves a two-step process, which requires the trial judge to determine first whether the proposed expert is qualified by "'knowledge, skill, experience, training, or education.'" *Id*. (quoting Fed. R. Evid. 702).  The district court must then determine whether the opinions are relevant and reliable.  *Tyson Foods*, 565 F.3d at 789.  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

A witness may qualify as an expert in various ways.  Rule 702 makes this clear, noting that an expert status may be based on "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The Committee Note to the 2000 Amendments of Rule 702 explains that "nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee note (2000 amends.). "Assertions that the witness lacks particular educational or other experiential background, "'go to the weight, not the admissibility, of [the] testimony.'" *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Id.*; *see also Ralston*, 275 F.3d at 970 ("As long as an expert stays 'within the reasonable confines of his subject area,' our case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight.'") (quotation omitted).

"The Supreme Court has described the consideration of relevant evidence as one of 'fit.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 591). "A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Id.* "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Hollander v. Sandoz Pharms. Corp*., 289 F.3d 1193, 1204 (10th Cir. 2002).

The party offering the expert testimony "need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). Rather, it "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Id.* (citing *Gomez v. Martinez Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)). "Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (citing *Daubert,* 509 U.S. at 595).

To guide district courts in their reliability analysis, the Supreme Court set forth the following factors that may be considered:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Daubert*, 509 U.S. at 593–94. These factors, however, are nonexclusive, and district courts performing their gate-keeping roles "have broad discretion to consider a variety of other factors." *Hollander,* 289 F.3d at 1205; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the

factors mentioned in *Daubert* .... Too much depends upon the particular circumstances of the particular case at issue."); *Bitler*, 400 F.3d at 1233 (noting the four factors set forth in *Daubert* are "most relevant in the context of a new and novel scientific theory"). "The focus, of course must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

> "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always the same: to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Hollander*, 289 F.3d at 1205-06 (quotation and brackets omitted).

Here, the relevant field is computer sciences—specifically, the application of a sophisticated relational database to large data sets. Mr. Block is highly qualified in this field and has generated helpful and reliable opinions based on his decades of experience and has done so employing the same level of intellectual rigor practiced by data analysts outside the courtroom. Therefore, VPC's motion should be denied.

**B. Mr. Block Is Qualified to Render Opinions.**

VPC makes a meager attempt to challenge Mr. Block's qualifications to offer opinions in this case. A simple review of his credentials, however, reveals he is highly qualified to render opinions related to the large data sets at issue. Specifically, Mr. Block is a graduate of Dartmouth College with a Bachelor of Arts degree in Computer Science. Ex. B, Dep. Tr. of Kenneth Joseph Block ("Block Tr.") 69:13-16; Ex. C, Kenneth J. Block Curriculum Vitae ("CV"), p. 2. He has over 30 years of experience in the computer science field. Ex. A, Block Decl., ¶¶7-8; Ex. B, Block Tr. 70:5-11; Ex. C, CV, pp.1-2. He is the President, Database Architect, and Chief Data Scientist at Simpatico Software Systems, a company that primarily focuses on building custom technology systems for its customers and addressing specific issues its customers may experience with their

current technology systems.  Ex. B, Block Tr. 72:10-18; 84:25-85:20.  Specifically, Mr. Block and his company design, build, and performance tune relational databases for their clients.  *Id*. at 73:21-74:24.  He has worked with mailing lists and merging data for mailing purposes throughout his career.  Ex. A, Block Decl., ¶7.

VPC argues Mr. Block has "extremely limited professional experience with election issues" and that this alleged lack of specific experience disqualifies him from testifying in this case.  Mtn. at 1.  While Defendants dispute VPC's contentions, VPC's argument has no bearing on whether this Court should find Mr. Block adequately qualified to testify about his findings as he is not being offered as an expert on an "election issue."  *See In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d at 282.  Here, Mr. Block used a sophisticated relational database program to compare large amounts of data from two different files to determine whether there were overlaps or deviations in those files—a task he performs weekly, and at times, daily.   Ex. B, Block Tr. 98:12-18; 125:3-126:5; 126:20-127:24.  Whether the files he compares specifically contain voter information makes no difference.  The goal in his comparing large data sets was to determine if there are overlaps or deviations between information in the respective files.  *Id*. at 125:7-126:5.  Everything in Mr. Block's reports is empirical in nature.  He correctly determined that the VPC mailers differed, in some cases, dramatically, from the Kansas voter file. Ex. A, Block Decl. ¶¶15-17; 22, 24, 27-30; Ex. D, Supplemental Decl. of Kenneth J. Block ("Block Supp. Decl."), ¶¶8-14.  This is a true, re-creatable and undeniable fact.  That such differences exist is not even called into question in VPC's motion.

VPC's attempt to claim that a data analyst needs extraordinary professional experience with election issues to perform what in the data industry is a relatively common analysis between two sets of data is absurd and not required under Rule 702's standards.  Mr. Block is obviously

qualified by each of Rule 702's standards—"knowledge, skill, experience, training, or education" and should be allowed to testify. Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 150 (noting that in cases not involving engineering testimony, "the relevant reliability concerns may focus upon personal knowledge or experience" and recognizing that "there are many different kinds of experts, and many different kinds of expertise").

Furthermore, contrary to VPC's assertions that Mr. Block lacks the necessary qualifications to analyze mailing data sets—a specific qualification not required—Mr. Block is certainly no stranger to analyzing and reconciling mailing systems. For example, he was one of the lead technicians who assisted the State of Texas in administering its Food Stamp Program. Ex. B, Block Tr. 80:7-82:21. Doing so required him to undertake the complex and complicated tasks of determining the identity of the welfare recipients and retailers that participated in the program. *Id*. This daunting undertaking required "cleaning up" and merging the various database systems to ensure the right individuals were receiving debit cards. *Id*. He similarly assisted Puerto Rico, Illinois, and Sacramento County in analyzing their programs for distributing electronic food stamps to the correct recipients. *Id*. at 83:10-84:22.

Additionally, and as VPC recognizes in passing, Mr. Block has experience in analyzing voter records. He has been retained to analyze voter data in the litigation context on approximately six occasions. *Id*. at 101:7-105:7. He also has an ongoing, nationwide analytics project on voter data from nearly every state. *Id*. at 86:12-87:13; 91:3-93:23; 113:10-21. For Rhode Island, specifically, he conducted an in-depth analysis of the state's voter records and determined the records contained the names of many voters who had either died or moved but never removed from the state's records. *Id*. at 89:7-91:2; 115:16-24. And he was retained in a non-litigation matter to analyze the presence of duplicate voting. *Id*. at 88: 7-18.

Finally, VPC's criticisms of Mr. Block for not having published any articles or public speaking engagements should not affect his ability to offer opinions in this case.  As the case law instructs, the four factors set forth in *Daubert* are "flexible" and each one does not have to be satisfied for every expert in all cases.  *Kumho Tire*, 526 U.S. at 150.  Indeed, "[t]the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Id*.  As Mr. Block correctly notes, the nature of his profession—technology systems—does not lend itself to such activities.  Ex. B, Block Tr. 72:6-18.

### C.  Mr. Block's Opinions Are Reliable.

Notably, VPC does not contest the reliability of PostgreSQL, the system Mr. Block utilized to perform his analyses.  Nor does VPC dispute the results of his various queries. In fact, VPC's Executive Vice President admitted that there were errors in the data VPC was receiving from its data vendor that caused VPC to stop sending pre-filled ballot applications for waves C and D until VPC could be confident that the information it was using was correct. Ex. E, Lionel Dripps Dep. Tr. 163:6-169:8; *see also* Ex. B, Block Tr. 217:13-20; 231:15-233:2.  Moreover, VPC's rebuttal expert, Eitan Hersh, does not directly dispute Mr. Block's factual findings in his rebuttal report.

VPC's decision not to challenge the reliability of the database system Mr. Block used is understandable given the general acceptance and widespread use of PostgreSQL in the data industry.  Ex. B, Block Tr. 30:20-23.  PostgreSQL is a tool commonly used in the industry to process, manage, store, and retrieve data.  *Id*. at 30:12-19.  For reference, PostgreSQL provides a means to filter and search data like Excel, which most people are familiar.  PostgreSQL, however, is "[d]ramatically more efficient" than Excel, has many more capabilities, and allows data experts to work much faster and efficiently.  *Id*. at 31:17-22; 32:3-8; *see also id*. at 161:7-10 (VPC's

counsel admitting, "Excels are slow to load."). It does so by utilizing SQL, a database language. *Id*. at 33:4-16. While PostgreSQL is publicly available, it requires proper training to run accurately. *Id*. at 129:4-130:2. Based on his analysis, Mr. Block identified various errors in the data files VPC utilized to pre-fill advance mail ballots, including inaccurate information and duplications. *Id*. at 15:12-23, 16:12-18, 17:2-6, and 275:12-277:4; Ex. A, Block Decl. ¶¶15-17; 22, 24, 27-30; Ex. D, Block Supp. Decl., ¶¶8-14.

       **1.**       **Mr. Block's Use of the February 11, 2021 Voter File Report Does Not Render His Opinions Unreliable.**

With no real basis to challenge the reliability of Mr. Block's findings, VPC's chief complaint and main reason for demanding Mr. Block's exclusion is his use of a February 11, 2021 Kansas voter file for his analyses. This complaint, however, amounts to much ado about nothing. As an initial matter, there is nothing magical or even significant about the February 11, 2021 date. Because ELVIS is a dynamic system, it is not possible to go back in time and request a printout of the full Kansas voter file as of some historical date. Ex. B, Block Tr. 39:2-11. Mr. Block simply was in possession of the full Kansas voter file from February 11, 2021 because of work he was doing on an independent project. *Id*. at 37:10-38:18. And he had previously requested the voter file for that particular date because that is also the approximate earliest date in Kansas by which every county in the State had entered its information on each voter's voting history in connection with the 2020 General Election. *Id*.

Mr. Block then used the February 2021 report as a baseline to determine which voters on the list-serv that VPC produced in discovery (of Kansas voters to whom it sent advance voting ballot applications for the 2020 General Election) were no longer actively registered voters in Kansas, *i.e*., had had their voter registration status cancelled as of February 11, 2021. If the voters remained on the official Kansas voter file as of that date, then no further inquiry need be undertaken

on them.  If, on the other hand, the voters on VPC's list-serv had had their voter registration status cancelled as of February 11, 2021, then further inquiry with Kansas election officials would be necessary.  *Id*. at 43:2-45:14.

Once Mr. Block, using his software and high-level expertise with spreadsheet management, came up with the list of VPC-targeted voters whose registration had been cancelled at some point prior to February 11, 2021, Defendants' counsel worked with Kansas election officials to determine the specific registration cancellation dates for those voters.  Because this information is not public and the State's voter registration database software does not have search capability for this specific information, election officials conducted the inquiry manually.  The resulting data – determining the specific date when each voter's registration had been cancelled – was then provided to Mr. Block and to Plaintiffs' counsel.  *Id*. at 59:16-61:14.  It is Exhibit XI to Mr. Block's Supplemental Declaration.  Ex. D, Block Supp. Decl.  Thus, VPC's contention that Mr. Block's use of the February 11, 2021 report renders his opinion unreliable, and, consequently, inadmissible is unsupported.  In reaching his ultimate conclusions and opinions, he utilized the PostgreSQL system in the customary manner to obtain his results, which are both helpful in analyzing the information and reliable.  *See Tyson Foods*, 565 F.3d at 780 ("when experts employ established methods in the usual manner, a district court need not take issue under *Daubert*; however, where established methods are employed in new ways, a district court may require further indications of reliability").

### 2. Mr. Block's Sampling Methods Are Appropriate in the Context of the Analysis Performed.

VPC additionally contends Mr. Block's sampling methodology is not a reliable foundation for any conclusions about its mailing lists.  Mtn. at 13-16.  VPC's assertions misconstrue the purpose of Mr. Block's analysis.  While rigorous sampling protocols should be followed when

attempting to produce a statistical analysis from which to make statistical projections, the goal of Mr. Block's analysis was not to conduct a statistical analysis of precisely how many VPC voter records were inaccurate.  There can be no way to do so without getting access to the records held by VPC's third-party vendor (Catalist). Rather, the primary purpose was to show different types of inaccuracies in VPC's database and to highlight multiple examples of such errors throughout the data.  The point was also to establish that VPC was putting corrupt data (data that differed from State of Kansas voter rolls) onto advance ballot application mailers.  Mr. Block, among other things, found that VPC sent mailers to many voters who had been removed from the voter rolls because they were deceased.  Ex. B, Block Tr. 200:12-201:2; Ex. A, Block Decl., ¶¶17, 27-30; Ex. D, Block Supp. Decl., ¶¶8-14. He also found VPC mailers that contained different and incorrect names and addresses compared to Kansas voter rolls.  Ex. B, Block Tr. 16:12-18 and17:3-6; Ex. A, Block Decl., ¶¶15-17, 22, 24.  VPC's criticisms that Mr. Block followed incorrect methodology from a statistical perspective are simply misplaced and should have no bearing on the Court's decision whether to allow his testimony and findings.

### 3.  Mr. Block's Reliance on Information Provided by Others Does Not Render His Opinions Unreliable.

In support of its motion, VPC additionally emphasizes the fact that Mr. Block relied on others to supply him information to assist him in forming his opinions in this case and argues that this, too, should be a basis for excluding his testimony.  Mtn. at 16-20.  However, "[u]nlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 702, 703).  Specifically, Federal Rule of Evidence 703 states that "[a]n expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed." Fed. R. Evid. 703 (emphasis added).  "If experts in the particular field would reasonably rely on

those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

Here, Mr. Block identified a subset of the data that did not match in the two data files and provided that subset to election officials. Ex. B, Block Tr. 58:12-25; 61:4-14. Utilizing the information and confidential systems available to them, the officials supplied additional information to Mr. Block, and he relied on the information for his analyses as he is allowed to do per the Federal Rules of Evidence. *Id.* at 61:4-14.

Contrary to VPC's assertions, Mr. Block is not like the expert witness in *Fish v. Kobach*, who the court found unqualified to render certain opinions about a survey attached to his report. 304 F.Supp.3d 1027, 1037-38 (D. Kan. 2018). Specifically, the court noted the expert had not written or administered the survey and did not possess any special skill or knowledge to testify about the survey results. *Id.* The expert recited the survey's findings but did not offer any opinions about the findings. *Id.* at 1038. Here, Mr. Block actually conducted the analyses of the two large data files and opined on his findings based on the discrepancies between the two files. The fact that he did not prepare certain of the information used in conducting his analysis does not render his opinions inadmissible. Fed. R. Evid. 703.

**D.  Mr. Block's Testimony and Opinions Will Assist the Court to Understand Relevant Evidence in this Case.**

As has been described herein, Mr. Block performed a relatively limited, but highly important task in this case—one that a layperson could not easily perform.[3] He took two extremely

---

[3] VPC makes note of the fact that Mr. Block described his searches as simple and that this description should somehow prevent him from offering opinions in this case. Mtn. at 20. A "simple" query in the PostgreSQL system for Mr. Block would certainly not be simple for the average person who has no experience with that program or managing/comparing large data files. Furthermore, Mr. Block testified that the nature of his queries were more complex as he began to discover VPC's data sets did not match the official Kansas voter records. Block Tr. 36:22-37:4.

large data sets, compared them using a robust relational database system, discovered various discrepancies in the two sets of data, and explained those discrepancies.  He also described how those various issues led to inaccurate and duplicate applications and unnecessarily injected problems into Kansas' election system. Ex. B, Block Tr. 179:9-182:9. Without this comparison and analysis, Defendants would be unable to fully and efficiently present their evidence to illustrate the various issues caused by VPC's pre-filling of advance voting ballot applications. *Id*. at 229:9-12.  Such evidence supports Defendants' claim that the State has legitimate regulatory bases to prohibit the pre-filling of those applications.

The very purpose of Rule 702 is to allow witnesses, like Mr. Block, to appear before the Court and explain complex issues not within laypersons' common knowledge.  While the data itself may not be complex, the manner in which it was compared and sorted was.  Rather than requiring this Court perform numerous and time-consuming Excel searches—a tedious method VPC's own counsel admits is inefficient—Mr. Block did the legwork using his specialized knowledge and skills.  Had such a task been so simple, one must ask why VPC did not perform it to ensure it was sending out pre-filled advanced ballot applications with accurate information and not sending them to voters who had died, moved, been convicted of a felony, or otherwise had their voter registrations cancelled.  Of course, we know the answer because VPC's own rebuttal expert told us:  it comes down to a cost-benefit calculation, and VPC decided it wasn't worth the trouble to ensure that the information included on its mailers to Kansas voters reflected the latest and most accurate data possible.  *See* Ex. F, Hersh Tr. 147:20-148:18.

## IV.  CONCLUSION

In sum, there is no sound basis to prevent Defendants from offering Mr. Block's testimony to support their claims and aid the Court in analyzing the evidence.  *See In re Zyprexa Prods. Liab.*

*Litig.*, 489 F.Supp.2d at 283 ("Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case—even if it simply explains facts and evidence already in the records.").  Defendants thus respectfully request that the Court deny VPC's Motion to Exclude the Testimony and Report of Kenneth J. Block (Dkt. 149).

Respectfully Submitted,

By /s/ Scott R. Schillings
Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (KS Bar #16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Telephone: (316) 267-2000
Facsimile: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com
*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of October 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By /s/ Scott R. Schillings