IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 21-2253-KHV |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; KRIS KOBACH, in his official capacity as Attorney General of the State of Kansas; and STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Voter Participation Center ("VPC") brings suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. Plaintiff alleges that the Personalized Application Prohibition in Section 3(k)(2) of HB2332 (codified as K.S.A. § 25–1122(k)(2)) violates its First and Fourteenth Amendment rights, U.S. Const. amends. I and XIV.[1] The parties have submitted the matter for a bench trial.[2] After careful consideration, based on largely stipulated facts, the Court makes the following findings of fact and conclusions of law, as required by

---

[1] The Personalized Application Prohibition does not cover plaintiff VoteAmerica's conduct because VoteAmerica mails personalized advance mail ballot applications only to voters who have specifically requested them on its interactive website.

[2] The parties stipulated that their briefs on cross-motions for summary judgment would serve as trial briefs.

Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## Findings Of Fact

Based on the stipulations of the parties, the Court makes the following findings of fact:

Personalized Application Prohibition

On February 10, 2021, the Kansas Legislature introduced HB 2332, which restricted the distribution of advance mail ballot applications to potential Kansas voters.  On May 3, 2021, over the veto of Governor Laura Kelly, the Legislature enacted HB 2332.  Plaintiff challenged two of HB 2332's provisions.  Only one—the Personalized Application Prohibition—is still at issue in this lawsuit.

The Personalized Application Prohibition prohibits any person or organization (1) who solicits a registered voter by mail (2) from mailing to a registered Kansas voter a personalized advance mail ballot application (3) that is pre-filled with any information, such as the voter's name or address.  K.S.A. § 25-1122(k)(2).  A violation is a class C nonperson misdemeanor, which is punishable by up to one month in jail and/or fines.  HB 2332 carves out exceptions by permitting a subset of state and county election officials to mail pre-filled advance mail ballot applications.  H.B. 2332 § 3(k)(4).

The state argues that the Personalized Application Prohibition is necessary to (1) minimize voter confusion and disenfranchisement, (2) preserve and enhance voter confidence and (3) reduce the rejection of inaccurate applications and inefficiencies in the election administration, and reduce potential voter fraud.  Exhibit 34  (Doc #145-37) at 3-4.  These rationales are not a part of the Legislative Record for HB 2332.

In February of 2021, the Office of the Kansas Secretary of State submitted written

testimony to both the House and Senate Committees on Federal and State Affairs regarding the state's 2020 general election.  Among other things, the testimony advised the legislature as follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties.  This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26).  On March 17, 2021, the Kansas Secretary of State submitted written testimony on HB 2332 which mentioned "incomplete mail ballot applications" but did not discuss pre-filled applications.  Exhibit 32 (Doc. #145-31) at 3.

Voting In Kansas

Schwab is the Chief Election Officer for Kansas.  As such, he oversees all Kansas elections and administers the state's election laws and regulations.  Schwab also issues guidance and instruction to county election officers on election procedures and requirements.  Kansas law permits Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting.  K.S.A. §§ 25-1131, 25-1121(a)-(b), 25-1122d(c); see also HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS").  Schwab is responsible for maintaining an online voter registration database. 52 U.S.C. § 21083(a)(1)(A).  County election officials in all 105 counties in Kansas perform all additions, deletions and modifications of records in the database, and ELVIS reflects the voter data maintained by those county officials.  When a county election office receives a voter

registration application, election officials put that voter's registration information into the state's central database and thereby create a voter record in ELVIS.  ELVIS reflects real-time changes that officials make to individual voter files.

To vote by mail in Kansas, a voter generally must complete an advance ballot application and return it to the county election office where the voter is registered.  Voters on the permanent advance voting list or who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., need not file advance ballot applications to vote by mail.  The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431.

If a voter timely submits an advance voting ballot application, a county election official processes the application, and if the county accepts the application, mails the voter an advance ballot packet.[3]  If a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application.  If officials cannot contact the voter, the office will mail the voter a provisional ballot.

For the county election office to process an application without having to contact the voter to cure a mismatch or discrepancy, an advance voting ballot application must precisely

---

[3]        Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the General Election and the Tuesday of the week preceding such General Election.  K.S.A. § 25-1122(f)(2).  Other than voters entitled to receive ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, counties cannot transmit advance ballots to voters before the 20th day before the election for which an application has been received.  K.S.A. §§ 25-1123(a), 25-1220.  For advance voting ballot applications received by the county election office on or after the 20th day before the election, the county generally must process them within two business days of their receipt.  K.S.A. § 25-1123(a).

match the information in ELVIS; officials may only overlook clear inadvertent mismatches (e.g., minor misspelling of a street name such as omitting the letter "e" or signing as "Jim" despite being registered as "James").  Once the county election office processes an advance ballot application, it documents in ELVIS the date it processed the application and transmitted the regular or provisional ballot to the voter.  County election offices also document in ELVIS whether (and when) a voter has returned an advance ballot.

<u>Voter Participation Center</u>

Plaintiff's core mission is to promote voting among traditionally underserved groups—including young voters, voters of color and unmarried women—at rates commensurate with voters in other groups.  Plaintiff believes that when more eligible voters participate in elections, it benefits democracy in the United States and that encouraging and assisting voters to participate in elections through mail voting ensures a robust democracy.  Plaintiff believes that mail voting expands participation opportunities among its target voters—some of whom may not have the ability to vote in person or the resources to navigate the mail voting application process.

Plaintiff primarily uses direct mailings to encourage these voters to register and participate in the electoral process.  VPC President and Chief Executive Officer Thomas Lopach testified that plaintiff believes sending personalized advance mail ballot applications "increases voter engagement," which Lopach thinks would be a broad associational base with potential voters in Kansas.  <u>Exhibit 7</u> (Doc. #147-5) at 167:22–168:15.[4]  Plaintiff considers that providing

---

[4]    To support its belief that sending personalized applications increases voter engagement, plaintiff relies on a 2006 election cycle study which, among other things, evaluated the effectiveness of personalizing advance mail ballot applications.  Defendants argue that the study is inadmissible hearsay.  The Court finds that plaintiff may not rely on the study to prove

(continued . . .)

underserved groups the necessary personalized advance mail voting applications is key to effectively advocating its message.

Plaintiff encourages registered Kansans to participate in this manner by mailing voters a communication package that advocates for mail voting and provides a personalized advance mail ballot application. Through these communications, plaintiff communicates its message that advance mail voting is safe, secure, accessible and beneficial. Providing personalized applications to young voters, voters of color and unmarried women provides them simple access to advance mail ballot applications. Plaintiff tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.

Lopach and VPC Executive Vice President Lionel Dripps testified that plaintiff engages voting behavior and quantitative research professionals, including but not limited to Christopher B. Mann, associate professor of political science at Skidmore College, to analyze the efficacy of its direct mail programs. Plaintiff believes that the personalized applications are the most effective means of conveying its pro-mail voting message, and if the Prohibition stands, plaintiff must reconsider its communications with Kansas voters.

<u>2020 Elections In Kansas</u>

For the 2020 General Election, plaintiff and its 501(c)(4) sister organization, the Center for Voter Information ("CVI"), sent advance mail ballot application packets to approximately 507,864 Kansas voters. Plaintiff's communications included a letter that (1) encouraged each voter to request and cast an advance ballot and provided instructions on how to do so,

---

the true effectiveness of the personalized applications. This finding does not, however, dispute plaintiff's evidence of its *belief* that personalizing the applications increases engagement.

(2) detailed how to opt out of future VPC communications and (3) provided a step-by-step guide on how to submit the included application.  The packet also included a postage-paid envelope addressed to the voter's county election office.  The letter's opening paragraph specifically referred to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentioned the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form.  Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Exhibit A (Doc. #145-34) at 3.  On the reverse side of the enclosed personalized advance ballot application, plaintiff also printed a step-by-step guide.

To personalize the applications, plaintiff uses statewide voter registration files obtained from data vendors and fills in parts of the advance mail ballot applications with voter information (the voter's name and address).  Plaintiff relied on a vendor, Catalist, LLC, to provide the voter registration data for the Kansas voters whom plaintiff targeted with advance voting ballot application packets.[5]  For a $200 fee, the Secretary of State's office will provide a list of all registered voters in Kansas.  That list comes from ELVIS and presents a snapshot of the state's voter file as it appears on the date when the office generates the registration list.  On January 31, April 10 and September 15, 2020, Catalist sent Kansas active voter registration lists to plaintiff.  Plaintiff's CEO Lopach testified that he does not know how often Catalist requests updated voter files from the Secretary of State's office.

Plaintiff attempts to cull its lists to ensure efficiency and accuracy.  Because ELVIS is a

---

[5]     It is not clear exactly which voters plaintiff targets.  Plaintiff at least targets some underrepresented voters who may not have the ability and availability to vote in person or the resources to navigate the mail voting application process.

dynamic system, if a third party relies on voter registration information obtained from ELVIS, some information on the pre-filled application may not match the state's voter file database when the voter receives it.  This happens when an official has updated ELVIS (e.g., noting a change of name, change of address, death or ineligibility due to criminal conviction) after the Secretary of State's office generates the voter file which the third party has requested (using the stale data).

VPC Executive Vice President Dripps testified that *nationally*, plaintiff detected that roughly five per cent of the data vendor records had an incorrect middle name or initial and roughly three per cent had a suffix that did not match the voter file.  Dripps testified that he did not know whether the errors in Kansas data matched the national numbers.

Defendants' expert witness, Ken Block, analyzed a subset of the advance ballot applications that plaintiff sent to Kansas voters in the 2020 General Election.  This subset contained 312,918 of the approximately 507,864 applications that plaintiff sent.  Block identified errors in the information that plaintiff used to pre-populate the applications.  Block attested that during the 2020 General Election, plaintiff's data contained information on 385 Kansas voters whose registrations had been cancelled.  Of those 385 Kansans, plaintiff sent (1) five separate mailings to 176 of the Kansans; (2) four separate mailings to 99 of the Kansans; (3) three separate mailings to 39 of the Kansans; and (4) two separate mailings to 11 of the Kansans. Exhibit N (Doc. #151-14) at 3-4.  Block also attested that he identified 23 pairs of matched records in which two different voters showed the same voter registration number, which purportedly indicates that plaintiff had sent a pre-filled application for Voter #1 to Voter #2. Block further attested that Kansas' own voter file properly separated these individuals.  Block did not address whether recipients actually returned these erroneous advance mail ballot

applications, or purport to demonstrate that any erroneously pre-filled application came to the attention of election officials or negatively impacted the 2020 election process. Block nonetheless attested that plaintiff's use of stale voter registration data to pre-fill the advance mail ballot applications imposed an extra burden on county election officials.

Dr. Eitan Hersh, who analyzed Block's reports, testified that actually "it seems likely that the [plaintiff's] methods *reduced* the burden on election officials." Exhibit 5 (Doc. #156-6) ¶ 41 (emphasis in original). During his deposition, Dr. Hersh stated, "all voter registration data, whether it's sourced from the state or whether it's sourced from a third party, contain obsolete records essentially the day that it is downloaded." Exhibit 1 (Doc. #167-1) at 104:22–25. Connie Schmidt, Johnson County Elections Director, testified that she is "sure there are always data entry errors" in ELVIS. Exhibit 2 (Doc. #167-2) at 107:19–24.

In his report, Dr. Hersh attested that any errors in plaintiff's lists raised by Block "are nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters." Exhibit 5 (Doc. #156-6) ¶ 16. Dr. Hersh further attested that attempts to eliminate routine error in mailing lists would be "extreme," "costly and labor intensive, and it would delay the eventual sending of the mailing." Id. ¶ 20. Dr. Hersh concluded that "Block's concerns relate to just under 3% of the records in" plaintiff's database and "[e]ven if one were to stipulate that all the issues raised by" Block existed, "the total number of problems identified by [him] is quite in line with [Dr. Hersch's] expectations." Id. ¶ 27.

Plaintiff now contracts with two data vendors to ensure it has the most accurate data when creating mailing lists. Each year, plaintiff notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions that

plaintiff plans to distribute.  In the 2020 general election, an estimated 112,000 Kansas voters used a VPC- or CVI-provided pre-paid/pre-addressed envelope to mail an advance ballot application to their county election office.  An estimated 69,000 of such Kansas voters mailed an advance voting ballot application provided by plaintiff.  In 2020, county election offices received approximately 14,739 duplicate applications from Kansas voters using VPC- or CVI-provided envelopes.[6]

The 2020 general election in Kansas had record turnout (1,375,125 votes cast, a 70.9% turnout rate) and a steep increase in advance mail voting (459,229 voted by mail, 3.2% of total votes).  This compared to 1,039,085 total votes cast in the 2018 general election, which represented a 56.4% turnout rate with 152,267 votes cast by mail, and 1,225,667 total votes cast in the 2016 general election, which was a 67.4% turnout rate with 173,457 votes cast by mail.

Conducting a high-turnout presidential election race in the middle of a worldwide pandemic introduced many challenges for election administrators.  It also presented new hurdles for some voters due to COVID-19.  In the 2020 primary and general elections, many organizations, campaigns and elections offices, including plaintiff and Kansas election officials, encouraged voters to vote by mail.  Several Kansas counties sent communications to their registered voters regarding the advance mail voting process, including advance mail ballot applications.

Many voters with concerns about lost applications or mail delays called their respective election offices to inquire about the status of their applications.  Some voters re-submitted their

---

[6]    It is not clear how many Kansas voters, if any, submitted duplicate VPC- or CVI-provided applications before the 2020 general election.

applications.  Election Commissioner Andrew Howell attested that in Shawnee County, duplicate

and inaccurately pre-filled advance mail ballot applications resulted in telephone calls, letters, e-

mails and in-office visits from voters.  Howell testified, however, that he does not believe voters

were necessarily confused and frustrated because they received pre-filled applications.  Rather,

he believes that voters erroneously assumed that the county had mailed the pre-filled ballot

applications and were frustrated at the purported incompetency of his election office.  The

Shawnee County Election Office received 4,217 duplicate applications in 2020, as compared to

the dozen or fewer that it received in the 2016 and 2018 general elections.

Howell and Ford County Election Clerk Deborah Cox attested that after receiving a

duplicate application, their election offices cannot assume that the initially submitted application

was correct.  Depending on the situation, the offices may need to send a provisional ballot to the

voter.  For this reason, reviewing a duplicate application usually takes staff more time than the

review of the initially submitted application.  If the office does not need to contact the voter, staff

can review the duplicate application in about seven to 10 minutes.  If the office must contact the

voter, staff can review the duplicate application in about 15 to 30 minutes (occasionally longer).

Cox testified that she would normally agree that at least in some ways, "pre-filled

information increased the likelihood and the ease that [her] office can match information

between the voter file and application."  Exhibit 2 (Doc. #145-3) at 150:9–14.  Douglas County

Elections Director Jamie Shew testified that if not for budgetary constraints, his office would

actually prefer to pre-fill the applications sent to voters.  In 2020, for the primary and general

elections, Johnson County mailed applications to all voters—opting to expend additional

resources to personalize the applications and it actually pre-filled more information than

plaintiff.  Staff in the Johnson County Election Office chose to pre-fill as much of the voter's information as possible.  Exhibit 12 (Doc. #145-11) at 4.  The Office reasoned that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend."  Exhibit 9 (Doc. #145-8) at 2.

Bryan Caskey, Kansas Secretary of State Elections Director, testified that the 2020 post-election audits revealed that every cast ballot was accounted for and counted properly either by hand or by machine.  When asked whether the audits revealed "any systemic fraud in Kansas elections in 2020," Caskey responded, "They did not."  Exhibit 17 (Doc. #146-16) at 282:25–283:13.

Procedural History

On June 2, 2021, plaintiff filed this suit, alleging that the enforcement of K.S.A. §§ 25-1122(k)(2) and 25-1122(l)(1) violated its First and Fourteenth Amendment rights and breached the Constitution's Dormant Commerce Clause.  On November 19, 2021 (and a nunc pro tunc Order on December 15, 2021), the Court preliminarily enjoined enforcement of Sections 3(k)(2) and 3(l)(1) of HB 2332.  Through a stipulation with plaintiff that the Court entered on February 25, 2022, defendants agreed to a permanent injunction against the enforcement of the Out-of-State Distributor Ban as violative of plaintiff's First and Fourteenth Amendment rights.

The only claims remaining in dispute pertain to the Personalized Application Prohibition. Plaintiff alleges that the statutes violate its freedom of speech (Count I) and freedom of association (Count II) and are unconstitutionally overbroad (Count III).

**Conclusions of Law**

Count I alleges that sending personalized mail ballot applications constitutes expressive

conduct, and Count II alleges that plaintiff's mailings constitute protected association.  Count III asserts that the Personalized Application Prohibition is unconstitutionally overbroad, facially and as applied to plaintiff, because it needlessly regulates a substantial amount of protected expression and associations and impermissibly chills plaintiff's speech.  Defendants argue that plaintiff's activity is non-expressive conduct, not speech or association, and that the Personalized Application Prohibition is not unconstitutionally overbroad.

## I.      Counts I and II

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The party invoking the First Amendment's protections must prove that it applies. Clark v. Cmty. for Creative Non–Violence, 468 U.S. 288, 293 n.5 (1984).  The First Amendment protects several categories of speech and expression, and the Supreme Court's decisions in this area have created a "rough hierarchy" of available protections.  R.A.V. v. City of St. Paul, 505 U.S. 377, 422 (1992).  "Core political speech occupies the highest, most protected position" in the hierarchy, while obscenity and fighting words receive the least protection.  See id.  Other categories of speech rank somewhere between these poles.  See id.

### A.      Whether the Prohibition Implicates Plaintiff's First Amendment Rights

Defendants assert that the Personalized Application Prohibition regulates non-expressive conduct and does not implicate plaintiff's First Amendment rights.  Therefore, under defendants' theory, the Personalized Application Prohibition need only be rationally related to a legitimate state interest.  If plaintiff establishes that the Personalized Application Prohibition infringes upon its protected speech, conduct or association, however, the prohibition must withstand some form

-13-

of heightened scrutiny.  Accordingly, the Court will first address whether the Prohibition restricts plaintiff's expressive conduct and association.

### i.    Expressive Conduct (Count I)

The First Amendment "literally forbids the abridgement only of speech," but its protection is not limited to just spoken or written words.  Texas v. Johnson, 491 U.S. 397, 404 (1989).  Conduct that is "sufficiently imbued with elements of communication"—known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments.  Id.; see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006).  The test to determine whether conduct is sufficiently communicative to warrant First Amendment protection was originally articulated in two seminal free-speech cases, Spence v. Washington, 418 U.S. 405 (1974), and Texas v. Johnson, 491 U.S. 397 (1989).  Summarizing these cases in Cressman v. Thompson, 719 F.3d 1139 (10th Cir. 2013) ("Cressman I"), the Tenth Circuit found that the Spence-Johnson test requires "(1) an intent to convey a particularized message, and (2) a great likelihood that the message would be understood by those who viewed the symbolic act or display."  Id. at 1149.[7]  Under this test, courts must analyze plaintiff's

---

[7]    The Tenth Circuit has questioned the viability of the Spence-Johnson test. Cressman I, 719 F.3d at 1149.  In Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos., 515 U.S. 557 (1995), the Supreme Court revisited the Spence-Johnson test and "suggested the Spence-Johnson factors are not necessarily prerequisites for First Amendment protection for symbolic speech."  Cressman I, 719 F.3d at 1149.  After Hurley, the circuit courts took "divergent approaches" to reconciling the three cases.  Cressman v. Thompson, 798 F.3d 938, 955 (10th Cir. 2015) ("Cressman II").  The Second Circuit, for example, has "interpreted Hurley to leave intact the Supreme Court's test for expressive conduct in Texas v. Johnson."  Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 n.6 (2d Cir. 2004) (citation omitted); see also Voting for Am., Inc. v. Steen, 732 F.3d 382, 388 (5th Cir. 2013) (same).  The Third Circuit, on the other hand, has held that Hurley "eliminated the 'particularized message' aspect of the Spence-Johnson test."  Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, (continued . . .)

conduct "with the factual context and environment in which it was undertaken."   <u>Spence</u>, 418 U.S. at 410; <u>see also</u> <u>Clark</u>, 468 U.S. at 294 (expressive conduct examined "in context").

Plaintiff argues that (1) it "personalizes the applications to express a specific pro-advance mail voting message to a specific voter recipient whose information [it] conveys on its communications" and (2) "tens of thousands of Kansans did in fact receive and act on [its] specific message by completing and submitting an application that [it] sent."   <u>Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment</u> (Doc. #156) filed November 4, 2022 at 89.   Defendants do not deny that plaintiff intends to communicate a particularized message but argue that (1) plaintiff communicates its messages "through the contents of a cover letter that [it] sends with the application, not through the application itself" and (2) nothing in the Personalized Application Prohibition impedes plaintiff from distributing the cover letter.   <u>Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #151) filed October 28, 2022 at 23.[8]   Defendants assert that

─────────────

160 (3d Cir. 2002).   "Other circuits fall somewhere in the middle."   <u>Cressman II</u>, 798 F.3d at 956 (citing <u>Blau v. Fort Thomas Pub. Sch. Dist.</u>, 401 F.3d 381, 388 (6th Cir. 2005) (claimants must show conduct conveys particularized message, but message need not be narrow or succinctly articulable), and <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1270 (11th Cir. 2004) (looking to whether "reasonable person would interpret [a display] as some sort of message, not whether an observer would necessarily infer a specific message")).   Ultimately, the Tenth Circuit has not defined a post-<u>Hurley</u> test but has "observed that <u>Hurley</u> suggests that a <u>Spence-Johnson</u> 'particularized message' standard may *at times* be *too high a bar* for First Amendment protection."   <u>Id.</u> (quoting <u>Cressman I</u>, 719 F.3d at 1150) (emphasis in original).

Plaintiff argues that <u>Hurley</u> eschewed any particularized message prerequisite for expressive conduct.   Although plaintiff may be correct, the Court need not reach this issue because plaintiff's conduct satisfies even the more stringent particularized message standard under <u>Spence-Johnson</u>.

[8]     As explained below, the Court doubts that "the First Amendment would countenance slicing and dicing" plaintiff's actions for constitutional purposes.   <u>League of</u>
(continued . . .)

plaintiff has not established that any recipient of the personalized application discerns any particular message.

Viewed in context, a recipient is highly likely to understand that the personalized ballot application communicates plaintiff's pro-advance mail voting message. Defendants' argument that only the cover letter communicates plaintiff's message is not convincing. An organization with a neutral or negative opinion toward advance mail voting would not expend its resources to personalize mail ballot applications for specific voters. A recipient would readily understand that through the personalized mail ballot application, plaintiff is communicating that advance mail voting is safe, secure and accessible. Plaintiff presented evidence that in the 2020 general election, approximately 69,000 recipients submitted advance voting ballot applications which it provided, which strongly suggests that Kansans not only understood plaintiff's pro-advance mail voting message but also acted on its encouragement. Plaintiff has established that through mailing personalized advance mail ballot applications to select voters in Kansas, it intends to communicate a pro-advance mail voting message and that recipients understand that message.

Relying on Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47 (2006) ("FAIR"), defendants assert that plaintiff's decision to include an explanatory cover letter in its mailing packet demonstrates that a recipient would not understand plaintiff's alleged message through the personalized mail ballot application alone. In FAIR, a group of law schools sought to restrict military recruiting on their campuses because they objected to the

---

Women Voters v. Hargett, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting Steen, 732 F.3d at 401 (Davis, J. dissenting)) (quotation marks omitted). This issue does not affect the Court's analysis here, however, because it concludes that the personalized mail ballot applications constitute protected speech.

-16-

government's policy on homosexuals in the miliary.  Id. at 52.  Accordingly, the group

challenged the Solomon Amendment—which withheld federal funds from schools that denied

equal access to military recruiters—arguing that forcing them to choose between enforcing their

nondiscrimination policy against military recruiters and continuing to receive federal funds

violated their First Amendment rights.  Id.  The Supreme Court concluded that "the conduct

regulated by the Solomon Amendment is not inherently expressive."  Id. at 66.  The Court

explained as follows:

> Prior to the adoption of the Solomon Amendment's equal access
> requirement, law schools "expressed" their disagreement with the military by
> treating military recruiters differently from other recruiters. But these actions
> were expressive only because the law schools accompanied their conduct with
> speech explaining it. For example, the point of requiring military interviews to be
> conducted on the undergraduate campus is not "overwhelmingly apparent." . . .
> An observer who sees military recruiters interviewing away from the law school
> has no way of knowing whether the law school is expressing its disapproval of the
> military, all the law school's interview rooms are full, or the military recruiters
> decided for reasons of their own that they would rather interview someplace else.

Id. (quoting Johnson, 491 U.S. at 406).

Plaintiff correctly responds that its personalized mail ballot applications are readily

distinguishable from the conduct in FAIR.  Unlike in FAIR, it is overwhelmingly apparent to

someone who receives plaintiff's application that plaintiff is expressing a pro-advance mail

voting message.  Again, only an organization which intends to convey such a message would

expend its resources to personalize and distribute advance mail ballot applications.  Defendants'

argument that the Personalized Application Prohibition merely regulates names and addresses on

paper and that a recipient would not think anything of the personalized application oversimplifies

plaintiff's claim and defies common sense.

Defendants further argue that in its order on defendants' motion to dismiss, the Court

improperly distinguished <u>Lichtenstein v. Hargett</u>, 489 F. Supp. 3d 742 (M.D. Tenn. 2020). Defendants again assert that by mailing application packets and distributing personalized mail ballot applications, plaintiff is not engaging in speech or expressive conduct.   <u>Lichtenstein</u> involved First Amendment challenges to a Tennessee statute which prohibited anyone except election officials from distributing absentee ballot applications.  <u>Id.</u> at 748.  The district court held that the law did not prohibit spoken or written expression and therefore did not restrict expressive conduct.  <u>Id.</u> at 773.

In its previous order, the Court concluded that <u>Lichtenstein</u> is not germane because plaintiff's application packets include speech that communicates a pro-mail voting message. <u>Memorandum And Order</u> (Doc. #50) filed November 19, 2021 at 12.  Defendant argues that "there is no basis for this factual distinction" and that the court in <u>Lichtenstein</u> subsequently clarified that plaintiffs there—like plaintiff here—included other "voter engagement materials" with the applications.  <u>Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #151) at 38; <u>Lichtenstein v. Hargett</u>, No. 3:20-cv-00736, 2021 WL 5826246, at *6 (M.D. Tenn. Dec. 7, 2021).  Defendants' arguments miss the point.  By personalizing the mail ballot applications, plaintiff engages in expressive conduct which is distinguishable from distributing blank absentee ballot applications.  Moreover, as explained below, the Court rejects defendants' invitation to disaggregate the application and plaintiff's other voter engagement materials.  In the final analysis, <u>Lichtenstein</u> is not persuasive or binding.

The Court finds that mailing the personalized applications is inherently expressive conduct that the First Amendment embraces.  See <u>League of Women Voters of Fla. v. Cobb</u>, 447 F. Supp. 2d 1314 (S.D. Fla. 2006); <u>see also</u> <u>Democracy N.C. v. N.C. State Bd. of Elections</u>, 476

F. Supp. 3d 158 (M.D. N.C. 2020).[9]

### ii.      Association (Count II)

In Count II, plaintiff asserts that the Personalized Application Prohibition infringes upon its First Amendment right of association.  Specifically, plaintiff argues that the Personalized Application Prohibition interferes with its associational rights by (1) "limiting its ability to associate with Kansans to persuade them to vote by mail and assist them in requesting an advance mail ballot" and (2) foreclosing plaintiff "from using the assistance it offers its intended population of underrepresented voters to gain a foothold for future electoral engagement with those voters."   Plaintiffs' Memorandum In Support Of Their Motion For Summary Judgment  (Doc. #145) filed April 14, 2022 at 30.  Defendants argue that because plaintiff's communications are unilateral acts which a recipient may ignore, the Personalized Application Prohibition does not impact plaintiff's right to associate.

The right to associate to advance beliefs and ideas is at the heart of the First Amendment. NAACP v. Button, 371 U.S. 415, 430 (1963).  An organization's attempt to broaden the base of public participation in and support for its activities is conduct "undeniably central to the exercise

---

[9]      Defendants attempt to distinguish Cobb by arguing that voter registration drives are materially different from advance mail ballot applications.  Defendants seemingly argue that because advance voting ballot applications are more directly connected to the act of voting than registration drives, Cobb is not instructive.  As plaintiff correctly responds, even if defendants' argument is correct, this speaks to state rationales for the Personalized Application Prohibition—not the expressive nature of plaintiff's conduct.

Defendants also argue that Democracy North Carolina is distinguishable from this case because "nothing in Kansas law prevents a third-party from assisting a voter in completing an advance mail ballot application."   Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) at 37.  In the same step, however, defendants concede that the Personalized Application Prohibition does bar third parties from assisting voters by personalizing and distributing unsolicited applications.  Id.  The Court is not persuaded by defendants' hollow attempt to distinguish Democracy North Carolina.

of the right of association." <u>Am. Ass'n of People with Disabilities v. Herrera</u>, 690 F. Supp. 2d
1183, 1202 (D.N.M. 2010) (quoting <u>Tashjian v. Republican Party of Conn.</u>, 479 U.S. 208, 214–
15 (1986)), <u>on reconsideration in part</u>, No. CIV-08-0702 JB/WDS, 2010 WL 3834049 (D.N.M.
July 28, 2010).  Public endeavors which "assist people with voter registration are intended to
convey a message that voting is important," and public endeavors which expend resources "to
broaden the electorate to include allegedly under-served communities" qualify as expressive
conduct which implicates the First Amendment freedom of association.  <u>Democracy N.C.</u>, 476 F.
Supp. 3d at 223 (quoting <u>Am. Ass'n of People with Disabilities</u>, 690 F. Supp. 2d at 1215–16).

In <u>Button</u>, the Supreme Court emphasized that the state "cannot foreclose the exercise of
constitutional rights by mere labels."  371 U.S. at 429.  The Court continued that plaintiff's
conduct was a protected "form of political expression" because it was "a means for achieving the
lawful objectives of equality of treatment by all government" for Black communities in the
United States.  <u>Id.</u>  The Court emphasized that "in order to find constitutional protection for th[is]
kind of cooperative, organizational activity," it "need not . . . subsume such activity under a
narrow, literal conception of free of speech, petition or assembly."  <u>Id.</u> at 430.

Plaintiff argues that as in <u>Button</u>, the Prohibition abridges its ability "to engage in
association for the advancement of beliefs and ideas" to "persuade [its audience] to action."  <u>Id.</u>
at 430, 437.  Plaintiff uses personalized mail ballot applications as its chosen "means for
achieving" its desired result: persuading its audience to request a mail ballot and assisting them
in such process.  <u>Id.</u> at 429.  Plaintiff relies on the perceived effectiveness of its personalized
communications, and the ease with which voters can act on its persuasion, to build relationships
and increase advance mail voting in Kansas.  On this record, plaintiff has established that its

personalized mail ballot applications attempt to broaden the base of public participation in and support for its activities. Plaintiff expends resources to (1) convey a message that voting is important, (2) assist potential voters to vote by advance mail and (3) broaden electorate participation to include underserved communities who may not have the ability and availability to vote in person or the resources to navigate the mail voting application process. Plaintiff's associational actions implicate First Amendment protections.

Defendants argue that unlike the recipients of plaintiff's communications in Button—who responded to the NAACP's communications by joining its litigation efforts—the recipient of a personalized mail ballot application does not subsequently join plaintiff in a common endeavor. Defendants liken plaintiff's activity to that in City of Dallas v. Stanglin, 490 U.S. 19 (1989), and Voting for America v. Andrade, 488 F. App'x 890 (5th Cir. 2012). Plaintiff responds that its association is distinct from Stanglin, where the asserted associational activity was open to "all who [were] willing to pay the admission fee." 490 U.S. at 24. Similarly, plaintiff asserts that Andrade is not instructive because Andrade addressed restrictions on collecting and returning completed ballot applications, which the Fifth Circuit "perceive[d] [as] significant[ly] distinct[]" from "activity that urges citizens to vote." 488 F. App'x at 898.

Plaintiff here identifies a specific group of voters to target for its associations and continues to associate with these voters by, for example, tracking responses to its personalized applications and sending further get-out-the-vote communications. In the 2020 general election, 69,000 voters joined plaintiff's common endeavor by requesting advance mail ballots. Plaintiff includes unsubscribe information to ensure that it only associates with voters who are engaged in its advocacy and want to associate with its cause. Unlike Stanglin and Andrade, plaintiff's

activity is directed at specific voters—underrepresented members of the electorate—and clearly urges them to vote.  The Court is not persuaded by defendants' attempt to distinguish <u>Button</u> and finds that the Personalized Application Prohibition implicates plaintiff's First Amendment right to freedom of association.

**B.      What Level of Scrutiny Applies**

Because the Prohibition infringes upon plaintiff's First Amendment rights of speech and association, the Court must decide what level of scrutiny applies: strict scrutiny or the <u>Anderson-Burdick</u> balancing test.  <u>See</u> <u>Chandler v. City of Arvada, Colo.</u>, 292 F.3d 1236, 1241 (10th Cir. 2002); <u>Citizens for Responsible Gov't State Pol. Action Comm. v.  Davidson</u>, 236 F.3d 1174, 1196 (10th Cir. 2000).  Plaintiff argues that strict scrutiny applies because the Personalized Application Prohibition restricts core political speech.  Defendants argue that because the Prohibition does not regulate core political speech, the more flexible <u>Anderson-Burdick</u> balancing test applies.

Strict scrutiny applies to restrictions on core First Amendment activities.  <u>See</u> <u>Yes On Term Limits, Inc. v. Savage</u>, 550 F.3d 1023, 1028–29 (10th Cir. 2008).  Under strict scrutiny, a state must assert a significant and compelling government interest that is sufficiently narrowly tailored to serve that interest.  <u>See</u> <u>Perry Educ. Ass'n. v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45 (1983); <u>see also</u> <u>Dias v. City & Cnty. of Denver</u>, 567 F.3d 1169, 1181 (10th Cir. 2009) ("If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest.").

The Supreme Court has stated, however, that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order,

rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974); see Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election-and-campaign-related disorder."). The Supreme Court has noted that state voting laws, whether they govern "the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affect—at least to some degree—the individual's right to vote and his right to associate with others for political ends." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)).

Accordingly, First Amendment challenges to "election code provisions governing the voting process itself" require a specialized inquiry beyond a simple "'litmus-paper test' that will separate valid from invalid restrictions." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 345 (1995) (citation omitted). In such cases, the Supreme Court has "pursued an analytical process," balancing the relative interests of the state and an individual's right to vote and evaluating the extent to which the state's interests necessitated the contested restrictions. Id. (citation omitted).

The Supreme Court has applied the Anderson-Burdick framework to cases governing the "mechanics of the electoral process" rather than election-related speech. McIntyre, 514 U.S. at 345; see also Lerman v. Bd. of Elections in City of New York, 232 F.3d 135, 146 (2d Cir. 2000) ("Restrictions on core political speech so plainly impose a severe burden that application of strict scrutiny clearly will be necessary.") (citing Buckley v. Am. Const. L. Found. Inc., 525 U.S. 182, 208 (1999) (Thomas, J., concurring)).

Although the Tenth Circuit has applied the Anderson-Burdick framework when deciding

the "constitutionality of a content-neutral regulation of the voting process," it acknowledges that courts must apply strict scrutiny "where the government restricts the overall quantum of speech available to the election or voting process." Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir. 2000). Other courts have noted that some laws which govern elections, particularly election-related speech and associations, go beyond the intersection between voting rights and election administration, and veer into the area where the First Amendment "has its fullest and most urgent application." Tenn. State Conf. of NAACP v. Hargett, 420 F. Supp. 3d 683, 701 (M.D. Tenn. 2019) (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989)).

Likening its challenge to those raised in Meyer v. Grant, 486 U.S. 414 (1988), and Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999), plaintiff argues that the Personalized Application Prohibition regulates its core political speech and association and therefore the Court must apply strict scrutiny. In Meyer, the Supreme Court struck down a Colorado ban on the use of paid petition circulators. 486 U.S. at 428. In Buckley, the Supreme Court struck down three additional Colorado restrictions on petition circulators: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the circulator's name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186 (citations omitted). The Supreme Court reasoned that the regulation of such activities concerned "a limitation on political expression subject to exacting scrutiny." Meyer, 486 U.S. at 420 (citation omitted). Rejecting the state's argument that collecting signatures could be easily separated from the regulation of speech, the Court explained that the "circulation of an initiative petition of necessity involves both the expression

of a desire for political change and a discussion of the merits of the proposed change." <u>Id.</u> at 421. "[T]o guard against undue hindrances to political conversations and the exchange of ideas," the First Amendment "requires us to be vigilant" when states regulate such activities. <u>Buckley</u>, 525 U.S. at 192. Ultimately, the Court held that the prohibitions were unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change, and [were] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." <u>Id.</u>

Plaintiff first argues that because defendants concede that its cover letter is core political speech, the Court should apply strict scrutiny to both the cover letter and the personalized mail ballot application because they are "characteristically intertwined." <u>See</u> <u>Vill. of Schaumburg v. Citizens for a Better Env't</u>, 444 U.S. 620, 632 (1980). The Supreme Court has held that where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." <u>Riley v. Nat'l Fed'n of the Blind of N.C., Inc.</u>, 487 U.S. 781, 796 (1988). The Court reasoned that such "an endeavor would be both artificial and impractical." <u>Id.</u> In <u>Village of Schaumburg</u>, for example, the Supreme Court held as follows:

> Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests— communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation *is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues*, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money.

444 U.S. at 632 (emphasis added).

Plaintiff argues that "the entire point of [its] mailer is to convey a message that voting by mail is easy and provide direct assistance and the seamless means for how voters can engage in this manner."  Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) at 85.   Accordingly, although the application itself communicates plaintiff's message, plaintiff includes the cover letter, and other instructional materials, to inform and persuade the recipient that opting to vote by mail is easily done *with the attached personalized application*.  Defendants argue that the cover letter would be "wholly unaffected" by the Personalized Application Prohibition.  Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) filed October 28, 2022 at 30.  The record, however, does not support defendants' contention.  Plaintiff's cover letter explicitly states, for example: "I have sent you the enclosed advance ballot by mail application already filled out with your name and address."  Exhibit I (Doc. #151-9) at 2.

Defendants further argue that unlike in Village of Schaumburg, the Personalized Application Prohibition does not effectively bar plaintiff's conduct.  Instead, defendants assert that even if the Personalized Application Prohibition regulates plaintiff's speech, it is a "*de minimus*" regulation.  The Supreme Court has, however, "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired."  Cal. Democratic Party v. Jones, 530 U.S. 567, 581 (2000).  Plaintiff has established that the personalized mail ballot application is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues."  Village of

Schaumburg, 444 U.S. at 632.  Defendants have provided no evidence to the contrary.  For constitutional purposes, the First Amendment does not countenance slicing and dicing plaintiff's actions.  Steen, 732 F.3d at 401 (Davis, J. dissenting).

The Court therefore rejects defendants' invitation to disaggregate the application from the cover letter, which conflicts with the Supreme Court's refusal "to separate component parts of" a communication "from the fully protected whole."  Riley, 487 U.S. at 796; see also League of Women Voters, 400 F. Supp. 3d at 720.  Because defendants concede that the cover letter, is protected core political speech, the Court applies strict scrutiny.[10]

Even if the Court were to find that it must independently analyze the personalized mail ballot application, the record supports plaintiff's contention that as in Meyer and Buckley, sending personalized applications constitutes "interactive communication concerning political change."  Meyer, 486 U.S. at 422.  Plaintiff tracks the effectiveness of its communications and from experiences believes that personalizing applications is the most effective way to convey its pro-advance mail voting message.  The Personalized Application Prohibition significantly inhibits communication with voters about proposed political change because it effectively eliminates the program which plaintiff believes most effectively delivers its message.

---

[10]     Although decided under Kansas rather than federal law, the Court notes that the Kansas Court of Appeals recently considered the constitutionality of a ballot collection restriction.  See League of Women Voters of Kan. v. Schwab, 525 P.3d 803 (Kan. Ct. App. 2023).  It held that under Kansas law, the restriction must withstand strict scrutiny because such scrutiny applies to any infringement of a fundamental right, regardless of the degree of infringement.  Id. at 824.  The court also emphasized that "other courts have been skeptical of an analytic approach that would separate an advocacy for voting from the collection of ballots or applications themselves" because "[t]his approach allows the government to indirectly burden protected activity."  Id. at 830.  Finally, the court concluded that the ballot collection limitation statute infringes upon the free speech rights of the ballot collector.  Id. at 831.

Ultimately, the Personalized Application Prohibition would reduce the total quantum of speech on this important public issue and deprive plaintiff of its First Amendment right to "select what [it] believe[s] to be the most effective means" of advocating its message, Meyer, 486 U.S. at 424; see also Chandler, 292 F.3d at 1244 (recognizing First Amendment protection for what plaintiff "believes" to be its most effective means of communication).

Defendants' argument that plaintiff remains free to communicate its pro-advance mail voting message through its cover letter misses the point. That plaintiff remains free to employ other speech to disseminate its ideas does not take plaintiff's speech outside the bounds of First Amendment protection. See Meyer, 486 U.S. at 424.

Relying on Voting for America v. Steen, 732 F.3d 382 (5th Cir. 2013), defendants argue that plaintiff's "novel theory would render virtually every feature of a state's electoral regulatory scheme vulnerable to constitutional attack just because such law might stand in the way of an advocacy organization's effort to maximize the success of its operations." Defendants' Response To Plaintiffs' Motion For Summary Judgment (Doc. #155) at 50. Plaintiff correctly responds, however, that it is not advocating for the right to a successful program but for its right to advocate its cause through the means it believes to be most effective. See Meyer, 486 U.S. at 424.

Defendants further argue that ballot applications are merely official state forms, not core political speech. Relying on Doe v. Reed, 561 U.S. 186 (2010), plaintiff responds that by personalizing the applications to a specific voter, it expresses its political view that the recipient whose name has been personalized on the application should complete and submit the application to request an advance mail ballot and participate in the upcoming election. In Reed,

the Supreme Court found that by its very inclusion on a ballot petition form, a signature "expresses the political view [of the signor] that the question should be considered by the whole electorate" and thereby constitutes "the expression of a political view" implicating a First Amendment right.  Id. at 195 (quotation marks and citation omitted).  Similarly, plaintiff here expresses its political view that the recipient of the personalized mail ballot application should vote by advance mail, and the state—having chosen to tap the energy and the legitimizing power of the democratic process—must accord the participants in that process the First Amendment rights that attach to their roles.  Id.

Finally, defendants argue that unlike the cases which address petition restrictions, the Personalized Application Prohibition "does not restrict anyone from communicating with anyone else and about anything."  Defendants' Response To Plaintiffs' Motion For Summary Judgment (Doc. #155) at 69.  Defendants oversimply the issue.  Like Meyer and Buckley, this case involves more than names and addresses on mail ballot applications or some other matter of election administration regulation.  It involves the "direct regulation of communication and political association, among private parties, advocating for a particular change," namely an increase in advance mail voting for underrepresented voters.  Hargett, 420 F. Supp. 3d at 704. Like citizen petition circulators, plaintiff uses state-created forms—advance mail ballot applications—to have an effect in the political process and express its political message that voting by mail is a safe alternative, especially for underrepresented and underserved populations. The Personalized Application Prohibition restricts "the overall quantum of speech available to the election or voting process" and must survive strict scrutiny.  Campbell, 203 F.3d at 745.

Even if the Court were to find that the Personalized Application Prohibition constitutes a

content-neutral regulation of the voting process, it must apply the Anderson-Burdick balancing framework to determine the appropriate level of scrutiny.  This approach would not necessarily change the analysis or the outcome of this case.  When the challenged law is "minimally burdensome" on the exercise of constitutional rights, Anderson-Burdick requires a "less-searching examination close to rational basis" review.  Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016) (citing Burdick, 504 U.S. at 434).  Regulations "imposing severe burdens" on plaintiff's rights, however, "must be narrowly tailored and advance a compelling state interest."  Campbell, 203 F.3d at 743 (quoting Timmons, 520 U.S. at 358).

In American Constitutional Law Foundation, Inc. v. Meyer, for example, the Tenth Circuit considered the constitutionality of a provision which provided, in part, that "[n]o petition for any ballot issue shall be of any effect unless filed with the secretary of state within six months from the date that the title, submission clause, and summary have been fixed and determined."  120 F.3d 1092, 1098 (10th Cir. 1997).  The Court of Appeals concluded that the six-month deadline was "not a significant burden on the ability of organized proponents to place a measure on a ballot" because "by planning and proper preparation of the ballot, title proponents enjoy ample time to circulate petitions."  Id. at 1099.  Accordingly, it only considered whether the state's purported interest were "sufficiently weighty to justify the limitation imposed on" plaintiffs' rights.

On the other hand, the Tenth Circuit applied strict scrutiny to the requirement that each petition circulator wear a personal identification badge.  Id. at 1101.  It rejected the state's invitation to avoid exacting scrutiny because the "First Amendment affords the broadest protection to political expression in order to assure the unfettered interchange of ideas for the

bringing about of political and social changes desired by the people." Id. at 1101–02 (quoting Buckley, 424 U.S. at 14 (quotation marks omitted)). It therefore concluded that the badge requirement chilled petition circulation. Id. at 1102.

Here, even if the Court applied the Anderson-Burdick balancing framework to determine the appropriate level of scrutiny, strict scrutiny would apply. Planning and proper preparation could not remedy plaintiff's loss: its ability to advocate its pro-advance mail voting message to underrepresented voters through the means it believes to be the most effective. The Personalized Application Prohibition criminalizes what plaintiff believes to be the most effective means of speech and association. Plaintiff has established that the Personalized Application Prohibition significantly burdens its speech and association, and as discussed below, defendants have failed to provide much, if any, factual basis to justify that burden. Because the First Amendment affords the broadest protection to political expression like plaintiff's conduct, the Personalized Application Prohibition must survive strict scrutiny even under the Anderson-Burdick framework.

## C.    Strict Scrutiny

To survive strict scrutiny, defendants must show that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest. See Yes On Term Limits, 550 F.3d at 1028 (citing Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002)). Defendants assert the following justifications for the Personalized Application Prohibition: (1) enhancement of public confidence in the integrity of the electoral process and avoiding fraud, (2) avoidance of voter confusion and (3) facilitation of orderly and efficient election administration. Defendants' Response To Plaintiff's Motion For Summary Judgment (Doc.

#155) at 56.

### i.    Public Confidence and Avoiding Fraud

Defendants argue that the Personalized Application Prohibition is narrowly tailored to achieve its interest in avoiding potential fraud.  Preventing voter fraud and preserving election integrity are important state interests.  See Timmons, 520 U.S. at 364 ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.").  The Supreme Court has observed that the courts do not "require elaborate, empirical verification of the weightiness" of the state's asserted justifications.  Id. at 364.  "Indeed, the Supreme Court has upheld what is likely a more burdensome regulation, requiring photo identification issued by the government in order to vote in person, even in the face of a record devoid of any evidence of voter fraud occurring in Indiana in its history."  Democracy N.C., 476 F. Supp. 3d at 207 (citing Crawford, 553 U.S. at 194–96).

To start, although preventing voter fraud is a potentially compelling state interest, defendants have presented no evidence of voter fraud effectuated through advance mail voting or otherwise.  Defendants have presented no evidence of a single instance in which a voter received duplicate mail ballots, and they have presented that every cast ballot was accounted for.  Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems.

As the Court noted in its order granting plaintiff's motion for preliminary injunction, defendants' argument has superficial appeal but boils down to an issue of administrative efficiency.  The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of dealing with requests for initial ballots.  See Defendants' Memorandum

<u>In Support Of Motion For Summary Judgment Regarding Counts I-III</u> (Doc. #151) at 50 ("While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate pre-filled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general.").

Even if Kansas had a problem with election fraud, the Personalized Application Prohibition is not narrowly tailored to prevent such fraud.  Defendants argue that a surge of "inaccurate and duplicate" advance mail ballot applications decreased the efficiency of county election officials, which in turn increased the "opportunity" for mistakes.  Even in a historically unprecedented election, they cite no evidence of a single mistake.  <u>Id.</u>  Given the overall surge in advance mail ballot applications, the Court does not doubt that some county election offices felt put upon or overburdened.   In the 2020 elections, many organizations, campaigns, election offices and even Kansas election officials were encouraging voters to vote by mail.  Kansas voters got the message: compared to 2018, three times as many of them voted by mail.  Because of the highly contested nature of the election, in addition to the pandemic, many voters were concerned that their mail ballots would not be received and counted, and requested duplicate ballots for peace of mind.  Defendants have not demonstrated that in this context, any "surge" of "inaccurate and duplicate" advance mail ballot requests was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit.  In fact, the record suggests that on balance, such activity is more helpful than harmful to overburdened elections officials.

Again, defendants have not presented any evidence of voter fraud effectuated on account

of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots. The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431. These safeguards are extremely effective in preventing fraud in Kansas. Plaintiff persuasively observes that following defendants' logic, "any activity that takes up an election official's time and attention can be criminalized on the basis of potential fraud." Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) filed November 4, 2022 at 114.

Even if pre-filled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue. It does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit. Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, these errors relate to under *three per cent* of plaintiff's records in a general election year that was sui generis, and the record contains no evidence that these errors had any impact on election processes. Block could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud.

### ii.   Voter Confusion

Defendants argue that the Personalized Application Prohibition prevents voter confusion because it eliminates the opportunity for mistakes in pre-filled applications and reduces any mistaken belief that the applications originated from election officials. Specifically,

-34-

defendants assert that some voters were confused about inaccurately pre-filled and duplicate applications and that this confusion caused disorder, which endangered the integrity of the election.  The state's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity.  Fish v. Kobach, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016); see also Burson v. Freeman, 504 U.S. 191, 199 (1992) (state has "compelling interest in protecting voters from confusion and undue influence").

Although protecting voters from confusion is a compelling interest, the Personalized Application Prohibition is not narrowly tailored to serve that interest.  Howell attested that duplicate and inaccurately pre-filled advance mail ballot applications resulted in telephone calls, letters, e-mails and in-office visits from voters.  Howell does not believe that voters were confused or frustrated because the applications which they received were pre-filled.  Rather, he believes that voters erroneously assumed that the county had mailed the duplicate ballot applications and were frustrated by the purported incompetency of his election office.

Given the record turnout and COVID-19, some voter confusion was perhaps inevitable.  Even assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the pre-filled advance mail ballot.  Furthermore, it is not clear that the state has a compelling interest in protecting the reputations of election officials for administrative efficiency.  Even so, defendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests.  Johnson County officials distributed pre-filled ballot applications because they believed doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix

on the backend," Exhibit 9 (Doc. #145-8) at 2, so it appears that the real problem is not pre-filled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate.  Defendants presented minimal evidence of voter confusion and frustration and have not established that the pre-filled applications caused the alleged confusion.

On this record, defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve its alleged interest in preventing voter confusion regarding the source of unsolicited pre-filled applications, or any other electoral issues.

### iii.        Orderly And Efficient Election Administration

Finally, defendants argue that the Personalized Application Prohibition is necessary to facilitate orderly and efficient administration of elections.  Preserving the integrity and administration of the electoral process is a compelling state interest.  Fish, 957 F.3d at 1133.

Defendants submitted evidence that if a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application.  If officials cannot contact the voter, the office will mail a provisional ballot to the voter.  Howell and Cox attested that reviewing a duplicate application usually takes more staff time than review of the initially submitted application.  Again, the real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not address.  Moreover, even if receiving such duplicates hinders efficient election administration, defendants have not established that in the context of an unprecedented election during a global pandemic, any "surge" of inaccurate and duplicate applications was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit.

In fact, the record suggests that on balance, personalizing advance mail ballot

applications actually facilitates orderly and efficient election administration.  Cox testified that normally she agrees that at least in some ways, pre-filled information increases the likelihood and the ease with which her office can match information between voter files and applications. Shew testified that if not for budgetary constraints, his office would prefer to personalize applications sent to voters with pre-filled information.  Even more, in the 2020 primary and general elections, Johnson County mailed applications to all voters—expending additional resources to personalize applications and actually pre-filling more information than plaintiff. Staff in the Johnson County Election Office chose to pre-fill as much of the voter's information as possible because doing so makes it easier for voters and reduces mistakes that officials have to fix on the back end.

On this record, defendants' contention that the Personalized Application Prohibition is narrowly tailored to facilitate orderly and efficient election administration is not persuasive.  The prohibition does nothing to address duplicate application concerns, and defendants have not established that pre-filling advance mail ballot applications hinders election administration.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the state's alleged interests in the enhancement of public confidence in the integrity of the electoral process and avoiding fraud, the avoidance of voter confusion or the facilitation of orderly and efficient election administration.   The Personalized Application Prohibition cannot withstand strict scrutiny and is therefore an unconstitutional infringement on plaintiff's First Amendment rights to speech and association.

## II.      Count III

Count III asserts that the Personalized Application Prohibition is unconstitutionally

overbroad because it needlessly regulates a substantial amount of protected expression and associations and impermissibly chills plaintiff's speech.   Plaintiff brings both as-applied and facial overbreadth challenges.

Facial challenges and as-applied challenges can overlap conceptually.   See Reed, 561 U.S. at 194.   Where the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs," "they must satisfy th[e] standards for a facial challenge to the extent of that reach."   Id.; see also United States v. Sup. Ct. of N.M., 839 F.3d 888, 913 (10th Cir. 2016) (same).   In Reed, for example, the Supreme Court held that because plaintiffs sought "an injunction barring the secretary of state from making referendum petitions available to the public," not just an injunction barring the public disclosure of the referendum petition involving them, plaintiffs must satisfy the "standards for a facial challenge to the extent of that reach."   561 U.S. at 194.   Here, plaintiff's claim for relief reaches beyond its particular circumstances, and the Court therefore analyzes plaintiff's claims under the heightened facial challenge standard.   Id.

A statute is "facially overbroad if it criminalizes 'a *substantial amount* of protected speech.'"   United States v. Hernandez-Cavillo, 39 F.4th 1297, 1309 (10th Cir. 2022) (quoting United States v. Williams, 553 U.S. 285, 292 (2008) (emphasis added)).   That is, "a substantial number of instances must exist in which [the Personalized Application Prohibition] cannot be applied constitutionally."   Id. (quoting N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 14 (1988)).   That number must be substantial "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."   Williams, 553 U.S. at 292.   Accordingly, the Court must compare the Personalized Application Prohibition's "legitimate and illegitimate applications."   Harmon v. City of Norman, 981 F.3d 1141, 1153 (10th Cir. 2020) (citation

-38-

omitted).  The Court may invalidate the Personalized Application Prohibition as overbroad "only if this comparison reveals 'a realistic danger that [it] . . . will significantly compromise recognized First Amendment protections'" of parties not before the Court.  Hernandez-Cavillo, 39 F.4th at 1309 (quoting N.Y. State Club Ass'n, 487 U.S. at 11).  The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial" in both absolute and relative terms.  Williams, 553 U.S. at 292.  "Application of the overbreadth doctrine . . . is, manifestly, strong medicine" which courts employ "sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973).

Defendants assert that the Personalized Application Prohibition has three legitimate purposes: eliminating voter fraud, preventing voter confusion and preserving limited resources to maintain orderly administration of the electoral process.  See Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I-III (Doc. #151) at 55.  Plaintiff argues that the Personalized Application Prohibition is facially overbroad because it punishes all advance mail ballot application personalization with the potential of criminal penalties.

The record reflects that the Personalized Application Prohibition criminalizes a substantial amount of protected speech and that any legitimate applications are hypothetical or rare.  Defendants offer little support for the claim that inaccurately personalized mail ballot applications are a significant problem and no evidence that fraudulent applications are a problem in Kansas.  Even more, "other statutes independently—and more narrowly—proscribe" the creation or submission of fraudulent advance mail ballot applications.  Hernandez-Cavillo, 39 F.4th at 1309; see e.g., K.S.A. § 25-2431.  "The availability of these alternative prosecutorial tools dilutes the force" of the Personalized Application Prohibition's legitimate application.  Id.

at 1310.  Further, defendants have presented minimal evidence of voter confusion and frustration and have not established that the pre-filled applications caused the alleged confusion.  The record also suggests that on balance, personalizing advance mail ballot applications is more helpful than harmful to overburdened elections officials.

On the other hand, the illegitimate applications are far broader.  The Personalized Application Prohibition criminalizes *all* personalization, which "may cause others not before the court to refrain from constitutionally protected speech or expression."  Hernandez-Cavillo, 39 F.4th at 1302 n.6.  The Personalized Application Prohibition does not include a scienter requirement, which creates "a real danger that the statute will chill First Amendment expression."  Id. at 1300.  Further, the Personalized Application Prohibition excludes only a subset of state and county election officials, who are permitted to mail pre-filled advance mail ballot applications.  H.B. 2332 § 3(k)(4); cf. United States v. Stevens, 559 U.S. 460, 477–78 (2010) (federal statute criminalizing animal-cruelty depictions unconstitutionally overbroad even though it excluded speech having "serious religious, political, scientific, educational, journalistic, historical, or artistic value" (quoting 18 U.S.C. § 48 (2010))).

Ultimately, the comparison of the Personalized Application Prohibition's legitimate and illegitimate applications is one-sided.  Because other statutes proscribe voter fraud, the Personalized Application Prohibition would not deprive the government of "a critical enforcement tool or leave wide swaths of criminal conduct unpunished."  Hernandez-Cavillo, 39 F.4th at 1313; see also Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 609 (1967) ("The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." (citation omitted)); cf. Younger v. Harris, 401 U.S. 37, 51

(1971) ("[I]t is well settled that [a] statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so."). Defendants have also failed to establish that inaccurately pre-filled applications caused voter confusion or that the Personalized Application Prohibition facilitates orderly election administration.

By proscribing all advance mail ballot application personalization, the Personalized Application prohibition criminalizes a substantial amount of protected speech and association. Even if a person drew directly from ELVIS to instantaneously personalize and deliver an application, the Personalized Application Prohibition prohibits that practice. Simply put, regardless of source or timing, the Personalized Application Prohibition would prohibit all personalization—meaning that "many of [the Personalized Application Prohibition's] potential applications involve protected speech." Hernandez-Cavillo, 39 F.4th at 1311. The Court therefore finds that facially, the Personalized Application Prohibition is unconstitutionally overbroad.

**IT IS THEREFORE ORDERED** that the Clerk of the Court enter judgment in favor of plaintiff. Because the second sentence of K.S.A. § 25-1122(k)(2) restricts plaintiff's core political speech and association and it cannot withstand strict scrutiny, it is an unconstitutional infringement on plaintiff's First Amendment rights to speech and association. Because plaintiff has established that the second sentence of K.S.A. § 25-1122(k)(2) criminalizes a substantial amount of protected speech, the prohibition is also unconstitutionally overbroad. Defendants are enjoined from enforcing the second sentence of K.S.A. § 25-1122(k)(2).

Dated this 4th day of May, 2023 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge