**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER,<br><br>               Plaintiffs,<br><br>    v.<br><br>SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; KRIS KOBACH, in his official capacity as Attorney General of the State of Kansas; STEPHEN M. HOWE, in his official capacity as District Attorney of Johnson County,<br><br>               Defendants. | Civil Action No. 2:21-CV-2253 |

**PLAINTIFFS' OPENING BRIEF**

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

      A.  Relevant Facts ................................................................................................... 2

      B.  Procedural History ............................................................................................. 5

ARGUMENT ......................................................................................................................... 6

    I.  The Personalized Application Prohibition Is Subject To—And Cannot Survive—Strict Scrutiny Because It Was Enacted For An Improper Purpose ........................................... 8

    II.  The Personalized Application Prohibition Cannot Survive Intermediate Scrutiny .......... 11

      A.  The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Fraud ....................................................................................................... 13

      B.  The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Confusion ................................................................................................ 15

      C.  The Personalized Application Prohibition Is Not Narrowly Tailored To Promote Orderly And Efficient Election Administration ........................................................ 18

      D.  The Personalized Application Prohibition Does Not Leave Open Ample Alternative Channels Of Communication .............................................................. 20

CONCLUSION ...................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Animal Legal Def. Fund v. Kelly*,
9 F.4th 1219 (10th Cir. 2021) ................................................................................ 8

*Bl(a)ck Tea Soc'y v. City of Boston*,
378 F.3d 8 (1st Cir. 2004) .................................................................................... 12

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) ..................................................................... passim

*Citizens for Peace in Space v. City of Colorado Springs*,
477 F.3d 1212 (10th Cir. 2007) ........................................................................... 12

*City of Austin v. Reagan National Advertising of Austin, LLC*,
596 U.S. 61 (2022).......................................................................................... 6, 8

*Cutting v. City of Portland*,
802 F.3d 79 (1st Cir. 2015)................................................................................... 20

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) .................................................................... passim

*Edenfield v. Fane*,
507 U.S. 761 (1993)............................................................................................. 12

*McCraw v. City of Oklahoma City*,
973 F.3d 1057 (10th Cir. 2020) ..................................................... 15, 16, 19, 20

*McCullen v. Coakley*,
573 U.S. 464 (2014) (Scalia, J., concurring in judgment) ............................. passim

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015).......................................................................................... 8, 11

*Rideout v. Gardner*,
838 F.3d 65 (1st Cir. 2016)............................................................................. 13, 14

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)............................................................................................. 13

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)................................................................. 12, 13, 16, 18

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .............................................................................................. 11

*VoteAmerica v. Schwab*,
    121 F.4th 822 (10th Cir. 2024) .................................................................... passim

*VoteAmerica v. Schwab*,
    671 F. Supp. 3d 1230 (D. Kan. 2023) ........................................................... passim

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .......................................................................................... 8, 11, 12

**Statutes**

Kan. Stat. Ann. § 25-1122(k)(1)-(2), (*l*)(1) (2022) ............................................ 3, 8, 9, 17

Kan. Stat. Ann. § 25-1122(*l*)(1) .................................................................................. 10

## PRELIMINARY STATEMENT

Plaintiff Voter Participation Center ("VPC") and other civic organizations encourage Kansas voters to vote by mail by sending certain registered voters an advance mail ballot application that is personalized with the voter's information. Kansas House Bill 2332 included, among other restrictions on pro-mail-voting communications, a provision that criminalized prefilling any portion of an application mailed to a voter if the mailer solicits the voter to submit the advance mail ballot application (the "Personalized Application Prohibition" or the "Prohibition"). This Court preliminarily, and then permanently, enjoined enforcement of the Personalized Application Prohibition. *See generally VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230 (D. Kan. 2023) [hereinafter *VoteAmerica I*]. Defendants appealed.

The Tenth Circuit held that "VPC's mailing of the prefilled mail-ballot applications constitutes speech entitled to First Amendment protection." *VoteAmerica v. Schwab*, 121 F.4th 822, 838 (10th Cir. 2024) [hereinafter (*VoteAmerica II*)]. Two narrow questions remain before this Court on remand: (1) did Kansas enact the Personalized Application Prohibition for an impermissible purpose or justification that warrants strict scrutiny review and (2) can the Prohibition survive the appropriate level of First Amendment scrutiny?

The record demonstrates that the Personalized Application Prohibition was enacted to target organizations encouraging Kansans to vote by mail—especially VPC—such that strict scrutiny is the appropriate level of review. However, even if this Court were to apply intermediate scrutiny, the outcome is the same: Defendants fail to carry their burden that the Personalized Application Provision is sufficiently tailored to their stated interests. The Court should enter judgment in favor of Plaintiffs.

## BACKGROUND[1]

### A.    Relevant Facts

Plaintiff VPC's core mission is to promote voting among and expand participation opportunities for traditionally underserved groups (including young voters, voters of color and unmarried women) which VPC believes in turn ensures a more robust democracy. *VoteAmerica I* at 1236. VPC primarily uses direct mailings to communicate with these voters and, based on its tracking of responses and randomized control trials, considers utilizing personalized advance mail ballot applications key to effectively advocating its message. *Id.* at 1236–37. In Kansas, VPC encourages registered voters to vote by mail by sending them a mailer that includes an advanced mail ballot application personalized with the voter's name and address. *Id.* at 1237.

During the 2020 General Election, VPC, together with its 501(c)(4) sister organization the Center for Voter Information ("CVI"), mailed personalized advance voting ballot application packets to Kansas voters. *Id.* Many other organizations, campaigns, and election offices likewise encouraged Kansas voters to vote by mail in the 2020 election, including by sending advance mail ballot applications. *Id.* at 1239. CVI and Kansas Democratic Paty also sent partially prefilled advance mail ballot applications to Kansas voters in 2020. *See* Declaration of Mark Johnson (Jan. 31, 2025) ("Johnson Decl."), Ex. 1 (Prelim. Inj. Hr'g Ex. 4 (VPC mailer)); Ex. 2 (Prelim Inj. Hr'g Ex. C (CVI mailer)); Ex. 3 (Prelim Inj. Hr'g Ex. D (Kansas Democratic Party mailer)).[2]

---

[1]    This Court made findings of fact pursuant to Rule 52(a)(1) during the bench trial on Plaintiff's claims. *VoteAmerica I* at 1234–40. The Tenth Circuit's opinion did not disturb these findings. *See VoteAmerica II* at 834 (stating that the "opinion addresses only legal issues arising from the dispute"). The parties agreed that no further discovery was necessary. *See* ECF No. 197 at 1. Plaintiff accordingly incorporates this Court's findings by reference and summarizes facts relevant to the remaining issues on remand.

[2]    This Court admitted these exhibits during the preliminary injunction hearing. *See* ECF No. 43 (Clerk's Courtroom Min. Sheet for Evidentiary Mot. Hr'g (Sept. 8, 2021)); ECF No. 45 (Tr. of Prelim. Inj. Hr'g before the Hon. Kathryn H. Vratil (Sept. 8, 2021)) at 2. For the

In the wake of 2020 election and record mail voting participation in Kansas, the Kansas Legislature enacted HB 2332 over Governor Kelly's veto, including section (*l*)(1) that barred any person from mailing or causing to be mailed "an application for an advance voting ballot, unless person is a resident of this state or is otherwise domiciled in this state" (the "Out-of-State Distributor Ban" or the "Ban") and section (k)(2), the Personalized Application Prohibition prohibiting "[a]ny person who solicits by mail a registered voter to file an application for an advance voting ballot" and includes an "application" from "complet[ing]" "any portion of such application . . . prior to mailing such application to the registered voter." *See VoteAmerica I* at 1235, 1239; Kan. Stat. Ann. § 25-1122(k)(1)-(2), (*l*)(1) (2022); ECF No. 176 (Joint Revised Uncontroverted Facts) ¶¶ 127, 130.

In these proceedings, Defendants have argued that the Personalized Application Prohibition is necessary to reduce potential voter fraud, minimize voter confusion, enhance voter confidence, and reduce inefficiencies in election administration. *See VoteAmerica I* at 1235. None of these rationales are part of the Legislative Record for HB 2332, nor did the written testimony submitted by the Office of the Kansas Secretary of State to the House and Senate Committees on Federal and State Affairs regarding the 2020 election discuss prefilled applications. *Id.*

But the Legislative Record does reflect a desire to target and stifle the speech of third-party organizations that encourage Kansas voters to vote by mail, including specifically Plaintiff VPC. The Kansas Secretary of State's written testimony advised the legislature that "[l]eading up to the 2020 general election, . . . [voters] continued to receive unsolicited advance ballot applications from third parties." *Id*. Defendants' witnesses' testimony similarly focused on third parties,

Court's convenience, Plaintiff has included the preliminary injunction exhibits as exhibits to this brief.

including VPC in particular. For example, Kansas Elections Director Bryan Caskey testified that he was aware of only two organizations that were sending advance mail ballot applications to Kansas voters: VPC and the Democratic Congressional Campaign Committee. ECF No. 176 ¶ 11 (citing Prelim. Inj. Hr'g Tr. at 70:18-25 (Caskey testifying that he was "aware of two organizations" that were the source of duplicate advance mail ballot applications: "One is the Voter Participation Center . . . and the other was the DCCC, the Democratic Congressional Campaign Committee. Those are the two entities that I'm aware of")). In addition, Shawnee County Election Commissioner Andrew Howell and Ford County Election Clerk Deborah Cox attested to issues in their respective counties arising from duplicate applications, *see VoteAmerica I* at 1239–40, and their belief that the majority of duplicate applications their offices received had been prefilled by VPC, even though they did not attempt to quantify how many duplicate applications they received involved VPC-pre-populated applications. ECF No. 176 ¶ 174. Cox also attested that "she heard from 20-30 voters per day about the advance ballot applications they were receiving from VPC (via CVI)." *Id.* ¶ 150.

The record also demonstrates a lack of tailoring between Kansas's post-hoc rationales for HB 2232 and its provisions. Despite the testimony on duplicate applications, "[t]he [P]rohibition does nothing to address duplicate application concerns." *See VoteAmerica I* at 1254. With respect to voter fraud, Caskey testified that the 2020 post-election audits did not reveal "any systemic fraud," and that "every cast ballot was accounted for and counted properly." *Id.* at 1240. As to voter confusion, Howell attested that voters contacted his office about duplicate and inaccurately prefilled advance mail ballot applications they had received but does not believe these voters were necessarily confused and frustrated because they received prefilled applications. *See id.* at 1239. With respect to efficient election administration, Plaintiffs' expert witness Dr. Eitan Hersh

4

concluded that it seemed likely that VPC's methods of prefilling applications reduced the burden on election officials. *Id.* at 1238. Cox testified that in some ways, prefilled information increased the likelihood and ease that her office can match information between the voter file and the application. *Id.* at 1240. Douglas County Elections Director Jamie Shew testified that his office would prefer to prefill applications sent to voters. *Id.* And in 2020, Johnson County mailed applications to voters that were prefilled with as much of the voter's information as possible to "make[] it easier for the voter [to complete the application] and reduce[] mistakes that [officials] then have to work harder to fix on the backend." *Id.* In sum, there is no evidence of a coherent justification for the Personalized Application Prohibition.

## B.    Procedural History

Plaintiffs filed suit alleging that the Personalized Application Prohibition and the Out-of-State Distributor Ban violated their First Amendment rights to free speech and association and were unconstitutionally overbroad, and the Out-of-State Distributor Ban violated the Dormant Commerce Clause. Plaintiffs moved for a preliminary injunction. After a live evidentiary hearing with witnesses and oral argument, this Court granted a preliminary injunction against the enforcement of both provisions. Defendants did not appeal and subsequently stipulated to a permanent injunction against the enforcement of the Out-of-State Distributor Ban and declaratory judgment that the Ban violates the First and Fourteenth Amendment, both facially and as applied to Plaintiffs. *See VoteAmerica I* at 1240; ECF No. 176 ¶¶ 185–87.

Following discovery, the parties cross-moved for summary judgment and, following conferences with this Court, stipulated to joint uncontroverted facts and that their briefs would serve as trial briefs for a bench trial. *See VoteAmerica I* at 1234. This Court held that the Personalized Application Prohibition was unconstitutional as to its abridgement of VPC's speech and associational First Amendment rights as well as its overbreadth. *See id.* at 1256. The Court

held that the Personalized Application Prohibition failed strict scrutiny as to each of the State's purported interests. *See id.* at 1254. The State presented "no" or "minimal evidence" of each purported harm and failed to establish that prefilled applications caused the alleged harms or that the Prohibition would serve the stated interests. *See generally id.* at 1251–54. The Court found that "the record suggests that on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration." *Id.* at 1254. The Court entered judgment for Plaintiffs on all counts. Defendants appealed. *See VoteAmerica II* at 827.

On appeal, the Tenth Circuit reversed the judgment on Plaintiffs' associational and overbreadth claims and remanded Plaintiffs' free speech claim. *See id.* at 854. The Tenth Circuit held that VPC's mailing of prefilling applications was protected speech that, absent evidence of improper purpose, should be subject to intermediate scrutiny. *See id.* at 838, 851. Therefore, on remand, the Tenth Circuit invited the parties to provide more focused briefing and evidence regarding whether the Prohibition was enacted for an improper purpose or justification: if so, the Court should apply strict scrutiny; if not, the Court should apply the intermediate scrutiny standard from *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 76 (2022). *See id.* at 851–52. The Court sustained the parties' agreement to submit written submissions on the remaining issues in this matter. *See* ECF No. 198.

## ARGUMENT

Under either strict or intermediate scrutiny, Defendants bear the burden of establishing that the Personalized Application Prohibition is constitutional. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012). They have failed to present evidence that soliciting voters to vote by mail by sending voters prefilled advance mail ballot applications causes any impediment to Defendants' stated interests, let alone that the Prohibition would alleviate these harms. This plainly insufficient tailoring is not only fatal to their defense, but also suggests that motivations

6

other than their stated interests motivated the enactment of HB 2332. Given the circumstances surrounding the passage of this bill and the evidence offered by Defendants, the only rational purpose of the Personalized Application Prohibition was to target and suppress speech by third parties like VPC that express a pro-vote-by-mail message. The Tenth Circuit specifically left the door open for this Court to consider whether the Prohibition was motivated by an improper purpose and, if so, to apply strict scrutiny. *See VoteAmerica II* at 851–52. It was, and this Court should apply strict scrutiny.

But even if this Court were to apply intermediate scrutiny, Defendants cannot carry their burden. In fact, many of the conclusions reached by the Court during the original bench trial apply with equal force when applying intermediate scrutiny because the Personalized Application Prohibition is so poorly tailored to Defendants' stated interests. *See VoteAmerica I* at 1252 ("Even if pre-filled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue."); *id*. at 1253 ("[D]efendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the pre-filled advance mail ballot" and "[D]efendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests . . . [because] it appears that the real problem is not pre-filled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate."); *id*. at 1254 ("The prohibition does nothing to address duplicate application concerns, and defendants have not established that pre-filling advance mail ballot applications hinders election administration.").

Accordingly, this Court should enter judgment for Plaintiffs and permanently enjoin the Personalized Application Prohibition.

**I.    The Personalized Application Prohibition Is Subject To—And Cannot Survive—Strict Scrutiny Because It Was Enacted For An Improper Purpose**

On remand, the Court must consider whether "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction." *City of Austin*, 596 U.S. at 76; *see VoteAmerica II* at 851. Laws that are facially content neutral may nevertheless be subject to strict scrutiny where they were adopted by the government "because of disagreement with the message [the speech] conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Both the text of the statute and the legislative history may point toward such an impermissible purpose. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021).

Here, the Personalized Application Prohibition functionally restricts only speech advocating for voting by mail, because only those communications would include a personalized advance mail ballot application. The restriction's practical impact of suppressing only communications encouraging registered voters to vote by mail is no coincidence; and the record suggests that this is the exact impermissible purpose for which HB 2332 was enacted.[3]

*First*, as this Court has found, and as explained below, *see infra* Sections II.A–C, there is no connection between Defendants' stated interests and the Personalized Application Prohibition. *See VoteAmerica I* at 1251–54. As the Court has observed, prefilling does not increase the risk of voter fraud, voter confusion,[2] or inefficient election administration; and it does nothing to prevent

---

[3]    In fact, the Personalized Application Prohibition applies specifically to speech "solict[ing] . . . a registered voter to file an application for an advance voting ballot." K.S.A. § 25-1122(k)(1)-(2); *see Reed*, 576 U.S. at 163–64 (holding that laws that "defin[e] regulated speech by its function or purpose . . . are subject to strict scrutiny").

[2]    With respect to voters' purported "confusion as to the source of the pre-filled advance mail ballot," *see VoteAmerica I* at 1253, in 2020, VPC, CVI, and the Kansas Democratic Party proactively included a clear statement in their cover letters that the mailers were paid for

organizations from sending multiple applications to voters. *Id*. A statute does not become "'justified without reference to the content of the regulated speech' simply because the statute itself and those defending it in court say that it is," especially where "[e]very objective indication shows that the provision's primary purpose is to restrict speech that [advances a certain viewpoint]." *See McCullen v. Coakley*, 573 U.S. 464, 502 (2014) (Scalia, J., concurring in judgment). Here, the only plausible explanation for the Personalized Application Prohibition supported by objective evidence is Defendants' desire to restrict the pro-vote-by-mail message conveyed by organizations that solicit Kansans to vote by mail.

There is a glaring disconnect between the actual issue Kansas elections officials confronted in the 2020 election—receipt of duplicate advanced mail ballot applications—and what the Personalized Application Prohibition forbids—soliciting voters to vote by mail by mailing them prefilled applications. As this Court has already found, the only election-administration concern that Defendants have demonstrated is the receipt of duplicate applications by election officials. *See VoteAmerica I* at 1254. Yet the Personalized Application Prohibition does not address duplicate applications; in fact, under the Prohibition, a person or organization is free to send as many applications to recipients as it wishes, so long as they are not prefilled. *See id.*

*Second*, while there is no rational relationship between the one problem Defendants have demonstrated (duplicate applications) and their purported solution (banning prefilled applications), the broader context of HB 2332 provides insight into their actual motivations. The Personalized Application Prohibition was part of a broader effort to restrict the distribution of advance mail

---

by a third-party organization. *See* Johnson Decl. Ex. 1 (VPC) at 3; Ex. 2 (CVI) at 2; Ex. 3 (Kansas Democratic Party) at 2. Moreover, HB 2332 now requires similar disclosures about the sender and the fact that they are not associated with the government. *See* K.S.A. § 25-1122 (k)(1)(A)–(D).

ballot applications: the legislation also passed the Out-of-State Distributor Ban, which proscribed any non-Kansas resident from "mail[ing] or caus[ing] to be mailed an application for an advance voting ballot," ECF No. 176 ¶130; K.S.A. § 25-1122(*l*)(1). Like the Prohibition, the Ban only applied to those encouraging voters to submit an advance mail ballot application. While the Out-of-State Distributor Ban is now permanently enjoined, its inclusion along with the Personalized Application Prohibition suggests that HB 2322 was aimed at limiting the flow of pro-vote-by-mail communications to Kansas voters, especially by third-party groups like Plaintiff VPC.

*Third*, there is evidence that pro-vote-by-mail groups were specifically singled out. Kansas Elections Director Bryan Caskey—who ultimately served as the 30(b)(6) witness for the office of the Kansas Secretary of State—testified that he was only aware of two organizations who sent applications that allegedly had caused duplicates: Plaintiff VPC and the Democratic Congressional Campaign Committee. *See* ECF No. 176 ¶ 11 (citing Prelim. Inj. Hr'g Tr. at 70:18-25). Election officials Howell and Cox attested to issues in their respective counties arising from duplicate applications that had been prefilled by VPC. *See VoteAmerica I* at 1239–40; ECF No. 176 ¶¶ 150, 174. But VPC takes proactive steps to avoid duplicate submissions, such as including a clear statement at the top of its cover letters that accompany personalized applications: "If you've already submitted a request for a ballot by mail for the 2020 General Election, there is no need to submit another request." *See* Johnson Decl. Ex. 1 (VPC) at 3.

Ultimately, the evidence in the record of groups that prefill applications and would be affected by the Personalized Application Prohibition are VPC, its sister organization CVI, and the Kansas Democratic Party, each of which sent mailers with personalized applications to encourage recipients to vote by mail. However, while Defendants identified these three organizations as causing duplicate submissions, all three organizations include clear statements on their mailers to

10

*discourage* voters from submitting duplicates. *See id*; Johnson Decl. Ex. 2 (CVI) at 2; Ex. 3 (Kansas Democratic Party) at 2 ("If you have already requested a ballot by mail, verify your status at KSVotes.org.")). This, too, suggests that these groups were not targeted because their mailers allegedly caused confusion or other issues, but because they encourage voters to vote by mail.

In sum, the record demonstrates that Kansas enacted the Personalized Application Prohibition for the improper purpose of restricting communications "because of disagreement with the message [they] convey[]," such that strict scrutiny applies. *See Ward,* 491 U.S. 781 at 791 (1989); *see Reed*, 576 U.S. at 164; *see also VoteAmerica II* at 852.

To survive strict scrutiny, Defendants must prove that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest. *See Reed*, 576 U.S. at 171. This Court has already determined that Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the State's alleged interests in "preventing voter fraud," "preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues," or "facilitat[ing] orderly and efficient election administration." *See VoteAmerica I* at 1251–54. The record has not changed with regard to those purported interests, so this Court's prior reasoning applies with equal force on remand: "The Personalized Application Prohibition cannot withstand strict scrutiny and is therefore an unconstitutional infringement on plaintiff's First Amendment rights to speech and association." *Id.* at 1254.

## II.    The Personalized Application Prohibition Cannot Survive Intermediate Scrutiny

Even if the Court were to conclude there is no evidence of an improper purpose or justification for the Personalized Application Prohibition such that intermediate scrutiny applies, Defendants would still fail to carry their burden. Because the Tenth Circuit has held that the Prohibition restricts speech, "the Government bears the burden of proving the constitutionality of its actions." *Doe*, 667 F.3d at 1131 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803,

11

816 (2000)). Under intermediate scrutiny, to establish that the Personalized Application Prohibition is constitutional, Defendants must show it "is narrowly tailored to achieving significant government interests, and that the [Prohibition] leaves open ample alternative channels of communication." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021). Defendants cannot carry that burden for the same reasons that they failed to carry their burden under strict scrutiny: the Prohibition is not narrowly tailored to Defendants' stated interests. The Personalized Application Prohibition is therefore an unconstitutional restriction of protected speech. The Court should enter judgment in favor of Plaintiffs and permanently enjoin enforcement of the Prohibition.

Intermediate scrutiny "demand[s] a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. at 486. First, the government "must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, (1994). "It is not enough that the [State] justify its restrictions based broadly" on general interests, as opposed to "the harms that a particular set of [restrictions] are designed to forfend." *See Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004)). The government must demonstrate "that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664. "Absent such proof, a restriction 'may not be sustained if it provides only ineffective or remote support for the government's purpose.'" *Citizens for Peace in Space*, 477 F.3d at 1220 (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

Then, the government must demonstrate that the restriction does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799 (1989). "[T]he government must demonstrate that alternative measures that burden

12

substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495.

Moreover, if the government fails to carry its burden that the restriction is narrowly tailored to serve its identified significant government interests, the Court "need not consider whether the [restriction] leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1257.

## A. The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Fraud

Defendants have failed to prove that the Personalized Application Prohibition is narrowly tailored to prevent voter fraud. To determine whether the government's stated harms are "real," courts begin with "an examination of the circumstances surrounding [the Prohibition]'s enactment." *Doe*, 667 F.3d at 1132 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315, (2000); *Turner*, 512 U.S. at 664). Here, preventing voter fraud is not "part of the Legislative Record for HB 2332." *VoteAmerica I* at 1235. As this Court found, "Defendants have presented no evidence of a single instance in which a voter received duplicate mail ballots, and they have presented that every cast ballot was accounted for." *Id.* at 1251.

Defendants' argument that "the fact that Kansas has avoided any major voter fraud from advance ballots is irrelevant" is unavailing under intermediate scrutiny, *VoteAmerica II* Dkt. No. 23-3100 (Aplt. Br.) at 54; they must show that the Personalized Application Prohibition alleviates a real harm in a "direct and material way." *See Turner*, 512 U.S. at 664. Even in the context of elections and interests that are "unquestionably 'compelling in the abstract,'" "intermediate scrutiny is not satisfied by the assertion of abstract interests." *See Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016).

For example, in *Rideout*, New Hampshire prohibited photographing marked ballots and publicizing such photos to prevent potential vote buying and voter coercion. *See id.* at 67–68.

13

While the First Circuit acknowledged that these interests were compelling in the abstract, it found that in reality, the State could not "identify a single complaint of vote buying or intimidation related to a voter's publishing a photograph of a marked ballot" since small cameras and digital photography have been ubiquitous. *See id.* at 72–73. Similarly, here, "defendants have not presented any evidence of voter fraud effectuated on account of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots." *VoteAmerica I* at 1252. "The government's burden is not met when a State offers <u>no</u> evidence or anecdotes in support its restriction." *Rideout*, 838 F.3d at 73 (emphasis original) (internal quotations and citations omitted).

In addition, as this Court has held, "[e]ven if prefilled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address this alleged issue" because the Prohibition "does not limit the number of applications a third party may send to a voter or the number of ballot applications a voter may submit." *VoteAmerica I* at 1252. To the extent Defendants rely on their expert witness's identification of purported inaccuracies in the applications VPC prefilled, "the record contains no evidence that these errors had any impact on election processes," and their expert witness "could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials." *Id.* at 1252–53. The Court's reasoning during the bench trial yields the same result under intermediate scrutiny: "Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud." *Id.*; *see Brewer*, 18 F.4th at 1220.

Moreover, Defendants have not "demonstrate[d] that alternative measures that burden substantially less speech"—such as Kansas's existing safeguards against fraud, *see VoteAmerica I* at 1236, or forbidding only inaccurately prefilling applications—"would fail to achieve the

14

government's interests." *See McCullen*, 573 U.S. at 495. Thus, Defendants' interest in preventing voter fraud does not justify the Personalized Application Prohibition under intermediate scrutiny.

### B. The Personalized Application Prohibition Is Not Narrowly Tailored To Prevent Voter Confusion

Defendants assert that the Personalized Application Prohibition is justified by their interest in avoiding voter confusion about duplicate and inaccurately prefilled advance mail ballot applications. Again, avoiding voter confusion is not part of the legislative record. *See VoteAmerica I* at 1235; *see also Doe*, 667 F.3d at 1132. In any event, Defendants' "minimal" anecdotal evidence of purported voter confusion does not demonstrate a "real" harm; and even if it did, Defendants have not established that the Personalized Application Prohibition would alleviate any confusion. *See VoteAmerica I* at 1253.

Defendants rely entirely on second-hand, anecdotal evidence that voters were confused. *See id.* at 1239, 1253 (describing Election Commissioner Andrew Howell's "belief" about why voters were frustrated); *see also* ECF No. 176 ¶¶ 141-44, 150, 162, 171, 179. Defendants did not proffer any objective evidence of voter confusion, nor did they establish that voters were confused because applications were prefilled. The Court found that Howell believed that voters were frustrated because they thought county election officers were sending duplicate applications, not because the applications were prefilled. *VoteAmerica I* at 1253. Accordingly, the Court concluded that "Defendants presented minimal evidence of voter confusion and frustration." *Id.*

Under intermediate scrutiny, the Tenth Circuit has rejected similar attempts to establish that the "recited harms are real" using unsupported anecdotal evidence. *See McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071–72 (10th Cir. 2020). In *McCraw*, Oklahoma City prohibited individuals from sitting or standing on certain road medians to protect pedestrians from traffic and avoid distracting drivers. *See id.* at 1061–62, 1071. The City sought to rely on the testimony of a

police investigator that he had seen "a couple hundred" vehicles on medians. *See id.* at 1072. The Tenth Circuit rejected this anecdotal evidence as establishing that accidents involving pedestrians on medians were an "actual issue, as opposed to a hypothetical concern" because the police investigator "could neither identify any data, reports, or other evidence to support [his] estimate, nor describe any involvement of pedestrians in these anecdotes." *See id.* Similarly, here, Defendants have not marshaled any objective evidence of voter confusion, nor have they established that any confusion was caused by the prefilled information on advance mail ballot applications. Defendants have not carried their burden under intermediate scrutiny to show that their recited harm of voter confusion caused by prefilled applications is "real."

Defendants have also failed to establish that the Personalized Application Prohibition "will in fact alleviate" voter confusion "in a direct and material way." *See Turner*, 512 U.S. at 664. This Court previously concluded that "[e]ven assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the prefilled advance mail ballot." *VoteAmerica I* at 1253. The Court reasoned that because some county election officials distributed prefilled applications, "it appears that the real problem is not prefilled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate." *Id.*

The Court's reasoning applies with equal force on remand. The Tenth Circuit has rejected similar attempts by the government to rely on "anecdotes" that are "too generic" to support the restriction at issue, or "where the nexus between the [harm] described and the conduct that the [restriction] proscribes is simply too tenuous to bolster the conclusion that the [government] narrowly tailored the [restriction]." *See Brewer*, 18 F.4th at 1237. For example, in *Brewer*, the

16

Tenth Circuit concluded that the government failed to demonstrate narrow tailoring under intermediate scrutiny where it supported a restriction of pedestrians on medians or in travel lanes based on "City Councilors' and their constituents' own observations and experiences," testimony about general traffic safety issues, "vague, second-hand accounts," and "good common sense.' *See id.*

As in *Brewer*, "in many respects, the situations described by the anecdotes are largely divorced from the central thrust of the [restriction]"—here, to ameliorate the purported harms caused by prefilled advance mail ballot applications. *See id.* Defendants' "anecdotal evidence simply misses the mark," and while general observations about voter confusion (such as the number of duplicate applications) may be "relevant factors in an overarching policymaking process," "they have little bearing, in *this* case, on the question of whether the [restriction] is narrowly tailored to achieving significant government interests that are real and not speculative." *See id.* at 1238 (emphasis original). Accordingly, under intermediate scrutiny, Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve their alleged interest in preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues.

Moreover, Defendants have failed to explain why less restrictive alternatives would fail to serve these interests. *See McCullen*, 573 U.S. at 495. HB 2332 requires disclosures about the sender of an unsolicited advance mail ballot (which Plaintiffs do not challenge), including a clear statement that "This is not a government mailing." *See* K.S.A. § 25-1122(k)(1)(A)–(D). Defendants have not demonstrated how the Personalized Application Prohibition avoids voter confusion about the sender of a prefilled application at all, much less why the required disclosures or other less restrictive measures included in the same bill would fail to serve this interest.

17

**C.      The Personalized Application Prohibition Is Not Narrowly Tailored To Promote Orderly And Efficient Election Administration**

Defendants assert that the Personalized Application Prohibition is justified by the State's interest in promoting orderly and efficient election administration. Like Defendants' stated interests in preventing voter fraud and voter confusion, promoting orderly and efficient election administration is not part of the legislative record. *See VoteAmerica I* at 1235; *see also Doe*, 667 F.3d at 1132. In any event, Defendants have failed to establish that prefilling hinders orderly election administration, or that the Prohibition "will in fact alleviate these harms in a direct and material way." *See Turner*, 512 U.S. at 664.

Defendants submitted evidence about the cure process for inaccurate or incomplete applications. *See VoteAmerica I* at 1236, 1254. However, Defendants "could not connect the alleged errors in plaintiff's mailing list with errors in applications received by election officials" that required curing, *id.* at 1252–53, and have not offered any evidence that personalizing advance mail ballot applications causes voters to submit incomplete applications. Defendants also submitted evidence about the process election officials undertake when they receive a duplicate application and the number of duplicate applications election officials received. *See id.* at 1239–40. However, while Defendants assert that there was a "surge" of "inaccurate and duplicate" advance mail ballot request, this Court previously concluded that "Defendants have not demonstrated that in this context, any 'surge' . . . was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit." *Id.* at 1252; *see id.* at 1254. Accordingly, the Personalized Application Prohibition would not "alleviate these harms." Again, these factual findings were not disturbed by the Tenth Circuit's opinion and apply on remand.

Moreover, this Court previously found that "on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration." *Id.* at 1254. The

Tenth Circuit has similarly credited evidence that the prohibited conduct actually serves the stated interests when applying intermediate scrutiny. *See, e.g.*, *McCraw*, 973 F.3d at 1072 (crediting plaintiffs' "evidence that they feel <u>safer</u> on medians than on sidewalks," as well as evidence of a "safety zone" on medians and the fact that most pedestrian fatalities occur "mid-block" and "not on medians" (emphasis original)).

Here, as in *McCraw*, VPC has both proffered evidence of its well-founded belief that mailing personalized applications increases voter engagement and identified evidence that election officials—including Defendants' witnesses—believe that prefilling makes it easier for election officials to carry out their duties. *See VoteAmerica I* at 1236–37 (citing testimony of VPC President and CEO Thomas Lopach), 1240 (citing testimony of Defendants' witness Ford County Election Clerk Deborah Cox and Plaintiffs' witness Douglas County Elections Director Jamie Shew). In addition, Johnson County mailed applications to voters in 2020 that prefilled more information than VPC. *Id.* at 1254. And Plaintiffs' expert witness Dr. Eitan Hersh opined that "it seems likely that the [plaintiff's] methods reduced the burden on election officials." *Id.* at 1238. In light of this evidence, Defendants have "not met [their] burden to demonstrate that its interest is based on a concrete, non-speculative harm." *See McCraw*, 973 F.3d at 1073. Based on this record and reasoning, the Court's conclusion that "defendants have not established that prefilling advance mail ballot applications hinders election administration" applies with equal force when applying intermediate scrutiny. *See VoteAmerica I* at 1254.

Lastly, Defendants have failed to demonstrate that they considered less burdensome alternatives that would promote orderly and efficient election administration. "The real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not

19

address." *See id.* And Defendants have proffered neither evidence nor argument that they considered any alternatives that would alleviate issues caused by duplicate applications.

### D.      The Personalized Application Prohibition Does Not Leave Open Ample Alternative Channels Of Communication

Defendants have failed to carry their burden that the Personalized Application Prohibition is narrowly tailored to any of their three asserted interests such that the Court "need not consider whether the [restriction] leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1257; *see McCullen*, 573 U.S. at 496 n.9; *see also Cutting v. City of Portland*, 802 F.3d 79, 88 (1st Cir. 2015) ("[T]he fact that there are other places where plaintiffs may engage in their expressive activity 'misses the point' of the narrow tailoring inquiry.").

In any event, Defendants have failed to make a showing that there are ample alternative channels for Plaintiff's speech, and that those channels are adequate. *See McCraw*, 973 F.3d at 1078. Defendants ignore "practical recognition of the facts giving rise to the [Prohibition]" that advocates like VPC may not be able to justify or afford engaging in a less effective mailing campaign with exclusively blank applications, which in turn limits their "ability to reach [their] intended audience[s]." *See id.* Accordingly, the Personalized Application Prohibition cannot survive intermediate scrutiny.

### CONCLUSION

For the foregoing reasons, Defendants have failed to carry their burden that the Personalized Application Prohibition can survive intermediate scrutiny, much less strict scrutiny. This Court should enter judgment in favor of Plaintiffs and permanently enjoin the enforcement of the Prohibition.

20

Date: January 31, 2025

By:  */s/ Mark P. Johnson*
Mark P. Johnson

Danielle M. Lang (*pro hac vice*)
Alice C.C. Huling (*pro hac vice*)
Katherine Hamilton (*pro hac vice*)
**CAMPAIGN LEGAL CENTER**
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(202) 736-2200
DLang@campaignlegalcenter.org
AHuling@campaignlegalcenter.org
KHamilton@campaignlegalcenter.org

Mark P. Johnson KS Bar #22289, D. Kan. #22289
**DENTONS US LLP**
4520 Main Street, Suite 1100
Kansas City, MO 64105
816/460-2400
816/531-7545 (fax)
mark.johnson@dentons.com

Jonathan K. Youngwood (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Brooke Jarrett (*pro hac vice*)
Nicole A. Palmadesso (*pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
bonnie.jarrett@stblaw.com
nicole.palmadesso@stblaw.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on this 31st day of January 2025, a copy of Plaintiffs'

Opening Brief has been served upon other counsel of record via electronic mail only, to the

following:

Bradley J. Schlozman (KS Bar #17621)
Scott R. Schillings (Bar # 16150)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, KS 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com
E-mail: sschillings@hinklaw.com

*Attorneys for Defendants*


*/s/ Mark P. Johnson*
Mark P. Johnson

22