## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| VOTEAMERICA and VOTER PARTICIPATION CENTER, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 21-2253-KHV |
| SCOTT SCHWAB, in his official capacity as Secretary of State of the State of Kansas; KRIS KOBACH, in his official capacity as Attorney General of the State of Kansas; and STEPHEN M. HOWE in his official capacity as District Attorney of Johnson County, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

### MEMORANDUM AND ORDER

VoteAmerica and Voter Participation Center ("VPC") bring suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. VPC alleges that by preventing third parties from mailing prefilled mail ballot applications, Section 3(k)(2) of HB 2332 (codified as K.S.A. § 25-1122(k)(2)) violates its freedom of speech under the First Amendment, U.S. Const. amend. I. Pretrial Order (Doc. #140) filed September 30, 2022 at 15.

This matter is before the Court on Plaintiffs' Opening Brief (Doc. #200) filed January 21, 2025, Defendants' Response To Plaintiff VPC's Brief Following Remand (Doc. #202) filed March 14, 2025 and Plaintiffs' Reply To Defendants' Response Following Remand (Doc. #204) filed April 4, 2025. After careful consideration, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

For reasons set forth below, the Court finds in favor of plaintiff.[1]

**Findings Of Fact**

Many of the Court's findings of fact are set forth in its <u>Memorandum And Order</u> (Doc. #183) filed May 4, 2023 ("<u>VoteAmerica I</u>").  The Tenth Circuit did not alter those findings on appeal, and on remand, the parties agreed that no further discovery or fact finding was necessary.  The Court repeats its original findings of fact but supplements them to address issued raised on appeal to the Tenth Circuit.

**I.    Personalized Application Prohibition**

On February 10, 2021, the Kansas Legislature introduced HB 2332, which included restrictions on the distribution of advance mail ballot applications to potential Kansas voters.[2]  On May 3, 2021, over the veto of Governor Laura Kelly, the legislature enacted HB 2332.  In part, HB 2332 sought to regulate third parties who use direct mailings to Kansas voters to

---

[1]    VoteAmerica has resolved all claims against defendants pursuant to a joint stipulation by the parties.  <u>See</u> <u>Stipulated Order For Permanent Injunction And Declaratory Relief</u> (Doc. #73) filed February 25, 2022.  Because VoteAmerica's claims have been fully resolved, the Court's reference to plaintiff is to VPC.

[2]    The legislation included several changes to Kansas election law.  Relevant to this lawsuit, HB 2332 contained the Personalized Application Prohibition and the Out-of-State Distributor Ban.  The Out-of-State Distributor Ban stated that "No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."  HB 2332, Session of 2021 (Kan.), § 3(l)(1).  The legislation also (1) prohibited the Kansas Governor, Secretary of State or Judicial Branch from modifying state election laws, <u>id.</u> at § 1(a)–(b), (2) required each county election officer to maintain a residential address and mailing address for each registered voter if the mailing address differed from the residential address, <u>id.</u> at § 2, (3) required organizations to include certain information and disclosures (such as the name and address of the mailing organization) on the mail ballot application, <u>id.</u> at § 3(k)(1), and (4) expanded the crime of election tampering to include changing, attempting to change, altering, destroying, concealing or manipulating any vote or voting mechanism and knowingly producing false vote totals, <u>id.</u> at § 4.

encourage them to vote by mail. As to direct mailings which include an application for an advance voting ballot, the statute stated as follows:

> The application for an advance voting ballot included in such mailing shall be the official application for advance ballot by mail provided by the secretary of state. *No portion of such application shall be completed prior to mailing such application to the registered voter.*

K.S.A. § 25-1122(k)(2) (italics added) ("the Personalized Application Prohibition").[3]

The Personalized Application Prohibition applies to any person or organization who solicits a registered voter by mail. It prohibits mailing to a registered Kansas voter an advance mail ballot application that is personalized, i.e. prefilled with any personalized information such as the voter's name or address. Id. A violation is a class C nonperson misdemeanor, which is punishable by up to one month in jail and/or fines.[4]

The State argues that the Personalized Application Prohibition is necessary to (1) minimize voter confusion and disenfranchisement, (2) preserve and enhance voter confidence

---

[3]    On April 9, 2025, defendants notified the Court that Governor Laura Kelly has signed into law HB 2016, which amended K.S.A. § 25-1122(k)(2) in part. See Defendants' Notice Of Statutory Amendments To K.S.A. § 25-1122(k)'s Pre-Filled Application Prohibition (Doc. #205). Effective July 1, 2025, the amended provision states as follows:

> The application for an advance voting ballot included in such mailing shall be the official application for advance ballot by mail provided by the secretary of state **or the appropriate county election office.** No portion of such application shall be completed prior to mailing such application to the registered voter**, except that the date of the election may be printed on the application.**

HB 2016, Session of 2025 (Kan.), § 2(k)(2) (changes in bold). The parties have not filed supplemental briefing or sought leave to file supplemental briefing on the amendment. The parties agree that the amendment does not alter the First Amendment issue in this case.

[4]    The statute carves out exceptions by permitting a subset of state and county election officials to mail prefilled advance mail ballot applications.

and (3) reduce potential voter fraud by reducing inaccurate applications and inefficiencies in election administration. Exhibit 34 (Doc. #145-37) filed October 14, 2022 at 3–4. These rationales are not a part of the Legislative Record for HB 2332, and the State does not explain how the Personalized Application Prohibition advances these objectives.

In February of 2021, the Office of the Kansas Secretary of State submitted written testimony regarding the State's 2020 general election to both the House and Senate Committees on Federal and State Affairs. Among other things, the testimony advised the legislature on problems which state and local election officials encountered in that election. It specifically stated as follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties. This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26) filed October 28, 2022. On March 17, 2021, the Kansas Secretary of State submitted written testimony on HB 2332 which did not discuss prefilled applications but mentioned "incomplete mail ballot applications." Exhibit 32 (Doc. #145-31) at 3.

## II.    Voting In Kansas

Schwab is the Chief Election Officer for Kansas. As such, he oversees all Kansas elections and administers the State's election laws and regulations. Schwab also gives guidance and instruction on election procedures and requirements to county election officers. Kansas law permits Schwab to adopt rules and regulations related to advance voting, including the general form of advance voting ballots and applications for advance mail voting. K.S.A. §§ 25-1131, 25-

1121(a)–(b), 25-1122d(c); see also HB 2332, Session of 2021 (Kan.), §§ 3(k)(2), (m).

The Kansas state voter registration database is known as the Election Voter Information System ("ELVIS"). Schwab is responsible for maintaining the online voter registration database. 52 U.S.C. § 21083(a)(1)(A). In all 105 counties in Kansas, county election officials perform all additions, deletions and modifications of records in the database, and ELVIS reflects the voter data maintained by those county officials. When a county election office receives a voter registration application, an election official puts that voter's registration information into the State's central database and thereby creates a voter record in ELVIS. ELVIS reflects real-time changes that officials make to individual voter files.

To vote by mail in Kansas, a voter generally must complete an advance ballot application and return it to the county election office where the voter is registered.[5] The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431.

If a voter timely submits an advance voting ballot application, a county election official processes the application and, if the county accepts the application, mails the voter an advance ballot packet.[6] If a voter submits an inaccurate or incomplete application, a county election

---

[5]     To vote by mail, voters on the permanent advance voting list and voters who vote by mail pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 et seq., need not file advance ballot applications.

[6]     Under Kansas law, an advance voting ballot application can be filed with the county between 90 days prior to the general election and the Tuesday of the week preceding the general election. K.S.A. § 25-1122(f)(2). Except for voters who are entitled to receive ballots under the Uniformed and Overseas Citizens Absentee Voting Act, counties cannot transmit advance ballots to voters before the 20th day before the election for which an application has been received. K.S.A. §§ 25-1123(a), 25-1220. For advance voting ballot applications received

(continued . . .)

official must contact the voter and "cure" the application.  If the official cannot contact the voter, the office will mail the voter a provisional ballot.

An advance voting ballot application must precisely match the information in ELVIS; otherwise, the county election office must contact the voter to cure the mismatch or discrepancy. Officials may only overlook mismatches that are clearly inadvertent (e.g., minor misspelling of a street name such as omitting the letter "e" or signing as "Jim" despite being registered as "James").  Once the county election office processes an advance ballot application, it documents in ELVIS the date that it processed the application and transmitted the regular or provisional ballot to the voter.  In ELVIS, county election offices also document whether (and when) a voter has returned an advance ballot.

## III.    Voter Participation Center

Plaintiff's core mission is to promote voting among traditionally underserved groups— including young voters, voters of color and unmarried women—at rates commensurate with voters in other groups.[7]  Plaintiff believes that when more eligible voters participate in elections, it benefits democracy in the United States and that encouraging and assisting voters to participate in elections through mail voting ensures a robust democracy.  Plaintiff believes that mail voting expands participation opportunities among its target voters—some of whom may not have the ability to vote in person or the resources to navigate the mail voting application process.

---

[6] (. . .continued)
on or after the 20th day before the election, the county generally must process them within two business days of receipt.  K.S.A. § 25-1123(a).

[7]      The record contains no information about whether other organizations are dedicated to promoting voting, or what demographic sectors they might target.

Plaintiff primarily uses direct mailings to encourage these voters to register and participate in the electoral process.  VPC President and Chief Executive Officer Thomas Lopach testified that plaintiff believes sending personalized advance mail ballot applications "increases voter engagement," which Lopach defines as a broad associational base of potential voters in Kansas.  Exhibit 7 (Doc. #147-5) filed October 15, 2022 at 167:22–168:15.[8]  Plaintiff believes that providing underserved groups the necessary personalized advance mail voting applications is key to effectively advocating its message.

Plaintiff encourages registered Kansans to participate in this manner by mailing voters a communication package that advocates voting by mail and provides a personalized advance mail ballot application.  Through these communications, plaintiff communicates its message that advance mail voting is safe, secure, accessible and beneficial. Providing personalized applications to young voters, voters of color and unmarried women provides them simple access to advance mail ballot applications.  Plaintiff tracks recipient responses to its communications and conducts randomized control trials to evaluate the effectiveness of its mailings.

Lopach and VPC Executive Vice President Lionel Dripps testified that plaintiff engages voting behavior and quantitative research professionals, including but not limited to Christopher B. Mann, associate professor of political science at Skidmore College, to analyze the efficacy of its direct mail programs.  Plaintiff believes that personalized applications are the most effective

---

[8]    To support its belief that sending personalized applications increases voter engagement, plaintiff relies on a 2006 election cycle study which, among other things, evaluated the effectiveness of personalizing advance mail ballot applications.  Defendants argue that the study is inadmissible hearsay if offered to prove the effectiveness of the personalized applications.  This argument does not address plaintiff's *belief* that personalizing the applications increases engagement.

means of conveying its pro-mail voting message and that if the prohibition stands, plaintiff must reconsider its communications with Kansas voters.

## IV.     2020 Elections In Kansas

For the 2020 General Election, plaintiff and its 501(c)(4) sister organization, the Center for Voter Information ("CVI"), sent advance mail ballot application packets to approximately 507,864 Kansas voters.  Plaintiff's communications included a letter that (1) encouraged each voter to request and cast an advance ballot, (2) provided instructions on how to do so, (3) detailed how to opt out of future VPC communications and (4) provided a step-by-step guide on how to submit the included application.  The packet also included a postage-paid envelope addressed to the voter's county election office.  The letter's opening paragraph specifically referred to "the enclosed advance voting application already filled out with [the voter's] name and address" and mentioned the personalization in the closing "P.S." message: "We have already filled in your name and address on the enclosed form.  Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." Exhibit A (Doc. #145-34) at 3.  On the reverse side of the enclosed personalized advance ballot application, plaintiff also printed a step-by-step guide.

To personalize the applications, plaintiff uses statewide voter registration files obtained from data vendors and completes parts of the advance mail ballot application forms with the voter's name and address.  Plaintiff has relied on a vendor, Catalist, LLC, to provide the voter registration data for the Kansas voters whom plaintiff targeted with advance voting ballot application packets.  For $200, the Secretary of State's office will provide a list of all registered voters in Kansas.  That list comes from ELVIS and is a snapshot of the State's voter file as it

appears on the date when the office generates the registration list.  Plaintiff's CEO Lopach does not know how often Catalist requests updated voter files from the Secretary of State's office, but on January 31, April 10 and September 15, 2020, Catalist sent Kansas active voter registration lists to plaintiff.

Plaintiff attempts to cull its lists to ensure efficiency and accuracy.  If a third party relies on voter registration information obtained from ELVIS, because ELVIS is a dynamic system, some information on a prefilled application may not match the State's voter file database when the voter receives it.  This happens when an official has updated ELVIS (e.g., noting a change of name, change of address, death or ineligibility due to criminal conviction) after the Secretary of State's office generates the voter file which the third party has requested.

VPC Executive Vice President Dripps testified that *nationally*, plaintiff detected that roughly five per cent of the data vendor records had an incorrect middle name or initial and roughly three per cent had a suffix that did not match the voter file.  Dripps testified that he did not know whether the errors in Kansas data matched the national numbers.

Defendants' expert witness, Ken Block, analyzed a subset of the advance ballot applications that plaintiff sent to Kansas voters in the 2020 general election.  This subset contained 312,918 of the approximately 507,864 applications that plaintiff sent.  Block identified errors in the information that plaintiff used to pre-populate the applications.  Block attested that during the 2020 General Election, plaintiff's data contained information on 385 Kansas voters

whose registrations had been cancelled.[9]  Block also identified 23 pairs of matched records in which two different voters showed the same voter registration number, even though Kansas voter files properly separated these individuals.[10]  Block did not purport to demonstrate that any erroneously prefilled application came to the attention of election officials, however, or conclude that they negatively impacted the 2020 election process.  Block attested that plaintiff's use of stale voter registration data to prefill the advance mail ballot applications imposed an extra burden on county election officials, but he did not explain how it did so.

Dr. Eitan Hersh, who analyzed Block's reports, testified that actually "it seems likely that the [plaintiff's] methods *reduced* the burden on election officials."  Exhibit 5 (Doc. #156-6) filed November 4, 2022, ¶ 41 (emphasis in original).  During his deposition, Dr. Hersh stated, "all voter registration data, whether it's sourced from the state or whether it's sourced from a third party, contain obsolete records essentially the day that it is downloaded."  Exhibit 1 (Doc. #167-1) filed December 8, 2022 at 104:22–25.  Connie Schmidt, Johnson County Elections Director, testified that she is "sure there are always data entry errors" in ELVIS.  Exhibit 2 (Doc. #167-2) at 107:19–24.

In his report, Dr. Hersh attested that any errors which Block identified "are nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters."  Exhibit 5 (Doc. #156-6), ¶ 16.  Dr. Hersh further attested that attempts to eliminate routine error

---

[9]     Of those 385 Kansans, plaintiff sent (1) five separate mailings to 176 of the Kansans; (2) four separate mailings to 99 of the Kansans; (3) three separate mailings to 39 of the Kansans; and (4) two separate mailings to 11 of the Kansans.  Exhibit N (Doc. #151-14) at 3–4.

[10]     This mismatch suggests that plaintiff had sent prefilled applications for Voter #1 to Voter #2.  Block did not address whether recipients actually returned these erroneous advance mail ballot applications.

-10-

in mailing lists would be "extreme," "costly and labor intensive" and "would delay the eventual sending of the mailing."  Id., ¶ 20.  Dr. Hersh concluded that Block's concerns relate to just under three per cent of the records in plaintiff's database and "[e]ven if one were to stipulate that all the issues raised by" Block existed, "the total number of problems identified by [him] is quite in line with [Dr. Hersch's] expectations."  Id., ¶ 27.

To ensure it has the most accurate data when creating mailing lists, plaintiff now contracts with two data vendors.  Each year, plaintiff notifies the Kansas Director of Elections of its upcoming advance mail voting program and seeks feedback on the forms and instructions that it plans to distribute.  In the 2020 general election, an estimated 112,000 Kansas voters used a VPC-provided or CVI-provided pre-paid/pre-addressed envelope to mail an advance ballot application to their county election offices.  An estimated 69,000 of such Kansas voters mailed an advance voting ballot application provided by plaintiff.  In 2020, county election offices received approximately 14,739 duplicate applications from Kansas voters using VPC-provided or CVI-provided envelopes.[11]

The 2020 general election in Kansas was one of a kind.  It had record turnout (1,375,125 votes cast, a 70.9 per cent turnout rate) and a steep increase in advance mail voting (459,229 mail ballots, 3.3 per cent of total votes).  This compared to 1,039,085 total votes cast in the 2018 general election, which represented a 56.4 per cent turnout rate with 152,267 votes cast by mail (1.5 per cent), and 1,225,667 total votes cast in the 2016 general election, which was a 67.4 per

---

[11]    It is not clear whether Kansas voters submitted duplicate VPC-provided or CVI-provided applications before the 2020 general election or if so, how many.  The parties agree that the 2020 election was unique, however, so references to prior elections are not particularly instructive.

cent turnout rate with 173,457 votes cast by mail (1.4 per cent).

Conducting a high-turnout presidential election race in the middle of a worldwide pandemic introduced many challenges for election administrators. COVID-19 also presented new hurdles for some voters. In the 2020 primary and general elections, many organizations, campaigns and elections offices, including plaintiff and Kansas election officials, encouraged voters to vote by mail. Several Kansas counties directly sent communications to registered voters regarding the advance mail voting process, including advance mail ballot applications.

Many voters had concerns about lost applications or mail delays and called their election offices to inquire about the status of their applications. Some voters re-submitted their applications. Election Commissioner Andrew Howell attested that in Shawnee County, duplicate and inaccurately prefilled advance mail ballot applications resulted in telephone calls, letters, e-mails and in-office visits from voters. Howell believed that voters were confused and frustrated, but not necessarily because they received prefilled applications. He believed that voters erroneously assumed that the county had mailed multiple prefilled ballot applications and were frustrated at the purported incompetency of his election office. The Shawnee County Election Office received 4,217 duplicate applications in 2020, as compared to the dozen or fewer that it received in the 2016 and 2018 general elections.

Ford County Election Clerk Deborah Cox testified that in the lead-up to the 2020 election, she heard from 20 to 30 voters a day about advance ballot applications. She had to send an ad to three Ford County newspapers to remind voters that most prefilled applications had not come from the county election office. Howell and Cox attested that these voters told election officials in Shawnee and Ford Counties that they thought they were required to complete and

return the prefilled applications even if they had already submitted applications. Howell and Cox attested that after receiving a duplicate application, their election offices could not assume that the initially submitted application was correct. Depending on the situation, the offices might need to send the voter a provisional ballot. For this reason, reviewing a duplicate application usually took staff more time than reviewing the initial application. If the office did not need to contact the voter, it could review the duplicate application in about seven to 10 minutes. If the office had to contact the voter, it could review the duplicate application in about 15 to 30 minutes (occasionally longer).

Though Howell and Cox believe that VPC had prefilled most of the duplicate applications which they received, Kansas election officials did not attempt to quantify how many duplicate applications in the 2020 general election involved VPC-prefilled applications. When they received an incomplete or inaccurate application, officials did not determine whether it was prefilled or track how many of them were prefilled. County election officials helped voters cure their applications regardless whether the voter had used a blank form or a prefilled form.

Cox testified that she would normally agree that at least in some ways, "pre-filled information increased the likelihood and the ease that [her] office can match information between the voter file and application." Exhibit 2 (Doc. #145-3) at 150:9–14. Douglas County Elections Director Jamie Shew testified that if not for budgetary constraints, his office would actually prefer to prefill the applications sent to voters. In 2020, for the primary and general elections, Johnson County mailed applications to all voters, and it spent additional resources to personalize the applications. The Johnson County Election Office chose to prefill as much of the voter's information as possible, and it actually prefilled more information than plaintiff did.

Exhibit 12 (Doc. #145-11) at 4. It reasoned that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend." Exhibit 9 (Doc. #145-8) at 2.

Bryan Caskey, Kansas Secretary of State Elections Director, testified that the 2020 post-election audits revealed that every cast ballot was accounted for and counted properly either by hand or by machine. When asked whether the audits revealed "any systemic fraud in Kansas elections in 2020," Caskey responded, "They did not." Exhibit 17 (Doc. #146-16) filed October 15, 2022 at 282:25–283:13.

### Procedural Background

On June 2, 2021, VoteAmerica and VPC filed suit for declaratory and injunctive relief against Scott Schwab in his official capacity as Kansas Secretary of State, Kris Kobach in his official capacity as Kansas Attorney General and Stephen M. Howe in his official capacity as District Attorney of Johnson County. See Complaint For Declaratory And Injunctive Relief (Doc. #1). VoteAmerica and VPC alleged that the Personalized Application Prohibition and Out-of-State Distributor Ban in HB 2332 violated their First Amendment rights to freedom of speech and freedom of association and were unconstitutionally overbroad.[12] Id. at 22–30 (Counts I–III). VoteAmerica and VPC also alleged that the Out-of-State Distributor Ban violated the Dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Id. at 30–33 (Count IV).

After an evidentiary hearing on September 8, 2021, the Court preliminarily enjoined defendants from enforcing both provisions of HB 2332. Memorandum And Order (Doc. #50)

---

[12]    As noted, the Out-of-State Distributor Ban prohibited any person or entity who was not a resident of Kansas or otherwise domiciled in Kansas from mailing an advance mail ballot application to a Kansas voter. HB 2332, Session of 2021 (Kan.), § 3(l)(1).

filed November 19, 2021.  VoteAmerica and VPC stipulated to a permanent injunction against enforcement of the Out-of-State Distributor Ban as violating plaintiffs' First and Fourteenth Amendment rights.  See Stipulated Order For Permanent Injunction And Declaratory Relief (Doc. #73) filed February 25, 2022.  The claims remaining pertained to the Personalized Application Prohibition—Counts I, II and III.[13]

On October 14, 2022, the parties filed cross-motions for summary judgment.  See Defendants' Motion For Summary Judgment Regarding Counts I–III (Doc. #141); Plaintiff's Motion For Summary Judgment (Doc. #144).  The parties agreed to submit the case by written submissions, with their summary judgment briefs serving as trial briefs.  On May 4, 2023, based largely on stipulated facts, the Court held that the Personalized Application Prohibition violated the First Amendment.  VoteAmerica v. Schwab, 671 F. Supp. 3d 1230, 1254 (D. Kan. 2023) ("VoteAmerica I").  Specifically, the Court held that (1) mailing personalized voting applications is inherently expressive conduct which the First Amendment protects, id. at 1244; (2) the Personalized Application Prohibition implicates plaintiff's First Amendment right to freedom of association, id. at 1246; (3) because the Personalized Application Prohibition restricts the overall quantum of speech available to the election or voting process, it is subject to strict scrutiny, id. at 1250; (4) the Personalized Application Prohibition was not narrowly tailored to achieve the State's compelling interest in preventing voter fraud and voter confusion, protecting election integrity or facilitating the orderly and efficient administration of elections, id. at 1253–54; and

---

[13]     As noted, the parties stipulated that the Personalized Application Prohibition does not apply to VoteAmerica's conduct.  See Stipulated Order For Permanent Injunction And Declaratory Relief (Doc. #73); see also Pretrial Order (Doc. #140) at 4–5.  The Court therefore considers only VPC's claims.

(5) facially, the Personalized Application Prohibition is unconstitutionally overbroad, id. at 1256. That same day, May 4, 2023, the Court entered judgment on all counts in favor of plaintiffs.  See Judgment In A Civil Case (Doc. #184).  Defendants appealed.  See Notice of Appeal (Doc. #187) filed June 1, 2023.

On November 12, 2024, the Tenth Circuit reversed the Court's judgment and remanded for further proceedings.  VoteAmerica v. Schwab, 121 F.4th 822, 827 (10th Cir. 2024) ("VoteAmerica II").  As relevant here, the Tenth Circuit reversed the Court's application of strict scrutiny to plaintiff's freedom of speech claim, holding that absent an improper purpose or justification for the statutory prohibition, intermediate scrutiny applies.[14]  Id. at 834.  The Tenth Circuit left to this Court the task of deciding what degree of scrutiny to apply, and applying it with the benefit of focused briefing on the remaining issues.  Id.

## Conclusions Of Law

Plaintiff alleges that the Personalized Application Prohibition is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech.   The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."   U.S. Const. amend. I.   "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve

---

[14]     The Tenth Circuit also reversed the Court's judgment on plaintiff's freedom of association and overbreadth claims, instructing the Court on remand to enter judgment for defendants.  Id. at 852, 854.

compelling state interests."[15]  Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015).   The rationale behind this general prohibition is that "content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 188 (2007) (quotations omitted).   Under the umbrella of content-based laws, viewpoint discrimination is a "particularly egregious form of content discrimination."  Vidal v. Elster, 602 U.S. 286, 293 (2024) (quotations omitted).  "A viewpoint-based regulation targets not merely a subject matter, but particular views taken by speakers on a subject," and is generally subject to heightened scrutiny.  Id. (quotations omitted).

Courts use a two-step inquiry to determine whether a regulation is content-based and subject to strict scrutiny.  First, the Court considers whether—on its face—the law is content-based.  Reed, 576 U.S. at 165.  If it is, strict scrutiny applies "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."  Id.  Nevertheless, some facially content-based restrictions pose only a slight threat to free speech, so adequate protection is afforded by lesser constitutional scrutiny.[16] R.A.V. v. City of St. Paul, 505 U.S. 377, 382–83 (1992).  Second, if the law is facially content-neutral, the Court considers whether the government adopted the regulation for an improper purpose or justification, i.e. the suppression of free expression.  Id. at 166; United States v. Eichman, 496 U.S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based

---

[15]    By contrast, content-neutral laws—those justified without reference to the content of the regulated speech—may be justified only if the government proves that they are narrowly tailored to serve a significant governmental interest.  Brewer v. City of Albuquerque, 18 F.4th 1205, 1220 (10th Cir. 2021).

[16]    Obscenity, defamation and "fighting words" are categories of content-based speech that receive lesser constitutional protection.  R.A.V., 505 U.S. at 383.

limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted interest is related to the suppression of free expression." (quotations omitted)). If an improper purpose or justification underpins an otherwise facially content-neutral law, the law is considered content-based and subject to strict scrutiny. City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 76 (2022).

Here, the Tenth Circuit has held that the Personalized Application provision prohibits certain content on its face: the information necessary to complete any portion of an advance mail ballot application. VoteAmerica II, 121 F.4th at 850. It also held that because the Personalized Application Prohibition is viewpoint neutral, "the threat to free speech posed by the Prohibition is sufficiently small that (absent evidence that it was enacted for an improper purpose or justification) adequate protection is provided by intermediate scrutiny." Id. The Court therefore first examines whether defendants enacted the Personalized Application Prohibition for an improper purpose or justification.

## I.     Whether Defendants Enacted The Personalized Application Prohibition For An Improper Purpose Or Justification

As noted, strict scrutiny applies if the State enacted the Personalized Application Prohibition for an improper purpose or justification. City of Austin, 596 U.S. at 76. In making this assessment, the Court considers whether the prohibition "cannot be justified without reference to the content of the regulated speech" or whether it "was adopted by the government because of disagreement with the message the speech conveys." TikTok Inc. v. Garland, 145 S. Ct. 57, 67 (2025). A purpose or justification is improper if it is "related to the suppression of free expression." Eichman, 496 U.S. at 315; see also Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984) (considering whether "ordinance was

designed to suppress certain ideas that the City finds distasteful" and if "bias or censorship" underpin enactment). Simply put, the government may not legislate "based on hostility—or favoritism—towards the underlying message expressed." R.A.V., 505 U.S. at 382. A regulation does not have an underlying improper purpose or justification, however, merely because "it may disproportionately affect speech on certain topics" or "it has an incidental effect on some speakers or messages but not others." McCullen v. Coakley, 573 U.S. 464, 480 (2014).

The key question in determining whether a regulation is neutral is whether the law is "justified without reference to the content of the regulated speech." Id. To determine this, the Court considers the statute's stated purposes, the purposes of the statute as advanced by the government in litigation and legislative purposes which the Court can infer when a statute singles out a particular topic.[17] Id. at 480–82.

To show that a facially content-neutral regulation is subject to strict scrutiny, plaintiff bears the burden of showing by a preponderance of the evidence that defendants adopted the regulation because of disagreement with the message it conveys. See Signs for Jesus v. Town of Pembroke, N.H., 977 F.3d 93, 101 (1st Cir. 2020) ("To show that a facially content-neutral regulation is subject to strict scrutiny, the plaintiff must show not only that the restriction distinguishes between speakers, but also that it 'reflects a content preference.'" (quoting Reed, 576 U.S. at 170)); Free Speech Coal., Inc. v. Att'y Gen. of U.S., 677 F.3d 519, 534 (3d Cir.

---

[17]        The Court may also rely on statements by legislators and concerned citizens about the passage of the regulation. Harmon v. City of Norman, Okla., 61 F.4th 779, 790 (10th Cir. 2023). The record here contains no such statements, and in any event, the Supreme Court has warned that it is a "hazardous matter" to inquire into congressional purpose or motive because what motivates one legislator does not necessarily reflect the intent of the legislature as a whole. United States v. O'Brien, 391 U.S. 367, 383–84 (1968).

2012) ("To demonstrate that a restriction is content based and thus subject to strict scrutiny, Plaintiffs must show that the Statutes single out speech for special treatment because of the effect that speech will have on its audience."); McCoy v. Town of Pittsfield, N.H., 59 F.4th 497, 506 (1st Cir. 2023) (plaintiff produced no evidence that ordinance could not be justified without reference to speech, so ordinance subject to intermediate scrutiny).[18]  Once plaintiff makes this showing, the burden shifts to defendants to justify the regulation.  See Brewer, 18 F.4th at 1220.

Here, as noted, HB 2332 does not explicitly set forth its purpose.[19]  Retroactively, defendants offer three justifications for it: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.  HB 2332 addresses many issues in addition to the Personalized Application Prohibition, however, and defendants do not explain how that prohibition is designed to minimize voter confusion, facilitate efficiency in election administration, promote confidence in and protect the integrity of the electoral process or make mail ballots more secure.

Facially, defendants' three justifications do not reference the content of ballot application forms or reflect disagreement with the message that plaintiff conveys by personalizing the forms

---

[18]    The Tenth Circuit has not explicitly held that plaintiff bears the burden of showing that the legislature enacted a regulation because of disagreement with the message it conveys.  In Pahls v. Thomas, 718 F.3d 1210 (10th Cir. 2013), however, it did state that to establish viewpoint discrimination, *plaintiff* must show that a government official acted with discriminatory purpose.  718 F.3d at 1236.

[19]    As noted, HB 2332 addressed various election matters in addition to the Personalized Application Prohibition.  It also restricted the distribution of ballots by non-Kansas residents (the Out-of-State Distributor Ban), set address requirements for mail ballots, enacted standards for disclosures on advance ballot applications, restricted the authority of state executives and the judicial branch to modify election laws and expanded the crime of election tampering.  See supra note 2.

with voter information.  See TikTok, 145 S. Ct. at 68 ("preventing China from collecting vast amounts of sensitive data" is content-neutral justification); Harmon, 61 F.4th at 790 (noise control is content-neutral justification).  As to legislative history, on February 18, 2021, the Office of the Kansas Secretary of State submitted written testimony regarding the State's 2020 general election to the House and Senate Committees on Federal and State Affairs.  The testimony advised the legislature as follows:

> Leading up to the 2020 general election, state and county election officials were inundated with calls from confused voters who submitted an advance by mail ballot application but continued to receive unsolicited advance ballot applications from third parties.  This created a substantial workload increase for local election offices who had to process thousands of duplicate forms at a time when county election officials were preparing for a high turnout, statewide election, in the middle of a pandemic.

Exhibit Z (Doc. #151-26).  On March 17, 2021, the Kansas Secretary of State submitted written testimony on HB 2332 which mentioned "incomplete mail ballot applications."[20]  Exhibit 32 (Doc. #145-31) at 3.

Approximately three months after the 2020 presidential election, on February 10, 2021, the legislature introduced HB 2332, which contained the Personalized Application Prohibition, Out-of-State Distributor Ban and other regulations of advance voting by mail.[21]  At a high level of generality, the timing of HB 2332 could support defendants' proffered justifications for the legislation as a whole.  In Evans v. Sandy City, the city prosecutor had received notice of safety problems and accidents related to panhandling.  944 F.3d 847, 854 (10th Cir. 2019).  To remedy

---

[20]     It did not specifically discuss prefilled applications, which would seem to prevent incomplete mail ballot applications, rather than facilitate them.

[21]     See supra notes 2 and 19.

the safety hazards, the prosecutor drafted an ordinance which prohibited individuals from sitting or standing on medians that were unpaved or less than 36 inches wide.  Id. at 852, 854.  The Tenth Circuit found that the process and timeline of the ordinance's enactment confirmed defendant's public safety justification for it.  Id. at 854.  Here, viewing HB 2332 as a whole, the legislature could have enacted it to generally minimize voter confusion, mitigate workload issues for local election offices and protect the integrity of the electoral process with regard to advance ballot applications.  But defendants' stated justifications do not explicitly address the logic behind the Personal Application Prohibition.  On this record, the evidence raises a reasonable inference that the legislature enacted the Personalized Application Prohibition because of disagreement with speech which advocates voting by mail.  This is particularly true when the Personalized Application Prohibition is read alongside the Out-of-State Distributor Ban, which is also part of HB 2332, and viewed in historical context.

As noted, the 2020 election was one of a kind—election officials in each state had to conduct a high-turnout presidential election race in the midst of a worldwide pandemic.  The 2020 election also stood out for another reason: widespread claims that the U.S. presidential election was fraudulent and that mail ballots in particular were partly to blame.  Before the election, President Donald Trump, state election groups and individual voters filed numerous lawsuits regarding state election processes, including challenges to mail ballots.  See O'Rourke v. Dominion Voting Sys. Inc., 552 F. Supp. 3d 1168, 1190–92 (D. Colo. 2021) (compiling 2020 election lawsuits).  For example, in Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331 (W.D. Pa. 2020), plaintiffs challenged a number of Pennsylvania's procedures for voting by mail, including the (1) use of drop boxes and other satellite ballot-collection sites;

(2) procedures for verifying the qualifications of voters applying in person for mail-in or absentee ballots; and (3) rules for counting non-compliant ballots.[22]  493 F. Supp. 3d at 344.  In Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354 (D.N.J. 2020), plaintiffs challenged New Jersey legislation which allowed "election officials to canvass mail-in ballots ten days before Election Day and to canvass mail-in ballots received within two days of Election Day even if those ballots lack[ed] a postmark from the United States Postal Service."  492 F. Supp. 3d at 358.  In Martel v. Condos, 487 F. Supp. 3d 247 (D. Vt. 2020), plaintiffs challenged the Vermont Legislature's decision "to authorize the Secretary of State to require local election officials to send ballots by mail to all registered voters."  487 F. Supp. 3d at 248.  In Gallagher v. N.Y. State Bd. of Elections, 496 F. Supp. 3d 842 (S.D.N.Y. 2020), plaintiffs challenged New York law which required that mail-in absentee ballots be postmarked by election day to be counted.  496 F. Supp. 3d at 847.

The lawsuits continued after election day.  For example, in King v. Whitmer, 505 F. Supp. 3d 720 (E.D. Mich. 2020), plaintiffs sought a declaratory judgment "that mail-in and absentee ballot fraud must be remedied with a manual recount or statistically valid sampling." 505 F. Supp. 3d at 730.  Across the country, courts dismissed suits which challenged election processes and election results because plaintiffs failed to prove fraud or illegal conduct.  See e.g., Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 381 (3rd. Cir. 2020) ("Free, fair elections are the lifeblood of our democracy.  Charges of unfairness are serious.  But

---

[22]     The Court does not cite these lawsuits for the truth of the evidence established therein, but takes judicial notice to show widespread partisan disagreement, and litigation over mail-in ballot procedures and whether they were responsible for the "stealing" of the 2020 election.  See Gilchrist v. Citty, 71 Fed. App'x 1, 3 (10th Cir. 2003).  These cases evidence the fact that voting by mail became a topic of partisan political debate and widespread litigation.

calling an election unfair does not make it so.  Charges require specific allegations and then

proof.  We have neither here.").  On January 6, 2021, the day Congress was to certify the

2020 election results, President Trump made the following statements:

- [T]his year, using the pretext of the China virus and the scam of mail-in ballots, Democrats attempted the most brazen and outrageous election theft and there's never been anything like this.  So pure theft in American history.  Everybody knows it.

- More than 10,000 votes in Pennsylvania were illegally counted, even though they were received after Election Day. In other words, they were received after Election Day. Let's count them anyway.

- And what they did in many cases is, they did fraud.  They took the date and they moved it back so that it no longer is after Election Day.  And more than 60,000 ballots in Pennsylvania were reported received back.  They got back before they were ever supposedly mailed out.  In other words, you got the ballot back before you mailed it, which is also logically and logistically impossible, right?

- In the state of Arizona, over 36,000 ballots were illegally cast by non-citizens. Two thousand ballots were returned with no address. More than 22,000 ballots were returned before they were ever supposedly mailed out. They returned, but we haven't mailed them yet.

- In Michigan, quickly, the secretary of state, a real great one, flooded the state with unsolicited mail-in ballot applications sent to every person on the rolls in direct violation of state law.

- We will ban ballot harvesting and prohibit the use of unsecured drop boxes to commit rampant fraud. These drop boxes are fraudulent. Therefore, they get disapp — they disappear, and then all of a sudden they show up.  It's fraudulent.

- We will stop the practice of universal unsolicited mail-in balloting.

Transcript of Trump's speech at rally before US Capitol riot, Associated Press (Jan. 13, 2021)

available    at    https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-

media-e79eb5164613d6718e9f4502eb471f27 (last visited June 23, 2025).[23]    President Trump further stated, "Now, it is up to Congress to confront this egregious assault on our democracy. And after this, . . . we're going to walk down to the Capitol . . . [b]ecause you'll never take back our country with weakness." Id.  Around one hour later, the United States Capitol building was breached.  Lisa Mascaro et al., Pro-Trump mob storms US Capitol in bid to overturn election, Associated Press (Jan. 5, 2021) available at https://apnews.com/article/congress-confirm-joe-biden-78104aea082995bbd7412a6e6cd13818 (last visited June 23, 2025).

The Kansas Legislature convened on January 11, 2021, two months after the 2020 general election and five days after January 6, 2021.[24]  One month later, on February 10, 2021, the legislature introduced HB 2332, which contained the Personalized Application Prohibition.  Aside from the language of the Personalized Application Prohibition, the Court finds no direct contemporaneous evidence of legislative intent for this provision.  Defendants' stated reasons for HB 2332 as a whole are not implausible, but as applied to the Personalized Application Prohibition, they are not more credible than plaintiff's position that the legislature enacted the Personalized Application Prohibition for an improper purpose.  Plaintiff bears the burden of proof, and the Court finds that it is more probably true than not true that the Kansas Legislature enacted the Personal Application Prohibition to suppress speech which favors voting

---

[23]    Again, the Court takes judicial notice of news articles for proof that a matter is publicly known or believed, not for the truth of the matter asserted.  Est. of Lockett by & through Lockett v. Fallin, 841 F.3d 1098, 1111 (10th Cir. 2016).

[24]    As set forth in the Kansas Constitution, the legislature convenes on the second Monday in January.  Kan. Const. art. 2, § 8.  In 2021, the second Monday of January was January 11.  See Plotner v. AT & T Corp., 224 F.3d 1161, 1167 n.1 (10th Cir. 2000) (court can take judicial notice of calendar and days of week on which certain dates fall).

by mail.[25]  In so holding, the Court considers the temporal proximity, the passion which the 2020 election inspired even before January 6, 2021, the widespread claims of election fraud and litigation related thereto, the culminating events of January 6, 2021, and the fact that the State has offered no rationale which explicitly links prefilled ballot applications to the stated reasons for the Personalized Application Prohibition.  As noted, before and after the 2020 election, mail-in voting had become one of several scapegoats for the alleged "stealing" of the 2020 presidential election.  In Kansas however, one week after the election, on November 10, 2020, Schwab had publicly declared that the 2020 election in Kansas was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems—an undisputed fact which calls into question any purported legislative intent to root out fraud, promote efficiency or avoid voter confusion in Kansas elections.  See McCullen, 573 U.S. at 481–82 (court can infer legislative purpose when statute singles out particular topic).

As noted, plaintiff bears the burden of showing that defendants enacted the prohibition because of disagreement with speech which advocates voting by mail.  Plaintiff has made this showing.  The Court finds that following the 2020 election, defendants enacted the Personalized Prohibition to suppress speech which advocates voting by mail.  It therefore merits strict scrutiny.

## II.    Whether The Personalized Application Prohibition Survives Strict Scrutiny

In VoteAmerica I, the Court held that the Personalized Application Prohibition could not withstand strict scrutiny and that it was therefore an unconstitutional infringement on plaintiff's

---

[25]    Through the Out-of-State Distributor Ban, the State also sought to silence speakers like VoteAmerica who advocated voting by mail but were not residents of Kansas.

First Amendment rights to speech.  VoteAmerica I, 671 F. Supp. 3d at 1251–54.  The Court reaffirms its conclusions of law here.

    A.    <u>Whether The Personalized Application Prohibition Is Narrowly Tailored To The Government's Interests</u>

To survive strict scrutiny, defendants must show that the Personalized Application Prohibition is narrowly tailored to serve a compelling state interest.  See Yes On Term Limits, Inc. v. Savage, 550 F.3d 1023, 1028 (10th Cir. 2008) (citing Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002)).  As noted, defendants assert the following justifications for the prohibition: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.

### 1.    Voter Confusion

Defendants argue that the Personalized Application Prohibition prevents voter confusion because it eliminates the opportunity for mistakes in prefilled applications and reduces any mistaken belief that the applications originated from election officials.  Specifically, defendants assert that some voters were confused about inaccurately prefilled and duplicate applications, and that this confusion caused disorder, which endangered the integrity of the election.  The State's interest in minimizing voter confusion is connected to its broader legitimate interest in protecting election integrity.  Fish v. Kobach, 189 F. Supp. 3d 1107, 1148 (D. Kan. 2016); see also Burson v. Freeman, 504 U.S. 191, 199 (1992) (state has "compelling interest in protecting voters from confusion and undue influence").

Although protecting voters from confusion is a compelling interest, the Personalized Application Prohibition is not narrowly tailored to serve that interest.  Howell attested that duplicate and inaccurately prefilled advance mail ballot applications resulted in telephone calls,

letters, e-mails and in-office visits from voters. But Howell did not believe that voters were confused or frustrated because the applications which they received were prefilled; he believed that voters erroneously assumed that the county had mailed the duplicate ballot applications and were frustrated by the purported incompetency of his election office. Moreover, HB 2332 requires the following disclosure on a mail ballot application: "Disclosure: This is not a government mailing. It is from a private individual or organization." HB 2332, Session of 2021 (Kan.), § 3(k)(1)(d). This provision addresses defendants' concern that voters were confused about the source of the prefilled applications.

Even assuming that receiving duplicate advance ballot applications confused some voters, defendants presented no evidence on how criminalizing the mailing of personalized mail ballot applications would prevent confusion as to the source of the prefilled advance mail ballot. Furthermore, it is not clear that the State has a compelling interest in protecting the reputations for administrative efficiency of county election officials. Even so, defendants have not established that the Personalized Application Prohibition is narrowly tailored to protect their reputational interests. Johnson County officials distributed prefilled ballot applications because they believed that doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend." Exhibit 9 (Doc. #145-8) at 2. It therefore appears that the real problem is not prefilled applications but duplicate applications—which the Personalized Application Prohibition does not attempt to regulate.

In short, defendants have presented minimal evidence of voter confusion and frustration and have not established that the prefilled applications caused the alleged confusion. On this record, defendants have not established that the Personalized Application Prohibition is narrowly

tailored to achieve its interest in preventing voter confusion regarding the source of unsolicited prefilled applications, or any other electoral issues.

### 2.      Efficient Election Administration

Defendants argue that the Personalized Application Prohibition is necessary to facilitate orderly and efficient administration of elections.    Preserving the integrity and administration of the electoral process is a compelling state interest.  Fish, 957 F.3d at 1133.

Defendants submitted evidence that if a voter submits an inaccurate or incomplete application, county election officials must contact the voter and "cure" the application.   If officials cannot contact the voter, the office will mail a provisional ballot to the voter.  Howell and Cox attested that reviewing a duplicate application usually takes more staff time than reviewing the initial application.  Again, the real issue here seems to be duplicate applications, which the Personalized Application Prohibition does not address.  Moreover, even if duplicates hinder efficient election administration, defendants have not established that in the context of an unprecedented election during a global pandemic, any "surge" of inaccurate and duplicate applications was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit.

In fact, the record suggests that on balance, personalizing advance mail ballot applications actually facilitates orderly and efficient election administration.  Cox testified that normally she agrees that at least in some ways, prefilled information increases the likelihood and the ease with which her office can match information between voter files and applications.  Shew testified that if not for budgetary constraints, his office would prefer to personalize applications sent to voters with prefilled information.  Even more, in the 2020 primary and general elections,

Johnson County mailed applications to all voters—expending additional resources to personalize applications and actually prefilling more information than plaintiff did. It chose to prefill as much of the voter's information as possible because doing so makes it easier for voters and reduces mistakes that officials have to fix on the back end.

On this record, defendants' contention that the Personalized Application Prohibition is narrowly tailored to facilitate orderly and efficient election administration is not persuasive. The prohibition does nothing to address duplicate application concerns, and defendants have not established that prefilling advance mail ballot applications hinders election administration. Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve the State's alleged interests in the enhancement of public confidence in the integrity of the electoral process, avoiding fraud and voter confusion or facilitating orderly and efficient election administration.

### 3.    Public Confidence And Election Integrity

Defendants argue that the Personalized Application Prohibition is narrowly tailored to achieve its interest in avoiding potential fraud. Preventing voter fraud and preserving election integrity are important state interests. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."). The Supreme Court has observed that courts do not "require elaborate, empirical verification of the weightiness" of the State's asserted justifications. Id. "Indeed, the Supreme Court has upheld what is likely a more burdensome regulation, requiring photo identification issued by the government in order to vote in person, even in the face of a record devoid of any evidence of

voter fraud occurring in Indiana in its history." Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 207 (M.D. N.C. 2020).

To start, although preventing voter fraud is a compelling state interest, defendants have presented no evidence of voter fraud effectuated through advance mail voting, prefilled ballot applications or otherwise. Defendants have presented no evidence of a single instance in which a specific voter received duplicate mail ballots, and they have presented evidence that every cast ballot was accounted for. Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems.

As the Court noted in its order granting plaintiff's motion for preliminary injunction, defendants' argument has superficial appeal but boils down to an issue of administrative efficiency. The real issue seems to be that the process of preventing duplicate ballots takes more time than the process of dealing with requests for initial ballots. See Defendants' Memorandum In Support Of Motion For Summary Judgment Regarding Counts I–III (Doc. #151) filed October 28, 2022 at 50 ("While Kansas appears to have avoided any systemic fraud in its recent elections, the surge of inaccurate and duplicate prefilled advance voting ballot applications in 2020 taxed the ability of overburdened county election offices to timely and efficiently process such applications, which also necessarily increased the opportunity for mistakes to be made both in connection with advance voting ballot applications and election administration in general.").

Even if Kansas had a problem with election fraud, the Personalized Application Prohibition is not narrowly tailored to prevent such fraud. Defendants argue that a surge of "inaccurate and duplicate" advance mail ballot applications decreased the efficiency of county

election officials, which in turn increased the "opportunity" for mistakes. Yet even in a historically unprecedented election, they cite no evidence of a single mistake. Id. Given the overall surge in advance mail ballot applications, the Court does not doubt that some county election offices felt put upon or overburdened. In the 2020 elections, in part due to the pandemic, many organizations, campaigns, election offices and even Kansas election officials were encouraging voters to vote by mail. Kansas voters got the message: compared to 2018, three times as many of them voted by mail. Because of the highly contested nature of the election, in addition to the pandemic, many voters were concerned that their mail ballots would not be received and counted—so they requested duplicate ballots for peace of mind. Defendants have not demonstrated that in this context, any "surge" of "inaccurate and duplicate" advance mail ballot requests was fairly attributable to activity which the Personalized Application Prohibition seeks to prohibit. In fact, the record suggests that such activity is more helpful than harmful to overburdened election officials.

Again, defendants have not presented any evidence of voter fraud effectuated on account of personalized advance ballot applications or any other reason, or even a single instance in which a voter received or cast duplicate mail ballots. The advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications. See, e.g., K.S.A. § 25-2431. These safeguards are extremely effective in preventing fraud in Kansas. Plaintiff persuasively observes that following defendants' logic, "any activity that takes up an election official's time and attention can be criminalized on the basis of potential fraud." Plaintiff Voter Participating Center's Opposition To Defendants' Motion For Summary Judgment (Doc. #156) filed November 4, 2022 at 114.

Even if prefilled or duplicate applications raised fraud concerns in Kansas, the Personalized Application Prohibition does nothing to address the alleged concern. It does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit. Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, these errors relate to under *three per cent* of plaintiff's records in a general election year that was sui generis, and the record contains no evidence that these errors had any impact on election processes. Block could not connect the alleged errors in plaintiff's mailing list to errors in applications received by election officials.

Defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any alleged interest in preventing voter fraud. The Personalized Application Prohibition therefore cannot withstand strict scrutiny on this ground.

**III.   Whether The Personalized Application Prohibition Survives Intermediate Scrutiny**

If the State had not enacted the Personalized Application Prohibition because of disagreement with speech which advocates voting by mail, the Court would apply intermediate scrutiny to that provision.[26] Under intermediate scrutiny, the government has the burden of showing that the regulation is "narrowly tailored to achieving significant government interests"

---

[26]   Without reference to the facts of which the Court takes judicial notice, plaintiff's case for strict scrutiny is much closer. In advance of this order, the Court did not inform the parties of the facts of which it now takes judicial notice. See Fed. R. Evid. 201(e). Accordingly, if any parties want to be heard on the issue of judicial notice, on or before July 14, 2025 at 5:00 PM, they may file an appropriate motion.

and "leaves open ample alternative channels of communication."[27]  Brewer, 18 F.4th at 1220.

Plaintiff does not disagree that the State has important interests in minimizing voter confusion, facilitating efficiency in election administration and fostering confidence in and protecting the integrity of the electoral process.  Rather, plaintiff argues that the Personalized Application Prohibition is not narrowly tailored to serve these interests.

     A.    Whether The Personalized Application Prohibition Is Narrowly Tailored To The Government's Interests

The narrow tailoring requirement demands a "close fit between ends and means." McCullen, 573 U.S. at 486.  Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994); see Brewer, 18 F.4th at 1226 (defendants must show real, non-speculative harms ameliorated by statute).[28]  "So

---

[27]    Defendants argue that the advance mail ballot application is a non-public forum and therefore the proper test is reasonableness, not intermediate scrutiny. Specifically, defendants assert that the Court should consider whether the government's decision to restrict the distribution of advance mail ballot applications to potential Kansas voters was reasonable.  The Court rejects this argument for two main reasons.  First, defendants raise this argument for the first time on remand.  Defendants never raised a forum analysis challenge before this Court or before the Tenth Circuit, and the argument is glaringly absent from the pretrial order.  For this reason, the Court does not consider the argument.  See Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1093 (10th Cir. 2015) (non-jurisdictional argument not raised on appeal is waived on remand); Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002) (party waives claims, issues or defenses not included in pretrial order).  Second, the Tenth Circuit conducted a robust analysis on the proper standard of review and directed the Court on remand to apply intermediate scrutiny—not reasonableness—unless defendants enacted the prohibition for an improper purpose or justification.  VoteAmerica II, 121 F.4th at 851.

[28]    Defendants claim that to determine whether a restriction is narrowly tailored in the context of election restrictions, they have a relaxed burden of proof and are "not required to prove with empirical evidence, that an election regulation is perfectly tailored."  Frank v. Lee, 84 F.4th 1119, 1140 (10th Cir. 2023) (brackets and quotations omitted), cert. denied, 144 S. Ct.

(continued . . .)

long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." TikTok, 145 S. Ct. at 71 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 800 (1989)).  The Court cannot displace the legislature's judgment respecting content-neutral regulations with its own, so long as the legislature's policy is "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." Id. (quoting Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 224 (1997)).

To some extent, the Court's analysis whether the statute is narrowly tailored to defendants' significant interests overlaps with its prior order and the above analysis, which considers whether the Personalized Application Prohibition is narrowly tailored to defendants' compelling interests.  See VoteAmerica I, 671 F. Supp. 3d at 1251–1254.  That said, strict and intermediate scrutiny differ in terms of the degree of precision required and the necessity of

---

[28] (. . .continued)
1349 (2024).  Defendants reason that the law does not require them to wait for concrete harm to befall the State before the legislature can enact prophylactic election integrity laws.  The Supreme Court has explained, however, that this "modified burden of proof" does not apply to all cases in which an election regulation conflicts with the First Amendment.  Burson v. Freeman, 504 U.S. 191, 209 n.11 (1992).  Rather, "the Supreme Court has relaxed the demands of the narrow-tailoring inquiry when a state's electioneering regulations are designed to protect voters engaged in the act of voting," i.e. cases involving overcrowded ballots or boundary lines at a polling location.  Frank, 84 F.4th at 1141; see also Burson, 504 U.S. 191, 209 n.11 (relaxed burden when "challenged activity physically interferes with electors attempting to cast their ballots").  This case involves nothing of the sort.  Prefilled applications are not the same as casting a ballot.  The Court cannot say that defendants' restriction physically interferes with voters engaged in the act of voting such that a relaxed burden of proof applies.  Defendants must show that the restriction is aimed at alleviating real, non-speculative harm and they must "come forward with more specific findings to support the regulation." Frank, 84 F.4th at 1141 (brackets omitted).

using the least restrictive means. Strict scrutiny is an exacting standard which requires that the statute be "the least restrictive means of achieving a compelling state interest." McCullen, 573 U.S. at 478. By contrast, with intermediate scrutiny, the statute "need not be the least restrictive or least intrusive means of serving the government's interests." Id. at 486 (quotations omitted). Rather, "[i]n this context, narrow tailoring requires that the chosen means do not burden substantially more speech than is necessary to further the government's legitimate interests." StreetMediaGroup, LLC v. Stockinger, 79 F.4th 1243, 1252 (10th Cir. 2023).

As noted, defendants assert the following justifications for the Personalized Application Prohibition: to (1) minimize voter confusion; (2) facilitate efficiency in election administration; and (3) foster confidence in and protect the integrity of the electoral process.

### 1.    Voter Confusion

Largely relying on the foregoing testimony of Howell and Cox, defendants argue that the prohibition minimizes voter confusion. While defendants may have shown that voter confusion was a real harm, for the reasons already explained, they have not shown how the prohibition will alleviate that harm in a direct and material way. The evidence is that voter confusion in the lead-up to the 2020 election related to the source of the advance ballot applications and whether voters had to complete applications even if they had already done so.

Defendants have not met their burden of showing that voters were confused because the applications were prefilled. As noted, Cox testified that she would normally agree that at least in some ways, "pre-filled information increased the likelihood and the ease that [her] office can match information between the voter file and application." Exhibit 2 (Doc. #145-3) at 150:9–14. Shew testified that if not for budgetary constraints, his office would actually prefer to prefill the

applications sent to voters, as doing so "makes it easier for the voter and reduces mistakes that [officials] then have to work harder to fix on the backend."  Exhibit 9 (Doc. #145-8) at 2.

Absent evidence that voter confusion existed because the applications were prefilled, defendants' means are unrelated to the ends.  Under intermediate scrutiny, defendants have not established that the Personalized Application Prohibition is narrowly tailored to achieve any interest in preventing voter confusion.

### 2.    Efficient Election Administration

Again relying on Howell and Cox, defendants argue that the prohibition facilitates efficiency in election administration because prefilled applications lead to incomplete or duplicate applications which require extra time and attention by election officials.

As previously noted, however, defendants have provided no evidence of how many duplicate, incomplete or inaccurate prefilled applications were submitted to county offices.  It is not clear how many Kansas voters, if any, submitted duplicate VPC-provided or CVI-provided applications before the 2020 general election. For the 2020 general election, Kansas election officials did not attempt to quantify how many duplicate advance voting ballot applications involved VPC-prefilled applications.  When officials received an incomplete or inaccurate application, they did not determine whether it was prefilled, or track how many were prefilled. County election officials helped voters cure their applications regardless whether the voters had used blank forms or prefilled forms.  Though Howell and Cox believed that most duplicate applications were prefilled by VPC, such speculation does not satisfy defendants' burden of showing that the prohibition is narrowly tailored.  See Brewer, 18 F.4th at 1226 (defendants must show real, non-speculative harms).  For these reasons, defendants have not demonstrated that the

recited harms are real.

Even if defendants had demonstrated real harm, the statute is not designed to alleviate these harms.  On this record, for the reasons stated above, defendants have not shown a close fit between prohibiting the distribution of prefilled ballot applications and facilitating efficient election administration.

### 3.    Public Confidence And Election Integrity

Defendants argue that the prohibition fosters confidence in and protects the integrity of the electoral process.  Defendants have presented no evidence of (1) voter fraud effectuated through advance mail voting or otherwise or (2) a single instance in which a voter received or cast duplicate mail ballots.  On the other hand, defendants have presented evidence that every cast ballot was accounted for.  Indeed, Kansas officials publicly declared that the 2020 election was successful, without widespread, systematic issues of voter fraud, intimidation, irregularities or voting problems.  As noted, the advance mail voting process includes multiple safeguards against fraud, and Kansas law criminalizes creation or submission of fraudulent advance mail ballot applications.  See, e.g., K.S.A. § 25-2431.  These safeguards have been extremely effective in preventing election fraud in Kansas.  For these reasons, defendants have not demonstrated that the recited harms of prefilled ballot applications are real.

Even if the harms were real, the Personalized Application Prohibition does nothing to alleviate election integrity concerns.  The prohibition does not limit the number of advance mail ballot applications a third party may send to a voter or the number of ballot applications a voter may submit.  Moreover, even accepting Block's identification of "hundreds" of purported errors in plaintiff's mailing list, the record contains no evidence that these errors had any impact on

election processes.  Accordingly, the prohibition will not alleviate defendants' harms in a direct and material way.

On this record, defendants have not shown that the prohibition is narrowly tailored to their stated interest in fostering confidence in and protecting the integrity of the electoral process.  The Court concludes that the Personalized Application Prohibition is not narrowly tailored to achieving defendants' significant interests.

B.    Whether The Prohibition Leaves Open Ample Alternative Channels Of Communication

As noted, under intermediate scrutiny, the government has the burden of showing that the regulation is "narrowly tailored to achieving significant government interests" and "leaves open ample alternative channels of communication."  Brewer, 18 F.4th at 1220.  "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) (citations omitted).  To determine whether alternative channels are adequate, the Court assesses the speaker's ability to reach its target audience.  Ward, 491 U.S. at 802.

Defendants argue that the Personalized Application Prohibition leaves open ample alternative channels of communication because its reach only precludes mailing unsolicited prefilled applications.  In VoteAmerica II, the Tenth Circuit noted that despite the prohibition, plaintiff "may continue using the mails to send unsolicited letters to Kansas voters advocating for mail voting and may even include a separate sheet with all the information VPC previously

placed on prefilled applications along with a blank application and instructions for using it."[29] 121 F.4th at 845.  While plaintiff's ideal method of communication may be restricted, it still has ample ability to reach its target audience.  Indeed, plaintiff "remains free to choose what avenue of communication it will use to advocate for mail voting, including the use of unsolicited mailers."  Id.  Accordingly, the Personalized Application Prohibition leaves open ample alternative channels of communication.

To satisfy intermediate scrutiny, however, defendants must show that the Personalized Application is narrowly tailored *and* leaves open ample channels of communication.  See Brewer, 18 F.4th at 1220.  Because defendants cannot establish the former, the latter does not render the statute constitutional.   Accordingly, the Personalized Application Prohibition cannot withstand intermediate scrutiny because it is not narrowly tailored to achieving defendants' significant interests.

The Court holds that under both strict and intermediate scrutiny, the Personalized Application Prohibition is an unconstitutional infringement on plaintiff's First Amendment rights to speech.

**IT IS THEREFORE ORDERED that the second sentence of K.S.A. § 25-1122(k)(2) is an unconstitutional infringement on plaintiff's First Amendment right to freedom of speech.  The Court therefore enjoins defendants from enforcing the second sentence of K.S.A. § 25-1122(k)(2).  If any parties want to be heard on the issue of judicial notice, they**

---

[29]    The Tenth Circuit made this observation in considering whether Meyer-Buckley strict scrutiny applied to plaintiff's First Amendment claim.  See Meyer v. Grant, 486 U.S. 414 (1988); Buckley v. Am. Const. Law Found., Inc., 525 U.S. 182 (1999). Even so, the fact remains undisputed that plaintiff has this alternative method of communication.

**may file a motion with the Court on or before July 14, 2025 at 5:00 PM.**

Dated this 3rd day of July, 2025 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge